# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 07/09/2021 11:58 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

Case 2:21-cv-08124-AB-MRW   Document 1-2   Filed 10/12/21   Page 2 of 80   Page ID #:7

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Rupert Byrdsong

David M. Given (SBN 142375)
Robert Carroll III (SBN 314345)
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 - The Presidio
San Francisco, CA 94129
Telephone: 415-398-0900
Fax:          415-398-0911
Email:       dmg@phillaw.com
                 rxc@phillaw.com

Attorneys for Plaintiffs

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| DOUGLAS CAMPBELL THOMSON; JOHN ANTHONY HELLIWELL; and ROBERT LAYNE SIEBENBERG, <br><br> Plaintiffs, <br> vs. <br><br> CHARLES ROGER POMFRET HODGSON, a/k/a ROGER HODGSON; RICHARD DAVIES; DELICATE MUSIC, a California general partnership; UNIVERSAL MUSIC CORP., a Delaware Corporation, d/b/a UNVERSAL MUSIC PUBLISHING GROUP; THE AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, a New York not-for-profit performing rights organization; and DOES 1-20, inclusive, <br><br> Defendants. | Case No.   218TCV25257 <br><br> **COMPLAINT FOR:** <br><br> **(1) BREACH OF CONTRACT;** <br> **(2) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **(3) CONVERSION;** <br> **(4) OPEN BOOK ACCOUNT;** <br> **(5) MONEY HAD AND RECEIVED; AND** <br> **(6) DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs allege:

1.       This lawsuit involves the business dealings of the multi-platinum band

Supertramp. Among other things, it has to do with the inexplicable cessation of royalty payments

to three of the band members by two of the other band members, Roger Hodgson and Richard

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

Davies, and their deliberate and calculated efforts to freeze out their former bandmates from the income contractually due them from their collective band endeavors.

## PARTIES

2.     Plaintiff DOUGLAS CAMPBELL THOMSON is an individual and a resident of the State of Illinois. Mr. Thomson was the bass guitarist for Supertramp and is a remaining member (by and through a so-called "loan-out" entity) of the SUPERTRAMP partnership.

3.     Plaintiff JOHN ANTHONY HELLIWELL is an individual and a resident of the United Kingdom. Mr. Helliwell was the saxophonist, keyboardist, clarinetist, and background vocalist for Supertramp and is a remaining member (by and through a so-called "loan-out" entity) of the SUPERTRAMP partnership.

4.     Plaintiff ROBERT LAYNE SIEBENBERG is an individual and a resident of the State of California. Mr. Siebenberg was the drummer for Supertramp and is a remaining member (by and through a so-called "loan-out" entity) of the SUPERTRAMP partnership.

5.     On information and belief, Defendant CHARLES ROGER POMFRET HODGSON, a/k/a ROGER HODGSON, is a resident of Nevada County in the State of California. Mr. Hodgson was the lead guitarist and vocalist for Supertramp and is a former member (by and through a so-called "loan-out" entity) of the SUPERTRAMP partnership.

6.     On information and belief, Defendant RICHARD DAVIES, is a resident of the State of New York. Davies was the keyboard player and vocalist for Supertramp and is a remaining member (by and through a so-called "loan-out" entity) of the SUPERTRAMP partnership.

7.     On information and belief, Defendant DELICATE MUSIC is a California general partnership with its principal place of business in Los Angeles County in the State of California. At all relevant times, Mr. Hodgson and Mr. Davies were and currently are partners of Delicate Music. On information and belief, Delicate Music is one of the publishing administrators (as that term is used in the music business) of the musical compositions (or songs) at issue in this case, and therefore receives some or all of the monies owed to Plaintiffs under the agreements at issue here.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

8.      Defendant UNIVERSAL MUSIC CORP., d/b/a UNIVERSAL MUSIC PUBLISHING GROUP, is a Delaware corporation licensed to do business in the State of California with its principal place of business in Los Angeles County in the State of California. Upon information and belief, as successor in interest by merger to ALMO Music Corp., Universal Music is a music publisher for the musical compositions (or songs) at issue in this case, and therefore receives some or all of the money owed to Plaintiffs under the agreements at issue here.

9.      Defendant AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("ASCAP") is a New York not-for-profit performing rights organization based in New York that collects and administers performing rights monies for music publishers and songwriters. ASCAP has a substantial physical presence in Los Angeles County and regularly conducts business here. ASCAP has collected and continues to collect the performing rights monies for the musical compositions (or songs) at issue in this case, distributing those monies to Mr. Hodgson, Universal Music, and Delicate Music in the State of California, and therefore receives some or all of the money owed to Plaintiffs under the agreements at issue here.

10.     On information and belief, the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as Does 1 through 20, inclusive, are unknown to Plaintiffs, who therefore sues said Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when such have been ascertained. On information and belief, each of the Defendants designated herein as "Doe" is legally responsible for the events and actions alleged herein, and proximately caused or contributed to the injuries and damages as hereinafter described.

## JURISDICTION AND VENUE

11.     This Court has original subject matter jurisdiction over this matter in that the amount in controversy exceeds the jurisdictional minimum of $25,000. This Court has personal jurisdiction over each Defendant inasmuch as he or it either resides in the State or has sufficient minimum contacts here under applicable law.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

12.     Venue is proper in this County because at least one Defendant resides in or has its principal place of business here.

## FACTUAL BACKGROUND

13.     Supertramp is a world-famous multi-platinum English progressive rock band formed in London in the 1970s. The group coalesced around the lineup of Mr. Hodgson on guitar and vocals, Mr. Thomson on bass, Mr. Helliwell on saxophone, keyboards, and backing vocals, Mr. Siebenberg on drums and percussion, and Mr. Davies on keyboards and vocals.

14.     From 1973 to 1983, when Mr. Hodgson left the band, Supertramp released six studio albums: *Crime of the Century*; *Crisis? What Crisis?*; *Even in the Quietest Moments*; *Breakfast in America*; *Paris*; and *Famous Last Words* (the "Supertramp Recordings"). All six albums went Gold, Platinum, Multi-Platinum, or Diamond (10x Platinum) in various countries in Europe and North America. For example, the band's biggest hit record, *Breakfast in America*, reached #1 in the U.S. in 1979 and was later certified 4x Platinum by the Recording Industry Association of America.

15.     All five members performed on and contributed to the Supertramp Recordings, and all five members toured assiduously behind and in support of the release of those albums. In connection with their collective endeavors, the band members formed SUPERTRAMP, a California general partnership, sometime in the late 1970s, later memorializing their partnership in a written agreement.

## The 1977 Agreement

16.     Messrs. Hodgson and Davies were the principal songwriters in the band and were credited as such. However, as popular music acts often do, because the band members collectively recognized the contributions of the non-songwriting members of the band to the success of the band's songs, on or about Jan. 18, 1977, the five members of Supertramp together with their manager David Margereson entered into a Memorandum of Agreement (Publishing) (the "1977 Agreement") pertaining to the sharing of songwriting and publishing royalties among them. A true and correct copy of that agreement is attached hereto as <u>Exhibit A</u>.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

17.     The 1977 Agreement states that "all songwriting and publishing royalties [and/or other income] derived from the parties' songwriting and/or publishing activities" for "compositions recorded by the performing group Supertramp []  shall be paid to each of the undersigned in the following proportions":

- 27% Roger Hodgson
- 27% Richard Davies
- 11.5% Douglas Thomson
- 11.5% John Helliwell
- 11.5% Robert Siebenberg
- 11.5% David Margereson

The 1977 Agreement provides a different apportionment of songwriting and publishing royalties for any musical compositions recorded by artists "other than the performing group Supertramp."

18.     The 1977 Agreement also provides that the "copyrights of the compositions shall be owned by the respective writers who write the compositions and shall be administered by Delicate Music, a partnership consisting of Richard Davies and Roger Hodgson." A list of the musical compositions (or songs) covered by the parties' 1977 Agreement, and by successor agreements discussed herein, is attached hereto as Exhibit B, referred to hereinafter as the "Supertramp Songs."

19.     Because of the different treatment under the 1977 Agreement of songwriting and publishing royalties depending on who recorded the Supertramp Songs, Delicate Music's obligation to administer the copyrights in and to the Supertramp Songs required it to allocate and account for songwriting and publishing royalties derived from Supertramp's recordings of those songs as well as those derived from recordings by musical artists "other than the performing group Supertramp." The former included Plaintiffs; the latter did not.

### The 1984 Agreement

20.     On or about Dec. 13, 1984, Plaintiffs, and their respective loan-out entities, Messrs. Hodgson and Davies and their respective loan-out entities, Delicate Music, and others,

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

PHILLIPS, ERLEWINE, GIVEN & CARLIN, LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

entered into a Withdrawal Agreement (the "1984 Agreement") pertaining to Mr. Hodgson's departure from the Supertramp band and partnership. A true and correct copy of the 1984 Agreement is attached hereto as <u>Exhibit C</u>.

21.     Among other things, the 1984 Agreement addresses the parties' relationship regarding songwriting and publishing royalties to be paid in connection with the Supertramp Songs. The 1984 Agreement acknowledges and largely leaves unchanged the parties' respective shares of those royalties derived from the use of Supertramp Songs on the Supertramp Recordings. It also acknowledges the different treatment given to songwriting and publishing royalties derived from the use of Supertramp Songs on a recording which "features the performance of a recording artist other than Supertramp" (defined as an "Outside Cover Recording") and confirms that Plaintiffs do not participate in any songwriting or publishing royalties derived from the use of the Supertramp Songs on such recordings.

22.     The 1984 Agreement prohibits Mr. Hodgson and his loan-out entity from using the Supertramp name in any future endeavors unless accompanied by the phrase "formerly of" (the "Credit Requirement"). In this connection, Mr. Hodgson and his loan-out entity agreed that they would use "best efforts to ensure strict compliance" with the Credit Requirement. Mr. Hodgson and his loan out entity also acknowledged that breach of the Credit Requirement and related provisions were material and would cause Plaintiffs and others irreparable harm, and for that reason agreed that Plaintiffs were entitled to "injunctive and other equitable relief" to prevent or cure any such breach.

## The 1991 Agreement

23.     On or about Dec. 31, 1991, Plaintiffs entered into an agreement with Mr. Davies, Delicate Music and others (the "1991 Agreement") modifying certain aspects of the songwriting and publishing royalties due them under the 1977 Agreement and the 1984 Agreement. A true and correct copy of the 1991 Agreement is attached hereto as <u>Exhibit D</u>.

24.     The 1991 Agreement confirms the share of songwriting and publishing royalties owed to Plaintiffs under the 1977 Agreement and the 1984 Agreement, restates Delicate Music's

obligation to account for and pay them "in perpetuity," and prohibits Delicate Music from "interfering or stopping any distribution to be made [of these royalties] to any other party." Since at least the time of the 1991 Agreement to about early 2018, Plaintiffs were accounted to and paid more or less every 90 days for their respective shares of songwriting and publishing royalties, either directly by Mr. Hodgson and/or Mr. Davies, or through Delicate Music. These royalties have been substantial, as the Supertramp Songs generate hundreds of thousands of dollars in yearly revenue.

25.     On information and belief, some or all of the songwriting and publishing royalties derived from the Supertramp Songs come from Universal Music and ASCAP, who paid and continue to pay those royalties to Mr. Hodgson, Mr. Davies, Delicate Music or a combination of the three, who in turn are obligated to distribute them to the individual Plaintiffs in the percentages agreed upon.

**Mr. Hodgson's Sound-Alike Recordings**

26.     On information and belief, beginning sometime in the late 2000s, Mr. Hodgson produced and recorded versions of all or almost all of the band's biggest hits, among those "Dreamer," "The Logical Song," and "Give A Little Bit." He did so in a manner intending to, and largely succeeding in, reproducing the exact sound of the Supertramp Recordings. Unless restricted by contract, an effort of this kind is lawful and is commonly referred to in the music business as a "sound-alike" recording. On information and belief, for accounting purposes, Mr. Hodgson and Delicate Music excluded Plaintiffs from any participation in the songwriting or publishing royalties derived from the sound-alike recordings' use of the Supertramp Songs.

27.     In connection with these soundalike recordings and his music business endeavors, Mr. Hodgson has variously referred to himself or credited his recorded or live performances as "Roger Hodgson/Supertramp," "Supertramp's Roger Hodgson," "The Voice of Supertramp," and other similar monikers using the Supertramp name. In addition, others to whom Mr. Hodgson has licensed rights in his soundalike recordings have credited them as Supertramp Recordings.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

7
**COMPLAINT**

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
Telephone: (415) 398-0900

**Accountings and Payments to Plaintiffs by Hodgson Cease**

28. Up until approximately 2018, Mr. Hodgson, by himself and through Delicate Music, more or less faithfully adhered to the payment allocation prescribed by the 1977 Agreement, the 1984 Agreement, and the 1991 Agreement, and accounted to and paid Plaintiffs their respective shares of songwriting and music publishing royalties, either directly or through Delicate Music, more or less every 90 days. Starting sometime in 2018, excepting various one-off payments lacking any accounting for same, Mr. Hodgson, either by himself or by and through Delicate Music, stopped accounting and paying (or instructed others not to account and pay) any portion of songwriting or publishing royalties to Plaintiffs due them on the Supertramp Songs. Even before these accountings ceased entirely, Mr. Hodgson's and Delicate Music's reporting often included no more than a single line-item without any explanation for the calculation of monies owed or employing accounting devices to minimize the amount paid Plaintiffs. For example, on some of those accountings, Mr. Hodgson allocated substantially all of the songwriting and publishing royalties he received from Universal Music, ASCAP and others to the use of the Supertramp Songs on recordings other than the Supertramp Recordings.
From Aug. 2019 to date, neither Mr. Hodgson, Delicate Music, nor any of their agents have given Plaintiffs any explanation for their failure to account and pay these amounts. Upon receipt of a March 2021 letter from Plaintiffs' counsel raising these issues, Mr. Hodgson's attorney purported to "refute each and every one of the allegations" pertaining to the subject, again without explanation, and threatened "to consult with litigation counsel," among other things. (Mr. Hodgson has since fired this attorney.) Upon information and belief, Mr. Hodgson has told others that he stopped making the required payments because, in his words, Plaintiffs "have been paid enough" and has expressed the sentiment that Plaintiffs "ripped me off" and "will never make any money off me again." Clearly, by these statements, Mr. Hodgson and Delicate Music have evinced an awareness of their contractual obligations to Plaintiffs and have chosen not to honor them, and in some circumstances, to actively frustrate and thwart them.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

### Mr. Davies Fails to Pay and Account for Royalties Owed to Plaintiffs

29. Up until sometime in or around 2019, Mr. Davies, by himself and through Delicate Music, more or less faithfully adhered to the payment allocation prescribed by the 1977 Agreement, the 1984 Agreement, and the 1991 Agreement, and accounted to and paid Plaintiffs their respective shares of songwriting and music publishing royalties, either directly or through Delicate Music, more or less every 90 days.

30. Starting sometime in or about 2019, Mr. Davies stopped paying and/or, on information and belief, instructed Delicate Music or others to stop paying the U.S. songwriting and publishing royalties due to Plaintiffs for those Supertramp Songs appearing on the Supertramp records *Breakfast in America* and *Famous Last Words*.

31.     In December 2019, counsel for Mr. Davies and Delicate Music advised counsel for Plaintiffs that it would no longer pay domestic songwriting royalties to Messrs. Helliwell, Thomson, and Siebenberg for songs appearing on *Breakfast in America* and *Famous Last Words* and that Mr. Davies would retain all that income.  In April 2020, Mr. Siebenberg received an email from Mr. Davies' accountant attaching a royalty distribution summary and stating that "these royalties exclude domestic income participation for all non-writers from *Breakfast in America* and *Famous Last Words*. [*   *   *] The royalties for these albums totaled approx. $29,000."

### FIRST CAUSE OF ACTION

#### (Breach of Contract)

#### (Against Defendants Hodgson, Davies and Delicate Music)

32. Plaintiffs incorporate the allegations of paragraphs 1-31 as though fully set forth herein.

33. The parties' 1977 Agreement is a valid and subsisting written contract.

34. The parties' 1984 Agreement is a valid and subsisting written contract.

35. The parties' 1991 Agreement is a valid and subsisting written contract.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

36. As set forth above, Mr. Hodgson, Mr. Davies, and Delicate Music breached these contracts by failing to properly and timely account for and pay to Plaintiffs their share of songwriting and publishing royalties owed them.

37. As set forth above, Mr. Hodgson and Delicate Music further breached these contracts by (A) misallocating songwriting and publishing royalties derived from uses of the Supertramp Songs as "Cover Income" and attributing those royalties to works other than the Supertramp Recordings, (B) failing to account for songwriting and publishing royalties derived from the use of the Supertramp Songs on Mr. Hodgson's sound-alike recordings, and (C) failing to use best efforts to ensure strict compliance with the Credit Requirement.

38. Plaintiffs have performed all conditions, covenants, and promises to be performed on their part under the pertinent contracts.

39. As a direct and proximate cause of Mr. Hodgson's, Mr. Davies' and Delicate Music's breaches, Plaintiffs, and each of them, have been damaged in an amount to be proven at trial, but at least the jurisdictional amount.

## SECOND CAUSE OF ACTION

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

### (Against Defendants Hodgson, Davies and Delicate Music)

40. Plaintiffs incorporate the allegations of paragraphs 1-39 as though fully set forth herein.

41. The parties' contracts each contain a covenant implied by law that Mr. Hodgson, Mr. Davies, and Delicate Music would act toward Plaintiffs in good faith and with fair dealing.

42. This implied covenant of good faith and fair dealing imposes on Mr. Hodgson, Mr. Davies, and Delicate Music the duty not to take any action with the motive to frustrate Plaintiffs' enjoyment of their rights under those contracts and to exercise any discretion they have thereunder fairly.

43. In doing the acts alleged hereinabove, Mr. Hodgson, Mr. Davies, and Delicate Music have breached this covenant of good faith and fair dealing. They have done so in that, in bad faith

and with a motive intentionally to frustrate if not defeat Plaintiffs' enjoyment of their rights under the parties' contracts, they have acted in a manner intended to freeze Plaintiffs out of their contractual entitlements, to divert royalties derived from the Supertramp Songs from the Supertramp Recordings to Mr. Hodgson's sound-alike recordings, and to otherwise avoid timely and properly paying Plaintiffs what they are owed under the parties' contracts in the accountings to them.

44. As a direct and proximate cause of the foregoing breaches of the covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount to be determined according to proof at trial, but at least the jurisdictional minimum of this Court.

## THIRD CAUSE OF ACTION

### (Conversion)

### (Against Defendants Hodgson, Davies, and Delicate Music)

45. Plaintiffs incorporate the allegations of paragraphs 1-44 as though fully set forth herein.

46. The songwriting and publishing royalties owed to Plaintiffs were and are the property of Plaintiffs.

47. These royalties were and are a sum capable of identification, and were received by Mr. Hodgson, Mr. Davies, and/or Delicate Music, who have in their exclusive possession, custody or control the information necessary to identify and determine said sum, and have otherwise failed and refused to account for any portion thereof on demand.

48. These royalties owed to Plaintiffs, or any portion thereof, were contractually required to have been administered and paid to Plaintiffs by Mr. Hodgson, Mr. Davies and/or Delicate Music, and neither Mr. Hodgson, Mr. Davies, nor Delicate Music had any right to retain or use those funds.

49. Mr. Hodgson, Mr. Davies and Delicate Music, with the aid of others, intentionally and substantially interfered with receipt by Plaintiffs of these royalties by wrongfully withholding these funds and misappropriating these funds for their own personal use and enjoyment.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
Telephone: (415) 398-0900

50. Plaintiffs did not consent in any manner to Mr. Hodgson, Mr. Davies, and Delicate Music withholding these royalties.

51. Neither Mr. Hodgson, Mr. Davies, nor Delicate Music have remitted these royalties, nor have they replaced any portion thereof, nor have they accounted for them, despite the demand therefor.

52. Mr. Hodgson's, Mr. Davies' and Delicate Music's acts described herein were malicious and oppressive. At all times herein, Mr. Hodgson, Mr. Davies and/or Delicate Music acted willfully, capriciously, and with conscious disregard for Plaintiffs' rights. Plaintiffs are therefore entitled to punitive damages against Mr. Hodgson, Mr. Davies and Delicate Music in an amount appropriate to punish them and set an example.

53. In addition, Plaintiffs' damages are ongoing and increasing due to Mr. Hodgson's and Delicate Music's contractual obligations to pay and account for these royalties.

## FOURTH CAUSE OF ACTION

### (Open Book Account)

### (Defendants Hodgson, Davies and Delicate Music)

54. Plaintiffs incorporate the allegations of paragraphs 1-53 as though fully set forth herein.

55. Mr. Hodgson, Mr. Davies, and Delicate Music, on the one hand, and Plaintiffs, on the other hand, have had financial transactions giving rise to an open book account maintained by certified professional accountants on Mr. Hodgson's, Mr. Davies' and Delicate Music's behalf, detailing the monies due and payable to Plaintiffs under the parties' contracts.

56. Mr. Hodgson, Mr. Davies, and Delicate Music owe Plaintiffs and each of them on such open book account in an amount according to proof at trial, but at least the jurisdictional minimum.

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

## FIFTH CAUSE OF ACTION

### (Money Had and Received)

### (Against All Defendants)

57. Plaintiffs incorporate the allegations of paragraphs 1-56 as though fully set forth herein.

58. Defendants and each of them have received monies belonging or intended to be paid to Plaintiffs.

59. On information and belief, such monies were not used for the benefit of Plaintiffs.

60. Defendants have not paid these monies to Plaintiffs.

## SIXTH CAUSE OF ACTION

### (Declaratory Relief)

### (Against All Defendants)

61. Plaintiffs incorporate the allegations of paragraphs 1-60 as though fully set forth herein.

62. An actual controversy has arisen between Plaintiffs and Defendants.  As described above, Plaintiffs contend that they are each entitled to certain songwriting and publishing royalties derived from the Supertramp Songs and that Mr. Hodgson's, Mr. Davies', and Delicate Music's obligations to account to and pay Plaintiffs are continuing and contractual in nature. Mr. Hodgson, Mr. Davies' and Delicate Music disagree and have failed to pay and account to Plaintiffs for these royalties since 2018 and have demonstrated by words and deeds that they intend to continue to do so.

## Prayer for Relief

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants as follows:

1.   That Defendants and each of them be ordered to furnish to Plaintiffs a complete and accurate accounting of all songwriting and publishing royalties received and

paid in connection with the Supertramp Songs from May 2017 to the final determination of this lawsuit;

2.     For actual damages in favor of Plaintiffs and against Mr. Hodgson, Mr. Davies, and Delicate Music in an amount to be determined at trial;

3.     For the imposition of a constructive trust on the monies owed Plaintiffs and their fruits;

4.     For compensatory, punitive, and exemplary damages against Mr. Hodgson, Mr. Davies, and Delicate Music;

5.     For a declaratory judgment that each Plaintiff is entitled to a specified percentage of all songwriting and publishing royalties received and derived from the Supertramp Songs as embodied on the Supertramp Recordings, with an accompanying order that such monies be paid from the source;

6.     That the Court enter such temporary restraining orders, preliminary injunctions, permanent injunctions, and other orders prohibiting Mr. Hodgson from further and continued violations of the Credit Requirement, and also requiring Mr. Hodgson to account for moneys received and paid in connection with violations of the Credit Requirement, as Plaintiffs shall specify in further application to the Court;

7.     That an award be made against Mr. Hodgson, Mr. Davies, and Delicate Music for Plaintiffs' costs, disbursements, and reasonable attorney fees, as applicable and pursuant to statute;

8.     For an award of prejudgment and post-judgment interest; and

9.     For such other relief as the Court deems just and proper.

Dated: July 8, 2021                          PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

                                             By: _____
                                                 David M. Given
                                                 Robert Carroll III
                                                 Attorneys for Plaintiffs

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA 94129
Telephone: (415) 398-0900

14
**COMPLAINT**

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand that their claims be heard before a jury.


Dated: July 8, 2021                                    PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By: _____
     David M. Given
     Robert Carroll III
     Attorneys for Plaintiffs

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA  94129
Telephone: (415) 398-0900

15
**COMPLAINT**

EXHIBIT A

MEMORANDUM OF AGREEMENT
(Publishing)

This Agreement is made and entered into by and between RICHARD DAVIES, ROGER HODGSON, DOUGLAS CAMPBELL THOMSON, JOHN ANTHONY HELLIWELL, ROBERT LAYNE SIEBENBERG and DAVID MARGERESON as of the 18th day of January, 1977.

1. The parties are executing this Memorandum to reflect the agreement reached between them concerning the matters contained herein. This Memorandum shall serve as a fully effective and binding contract unless and until such time as a formal agreement covering the same subjects is entered into.

2. The parties hereby agree that effective January 1, 1977, all song writing and publishing royalties [and/or other income] derived from the parties' songwriting and/or publishing activities shall be allocated in the following manner:

(a) On any compositions recorded by musical artists other than the performing group Supertramp, whether original or cover recordings, the net writing and publishing income, after deduction of co-publishing and administration fees, derived from said recordings shall be paid in equal shares to the writers of said compositions, subject to a 15% management commission to David Margereson.

(b) On any compositions recorded by the performing group Supertramp the net writing and publishing income derived from said recordings (herein, the "shared publishing income"), without any management commission payable to David Margereson, shall be paid to each of the undersigned in the following proportions:

| | |
|---|---|
| Roger Hodgson | 27% |
| Richard Davies | 27% |
| Douglas Campbell Thomson | 11.5% |
| John Anthony Helliwell | 11.5% |
| Robert Layne Siebenberg | 11.5% |
| David Margereson | 11.5% |

(c) The method of allocating the public performance income (both writers' and publishers' shares) between recordings with shared publishing income and other recordings, shall be to apply the ratio of reported mechanical income between recordings with shared publishing income and non-shared publishing income for the applicable period.

3. The copyrights of the compositions shall be owned by the respective writers who write the compositions and shall be administered by Delicate Music, a partnership consisting of Richard Davies and Roger Hodgson.

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

_____
Richard Davies

_____
Roger Hodgson

_____
Douglas Campbell Thomson

_____
John Anthony Helliwell

_____
Robert Layne Siebenberg

_____
David Margereson

-2-

EXHIBIT B

## **Crime of the Century (1974)**

"School"

"Bloody Well Right"

"Hide In Your Shell"

"Asylum"

"Dreamer"

"Rudy"

"If Everyone Was Listening"

"Crime of the Century"

## **Crisis? What Crisis? (1975)**

"Easy Does It"

"Sister Moonshine"

"Ain't Nobody But Me"

"A Soapbox Opera"

"Another Man's Woman"

"Lady"

"Poor Boy"

"Just A Normal Day"

"The Meaning"

"Two Of Us"

**<u>Even in the Quietest Moments (1977)</u>**

"Give A Little Bit"

"Lover Boy"

"Even In The Quietest Moments"

"Downstream"

"Babaji"

"From Now On"

"Fool's Overture"

**<u>Breakfast in America (1979)</u>**

"Gone Hollywood"

"The Logical Song"

"Goodbye Stranger"

"Breakfast In America"

"Oh Darling"

"Take The Long Way Home"

"Lord Is It Mine"

"Just Another Nervous Wreck"

"Casual Conversations"

"Child of Vision"

**Paris (1980)**

"School – Live At Pavillon de Paris/1979"

"Ain't Nobody But Me – Live At Pavillon de Paris/1979"

"The Logical Song – Live At Pavillon de Paris/1979"

"Bloody Well Right – Live At Pavillon de Paris/1979"

"Breakfast In America – Live At Pavillon de Paris/1979"

"You Started Laughing – Live At Pavillon de Paris/1979"

"Hide In Your Shell – Live At Pavillon de Paris/1979"

"From Now On – Live At Pavillon de Paris/1979"

"Dreamer – Live At Pavillon de Paris/1979"

"Rudy – Live At Pavillon de Paris/1979"

"A Soapbox Opera – Live At Pavillon de Paris/1979"

"Asylum – Live At Pavillon de Paris/1979"

"Take The Long Way Home – Live At Pavillon de Paris/1979"

"Fool's Overture – Live At Pavillon de Paris/1979"

"Two Of Us – Live At Pavillon de Paris/1979"

"Crime Of The Century – Live At Pavillon de Paris/1979"

**Famous Last Words (1982)**

"Crazy"

"Put On Your Old Brown Shoes"

"It's Raining Again"

"Bonnie"

"Know Who You Are"

"My Kind Of Lady"

"C'est Le Bon"

"Waiting So Long"

"Don't Leave Me Now"

EXHIBIT C

## WITHDRAWAL AGREEMENT

THIS WITHDRAWAL AGREEMENT (the "Agreement") is made and entered into this 13th day of November, 1984, by and among ROGER HODGSON ("Hodgson"), ROGER HODGSON PRODUCTIONS, INC. ("ROHOP"), SUPERTRAMP, A PARTNERSHIP, SUPERTRAMP TOURING COMPANY, SWINDON, INC., ROADSWEEPERS, INC., EQUIPMENT UNLIMITED, DELICATE MUSIC, RICHARD DAVIES ("Davies"), RICK DAVIES PRODUCTIONS, INC. ("RDAP"), JOHN A. HELLIWELL ("Helliwell"), P.A.R.P. PRODUCTIONS, INC. ("P.A.R.P."), ROBERT L. SIEBENBERG ("Siebenberg"), ROBERT SIEBENBERG PRODUCTIONS, INC. ("RSIP"), DOUGLAS C. THOMSON ("Thomson"), and DOUGLAS THOMSON PRODUCTIONS, INC. ("DTOP"), with reference to the following facts:

A.    Davies, Hodgson, Helliwell, Siebenberg, and Thomson have heretofore recorded and performed together as the musical group professionally known as "Supertramp". References in this Agreement to "Supertramp" shall be deemed to refer to the musical group professionally known as "Supertramp" irrespective of who the members of the group may be at the particular time in question.

B.    SUPERTRAMP, A PARTNERSHIP ("Supertramp Partnership") is a California general partnership, the original partners of which were RDAP, ROHOP, P.A.R.P., RSIP, DTOP, and Russel Pope Productions, Inc. ("RPOP"). Supertramp Partnership has a written General Partnership Agreement, dated as of January 1, 1981 (the "Supertramp Partnership Agreement").

C.    Swindon, Inc. ("Swindon") is a California corporation, all of the issued and outstanding stock of which is now owned by RDAP, ROHOP, P.A.R.P., RSIP, and DTOP.

D.    Roadsweepers, Inc. ("Roadsweepers") is a California corporation, all of the issued and outstanding stock of which is owned by Swindon.

E.    Supertramp Touring Company ("STC") is a California general partnership, the original partners of which were Davies, Hodgson, Helliwell, Siebenberg, Thomson, Russel Pope ("Pope") and David Margereson ("Margereson"). STC operates under an oral partnership agreement.

F.    Equipment Unlimited ("EQU") is a California general partnership, the original partners of which were Davies, Hodgson, Helliwell, Siebenberg, Thomson, Pope and Margereson. EQU operates under an oral partnership agreement.

1101841

G.   Delicate Music ("Delicate") is a California general partnership, the partners of which are Davies and Hodgson.  Delicate operates under an oral partnership Agreement.  Delicate's income is allocated among Davies, Hodgson, Helliwell, Siebenberg, Thomson, Mismanagement, Inc., and, to a more limited extent, Pope, in accordance with that certain "Memorandum of Agreement (Publishing)", dated as of January 18, 1977, as subsequently modified orally in March 1983 (the "Publishing Memorandum").

H.   RPOP has heretofore withdrawn as a partner of Supertramp Partnership and heretofore transferred all of RPOP's shares of Swindon stock back to Swindon.

I.   Pope has heretofore withdrawn as a partner from STC and EQU.

J.   ROHOP has decided to withdraw as a partner from Supertramp Partnership and to transfer all of its shares of Swindon stock back to Swindon.

K.   Hodgson has decided to withdraw as a partner from STC and EQU.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.   <u>Withdrawal from Supertramp Partnership</u>.

1.1  Effective as of September 30, 1983, ROHOP shall be deemed to have withdrawn as a partner from Supertramp Partnership.  Pursuant to paragraph 4.02 of the Supertramp Partnership Agreement, ROHOP shall receive from Supertramp Partnership the amounts provided in paragraph 4.05 of the Supertramp Partnership Agreement, treating September 30, 1983 as the Valuation Date.  ROHOP acknowledges and agrees that any recordings which were not released in the United States by A&M Records, Inc. ("A&M") on or before September 30, 1983 shall not be deemed to be "Pre-Valuation Masters", as that term is defined in subparagraph 4.05(b)(i) of the Supertramp Partnership Agreement.

1.2  Without limiting the applicability of any provision of the Supertramp Partnership Agreement, but subject to the provisions of paragraphs 13 and 14 hereof, ROHOP and Hodgson specifically agree to be bound by the provisions of paragraph 4.07(b) of the Supertramp Partnership Agreement. Without limiting the generality of the foregoing, but subject to the provisions of paragraphs 13 and 14 hereof, ROHOP and Hodgson specifically acknowledge and agree that neither of them

has, or shall ever claim to have, any right or interest whatso-ever in or to the name, trademark and service mark "SUPER-TRAMP", and neither of them shall hereafter use such name in any commercial manner whatsoever.

1.3   (a)   As additional compensation for services previously furnished by ROHOP in connection with the production of Pre-Valuation Masters, Supertramp Partnership shall pay ROHOP a royalty of one and one-half percent (1-1/2%) with respect to net sales of the first two million (2,000,000) royalty-bearing units of the first long-playing record album delivered by Supertramp to, and released by, A&M after the date hereof, which album consists of master recordings made by Supertramp after the Valuation Date (the "Next Supertramp Album"). ROHOP's royalties under this paragraph 1.3 shall be computed upon the retail list price of records, less packaging charges, taxes, and all other deductions taken from such price by A&M in calculating the royalties payable to Supertramp Partnership under the production agreement between A&M and Supertramp Partnership, dated as of January 1, 1981 (the "1981 Production Agreement"). If, with respect to any type of exploitation of the Next Supertramp Album, Supertramp Partner-ship is paid royalties on the basis of a percentage of gross or net receipts, ROHOP shall be paid a fraction of such receipts, the numerator of which shall be one and one-half percent (1-1/2%) and the denominator of which shall be the so-called "all-in" royalty rate payable to Supertramp Partnership under the 1981 Production Agreement with respect to single-disc albums, comprised entirely of master recordings featuring the performances of Supertramp, which albums are sold for distribu-tion through normal retail channels in the United States and for which Supertramp Partnership is entitled to a "full royalty rate".

(b)   The royalties payable to ROHOP under this paragraph 1.3 shall be computed in the same manner and method as the royalties payable to Supertramp Partnership by A&M under the 1981 Production Agreement, including, but not limited to, all reductions, deductions and category variations for tape sales, licensee sales, foreign sales, domestic sales for ex-port, record club sales and all other mail order sales, "econ-omy" and "budget" record sales and other reduced price sales, institutional and governmental sales, compact disc sales, cable transmission sales, packaging charges, reserves, taxes and other governmental or union payments, the computation of "gross" and/or "net" receipts, the distribution of the Next Supertramp Album in distribution channels other than normal retail channels, the distribution of "free", "no-charge" and "bonus" records (whether for promotional purposes or for re-

has, or shall ever claim to have, any right or interest whatso-
ever in or to the name, trademark and service mark "SUPER-
TRAMP", and neither of them shall hereafter use such name in
any commercial manner whatsoever.

1.3   (a)   As additional compensation for services
previously furnished by ROHOP in connection with the production
of Pre-Valuation Masters, Supertramp Partnership shall pay
ROHOP a royalty of one and one-half percent (1-1/2%) with
respect to net sales of the first two million (2,000,000)
royalty-bearing units of the first long-playing record album
delivered by Supertramp to, and released by, A&M after the date
hereof, which album consists of master recordings made by
Supertramp after the Valuation Date (the "Next Supertramp
Album").   ROHOP's royalties under this paragraph 1.3 shall be
computed upon the retail list price of records, less packaging
charges, taxes, and all other deductions taken from such price
by A&M in calculating the royalties payable to Supertramp
Partnership under the production agreement between A&M and
Supertramp Partnership, dated as of January 1, 1981 (the "1981
Production Agreement" ).   If, with respect to any type of
exploitation of the Next Supertramp Album, Supertramp Partner-
ship is paid royalties on the basis of a percentage of gross or
net receipts, ROHOP shall be paid a fraction of such receipts,
the numerator of which shall be one and one-half percent (1-
1/2%) and the denominator of which shall be the so-called
"all-in" royalty rate payable to Supertramp Partnership under
the 1981 Production Agreement with respect to single-disc
albums, comprised entirely of master recordings featuring the
performances of Supertramp, which albums are sold for distribu-
tion through normal retail channels in the United States and
for which Supertramp Partnership is entitled to a "full royalty
rate".

(b)   The royalties payable to ROHOP under this
paragraph 1.3 shall be computed in the same manner and method
as the royalties payable to Supertramp Partnership by A&M under
the 1981 Production Agreement, including, but not limited to,
all reductions, deductions and category variations for tape
sales, licensee sales, foreign sales, domestic sales for ex-
port, record club sales and all other mail order sales, "econ-
omy" and "budget" record sales and other reduced price sales,
institutional and governmental sales, compact disc sales, cable
transmission sales, packaging charges, reserves, taxes and
other governmental or union payments, the computation of
"gross" and/or "net" receipts, the distribution of the Next
Supertramp Album in distribution channels other than normal
retail channels, the distribution of "free", "no-charge" and
"bonus" records (whether for promotional purposes or for re-

1101841                         -3-

sale), and all other discounts, and ROHOP shall be paid on the same percentage of sales that Supertramp Partnership is paid by A&M under the Production Agreement.

(c)   ROHOP specifically acknowledges and agrees that:

(i)   ROHOP shall only be entitled to a royalty on net sales of disc and tape units of the Next Supertramp Album, and shall not be entitled to a royalty with respect to any other exploitation of the master recordings contained on the Next Supertramp Album ("Next Album Masters"). Without limiting the generality of the foregoing sentence, ROHOP shall not be entitled to any royalty with respect to the exploitation of any Next Album Masters on seven-inch or twelve-inch singles, or on any "Greatest Hits" album (except as provided in paragraph 8.3 below), or with respect to any licensed use of the Next Album Masters (including, without limitation, on a so-called K-tel-type compilation record or in a motion picture).

(ii)   ROHOP shall not be entitled to any royalty on net sales of the Next Supertramp Album in excess of two million (2,000,000) royalty-bearing units.  If net sales of the Next Supertramp Album exceed two million (2,000,000) royalty-bearing units, ROHOP's royalties hereunder shall be calculated on the first two million (2,000,000) royalty-bearing units reported as sold on accounting statements rendered by A&M to Supertramp Partnership.

(iii)   The one and one-half percent (1-1/2%) royalty rate set forth in subparagraph 1.3(a) above shall apply to sales in the United States, the United Kingdom, and Canada; such royalty rate shall be reduced for sales in all other countries as provided in subparagraph 1.3(b) above.

(d)   Within ten (10) days after the full execution of this Agreement, Supertramp Partnership shall pay to ROHOP the sum of One Hundred Thousand Dollars ($100,000.00) as an advance recoupable by Supertramp Partnership from any and all royalties payable to ROHOP pursuant to this paragraph 1.3 (but not from any other royalties or other monies payable to ROHOP or Hodgson pursuant to this Agreement, the Supertramp Partnership Agreement, or any other agreement between ROHOP and/or Hodgson, on the one hand, and any of the Supertramp Parties, on the other hand).

1.4   Supertramp Partnership shall use its best efforts to obtain A&M's agreement:  (a) to pay directly to ROHOP, at the same time statements are rendered to Supertramp Partner-

1101841                          -4-

ship by A&M, (i) all royalties (net of expenses chargeable to ROHOP hereunder or under the Supertramp Partnership Agreement) payable to ROHOP under the Supertramp Partnership Agreement in respect of exploitation of Pre-Valuation Masters, and (ii) all royalties (net of expenses chargeable to ROHOP hereunder) payable to ROHOP pursuant to paragraph 1.3 hereof; and (b) to permit ROHOP to examine directly A&M's books and records on the same terms and conditions as are applicable to Supertramp Partnership under the 1981 Production Agreement.  Such best efforts shall include sending A&M a letter irrevocably authorizing and directing A&M to make such direct payments and to grant such direct audit rights, and attempting to get A&M to execute this Agreement in the appropriate space below.  If A&M agrees to make such direct payments, the amount of chargeable expenses to be deducted from each such payment shall be determined solely by the accountant for Supertramp Partnership (using his/her reasonable business judgment), who shall advise A&M and ROHOP of such amount.  If A&M does not agree to make such direct payments, Supertramp Partnership shall pay such royalties to ROHOP within thirty (30) days after such royalties are received by Supertramp Partnership from A&M.

    1.5  All payments to ROHOP pursuant to paragraph 1.3 hereof shall be treated as payments of ROHOP's distributive share of Supertramp Partnership's income, as described in Section 736(a) of the Internal Revenue Code of 1954, as amended from time to time.

    1.6  ROHOP and Hodgson acknowledge and agree that, whenever the consent or approval of Supertramp Partnership is required under any agreement between Supertramp Partnership and a third party (including, without limitation, any agreement between Supertramp Partnership and A&M) relating to the Pre-Valuation Masters or to the master recordings delivered by Supertramp under the recording agreement (the "1973 Recording Agreement") between A&M Records Limited and Supertramp, dated October 30, 1973 (the "1973 Masters"), or to the master recordings delivered by Swindon under the production agreement (the "1977 Production Agreement") between A&M and Swindon, dated as of January 18, 1977 (the "1977 Masters"), such consent or approval may be given or withheld by Supertramp Partnership, in its sole and arbitrary discretion, without the approval or consent of ROHOP or Hodgson; provided, however, if an authorized representative of ROHOP is available prior to the Approval Date, Supertramp Partnership shall use its best efforts to consult with such authorized representative of ROHOP regarding any matter as to which such consent or approval is required, but the inadvertent failure of Supertramp Partnership to so consult with ROHOP shall not be deemed a breach of this Agreement.  As used in this paragraph 1.6, the term "Approval Date"

1101841                               -5-

ship by A&M, (i) all royalties (net of expenses chargeable to ROHOP hereunder or under the Supertramp Partnership Agreement) payable to ROHOP under the Supertramp Partnership Agreement in respect of exploitation of Pre-Valuation Masters, and (ii) all royalties (net of expenses chargeable to ROHOP hereunder) payable to ROHOP pursuant to paragraph 1.3 hereof; and (b) to permit ROHOP to examine directly A&M's books and records on the same terms and conditions as are applicable to Supertramp Partnership under the 1981 Production Agreement.  Such best efforts shall include sending A&M a letter irrevocably authorizing and directing A&M to make such direct payments and to grant such direct audit rights, and attempting to get A&M to execute this Agreement in the appropriate space below.  If A&M agrees to make such direct payments, the amount of chargeable expenses to be deducted from each such payment shall be determined solely by the accountant for Supertramp Partnership (using his/her reasonable business judgment), who shall advise A&M and ROHOP of such amount.  If A&M does not agree to make such direct payments, Supertramp Partnership shall pay such royalties to ROHOP within thirty (30) days after such royalties are received by Supertramp Partnership from A&M.

1.5  All payments to ROHOP pursuant to paragraph 1.3 hereof shall be treated as payments of ROHOP's distributive share of Supertramp Partnership's income, as described in Section 736(a) of the Internal Revenue Code of 1954, as amended from time to time.

1.6  ROHOP and Hodgson acknowledge and agree that, whenever the consent or approval of Supertramp Partnership is required under any agreement between Supertramp Partnership and a third party (including, without limitation, any agreement between Supertramp Partnership and A&M) relating to the Pre-Valuation Masters or to the master recordings delivered by Supertramp under the recording agreement (the "1973 Recording Agreement") between A&M Records Limited and Supertramp, dated October 30, 1973 (the "1973 Masters"), or to the master recordings delivered by Swindon under the production agreement (the "1977 Production Agreement") between A&M and Swindon, dated as of January 18, 1977 (the "1977 Masters"), such consent or approval may be given or withheld by Supertramp Partnership, in its sole and arbitrary discretion, without the approval or consent of ROHOP or Hodgson; provided, however, if an authorized representative of ROHOP is available prior to the Approval Date, Supertramp Partnership shall use its best efforts to consult with such authorized representative of ROHOP regarding any matter as to which such consent or approval is required, but the inadvertent failure of Supertramp Partnership to so consult with ROHOP shall not be deemed a breach of this Agreement.  As used in this paragraph 1.6, the term "Approval Date"

1101841                            -5-

shall mean the date occurring three (3) days before the last date on which Supertramp Partnership has the right, pursuant to its agreement with the third party, to grant or withhold its consent or approval in respect of the particular matter; provided, if there is no such date specified in such agreement, then the term "Approval Date" shall mean the date seven (7) days after Supertramp Partnership first attempts to consult with an authorized representative of ROHOP.  The provisions of paragraph 7.4 hereof, and not the provisions of this paragraph 1.6 or of paragraph 2.6 below, shall apply to the giving or withholding of approval or consent by Delicate with respect to exploitation of musical compositions owned by Delicate.

2.    Severance from Swindon.

2.1   Effective as of September 30, 1983, Hodgson shall be deemed to have resigned as an officer and director of Swindon.  Contemporaneously herewith, Hodgson shall submit a written resignation dated as of September 30, 1983, to such effect, to the Board of Directors of Swindon.

2.2   Effective as of September 30, 1983, ROHOP shall be deemed to have assigned and transferred to Swindon all right, title and interest in and to all shares of Swindon capital stock owned by ROHOP.  Contemporaneously herewith, ROHOP shall endorse over to Swindon stock certificate number seven, representing seventeen (17) shares of Swindon capital stock ("ROHOP's Shares"), which ROHOP represents and warrants are all of the shares of Swindon capital stock owned by ROHOP.

2.3   As full and complete payment to ROHOP for ROHOP's Shares, Swindon shall pay to ROHOP, on or before October 15, 1984, one-sixth (1/6) of the consolidated book value, as of March 31, 1984, of all of the issued and outstanding capital stock of Swindon and Roadsweepers.  ROHOP acknowledges that such consolidated book value as of March 31, 1984 is estimated to be approximately Three Thousand Dollars ($3,000.00).

2.4   Swindon shall pay Hodgson, as additional compensation for services previously rendered in connection with the production of recordings made by Supertramp prior to September 30, 1983, date hereof, one-sixth (1/6) of the net artist royalties received by Swindon from A&M under the 1977 Production Agreement and under the 1973 Recording Agreement.  All of the parties hereto acknowledge that Hodgson was entitled to receive the additional compensation described in this paragraph 2.4 without regard to the execution of this Agreement or the transfer to Swindon of ROHOP's Shares.  As used in this paragraph 2.4, the term "net artist royalties" shall mean the so-called

"all-in" royalties payable by A&M to Swindon, less all royalties payable by Swindon to third parties not affiliated with the Supertramp Parties (including, but not limited to, producers and recording engineers).

2.5   Swindon shall use its best efforts to obtain A&M's agreement (a) to pay directly to Hodgson, at the same time statements are rendered to Swindon by A&M, all royalties (net of expenses chargeable to Hodgson hereunder) payable to Hodgson pursuant to paragraph 2.4 hereof, and (b) to permit Hodgson to examine directly A&M's books and records on the same terms and conditions as are applicable to Swindon under the 1977 Production Agreement.  Such best efforts shall include sending A&M a letter irrevocably authorizing and directing A&M to make such direct payments and to grant such direct audit rights, and attempting to get A&M to execute this Agreement in the appropriate space below.  If A&M agrees to make such direct payments, the amount of chargeable expenses to be deducted from each such payment shall be determined solely by the accountant for Swindon (using his/her reasonable business judgment), who shall advise A&M and Hodgson of such amount.  If A&M does not agree to make such direct payments, Swindon shall pay such royalties to Hodgson within thirty (30) days after such royalties are received by Swindon from A&M.

2.6   ROHOP and Hodgson acknowledge and agree that, whenever Swindon's consent or approval is required under any agreement between Swindon and a third party (including, without limitation, any agreement between Swindon and A&M) relating to the 1973 Masters and/or the 1977 Masters, such consent or approval may be given or withheld by Swindon, in its sole and arbitrary discretion, without the approval or consent of ROHOP or Hodgson; provided, however, if Hodgson or his authorized representative is available prior to the Approval Date, Swindon shall use its best efforts to consult with Hodgson or such authorized representative regarding any matter as to which such consent or approval is required, but Swindon's inadvertent failure to so consult with Hodgson shall not be deemed a breach of this Agreement.  As used in this paragraph 2.6, the term "Approval Date" shall mean the date occurring three (3) days before the last date on which Swindon has the right, pursuant to its agreement with the third party, to grant or withhold its consent or approval in respect of the particular matter; provided, if there is no such date specified in such agreement, then the term "Approval Date" shall mean the date seven (7) days after Swindon first attempts to consult with an authorized representative of ROHOP.

3.   <u>Severance from Roadsweepers</u>.

Hodgson hereby acknowledges prior receipt from Road-
sweepers, as additional compensation for services previously
rendered in connection with Supertramp personal appearance
engagements performed prior to the date hereof, of one-sixth
(1/6) of Roadsweepers' net income for the fiscal year ended
January 31, 1984, after payment by Roadsweepers of any personal
management commissions due in respect of such income.  Hodgson
acknowledges and consents to the deduction by Roadsweepers from
Hodgson's share of such income of any and all loans and ad-
vances made to Hodgson by Roadsweepers prior to the date of
payment to Hodgson of his share of such income.  All of the
parties hereto acknowledge that Hodgson was entitled to the
additional compensation described in this paragraph 3 without
regard to the execution of this Agreement or the transfer to
Swindon of ROHOP's Shares.

4.   <u>Withdrawal from STC</u>.

4.1  Effective as of September 30, 1983, Hodgson
shall be deemed to have withdrawn as a partner from STC.
Hodgson hereby acknowledges prior receipt from STC of one-
seventh (1/7) of STC's net income for the fiscal year ended
December 31, 1983.  Hodgson acknowledges and consents to the
deduction by STC from Hodgson's share of such income of any and
all loans and advances made to Hodgson by STC prior to the date
of payment to Hodgson of his share of such income.

4.2  As between STC, on the one hand, and Hodgson and
ROHOP, on the other hand, STC shall be entitled to physical
custody and possession of any and all audio, visual, and audio-
visual materials owned by STC and recorded and/or shot before
October 1 1983 (hereinafter referred to as "Pre-Valuation
Materials").  Subject to the provisions of paragraph 4.4 below,
STC shall have the right to exploit all Pre-Valuation Mater-
ials, without restriction, in any manner or medium as STC, in
its sole and arbitrary discretion, may determine; provided
however, those portions of the Pre-Valuation Materials in which
the camera focuses on Hodgson's performances as lead vocalist
shall not comprise more than twenty percent (20%) of the
running time of any television program in which STC uses (or
authorizes any third party to use) any Pre-Valuation
Materials.  STC shall accord Hodgson appropriate credit in
connection with any exploitation by (or with the authority of)
STC of Pre-Valuation Materials which contain Hodgson's perfor-
mances.  Within thirty (30) days after receipt by STC of the
applicable sums, STC shall pay Hodgson one-seventh (1/7) of the
PVM Net Income received by STC.  As used in this paragraph 4,
"PVM Net Income" shall mean the gross sums received by the

Exploiting Party from its exploitation of the Pre-Valuation
Materials, less the costs and expenses described in paragraph
4.5 below.  As used in this paragraph 4, the term "Exploiting
Party" shall mean STC, as to STC's exploitation of the Pre-
Valuation Materials, and Hodgson, as to Hodgson's exploitation
of the Pre-Valuation Materials.

   4.3  Hodgson or his authorized representative shall
be given access to all Pre-Valuation Materials, at all reason-
able times, upon reasonable advance notice to STC.  Hodgson
shall have the right to use and exploit (and to authorize third
parties to use and exploit), only for the purpose of inclusion
in a television program about Hodgson, only those portions of
the Pre-Valuation Materials which focus on Hodgson's perfor-
mances as lead vocalist, lead guitarist, or keyboardist; pro-
vided, however, the portions of the Pre-Valuation Materials
included in any such television program shall not comprise more
than twenty percent (20%) of the running time of such
program.  Hodgson specifically acknowledges and agrees that "a
television program about Hodgson" shall not be deemed to
include (a) any advertisement or commercial relating to Hodgson
or any of his recording or performing activities, or (b) any
so-called "promotional video" or other audio-visual
reproduction intended primarily for promotional purposes.  STC
shall permit Hodgson to have temporary custody, and to make (at
his sole cost and expense) and retain not more than two (2)
copies, of the portions of the Pre-Valuation Materials which
Hodgson desires to use, provided that Hodgson shall promptly
return any and all Pre-Valuation Materials of which he is given
temporary custody, in the same condition as when he received
them.  Hodgson shall accord the other members of Supertramp
appropriate credit in connection with any use by Hodgson of the
Pre-Valuation Materials.  Within thirty (30) days after receipt
by Hodgson of the applicable sums, Hodgson shall pay STC six-
sevenths (6/7) of the PVM Net Income received by Hodgson.

   4.4  STC and Hodgson shall each use best efforts to
notify the other in writing whenever such party proposes to use
and/or exploit any Pre-Valuation Materials, and the party
receiving any such notice shall sign a copy thereof acknowledg-
ing receipt thereof.  Whenever Hodgson proposes to use and/or
exploit any Pre-Valuation Materials in accordance with the
provisions of paragraph 4.3 above, and whenever STC proposes to
use and/or exploit any Pre-Valuation Materials which contain
Hodgson's performances, such party shall use its best efforts
to consult with the other party and provide the other party
with the opportunity to express such other party's opinions
regarding artistic matters in connection with such use and/or
exploitation; provided, however, (a) such other party shall
make himself/itself available at reasonable times upon reason-

1213841                    -9-

able notice, (b) STC's decision regarding artistic matters in connection with its use of the Pre-Valuation Materials shall be final and controlling, (c) Hodgson's decision regarding artistic matters in connection with his permitted use of the Pre-Valuation Materials shall be final and controlling, and (d) neither STC's nor Hodgson's inadvertent failure to so consult with the other party shall be deemed a breach of this Agreement.

4.5  If any Pre-Valuation Materials are exploited in combination with other audio and/or visual materials, the PVM Net Income received by the Exploiting Party from the exploitation of such combination shall be reduced by multiplying such share by a fraction, the numerator of which shall be the playing time of the Pre-Valuation Materials used in such combination and the denominator of which shall be the total playing time of such combination.  All costs and expenses incurred by the Exploiting Party in connection with the exploitation of the Pre-Valuation Materials (including, without limitation, costs of editing, mixing, and otherwise preparing the Pre-Valuation Materials for exploitation, whether alone or in combination with other audio and/or visual materials, and all legal, accounting and other expenses incurred by the Exploiting Party in connection with such exploitation), shall be deducted by the Exploiting Party in calculating the PVM Net Income received by the Exploiting Party.

4.6  All payments to Hodgson pursuant to paragraphs 4.1 and 4.2 hereof shall be treated as payments of Hodgson's distributive share of STC's income, as described in Section 736(a) of the Internal Revenue Code of 1954, as amended from time to time.

5.  <u>Withdrawal from EQU</u>.

5.1  Effective as of September 30, 1983, Hodgson shall be deemed to have withdrawn as a partner from EQU.  Hodgson acknowledges and approves the transfer by EQU to Delicate Production Company ("DPC"), prior to the date hereof, of all right, title and interest in and to approximately Ninety Thousand Dollars ($90,000) of equipment owned by EQU in payment of amounts owed by STC to DPC.  Hodgson acknowledges that EQU received appropriate and adequate consideration from STC for such transfer to DPC.  In complete satisfaction of Hodgson's interest in EQU, EQU shall pay Hodgson one-seventh (1/7) of the Net Fair Market Value, as of September 30, 1984, of the remaining equipment owned by EQU as of March 31, 1984.  The fair market value of such remaining equipment shall be determined on or before December 31, 1984 by sale or by an appraiser selected by Paul Glass and approved by EQU, Hodgson and Pope (which approval shall not be unreasonably withheld), which appraiser

shall be a person with substantial knowledge of musical equipment. Such appraiser's determination of fair market value shall be binding upon Hodgson. In determining fair market value, such appraiser shall assume that the equipment must be sold within a reasonable period of time and shall not assume that there is an unlimited amount of time within which to sell such equipment. "Net Fair Market Value", as used herein, means the fair market value less estimated selling costs and expenses.

5.2 Notwithstanding anything to the contrary contained in paragraph 5.1 above:

(a) If Hodgson desires to have EQU transfer to him, in partial or total satisfaction of Hodgson's interest in EQU, title to certain items of equipment owned by EQU, Hodgson shall notify EQU in writing of such desire within sixty (60) days after the date hereof (the "Equipment Notice"), and Hodgson shall specify in such notice the particular items of equipment which he desires to acquire (the "Selected Items").

(b) Within thirty (30) days after EQU's receipt from Hodgson of the Equipment Notice, EQU shall decide (and shall notify Hodgson in writing of its decision), in its sole and arbitrary discretion, which Selected Items, if any, it is willing to sell to Hodgson. EQU shall execute a bill of sale or other instrument evidencing transfer to Hodgson of all right, title and interest in and to any Selected Items which EQU notifies Hodgson it is willing to sell to Hodgson. The Net Fair Market Value of the Selected Items, if any, which EQU notifies Hodgson it is willing to sell to Hodgson shall be deducted from the payment required to be made to Hodgson pursuant to paragraph 5.1 above.

5.3 All payments to Hodgson pursuant to paragraph 5.1 hereof shall be treated as payments for Hodgson's interest in EQU's property, as described in Section 736(b) of the Internal Revenue Code of 1954, as amended from time to time.

6.    **Costs and Expenses.**

Notwithstanding anything to the contrary contained in this Agreement, Hodgson and ROHOP expressly acknowledge and agree that all amounts payable to them pursuant to this Agreement shall be net of, and the entities obligated to pay such amounts (each such entity is hereinafter in this paragraph 6 referred to as a "Responsible Entity") shall be entitled to deduct therefrom, Hodgson's or ROHOP's (as the case may be) Applicable Share (as hereinafter defined) of the following costs and expenses: (a) all reasonable and necessary costs and

expenses incurred by the Responsible Entity in connection with all of its business and affairs conducted prior to October 1, 1983; and (b) all reasonable and necessary costs and expenses incurred by the Responsible Entity in connection with the generation, collection, and distribution, after September 30, 1983, of all monies payable to or received by the Responsible Entity and a portion of which is payable to Hodgson or ROHOP hereunder.  The "reasonable and necessary costs and expenses" referred to in clauses (a) and (b) of the preceding sentence shall include, without limitation, all legal and accounting fees (other than legal and accounting fees incurred in connection with the negotiation and preparation of this Agreement), personal management commissions, business management commissions, insurance, taxes, and audit expenses [whether the audit is an audit of a third party conducted by the Responsible Entity, or is an audit of the Responsible Entity conducted by a third party (e.g., an audit by the Internal Revenue Service)].  As used in this paragraph 6, the term "Applicable Share" shall mean, with respect to a particular Responsible Entity, the percentage of such Responsible Entity's income which Hodgson or ROHOP (as the case may be) is entitled to receive pursuant to the provisions of this Agreement.

7.    Music Publishing Income.

7.1  For purposes of this Agreement, the term "Net Music Publishing Income" shall mean gross music publishing income (including publisher's and writer's shares) less applicable expenses described in paragraph 6 hereof.  Hodgson shall continue to receive from Delicate, in perpetuity:  (a) twenty-seven percent (27%) of the Net Music Publishing Income received by Delicate from the exploitation of all musical compositions embodied on all Supertramp long-playing record albums released prior to the release of the album entitled "Famous Last Words" ("Pre-FLW Compositions"); and (b) thirty-two and fifteen hundredths percent (32.15%) of the Net Music Publishing Income received by Delicate from the exploitation of all musical compositions embodied on the Supertramp record album entitled "Famous Last Words" ("FLW Compositions").  Pre-FLW Compositions and FLW Compositions are hereinafter sometimes collectively referred to as "Delicate Compositions".  Notwithstanding the foregoing or anything to the contrary contained in the Publishing Memorandum, if any Delicate Composition is exploited on a recording other than a Pre-Valuation Master, a 1977 Master, or a 1973 Master (such recording is hereinafter referred to in this paragraph 7.1 as a "Cover Recording"):  (i) if the Cover Recording features the performance of a recording artist other than Supertramp (such Cover Recording is hereinafter referred to in this paragraph 7.1 as an "Outside Cover Recording"), Hodgson shall be entitled to receive from Delicate, in

1101842                      -12-

perpetuity, fifty percent (50%) of the Net Music Publishing
Income received by Delicate from the exploitation of such
Outside Cover Recording; (ii) if the Cover Recording features
the performance of Supertramp (such Cover Recording is herein-
after referred to in this paragraph 7.1 as a "Supertramp Cover
Recording"), Hodgson shall be entitled to receive from
Delicate, in perpetuity, the Adjusted Percentage (as herein-
after defined) of the Net Music Publishing Income received by
Delicate from the exploitation of such Supertramp Cover Re-
cording; and (iii) all public performance income received by
Delicate with respect to such Delicate Composition which cannot
be specifically attributed to the public performance of a
particular recorded version of such Delicate Composition shall
be allocated by Delicate's accountant in good faith to each
recorded version (including the Pre-Valuation Master, the 1977
Master, or the 1973 Master) of such Delicate Composition.  As
used in this paragraph 7.1, the term "Adjusted Percentage"
shall mean Hodgson's applicable percentage set forth in clause
(a) or (b) of this paragraph 7.1, plus an additional percen-
tage, if any (the "Additional Percentage"), computed as fol-
lows:  (A) if the Supertramp Cover Recording embodies a Pre-FLW
Composition, then, to the extent any one or more of Davies,
Helliwell, Siebenberg, Thomson and Margereson does not partici-
pate in Delicate's Net Music Publishing Income from exploita-
tion of such Supertramp Cover Recording, the Additional Percen-
tage shall equal the percentage such non-participating person
or persons would otherwise have received pursuant to the Pub-
lishing Memorandum multiplied by a fraction, the numerator of
which shall be twenty-seven percent (27%) and the denominator
of which shall be the aggregate percentage participations of
each of Davies, Hodgson, Helliwell, Siebenberg, Thomson and
Margereson who does participate in Delicate's Net Music Pub-
lishing Income from exploitation of such Supertramp Cover
Recording; (B) if the Supertramp Cover Recording embodies an
FLW Composition, then to the extent any one or more of Davies,
Helliwell, Siebenberg, Thomson, Pope and Margereson does not
participate in Delicate's Net Music Publishing Income from
exploitation of such Supertramp Cover Recording, the Additional
Percentage shall equal the percentage such non-participating
person or persons would otherwise have received pursuant to the
Publishing Memorandum multiplied by a fraction, the numerator
of which shall be thirty-two and fifteen hundredths percent
(32.15%) and the denominator of which shall be the aggregate
percentage participations of each of Davies, Hodgson,
Helliwell, Siebenberg, Thomson, Pope and Margereson who does
participate in Delicate's Net Music Publishing Income from
exploitation of such Supertramp Cover Recording.

    7.2  (a)  Hodgson hereby acknowledges and agrees
that, except as set forth in paragraph 8.6 below, he does not

1101842                         -13-

have and shall not claim any economic or other interest in any
musical composition not written (in whole or in part) by him
which composition is recorded by Supertramp (or by any one or
more of the persons heretofore or hereafter comprising the
group Supertramp) after the Valuation Date ("Post-Valuation
Composition").  Any Post-Valuation Composition written by a
member of Supertramp (other than Hodgson) is hereinafter some-
times referred to as a "New Supertramp Composition".

(b)  Davies, Helliwell, Siebenberg and Thomson
hereby acknowledge and agree that none of them shall have, and
none of them shall claim, any economic or other interest in any
musical composition written (in whole or in part) by Hodgson
and not recorded by Supertramp prior to the Valuation Date.

7.3  Delicate shall use its best efforts to obtain
the agreement of Almo Music Corp. ("Almo") (a) to pay directly
to Hodgson, at the same time statements are rendered to
Delicate by Almo, all monies (net of expenses chargeable to
Hodgson hereunder) payable to Hodgson pursuant to paragraph 7.1
hereof, and (b) to permit Hodgson to examine directly Almo's
books and records on the same terms and conditions as are
applicable to Delicate under the Administration Agreement
between Almo and Delicate, dated as of January 1, 1981.  Such
best efforts shall include sending Almo a letter irrevocably
authorizing and directing Almo to make such direct payments and
to grant such direct audit rights, and attempting to get Almo
to execute this Agreement in the appropriate space below.  If
Almo agrees to make such direct payments, the correct amount of
each such payment, and the amount of chargeable expenses to be
deducted from each such payment, shall be determined solely by
the accountant for Delicate (using his/her reasonable business
judgment), who shall advise Almo and Hodgson of such amounts.
If Almo does not agree to make such direct payments, Delicate
shall pay such monies to Hodgson within thirty (30) days after
such monies are received by Delicate from Almo.

7.4  Hodgson shall establish a new music publishing
company to own musical compositions written (in whole or in
part) by him, other than the Delicate Compositions.  Davies
shall establish a new music publishing company to own musical
compositions written (in whole or in part) by him, other than
the Delicate Compositions ("Davies New Publishing Company").
Davies and Hodgson agree that Delicate shall continue in busi-
ness, and shall not be dissolved notwithstanding the death or
disability of either of them, until the expiration of all
copyrights (including renewal terms) owned (in whole or in
part) by Delicate.  Davies and Hodgson agree that, whenever
Delicate's consent or approval is required under any agreement
between Delicate and a third party (including, without limita-

1101841                          -14-

tion, any agreement between Delicate and Almo), such consent or approval may be given or withheld only by whichever of Davies or Hodgson actually wrote the major portion of the Delicate Composition as to which such consent or approval is sought, or by such person's authorized representative. Attached hereto as Exhibit "A" is a schedule of the titles of all Delicate Compositions showing the actual writer(s) of each composition.

7.5   Immediately upon receipt by Hodgson or his representatives of any monies representing the writer's share of public performance income derived from exploitation of the Delicate Compositions (whether such income is received from a public performance society such as ASCAP, or from any other source except Delicate), Hodgson shall pay over to Delicate (and shall endorse any and all checks and drafts necessary to effect such payment over to Delicate) any and all such monies. Upon receipt by Delicate, all such monies shall be included in the calculation of Delicate's Net Music Publishing Income from the exploitation of the Delicate Compositions. If any such monies are received by Hodgson as part of a single payment which includes performance income from musical compositions other than Delicate Compositions ("Other Hodgson Compositions"), Hodgson shall nevertheless immediately pay over to Delicate the full amount of such payment if, but only if, Paul W. Glass ("Glass") or another person approved by Hodgson ("Approved Substitute") is, at the time Hodgson receives such payment, the accountant for Delicate. In such event, Delicate's accountant shall promptly calculate the amount of such payment which is allocable to Other Hodgson Compositions and shall promptly pay such amount back to Hodgson. If, at the time Hodgson receives such payment, Glass or an Approved Substitute is not the accountant for Delicate, Hodgson shall have the right to retain the full amount of such payment, and the portion thereof allocable to Delicate Compositions shall be credited by Delicate against monies otherwise payable to Hodgson pursuant to paragraph 7.1 hereof.

7.6   (a)   Notwithstanding anything to the contrary contained in this Agreement, if either Davies' or Hodgson's twenty-seven percent (27%) share of Delicate's Net Music Publishing Income from the exploitation of Pre-FLW Compositions, and/or if Davies' or Hodgson's thirty-two and fifteen hundredths percent (32.15%) share of Delicate's Net Music Publishing Income from the exploitation of FLW Compositions, increases for any reason (other than by gift, bequest, inheritance operation of law, or court decree) at any time after the date hereof (e.g., by reason of such party's purchase of all or a portion of another person's interest in such income), whichever of Davies or Hodgson whose share of such income did not so increase shall have the right to acquire from the other of them

1101841                          -15-

fifty percent (50%) of the amount by which such other party's share of such income increased over the share owned by such other party immediately prior to the increase. [By way of example, if Davies' twenty-seven percent (27%) share of Delicate's Net Music Publishing Income from the exploitation of Pre-FLW Compositions increases on January 1, 1986 to thirty-seven percent (37%) by reason of purchase from another person, Hodgson shall have the right to acquire from Davies fifty percent (50%) of the ten percent (10%) increase in Davies' share. If Hodgson elects to acquire such additional five percent (5%), thus leaving Davies with a thirty-two percent (32%) share, and if Davies' thirty-two percent (32%) share again increases on June 30, 1987 to forty percent (40%) by reason of purchase from another person, Hodgson shall have the right to acquire from Davies fifty percent (50%) of the eight percent (8%) increase in Davies' share.]

(b)   Davies and Hodgson shall each give the other written notice of any increase in such party's share of Delicate's Net Music Publishing Income from the exploitation of Pre-FLW Compositions, and/or from the exploitation of FLW Compositions, within fifteen (15) days after the effective date of any such increase. Such notice (the "Increase Offer Notice") shall offer to the other party (the "Increase Offeree") the right to acquire the percentage share described in subparagraph 7.6(a) above for a price equal to one-half (1/2) of the amount (if any) paid by the offering party (the "Increase Offering Party") for one hundred percent (100%) of the increase which gives rise to the offer. The Increase Offeree shall have thirty (30) days after receipt of the Increase Offer Notice in which to notify the Increase Offering Party whether or not the Increase Offeree desires to acquire such percentage share at the price and pursuant to the terms set forth in the Increase Offer Notice (which terms shall be consistent with the terms of payment pursuant to which the Increase Offering Party acquired the increase giving rise to the offer). If the Increase Offeree fails to give the Increase Offering Party written notice within said thirty (30) day period that the Increase Offeree is exercising its right to acquire the offered percentage share at the price and pursuant to the terms set forth in the Increase Offer Notice, such right shall be deemed waived and the Increase Offering Party shall be entitled to retain one hundred percent (100%) of the increase which gave rise to the offer as if no such right had been available to the Increase Offeree.

7.7  Notwithstanding anything to the contrary contained in this Agreement, neither Davies nor Hodgson shall sell, transfer, assign or otherwise dispose of any interest in or to Delicate, or any interest in or to the copyright of any

1101841                         -16-

Delicate Composition, to any person other than Family Members
(as defined in paragraph 14.5 below) without first offering to
the other of them (i.e., Davies offering to Hodgson, or Hodgson
offering to Davies) the right to buy or acquire such interest
at the same bona fide price, and pursuant to the same bona fide
terms concerning the manner and time of payment only [it being
understood and agreed that the party to whom such interest is
offered (the "Delicate Offeree") shall not have to match any
other terms], as may be offered to the party (the "Delicate
Offering Party") making such offer to the Delicate Offeree by
any responsible and unaffiliated third person, which terms may,
however, only provide for payment of cash in a lump sum or in
installments.   The Delicate Offering Party shall give the
Delicate Offeree prompt written notice (the "Delicate Offer
Notice") of any such bona fide and acceptable offer described
above (which Delicate Offer Notice shall set forth the name of
the prospective purchaser, the price, and all other terms of
such offer), and the Delicate Offeree shall have thirty (30)
days after receipt of the Delicate Offer Notice in which to
notify the Delicate Offering Party whether or not the Delicate
Offeree desires to buy or acquire such interest in or to
Delicate, or in or to the copyright of such Delicate Composi-
tion, at the price and pursuant to the terms set forth in the
Delicate Offer Notice.   If the Delicate Offeree fails to give
the Delicate Offering Party written notice within said thirty
(30) day period that the Delicate Offeree is exercising its
right to buy or acquire such interest, the Delicate Offering
Party shall have the right to accept the bona fide offer by the
prospective purchaser, but only as set forth in the Delicate
Offer Notice; provided, however, if the Delicate Offering Party
does not accept such bona fide offer from such prospective
purchaser within sixty (60) days after expiration of said
thirty (30) day period, the procedure set forth in this para-
graph 7.7 shall again be followed by the Delicate Offering
Party before the Delicate Offering Party may dispose of such
interest in or to Delicate, or in or to the copyright of such
Delicate Composition.

   8.   <u>Greatest Hits Albums.</u>

        The following provisions shall apply to any "Best Of"
or "Greatest Hits" type of album, featuring the performances of
Supertramp, to be released by A&M after the date hereof (a
"Greatest Hits Album"):

        8.1   The parties hereto contemplate the release of
the first such Greatest Hits Album (the "First Greatest Hits
Album") at some time during calendar year 1985.   However, ROHOP
and Hodgson acknowledge and agree that the actual date of
release of the First Greatest Hits Album shall be determined by

1101841                         -17-

mutual agreement of A&M and Supertramp Partnership, and such release date may occur later than calendar year 1985.

8.2   ROHOP and Hodgson shall be entitled to share in the royalties derived by Supertramp Partnership and Swindon from sales of a Greatest Hits Album as follows:

(a)   With respect to any and all 1973 Masters and/or 1977 Masters contained on a Greatest Hits Album, Hodgson shall receive royalties in accordance with the provisions of paragraph 2.4 hereof.

(b)   With respect to any and all Pre-Valuation Masters contained on a Greatest Hits Album, ROHOP shall receive royalties in accordance with the provisions of paragraph 1.1 hereof.

(c)   With respect to any and all master recordings contained on a Greatest Hits Album, which master recordings feature the performances of Supertramp but are not 1973 Masters, 1977 Masters, or Pre-Valuation Masters (such masters are sometimes hereinafter referred to in this paragraph 8 as "New Masters"), neither ROHOP nor Hodgson shall be entitled to any share of the royalties allocable to the New Masters, except as provided in paragraph 8.3 below.

8.3   Notwithstanding anything to the contrary contained in this Agreement, if a Hodgson New Song (as defined in paragraph 8.8 below) is embodied in a Supertramp/Hodgson New Master (as defined in paragraph 8.9 below) which is contained on the First Greatest Hits Album, then ROHOP shall be entitled to receive the following additional royalties from Supertramp Partnership, which royalties shall be payable in the same manner, and shall be subject to the same deductions [including, without limitation, pursuant to paragraph 4.05(b) of the Supertramp Partnership Agreement and paragraph 6 hereof], as the royalties payable to ROHOP pursuant to paragraph 1.1 hereof:

(a)   Twenty percent (20%) of the net artist royalties received by Supertramp Partnership from the use of the Supertramp/Hodgson New Master on the First Greatest Hits Album and singles derived therefrom;

(b)   Twenty percent (20%) of the net artist royalties received by Supertramp Partnership from any and all exploitation of the Supertramp/Hodgson New Master other than its use on the First Greatest Hits Album and singles derived therefrom;

1101841                         -18-

(c)   Twenty percent (20%) of the net artist royalties received by Supertramp Partnership from the use of the Supertramp/Davies New Master (as defined in paragraph 8.9 below) on the First Greatest Hits Album and singles derived therefrom; and

(d)   Twenty percent (20%) of the net artist royalties received by Supertramp Partnership from the use on the First Greatest Hits Album of one (1) New Master, if any, other than the Supertramp/Hodgson New Master and the Supertramp/Davies New Master; if there is more than one (1) New Master contained on the First Greatest Hits Album in addition to the Supertramp/Hodgson New Master and the Supertramp/Davies New Master, Supertramp Partnership shall determine, in its sole and arbitrary discretion, by a majority vote of its partners, to which New Master the provisions of this subparagraph 8.3(d) will apply.

8.4   With respect to Delicate Compositions embodied in any master recordings contained on any Greatest Hits Album, Hodgson shall be entitled to share in Delicate's Net Music Publishing Income, derived from sales of such Greatest Hits Album and from exploitation of such master recordings, in accordance with the provisions of paragraph 7.1 hereof.

8.5   (a)   With respect to any Hodgson New Song embodied in a Supertramp/Hodgson New Master contained on the First Greatest Hits Album, Hodgson shall receive credit as the sole writer and composer of such Hodgson New Song, and Hodgson shall be entitled to receive and retain one hundred percent (100%) of the Net Music Publishing Income derived from exploitation of such Hodgson New Song, including, without limitation, from sales of the First Greatest Hits Album and from any and all exploitation of such Supertramp/Hodgson New Master.

(b)   With respect to any Davies New Song (as defined in paragraph 8.8 below) embodied in a Supertramp/Davies New Master contained on the First Greatest Hits Album, Davies shall receive credit as the sole writer and composer of such Davies New Song, and Davies shall be entitled to receive and retain one hundred percent (100%) of the Net Music Publishing Income derived from any and all exploitation of such Davies New Song, including, without limitation, from sales of the First Greatest Hits Album and from exploitation of such Supertramp/Davies New Master.

8.6   Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, the provisions of paragraph 7.2 above), if a Hodgson New Song is embodied in a Supertramp/Hodgson New Master which is contained

1101841                          -19-

on the First Greatest Hits Album, then Hodgson shall be enti-
tled to receive the following additional music publishing
income from Davies New Publishing Company, which income shall
be payable in the same manner, and shall be subject to the same
deductions (including, without limitation, pursuant to para-
graph 6 hereof), as the Net Music Publishing Income payable by
Delicate pursuant to paragraph 7.1 hereof: thirty-two and
fifteen hundredths percent (32.15%) of the net mechanical
copyright royalty income (including publisher's and writer's
shares) derived by Davies New Publishing Company from the
exploitation, only on the First Greatest Hits Album and singles
derived therefrom, of one (1) New Master (if any) contained on
the First Greatest Hits Album (other than the Supertramp/
Davies New Master), which New Master embodies a New Supertramp
Composition.  If there is more than one (1) New Master, embody-
ing a New Supertramp Composition, contained on the First
Greatest Hits Album in addition to the Supertramp/Davies New
Master, Davies New Publishing Company shall determine, in its
sole discretion, to which New Master the provisions of this
paragraph 8.6 will apply.

8.7  Without limiting the generality of the provi-
sions of paragraph 7.2 above, Hodgson acknowledges and agrees
that, in all events, he shall not have, and shall not claim,
any economic or other interest in any Davies New Song.

8.8  Hodgson shall have the right, but not the obli-
gation, to submit to Supertramp Partnership, specifically for
inclusion on the First Greatest Hits Album, a musical composi-
tion, written solely by Hodgson and not released (or recorded
by any person for release) in any medium (including, without
limitation, phonorecords, motion pictures, or television) prior
to the date of Hodgson's submission (such composition is herein
sometimes referred to as a "Hodgson New Song").  Such right may
be exercised by Hodgson at any time after January 1, 1985, but
not later than thirty (30) days after written request by Super-
tramp Partnership that Hodgson submit the Hodgson New Song.
Davies shall have the right, but not the obligation, to submit
to Supertramp Partnership, specifically for inclusion on the
First Greatest Hits Album, a musical composition, written
solely by Davies and not released (or recorded by any person
for release) in any medium (including, without limitation,
phonorecords, motion pictures, or television) prior to the date
of Davies' submission (such composition is herein sometimes
referred to as a "Davies New Song").  Such right may be exer-
cised by Davies at any time after January 1, 1985, but not
later than thirty (30) days after written request by Supertramp
Partnership that Davies submit the Davies New Song.  The
Hodgson New Song and the Davies New Song (hereinafter sometimes
collectively referred to as the "New Songs") shall each be

1101841                    -20-

submitted in the form of a demonstration tape recording containing both music and vocals.

8.9    Davies and Hodgson, together with the other persons who are performing members of the group Supertramp at the time the New Songs are to be recorded for inclusion on the First Greatest Hits Album, shall comprise the "Evaluation Group" which shall determine, by a majority vote, whether the Hodgson New Song and the Davies New Song (if any) are acceptable for recording and inclusion on the First Greatest Hits Album.  With respect to each New Song submitted to Supertramp Partnership, the Evaluation Group shall make such determination within fourteen (14) days after the submission of such New Song; any New Song not rejected by the Evaluation Group within such fourteen (14)-day period shall be deemed accepted by the Evaluation Group.  Any New Song accepted by the Evaluation Group shall be recorded by the Evaluation Group promptly after acceptance without the participation of any other performers or musicians (unless a majority of the Evaluation Group decides otherwise), and shall be recorded in a top-quality recording studio located within the State of California.  Hodgson shall select the studio where the Hodgson New Song shall be recorded, and Davies shall select the studio where the Davies New Song shall be recorded.  The master recording of the Davies New Song embodying the performances of the Evaluation Group is herein sometimes referred to as the "Supertramp/Davies New Master".  The master recording of the Hodgson New Song embodying the performances of the Evaluation Group is herein sometimes referred to as the "Supertramp/Hodgson New Master".

8.10    If the Evaluation Group determines that a New Song is not acceptable for recording and inclusion on the First Greatest Hits Album, the writer of such New Song shall have fourteen (14) days after receipt of written notice from a representative of the Evaluation Group rejecting such New Song within which to submit to Supertramp Partnership a second New Song.  This process shall be repeated until the earlier of (a) the acceptance by the Evaluation Group of a New Song from the writer thereof for recording and inclusion on the First Greatest Hits Album, or (b) seventy-five (75) days after Supertramp Partnership first requests submission of a Hodgson New Song.  If, seventy-five (75) days after Supertramp Partnership first requests submission of a Hodgson New Song, the Evaluation Group has not accepted a Hodgson New Song (if Hodgson submits one) and/or has not accepted a Davies New Song (if Davies submits one), the New Songs submitted by Davies (if a Davies New Song has been submitted and not accepted) and/or by Hodgson (if a Hodgson New Song has been submitted and not accepted) shall be submitted to A&M Chairman Jerry Moss, or his designee (Moss or his designee are hereinafter referred to as "Moss"),

1101841                              -21-

for his evaluation.  Any Davies New Song submitted to and
selected by Moss for recording and inclusion on the First
Greatest Hits Album shall be recorded by the Evaluation Group
and included on the First Greatest Hits Album.  Any Hodgson New
Song submitted to and selected by Moss for recording and inclu-
sion on the First Greatest Hits Album shall be recorded by the
Evaluation Group and included on the First Greatest Hits Album.

8.11  Notwithstanding anything to the contrary con-
tained in this Agreement or elsewhere, the Supertramp/Hodgson
New Master shall, for all purposes, be deemed a master deli-
vered to A&M by Supertramp Partnership under and pursuant to
the 1981 Production Agreement.  Without limiting the generality
of the foregoing, the provisions of paragraph 1.6 hereof shall
be applicable to the Supertramp/Hodgson New Master.

8.12  If a Hodgson New Song is embodied in a Super-
tramp/Hodgson New Master which is contained on the First
Greatest Hits Album, then, if and to the extent Supertramp
Partnership has the right, pursuant to the 1981 Production
Agreement, to designate or approve the master recordings to be
included on any "single" record derived from the First Greatest
Hits Album, such right shall be exercised by a majority vote of
the Evaluation Group.

8.13  Notwithstanding anything to the contrary con-
tained in this Agreement, the parties specifically acknowledge
and agree:

(a) Whether or not Hodgson submits a Hodgson
New Song to Supertramp Partnership, Davies shall not be obli-
gated to submit a Davies New Song to Supertramp Partnership.

(b) If Hodgson elects not to submit a Hodgson
New Song to Supertramp Partnership in accordance with the
provisions of paragraph 8.8 or 8.10 above, or if Hodgson does
not submit a Hodgson New Song to Supertramp Partnership within
the time periods specified in paragraph 8.8 or 8.10 above, or
if a Hodgson New Song is not accepted, in accordance with the
provisions of paragraphs 8.9 and 8.10 hereof, for recording and
inclusion on the First Greatest Hits Album, or if Hodgson
refuses or fails to perform as part of the Evaluation Group on
the master recording of any New Song which is intended for
inclusion on the First Greatest Hits Album, then, in any of
such events, neither Hodgson nor ROHOP shall be entitled to any
of the benefits set forth in paragraphs 8.3, 8.5, or 8.6 above.

9.   Audit Rights.

9.1  At any time within the Audit Period (as herein-
after defined) relating to any royalty statement or other

1101842                        -22-

account rendered by Supertramp Partnership, Swindon, STC,
Roadsweepers, EQU or Delicate (whichever of the foregoing
entities renders such royalty statement or account is herein-
after in this paragraph 9 referred to as the "Supertramp
Entity") hereunder, ROHOP or Hodgson (whichever of them is the
recipient of such royalty statement or account; such recipient
is hereinafter referred to in this paragraph 9.1 and in para-
graphs 9.2, 9.3 and 9.4 as "Hodgson") shall have the right to
examine the books and records of the Supertramp Entity with
respect to such statement.  Such examination (a) shall only be
conducted after at least fifteen (15) days prior written notice
to the Supertramp Entity, (b) shall be commenced at a mutually
convenient time, and (c) shall be conducted at Hodgson's sole
cost and expense by an independent certified public accountant
or other qualified representative designated by Hodgson.  Such
examination shall be made during the Supertramp Entity's usual
business hours at the place where the Supertramp Entity main-
tains the books and records that are necessary to verify the
accuracy of the royalty statements and/or other accounts speci-
fied in Hodgson's notice to the Supertramp Entity, and
Hodgson's examination shall be limited to the foregoing.
Hodgson's sole right to inspect the Supertramp Entity's books
and records shall be as set forth in this paragraph 9.1.  No
Supertramp Entity shall have any obligation to make available
any such books and records more than once with respect to each
royalty statement or other account rendered hereunder, or more
than once during any calendar year.

9.2  All royalty statements and other accounts ren-
dered by a Supertramp Entity shall be binding upon Hodgson and
shall not be subject to any objection for any reason unless
specific objection is made by Hodgson, by written notice to the
Supertramp Entity stating the basis thereof, within the Audit
Period.  Unless notice is given to the Supertramp Entity as
provided in this paragraph 9.2, each royalty statement and
other account rendered by the Supertramp Entity shall be final,
conclusive, and binding upon Hodgson, and shall constitute an
account stated.  Hodgson shall be foreclosed from maintaining
any action, claim or proceeding against any of the Supertramp
Parties (as defined in paragraph 10.1 below) in any forum or
tribunal with respect to any royalty statement or account due
hereunder unless (a) written notice is made to the Supertramp
Entity as provided in this paragraph 9.2 and (b) such action,
claim or proceeding is commenced against the Supertramp Entity
in a court of competent jurisdiction within the Litigation
Period.

9.3  Hodgson shall be entitled to receive his appro-
priate share of any monies recovered by a Supertramp Entity as
a result of an audit of the books and records of A&M, Almo, or

1101841                        -23-

any other person from whom the Supertramp Entity receives royalties or other payments (hereinafter in this paragraph 9 referred to as a "Third-Party Payor").  Hodgson shall have the right, at his sole cost and expense, to join any audit conducted by a Supertramp Entity of A&M, Almo or any Third-Party Payor, but all decisions with respect to the conduct of such audit and the settlement thereof shall be within the sole discretion of the Supertramp Entity conducting such audit.

9.4  As used in paragraphs 9.1 and 9.2 above:

(a)  The term "Audit Period" shall mean:  (i) with respect to any statement or account which relates to royalties or other monies received by the Supertramp Entity from A&M or Almo, the period of time beginning upon the date such statement or account is rendered to Hodgson and ending six (6) months before the end of the period of time within which the Supertramp Entity has the right to object to statements and accounts rendered by A&M or Almo, as applicable; (ii) with respect to any statement or account which relates to royalties or other monies received by the Supertramp Entity from any third party other than A&M and Almo, eighteen (18) months after the date such statement or account is rendered.

(b)  The term "Litigation Period" shall mean the period of time beginning upon the date a statement or account is rendered to Hodgson and ending six (6) months after the end of the applicable Audit Period.

9.5  At any time within the Audit Period relating to any accounting rendered and/or payment made to STC by Hodgson pursuant to paragraph 4.3 hereof, STC shall have the right to examine the books and records of ROHOP or Hodgson (whichever of them is the person rendering such accounting or payment; such person is hereinafter referred to in this paragraph 9.5 as "Hodgson") with respect to such statement and/or payment.  All of paragraph 9.1 hereof after the first sentence thereof, as well as the provisions of paragraphs 9.2, 9.3 and 9.4, shall apply with respect to accountings and payments from Hodgson to STC.  For purposes of applying such provisions to the accountings and payments made by Hodgson to STC, the word "Hodgson" shall be substituted for the words "the Supertramp Entity", the term "STC" shall be substituted for the word "Hodgson", and the words "Hodgson or ROHOP" shall be substituted for the words "Supertramp Parties".

9.6  As used in paragraph 4.05 of the Supertramp Partnership Agreement, and in paragraphs 1.4, 2.4, 2.5, 4.2, 7.1, 7.3, and 8.3 hereof, the words "received by the Partnership," "received by Supertramp Partnership," "received by

1101841                        -24-

Swindon," "received by STC," and "received by Delicate" shall
be interpreted specifically to exclude monies otherwise payable
to those entities (hereinafter referred to in this paragraph
9.6 as the "Supertramp Entities" or, in the singular, as a
"Supertramp Entity") but which are withheld by any third party
not directly or indirectly affiliated with any of the
Supertramp Entities (each such third party is referred to in
this paragraph 9.6 as a "Third Party Payor").  If, when, and to
the extent that any such withheld sums are paid to any of the
Supertramp Entities, such sums shall thereafter be deemed to be
monies received by such Supertramp Entity.  Notwithstanding the
foregoing, if any Third Party Payor withholds any monies other-
wise payable to a Supertramp Entity ("Payable Monies"), other
than monies which are withheld based on a breach or alleged
breach prior to the Valuation Date of a Third Party Payor's
rights or any other third party's rights, the Payable Monies so
withheld shall be deemed to have been received by the appro-
priate Supertramp Entity (whether or not such Payable Monies
are in fact received by such Supertramp Entity) on the earlier
of (a) the date nine (9) months after the date such Payable
Monies were originally withheld or (b) the date such Payable
Monies are actually paid to such Supertramp Entity.

10.  **Mutual Release.**

        10.1  Except as expressly provided in this Agreement,
Supertramp Partnership, STC, Swindon, Roadsweepers, EQU, Deli-
cate, Davies, RDAP, Helliwell, P.A.R.P., Siebenberg, RSIP,
Thomson and DTOP, for themselves and, to the full extent that
their execution hereof renders it legally possible, for each of
their predecessors, successors, partners, officers, directors,
shareholders, employees, assigns, agents and representatives
(all of the foregoing are hereinafter sometimes individually
and collectively referred to as the "Supertramp Parties")
hereby release and forever discharge Hodgson and ROHOP, and
their respective predecessors, successors, partners, officers,
directors, shareholders, employees, assigns, agents and repre-
sentatives (all of the foregoing released persons and entities
are hereinafter sometimes individually and collectively re-
ferred to as the "Hodgson Parties") from any and all claims,
demands, debts, liabilities, obligations, accounts, and causes
of action of every kind and nature whatsoever, in law, equity
or otherwise, whether known, suspected or unknown, which the
Supertramp Parties ever had or now have against the Hodgson
Parties, including, but not limited to, any claims, demands,
debts, liabilities, obligations, accounts and causes of action
in any way arising out of, relating to, or in connection with
any business or personal relationship or agreement (whether
oral or written) between the Supertramp Parties and the Hodgson
Parties.  The Supertramp Parties acknowledge and agree that the

1101841                          -25-

release set forth in this paragraph 10.1: (a) is given in consideration of the release set forth in paragraph 10.2 hereof; (b) shall be deemed independent of and severable from the other provisions of this Agreement; and (c) shall remain in full force and effect notwithstanding the breach by the Hodgson Parties (or any of them) of any other provision of this Agreement.

10.2   Except as expressly provided in this Agreement, Hodgson and ROHOP, for themselves and, to the full extent that execution hereof renders it legally possible, for each of their predecessors, successors, partners, officers, directors, shareholders, employees, assigns, agents and representatives release and forever discharge Supertramp Partnership, STC, Swindon, Roadsweepers, EQU, Delicate, Davies, RDAP, Helliwell, P.A.R.P., Siebenberg, RSIP, Thomson and DTOP, and their respective predecessors, successors, partners, officers, directors, shareholders, employees, assigns, agents and representatives from any and all claims, demands, debts, liabilities, obligations, accounts, and causes of action of every kind and nature whatsoever, in law, equity or otherwise, whether known, suspected or unknown, which the Hodgson Parties ever had or now have against the Supertramp Parties, including but not limited to any claims, demands, debts, liabilities, obligations, accounts, and causes of action in any way arising out of, relating to, or in connection with any business or personal relationship or agreement (whether oral or written) between the Hodgson Parties and the Supertramp Parties. The Hodgson Parties acknowledge and agree that the release set forth in this paragraph 10.2: (a) is given in consideration of the release set forth in paragraph 10.1 hereof; (b) shall be deemed independent of and severable from the other provisions of this Agreement; and (c) shall remain in full force and effect notwithstanding the breach by the Supertramp Parties (or any of them) of any other provision of this Agreement.

10.3   The Supertramp Parties and the Hodgson Parties each acknowledge their familiarity with Section 1542 of the Civil Code of the State of California, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

The Supertramp Parties and the Hodgson Parties hereby waive and relinquish any right or benefit under Section 1542 of the Civil

1101841                         -26-

Code of the State of California to the full extent that all
such rights and benefits may be so waived.

10.4  Each of the parties hereto has conducted an
independent investigation of the facts and circumstances upon
which he or it has based his or its decision to execute this
Agreement.  Each of the parties has independently made the
decision to execute this Agreement and to assume the risk that
the facts and circumstances are different than he or it be-
lieves them to be.

10.5  Notwithstanding anything to the contrary con-
tained in this Agreement, but subject to the provisions of
paragraph 9.1 hereof:  (a) ROHOP shall remain fully liable as a
general partner of Supertramp Partnership to all third parties
(and, for contribution only, to the other partners of
Supertramp Partnership in the event of liability to third
parties) for all acts and omissions occurring prior to October
1, 1983 for which Supertramp Partnership is liable to such
third parties; (b) ROHOP shall remain fully liable as a share-
holder of Swindon to all third parties (and, for contribution
only, to the other shareholders of Swindon in the event of
liability to third parties) for all acts and omissions oc-
curring prior to October 1, 1983 for which Swindon and/or
Roadsweepers is liable to such third parties; and (c) Hodgson
shall remain fully liable as a general partner of STC and of
EQU to all third parties (and, for contribution only, to the
other Partners of STC and EQU in the event of liability to
third parties) for all acts and omissions occurring prior to
October 1, 1983 for which STC and/or EQU is liable to such
third parties.  Set forth in Exhibit "B" attached hereto is a
description of any and all claims known to the Supertramp
Parties against Supertramp Partnership, Swindon, Roadsweepers,
STC or EQU, which claims (i) have been asserted in writing by
third parties prior to the date hereof, (ii) arise out of acts
or omissions of any of such entities prior to October 1, 1983,
and (iii) have not been settled or withdrawn prior to the date
hereof.

11.  **Legal Counsel.**

11.1  Each of the parties hereto acknowledges and
understands that he or it has the right to seek the advice of
independent legal counsel concerning his or its rights and the
advisability of executing this Agreement.  Each of the parties
hereto acknowledges and confirms that (a) he or it has been
given the opportunity to seek, and has obtained, the advice of
independent counsel, and (b) he or it is executing this Agree-
ment voluntarily after consultation with, and upon the advice
of, independent counsel.

1101841                              -27-

11.2  All of the parties hereto acknowledge that this
Agreement has been prepared by Ervin, Cohen & Jessup ("ECJ") at
the request of both the Supertramp Parties and the Hodgson
Parties.  The Hodgson Parties acknowledge and understand that
in the preparation of this Agreement, ECJ is representing the
Supertramp Parties and is not representing the Hodgson Parties,
notwithstanding that ECJ has heretofore represented, and con-
tinues to represent, the Hodgson Parties in connection with
other matters.  The Hodgson Parties acknowledge and understand
that ECJ may not represent interests adverse to and/or in
conflict with those of an existing client (or, under certain
circumstances, those of a former client) without fully dis-
closing such representation and the nature of the adversity
and/or conflict, and obtaining the consent of such client.
Recognizing and understanding all of the foregoing, the Hodgson
Parties hereby consent to the representation by ECJ of the
Supertramp Parties in connection with the preparation of this
Agreement.  The Hodgson Parties acknowledge that they have
sought and obtained the advice of independent legal counsel
concerning their rights, the contents of this Agreement, the
advisability of executing this Agreement, and ECJ's role in the
preparation of this Agreement.  The Hodgson Parties acknowledge
that they are executing this Agreement in reliance upon the
advice of their independent counsel and not in reliance on any
advice from ECJ.  Each of the Hodgson Parties acknowledges and
agrees that:  (a) in connection with the negotiation, prep-
aration and execution of this Agreement, ECJ does not owe any
duty, fiduciary or otherwise, to the Hodgson Parties; (b) the
Hodgson Parties do not have, and will not assert, any claim
against ECJ by reason of ECJ's representation of the Supertramp
Parties in connection with this Agreement; and (c) at no time
shall ECJ's representation of the Supertramp Parties in con-
nection with this Agreement derogate from the binding nature of
this Agreement.

11.3  The Supertramp Parties acknowledge and under-
stand that, in the preparation of this Agreement, ECJ is repre-
senting all of the Supertramp Parties as a group, and is not
representing the interests of any one of the Supertramp Parties
individually.  The Supertramp Parties acknowledge and under-
stand that ECJ may not represent clients with conflicting, or
potentially conflicting, interests without fully disclosing
such representation and the nature of the conflict or potential
conflict, and obtaining the consent of all such clients.  The
Supertramp Parties acknowledge and understand that actions and
agreements in the best interests of any one of the Supertramp
Parties may not be in the best interests of another of the
Supertramp Parties because of different circumstances appli-
cable to each of the Supertramp Parties.  The Supertramp
Parties acknowledge that they have sought and obtained the

1101841                        -28-

advice of independent legal counsel as to the nature of the
aforementioned conflict or potential conflict of interests
among the Supertramp Parties.  Recognizing and understanding
all of the foregoing, and in reliance upon the advice of their
independent legal counsel, each of the Supertramp Parties
hereby consents to the representation by ECJ of all of the
Supertramp Parties as a group in connection with the prepara-
tion of this Agreement.  Each of the Supertramp Parties agrees
that at no time shall ECJ's representation of the Supertramp
Parties as a group (a) be deemed a breach of any fiduciary
relationship between ECJ and any of the Supertramp Parties, or
(b) derogate from the binding nature of this Agreement.

   12.  Notices.

        The respective addresses of the parties for all pur-
poses of this Agreement shall be as set forth below until
notice of a new address is duly given and received by the
parties to whom sent.  Any notice desired or required to be
given by any party to another shall be in writing and shall be
delivered by hand or sent by United States certified mail,
postage prepaid, return receipt requested, or sent by telex or
telegraph with all charges pre-paid, provided that any royalty
statement and payment may be sent by regular mail.  Properly
addressed notices delivered or sent as provided herein shall be
deemed given when delivered by hand, or when postmarked if
delivered by mail, or on the date thereof if sent by telex or
telegraph.

"Hodgson" and "ROHOP"            "Davies" and "RDAP"
c/o Unicorn Studios              c/o Glass & Rosen, An
P.O. Box 1656                      Accountancy Corporation
Nevada City, CA  95959           Suite 202
Attn:  Doug Pringle              16530 Ventura Boulevard
                                 Encino, CA  91436
                                 Attn:  Sue Davies


with copies to:                  with copies to:

Kassoy Kraus Lopez & Geoghegan   Ervin, Cohen, & Jessup
Third Floor                      Ninth Floor
270 No. Canon Drive              9401 Wilshire Boulevard
Beverly Hills, CA  90210         Beverly Hills, CA  90212
Attn:  Michele Anthony, Esq.     Attn:  Gregg Harrison, Esq.


1101841                          -29-

```
"Supertramp Partnership", "STC",
"Swindon" and "EQU"
c/o Supertramp Productions
Suite 202
16530 Ventura Boulevard
Encino, CA  91436
Attn:  Sue Davies

with copies to:

Ervin, Cohen & Jessup
Ninth Floor
9401 Wilshire Boulevard
Beverly Hills, CA   90212
Attn:  Gregg Harrison, Esq.

"Helliwell" and "P.A.R.P."      )
c/o Glass & Rosen,              )
   An Accountancy Corporation   )
Suite 202                       )
16530 Ventura Boulevard         )
Encino, CA  91436               )
Attn:  Paul W. Glass            )       with copies to:
                                )
"Siebenberg" and "RSIP"         )       Ervin, Cohen & Jessup
c/o Glass & Rosen,              )       Ninth Floor
   An Accountancy Corporation   )       9401 Wilshire Boulevard
Suite 202                       )       Beverly Hills, CA   90212
16530 Ventura Boulevard         )       Attn:  Gregg Harrison, Esq.
Encino, CA  91436               )
Attn:  Paul W. Glass            )
                                )
"Thomson" and "DTOP"            )
c/o Glass & Rosen,              )
   An Accountancy Corporation   )
Suite 202                       )
16530 Ventura Boulevard         )
Encino, CA  91436               )
Attn:  Paul W. Glass            )
```

13.  Use of Supertramp Name.

13.1  Notwithstanding anything to the contrary con-
tained in this Agreement or in the Supertramp Partnership
Agreement, ROHOP and/or Hodgson shall have the right to use the
name SUPERTRAMP (the "Name") solely in the phrase "formerly of
Supertramp" (the "Phrase"), subject to and in strict compliance
with the following provisions:

1101841                      -30-

(a)   The Name shall not be used alone or to-
gether with any words other than "formerly of"; provided,
however, (i) use by third parties prior to the date hereof of
the words "Ex-Supertramp" shall not be deemed a breach of this
Agreement, and (ii) in languages other than English, the Name
may be used with words which translate as "formerly of" or the
functional equivalent of "formerly of".

(b)   The Name and the Phrase shall not appear
in any size of type larger than one-third (1/3) of the size of
type used for the largest version of Hodgson's name appearing
in or on any printed matter, or on billboards, signs or other
display advertising, or on marquees or signs inside or outside
any concert hall or other site of a personal appearance by
Hodgson.

(c)   The Name shall not appear in any of the
stylized forms shown in Exhibit "C" attached hereto ("Prior
Styles") or in any stylized form substantially similar to the
Prior Styles.

(d)   Any use by ROHOP and/or Hodgson of the
Name and/or the Phrase which is not in strict compliance with
the provisions of subparagraphs 13.1(a), (b) and (c) above
shall require the express prior written consent of Supertramp
Partnership, which consent may be arbitrarily withheld for any
reason.

(e)   ROHOP and Hodgson shall use their best
efforts to ensure strict compliance by third parties with the
provisions of this paragraph 13.1.  Such best efforts shall
include, but are not limited to, (i) advising third parties in
writing of the restrictions contained in this paragraph 13.1 if
ROHOP and/or Hodgson (or their authorized representatives) have
reason to believe such third parties are likely to use the Name
in connection with Hodgson's activities, and (ii) setting forth
the restrictions contained in this paragraph 13.1 in any con-
tract or agreement relating to a personal appearance by
Hodgson.

13.2   ROHOP and Hodgson acknowledge the worldwide
fame, outstanding reputation, and enormous goodwill associated
with the Name.  ROHOP and Hodgson further acknowledge that the
Name is a registered servicemark and/or trademark of Supertramp
Partnership in the United States and other countries.  The
parties acknowledge the well-established principle of trademark
law that trademark infringement, because it subjects the repu-
tation of the trademark owner to the consequences of conduct by
another, by its very nature causes the trademark owner irrepar-
able harm entitling the trademark owner to injunctive relief.
ROHOP and Hodgson acknowledge that the Name and the goodwill
associated therewith are of a special, unique, unusual and
extraordinary character which gives the Name a peculiar value,
the loss of which cannot be reasonably or adequately compen-
sated by damages in any action at law, and that a breach by

1213841                    -31-

ROHOP and/or Hodgson of any of the provisions of paragraph 13.1 hereof will cause Supertramp Partnership and the other Supertramp Parties great and irreparable injury and damage. ROHOP and Hodgson agree that Supertramp Partnership and the other Supertramp Parties shall be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available to such persons, to prevent or cure any such breach or threatened breach by ROHOP and/or Hodgson hereunder.

14.   Sale of Supertramp Name.

Notwithstanding anything to the contrary contained in this Agreement or in the Supertramp Partnership Agreement, if the Name is sold solely under the circumstances described in paragraph 14.1 or 14.2 below, ROHOP shall be entitled to receive a portion of the proceeds of such sale in accordance with the following provisions:

14.1  If Supertramp Partnership, as constituted as of the date hereof (i.e., RDAP, P.A.R.P., RSIP and DTOP), sells, assigns or transfers the Name to any person who is not one of the Supertramp Parties, ROHOP shall be entitled to receive, as and when received by Supertramp Partnership, twenty percent (20%) of the proceeds of such sale, assignment or transfer.

14.2  If RDAP or Davies acquires one hundred percent (100%) of the ownership of the Name from Supertramp Partnership, and such person thereafter sells, assigns, or transfers the Name to any person who is not one of the Supertramp Parties, ROHOP shall be entitled to receive, as and when received by RDAP or Davies (as the case may be), fifty percent (50%) of the proceeds of such sale, assignment or transfer.

14.3  If the Name is sold, assigned or transferred together with any other asset or assets in a transaction which is subject to the provisions of paragraph 14.1 or 14.2 above, ROHOP shall be entitled to its percentage only of the portion of the sale proceeds specifically allocated to the Name by the Seller (as defined below).  The allocation of the sale proceeds between the Name and the other assets sold shall be made by the Seller in the Seller's sole and arbitrary discretion, and such allocation shall be binding upon ROHOP.  ROHOP specifically acknowledges and agrees that the Seller shall not be obligated to allocate to the Name any specific portion of the sale proceeds.  As used in this paragraph 14, the term "Seller" shall mean Supertramp Partnership, RDAP, or Davies, as applicable.

1101841                         -32-

14.4  ROHOP and Hodgson specifically acknowledge and agree that:  (a) the Seller shall not have any duty or obligation whatsoever to ROHOP or Hodgson (i) to sell the Name at any time, or (ii) to obtain the highest price or best terms available upon sale of the Name, or (iii) to obtain any minimum amount of compensation for the sale of the Name; (b) the price at which and the terms on which the Name is sold shall be determined by the Seller in the Seller's sole and arbitrary discretion, and shall be binding upon ROHOP; and (c) the Seller shall not have any duty of good faith or fair dealing to ROHOP or Hodgson with respect to the sale of the Name.

14.5  Notwithstanding anything to the contrary contained herein, neither ROHOP nor Hodgson shall be entitled to receive any monetary compensation or other consideration in connection with any assignment, transfer or conveyance of any rights in or to the Name:  (a) to any Family Members; (b) by Supertramp Partnership if, at the time of such assignment, transfer or conveyance, there are more, less or different partners than as of the date hereof; or (c) which occurs by reason of death, disability, gift, bequest, marital dissolution, operation of law or court decree.  As used in this paragraph 14.5, the term "Family Members" shall mean:  (i) Davies, Helliwell, Siebenberg, and Thomson; (ii) the brothers and sisters of any of the persons named in clause (i); (iii) the parents and grandparents of any of the persons described in clause (i); (iv) the spouses and children of any of the persons named in clause (i) and of the brothers and sisters of any of the persons named in clause (i); (v) the direct descendants of the children of any of the persons named in clause (i) and of the brothers and sisters of any of the persons named in clause (i); (vi) the estate of any of the persons described in clauses (i) through (v); (vii) any trust established for the benefit of any of the persons described in clauses (i) through (v).  As used in paragraph 7.7 above, the term "Family Members" shall have the same meaning as in this paragraph 14.5, except that the only persons named in clause (i) shall be Davies and Hodgson (and not Helliwell, Siebenberg, or Thomson).

15.  **Miscellaneous.**

15.1  All parties hereto agree to execute any further documents and instruments which either the Supertramp Parties or the Hodgson Parties deem necessary or desirable to effectuate the substance and intent of this Agreement.

15.2  This Agreement is intended by all parties as a final expression of their agreement and understanding with respect to the subject matter hereof and as a complete and exclusive statement of the terms thereof and supersedes any and

all prior or contemporaneous agreements and understandings
related thereto.  This Agreement cannot be canceled, modified,
amended or waived, in part or in full, in any way except by an
instrument in writing signed by the party to be charged.

15.3  No waiver by any party, whether express or im-
plied, of any provision of this Agreement or any default here-
under shall affect such party's right to thereafter enforce
such provision or to exercise any right or remedy in the event
of any other default, whether or not similar.  All rights and
remedies at law or equity, or pursuant to any provision of this
Agreement, which any party may enjoy as a result of the default
or breach of this Agreement by another party, shall be deemed
cumulative and not exclusive of one another.

15.4  The headings of the paragraphs hereof are for
convenience only and shall not be deemed to limit or in any way
affect the scope, meaning or intent of this Agreement or any
portion thereof.  Should any paragraph or provision of this
Agreement be held to be void, invalid or inoperative, such
decision shall not affect any other paragraph or provision
hereof, and the remainder of this Agreement shall be effective
as though such void, invalid or inoperative paragraph or provi-
sion had not been contained herein.  Words in the singular
number shall include the plural, and vice versa.

15.5  This Agreement has been entered into in the
State of California, and the validity, interpretation and legal
effect of this Agreement shall be governed by the laws and
judicial decisions of the State of California applicable to
contracts entered into and performed entirely within the State
of California.  The state and federal courts located within
Los Angeles County in the State of California shall have juris-
diction of any controversies regarding this Agreement; any
action or other proceeding which involves such a controversy
shall be brought in the courts located within Los Angeles
County in the State of California, and not elsewhere.  All
parties hereto hereby agree to submit to the jurisdiction of,
and agree not to object to the venue of, such courts.

15.6  For all purposes of this Agreement, Davies'
authorized representative shall be Sue Davies, Hodgson's autho-
rized representative shall be Pringle, and ROHOP's authorized
representatives shall be Hodgson and/or Pringle, unless and
until such party revokes such authorization and/or designates a
different representative by written notice to the other par-
ties.

1101841                   -34-

15.7  If, as of the date of execution hereof, the parties hereto have not executed a written withdrawal agreement with Pope and RPOP relating to the termination of Pope's and RPOP's relationships with Supertramp Partnership, Swindon, Roadsweepers, STC, EQU and Delicate, then Hodgson and ROHOP agree to cooperate fully with the other parties hereto in any and all efforts to sever the aforementioned relationships in a manner favorable to the other parties hereto.  Without limiting the generality of the foregoing, upon request by RDAP, ROHOP agrees to vote for the expulsion of RPOP as a partner of Supertramp Partnership.

15.8  Neither ROHOP nor Hodgson shall assign any of such person's rights under this Agreement (other than the right to receive money) to any person other than Family Members without the express prior written consent of each Supertramp Entity affected by such assignment.  Any such consent may be arbitrarily withheld for any reason.  As used in this paragraph 15.8, the term "Supertramp Entity" shall mean any one (1) of the following entities:  Supertramp Partnership, Swindon, STC, Roadsweepers, EQU and Delicate.  Without limiting the generality of the foregoing, the parties acknowledge and agree that the foregoing provisions of this paragraph 15.8 shall apply to Hodgson's rights under paragraphs 4.3, 5.2, 7.6 and 7.7 hereof. Anything contained in this Agreement to the contrary notwithstanding, the "best efforts" consultation obligations of Supertramp Partnership and Swindon under paragraphs 1.6 and 2.6 hereof shall terminate upon the death or mental incompetency of Hodgson; provided, however, Hodgson shall not be deemed mentally incompetent unless two (2) duly-licensed physicians give their opinions, in writing, that Hodgson is mentally incompetent.

15.9  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, legal representatives, successors and permitted assigns.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

"Hodgson"

_____
ROGER HODGSON, individually


ROGER HODGSON PRODUCTIONS, INC.
("ROHOP")

By_____
   Roger Hodgson, President


SUPERTRAMP, A PARTNERSHIP
("Supertramp Partnership")

By: Rick Davies Productions, Inc., general partner

   By_____
      Rick Davies, President


By: P.A.R.P. Productions, Inc., general partner

   By_____
      John Helliwell, President


By: Robert Siebenberg Productions, Inc., general partner

   By_____
      Robert Siebenberg, President


By: Douglas Thomson Productions, Inc., general partner

   By_____
      Douglas Thomson, President

            [signatures continued on next page]


1101841                    -36-

SUPERTRAMP TOURING COMPANY
("STC")

By _____
     Rick Davies, general partner

By _____
     John Helliwell, general partner

By _____
     Robert Siebenberg, general partner

By _____
     Douglas Thomson, general partner


SWINDON, INC.
("Swindon")

By _____
     Robert Siebenberg, President

By _____
     Susan Davies, Secretary


ROADSWEEPERS, INC.
("Roadsweepers")

By _____
     John Helliwell, President

By _____
     Susan Davies, Secretary


[signatures continued on next page]

EQUIPMENT UNLIMITED
("EQU")

By _____
    Rick Davies, general partner

By _____
    John Helliwell, general partner

By _____
    Robert Siebenberg, general partner

By _____
    Douglas Thomson, general partner


DELICATE MUSIC
("Delicate")

By _____
    Rick Davies, general partner

By _____
    Roger Hodgson, general partner


"Davies"

_____
RICHARD DAVIES, individually



[signatures continued on next page]

RICK DAVIES PRODUCTIONS, INC.
("RDAP")

By _____
   Rick Davies, President


"Helliwell"

_____
JOHN A. HELLIWELL, individually


P.A.R.P. PRODUCTIONS, INC.
("P.A.R.P.")

By _____
   John Helliwell, President


"Siebenberg"

_____
ROBERT L. SIEBENBERG, individually


ROBERT SIEBENBERG PRODUCTIONS, INC.
("RSIP")

By _____
   Robert Siebenberg, President


"Thomson"

_____
DOUGLAS C. THOMSON, individually

                [signatures continued on next page]


1101841                         -39-

DOUGLAS THOMSON PRODUCTIONS, INC.
("DTOP")

By _____
    Douglas Thomson, President


APPROVED AS TO FORM AND CONTENT:

_____
Michele Anthony, attorney
for Roger Hodgson and Roger
Hodgson Productions, Inc.


A&M ACCOMMODATION:

As an accommodation to Supertramp Partnership, Swindon, ROHOP
and Hodgson, we hereby agree (a) to make the direct payments to
ROHOP and to Hodgson described in paragraphs 1.4 and 2.5 of the
above Agreement, (b) that ROHOP shall have the right to examine
our books and records directly, as described in paragraph 1.4
of the above Agreement, and (c) that Hodgson shall have the
right to examine our books and records directly, as described
in paragraph 2.5 of the above Agreement.  All amounts paid by
us directly to ROHOP and/or to Hodgson shall be deducted by us
from the amounts otherwise payable by us to Supertramp Partner-
ship or Swindon, as the case may be.

A&M RECORDS, INC.

By _____
    An Authorized Officer


                [signatures continued on next page]


1101841                        -40-

ALMO ACCOMMODATION:

As an accommodation to Delicate and Hodgson, we hereby agree
(a) to make the direct payments to Hodgson described in para-
graph 7.3 of the above Agreement, and (b) that Hodgson shall
have the right to examine our books and records directly, as
described in paragraph 7.3 of the above Agreement.

ALMO MUSIC CORP.

By_____
    An Authorized Officer

## DELICATE COMPOSITIONS

<u>Written by Rick Davies</u>

Summer Romance

Bloody Well Right

Crime of the Century

Asylum

Rudy

Another Man's Woman

Ain't Nobody But Me

Poor Boy

Lover Boy

Downstream

From Now On

Casual Conversations

Gone Hollywood

Goodbye Stranger

Just Another Nervous Wreck

Oh Darling

You Started Laughing

Put on Your Old Brown Shoes

Bonnie

My Kind of Lady

Waiting So Long

<u>Jointly Authored by
Davies and Hodgson</u>

Just a Normal Day

School

<u>Written by Roger Hodgson</u>

Land Ho

If Everyone Was Listening

Dreamer

Hide in Your Shell

Easy Does It

Lady

The Meaning

Sister Moonshine

Two of Us

A Soapbox Opera

Give a Little Bit

Even in the Quietest Moments

Babaji

Fool's Overture

Breakfast in America

Child of Vision

The Logical Song

Lord Is It Mine

Take the Long Way Home

Crazy

It's Raining Again

Know Who You Are

C'est Le Bon

Don't Leave Me Now

EXHIBIT "A"

Please Initial

## EXHIBIT "B"

**None.**

EXHIBIT "B"

132-008
1101841

EXHIBIT D

SENT BY: Case 2:21-cv-08124-AB-MRW   Document 1-1   Filed 10/12/21   Page 71 of 80   Page ID #:76
2-13-02 ; 3:20PM ;            LA BNF&Y 4-            310 207 2209;#20/29

Glass, Rosen & Orkin

AN ACCOUNTANCY CORPORATION
THE ATRIUM
16830 VENTURA BOULEVARD SUITE 802
Encino, California 91436

Paul W. Glass, C.P.A.
Gerald S. Rosen, C.P.A.
Gary Orkin, C.P.A.

TELEPHONE
(818) 907-1800
TELECOPIER (818) 907-5337

December 30, 1991


TO:     Kevin Kane, Esq.
        Stanley E. Maron, Esq.
        Richard Davies
        John Helliwell
        Douglas Thomson
        Robert Siebenberg
        Susan Davies

From:   Paul W. Glass


        This will confirm the agreement reached between the parties:

1)      Delicate Music and Silver Cab Music hereby formalize an
        agreement with John, Dougie and Bob for an income
        participation in perpetuity (with no administration
        or consultation rights except as to verifying with Paul
        Glass or his successor their income participation
        amounts) as follows:

            Mechanicals from Supertramp recordings and
            performance income from publishing and songwriting
            royalties from the songs included in the following
            albums (as well as any other album which includes
            any such song thereon such as any "Greatest Hits"
            album released or to be released):

        A)    i)    "Crime of the Century"
             ii)    "Crisis What Crisis"
            iii)    "Even in the Quietest Moments"
             iv)    "Breakfast in America"

            Income is received as follows:

                                              %

            Delicate Music              61.5
            Roger Hodgson               27.0
            Mismanagement               11.5
                                       100.0

-1-

SENT BY:Buchalter et al      ; 2-14-92 ; 3:20PM ;            LA BNF&Y 4→        310 207 2209;#21/29

Such Delicate Music income net of expenses will
be distributed as follows:

|  | % |
|---|---|
| R. Davies | 43.9 |
| J. Helliwell | 18.7 |
| D. Thomson | 18.7 |
| R. Siebenberg | 18.7 |
| | 100.0 |

### Proof

11.5% X 100% of gross income =   11.5
18.7% X 61.5% (DM income)    =   11.5

B)   "Famous Last Words"

Income received as follows:            %

| Delicate Music | 53.57 |
|---|---|
| Roger Hodgson | 32.15 |
| Russel Pope | 7.14 |
| Mismanagement | 7.14 |
| | 100.00 |

Such Delicate Music income, net of expenses
will be distributed as follows:       %

| R. Davies | 60.00 |
|---|---|
| J. Helliwell | 13.334 |
| D. Thomson | 13.333 |
| R. Siebenberg | 13.333 |
| | 100.00 |

### Proof

7.14% X 100%    =  7.14
13.333% X 53.57% =  7.14

C)   "Paris"

    This album includes songs from 1A above.   Income
will be distributed in accordance with the
percentages reflected in 1A above.

D)   "Brother Where You Bound"
     "Free As A Bird"

    John, Dougie and Bob will receive 7.14% each
of Silver Cab's such income, net of expenses.

John, Dougie and Bob shall have no right to, and shall not in any way approach the co-publisher/administrator (Almo Music/Rondor Music/Irving Music and associated or successor companies et al) concerning the computation of publishing royalties or any other related matters; only Rick through Delicate Music and Silver Cab shall have such right. In the event that Rick determines to audit the co-publisher/administrator, the costs thereof shall be paid by Rick, John, Dougie and Bob pro rata with their respective percentages as specified in 1 A, B, C and D above.

2) As full and complete compensation for Sue Davies' management services on behalf of Power Steering to Supertramp, Power Steering will receive the following commissions in perpetuity.

A) Record and video royalties:

 i) "The Story Thus Far" - 10% of Supertramp's video royalties after recoupment of its costs.

 ii) "Free As A Bird" and "Live 88" - 15% of royalty income net of advances and producer's royalties.

 iii) "Autobiography", "Supertramp Greatest Hits" (AKA "Greatest Hits") and "Classics Vol. 9 - 10% of royalty income net of producer's royalties. Paul Glass shall provide the parties with a list (Exhibit A attached hereto) of catalogue numbers of all versions released to date.

 iv) "The Very Best of Supertramp". There are several versions released to date which include but are not limited to the following:

   German compilation
   Holland compilation
   Italy compilation
   Spain compilation
   France compilation

  - 10% of royalty income, net of producer's royalties for all versions released on or before the date of this agreement. Paul Glass shall provide the parties with a list (Exhibit A attached hereto) of all catalogue

numbers of all versions released on or before
the date of this agreement plus the Canadian
version.

- 10% of royalty income net of producer's
royalties for all versions released after the
date of this agreement wherever and whenever
released if both of the following
characteristics exist:

    a) Same songs as used in one of the
        previously released versions.

         and

    b) Same album cover design as used in one
        of the previously released versions. An
        album name or color change alone would
        not constitute a difference.

  v) 15% of Supertramp's royalty income, net of
     producer's royalties of any single or other
     release in conjunction with "Free As A Bird"
     and "Live 88".

  vi) 10% of Supertramp's royalty income net of
     producer's royalties of any single or other
     release in conjunction with versions of the
     "Greatest Hits" records listed in paragraph
     2A) iii and iv above.

B) Publishing royalties:

| Songs from Albums | Rate, Net and Terms of All Publishing Income |
|---|---|
| i) "Free As a Bird" | 15% of all net publishing income except when included in "Greatest Hits" albums, whereby it will be 10%.<br><br>Royalties to Power Steering will reduce advances from the "Free As A Bird" album before payments are remitted. |
| ii) "Live 88" | 15% of all net publishing income. |

   iii)   "Autobiography" AKA      10% of mechanicals only
          "Supertramp Greatest
          Hits" AKA "Greatest Hits,"
          "Classics Vol 9"

   iv)   "The Very Best of        10% of mechanicals only
          Supertramp"

Because of the lack of detail contained in the co-publisher/administrator's publishing statements, calculation of items 2B ii, iii and iv shall be as follows:

Album sales per A&M royalty statements will be adjusted to include estimated free goods and A&M's policy of only paying record royalties on 90% of sales. Delicate Music's and/or Silver Cab's royalty per song will be reduced by the royalty per song paid to Roger Hodgson, Mismanagement and Russel Pope. The adjusted sales applied to the net royalty per song will be applied to Power Steering's commission rate. Only mechanical income is subject to Power Steering's commission for the "Greatest Hits" recordings. (See example attached.)

3)  On the date of this agreement, Paul Glass shall distribute to the parties their respective income participations/commissions as per paragraph 1 and 2 above together with a calculation of said payments. Each of the parties hereby agrees and stipulates that the specific compensatory provisions set forth in paragraphs 1 and 2 hereinabove fully and finally define each party's respective income participation from mechanicals, publishing and songwriting royalties/commission interest in the recordings, albums, songs and video materials specified in said provisions, that said provisions constitute the final agreement with respect thereto and each party hereby agrees to waive and release any and all rights to in any way question or challenge said provisions on and after the date hereof. In this connection, the parties specifically waive the provisions of California Civil Code Section 1542, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the Release, which if known by him must have materially affected his settlement with the debtor."

This release is applicable solely and exclusively to the compensatory provisions covered in paragraphs 1 and 2 of this agreement and shall have no relation to or impact upon

-5-

SENT BY:Buchalter et al        ; 2-14-92 ; 3:23PM ;                    LA BNF&Y 4→        310 207 2209;#25/29

any other rights of the parties of any nature including but not
limited to rights of a monetary and/or non-monetary nature.

4) No party can or should interfere with or stop any
   distribution to be made hereunder to any other party.

5) This agreement may be executed by the parties in
   counterparts and/or by facsimile.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the
dates indicated hereinbelow.

DATED: X Dec. 31     , 1991     RICK DAVIES PRODUCTIONS, INC.,
                                a California corporation

                                By: X _____
                                    Richard Davies, President


DATED: X Dec. 31     , 1991     X _____
                                RICHARD DAVIES, An Individual


DATED:_____, 1991       ROBERT SIEBENBERG PRODUCTIONS, INC.
                                a California corporation


                                By:_____
                                   Robert Siebenberg, President


DATED:_____, 1991       _____
                                ROBERT SIEBENBERG, An Individual


DATED:_____, 1991       P.A.R.P. PRODUCTIONS, INC.
                                a California corporation


                                By:_____
                                   John A. Helliwell, President


DATED:_____, 1991       _____
                                JOHN A. HELLIWELL, An Individual

SENT BY:Bochmatter et al ; 2-14-92 ; 3:24PM ; LA BN&Y 4→ 310 207 2209;#26/29

any other rights of the parties of any nature including but not limited to rights of a monetary and/or non-monetary nature.

4) No party can or should interfere with or stop any distribution to be made hereunder to any other party.

5) This agreement may be executed by the parties in counterparts and/or by facsimile.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates indicated hereinbelow.

DATED:_____, 1991    RICK DAVIES PRODUCTIONS, INC.,
                                 a California corporation

                                 By:_____
                                    Richard Davies, President


DATED:_____, 1991    _____
                                 RICHARD DAVIES, An Individual


DATED:____12-31___, 1991        ROBERT SIEBENBERG PRODUCTIONS, INC.
                                 a California corporation

                                 By:_____
                                    Robert Siebenberg, President


DATED:____12-31___, 1991        _____
                                 ROBERT SIEBENBERG, An Individual


DATED:_____, 1991    P.A.R.P. PRODUCTIONS, INC.
                                 a California corporation

                                 By:_____
                                    John A. Helliwell, President


DATED:_____, 1991    _____
                                 JOHN A. HELLIWELL, An Individual

SENT BY:Buchalter et al    ; 2-14-92 ; 3:24PM ;           LA BNF&Y 4→        310 207 2209;#27/29

any other rights of the parties of any nature including but not limited to rights of a monetary and/or non-monetary nature.

4)  No party can or should interfere with or stop any distribution to be made hereunder to any other party.

5)  This agreement may be executed by the parties in counterparts and/or by facsimile.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the dates indicated hereinbelow.

DATED:_____, 1991       RICK DAVIES PRODUCTIONS, INC., a California corporation


                                   By:_____
                                      Richard Davies, President


DATED:_____, 1991       _____
                                   RICHARD DAVIES, An Individual


DATED:_____, 1991       ROBERT SIEBENBERG PRODUCTIONS, INC. a California corporation


                                   By:_____
                                      Robert Siebenberg, President


DATED:_____, 1991       _____
                                   ROBERT SIEBENBERG, An Individual


DATED: December 31, 1991           P.A.R.P. PRODUCTIONS, INC. a California corporation

                                   By: John A. Helliwell
                                      John A. Helliwell, President


DATED: December 31, 1991           John A. Helliwell
                                   JOHN A. HELLIWELL, An Individual

-6-

DATED: Dec 31st , 1991        DOUGLAS THOMSON PRODUCTIONS, INC.
                              a California corporation

                              By: _____
                                  Douglas Thomson, President

DATED: Dec 31 ST , 1991       _____
                              DOUGLAS THOMSON, an Individual

DATED: _____, 1991  POWER STEERING, INC.
                              a California corporation

                              By: _____
                                  Susan Davies, President

DATED: _____, 1991  _____
                              SUSAN DAVIES, An Individual

-7-

DATED: _____, 1991    DOUGLAS THOMSON PRODUCTIONS, INC.
                                a California corporation

                                By: _____
                                    Douglas Thomson, President


DATED: _____, 1991    _____

                                DOUGLAS THOMSON, an Individual


DATED: X  Dec. 31 _____, 1991  POWER STEERING, INC.
                                a California corporation

                                By: X _____
                                    Susan Davies, President


DATED: X  Dec. 31 _____, 1991  _____
                                SUSAN DAVIES, An Individual

-7-