1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3         HONORABLE ANDRÉ BIROTTE, JR., U.S. DISTRICT JUDGE

4

5    DOUGLAS CAMPBELL THOMSON, et al.,      )
                                            )
6               PLAINTIFFS,                 )         Case No.
                                            )
7               vs.                         )         CV 21-08124-AB
                                            )
8    CHARLES ROGER POMFRET HODGSON,         )
     et al.,                                )
9                                           )
                                            )         PAGES 1 TO 135
10              DEFENDANTS.                  )
     _____)

11

12

13

14                   REPORTER'S TRANSCRIPT OF
                       JURY TRIAL DAY 5
15                     MORNING SESSION
                  MONDAY, FEBRUARY 26, 2024
16                       9:14 A.M.
                   LOS ANGELES, CALIFORNIA
17

18

19

20

21

22

23    _____

24           MIRANDA ALGORRI, CSR 12743, RPR, CRR
               FEDERAL OFFICIAL COURT REPORTER
25             350 WEST 1ST STREET, SUITE 4455
               LOS ANGELES, CALIFORNIA 90012
                   MIRANDAALGORRI@GMAIL.COM

1                          **APPEARANCES OF COUNSEL:**

2

3      **FOR THE PLAINTIFFS:**

4           PHILLIPS ERLEWINE GIVEN & CARLIN, LLP
            BY:  DAVID M. GIVEN
5           BY:  KYLE O'MALLEY
            BY:  NICHOLAS CARLIN
6           THE PRESIDIO
            39 Mesa Street
7           Suite 201
            San Francisco, California 94129
8

9

       **FOR THE DEFENDANT:**
10
            GUTMAN LAW
11          BY:  ALAN S. GUTMAN
            9350 Wilshire Boulevard
12          Suite 350
            Beverly Hills, California 90212
13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **INDEX OF WITNESSES**

2

3    **WITNESSES**                                                          **PAGE**

4    HODGSON, Charles Roger Pomfret

5            Direct examination resumed by Mr. Gutman          43
             Cross-examination by Mr. Given                    55

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 13 | 1981 A&M Agreement | 98 | 98 |
| 14 | Songwriter & Composer Agreement | 98 | 98 |
| 77 | Pleadings from Nevada Action | 128 | 128 |
| 85 | Album Cover | 85 | 85 |
| 106 | Letter | 44 | 44 |

1              **MONDAY, FEBRUARY 26, 2024; 9:14 A.M.**

2                  **LOS ANGELES, CALIFORNIA**

3                          -oOo-

4

5          (The following proceedings were held in

6       open court outside the presence of the jury:)

7          THE CLERK:  Calling civil case 21-08124,

8  Douglas Campbell Thomson, et al., versus Charles Roger Pomfret

9  Hodgson, et al.  Jury trial day 5.

10              Counsel, please state your appearances.

11          MR. GIVEN:  Good morning, Your Honor.

12  David Given, Nicholas Carlin, Kyle O'Malley for the plaintiffs.

13          THE COURT:  Good morning.

14          MR. GUTMAN:  Good morning.  Alan Gutman on behalf

15  of the defendants.

16          THE COURT:  All right.  Some things that I want

17  to discuss with you all.  I received the filings this weekend.

18  Let me just get my notes.

19              All right.  So I've got some questions that will

20  be combined with some thoughts to let you know where I stand.

21  Like I said, I received the briefing.  I guess, as a somewhat

22  related aside, and I'm somewhat joking.  I noted the -- well,

23  the argument by both sides exceeded the page limit although I'm

24  sure the plaintiff would say they included the Rule 50.

25              Mr. Gutman, I'm not sure what your excuse is.  I

1    nevertheless reviewed it, spent the weekend looking over these

2    contracts again and again and again.  So I have some questions.

3    And I just want to pull up my notes to make sure -- all right.

4    I'm not sure who is drawing the short straw from the plaintiff.

5              With respect to the 1984 agreement, does the '84

6    agreement, from your perspective, make any explicit reference

7    to net writing and publishing income derived for Thomson,

8    Helliwell, and Siebenberg?  In other words, does it reference

9    their -- reference those three in the '84 agreement with

10   respect to any proportions of their publishing income?

11             MR. CARLIN:  No, Your Honor.  It doesn't

12   specifically mention their specific shares although it

13   obviously does incorporate by reference the '77 agreement.

14             THE COURT:  So tell me where does it incorporate

15   by reference the '77 agreement?

16             MR. CARLIN:  Well, in recital G --

17             THE COURT:  Hold on.  I want to pull it up.

18   Recital G of the '84 agreement?

19             MR. CARLIN:  Right.

20             THE COURT:  Let me just see if I can pull it up.

21             Recital G, it says, "Delicate Music is a

22   California general partnership, the partners of which are

23   Davies and Hodgson.  Delicate operates under an oral

24   partnership agreement.  Delicate's income is allocated among

25   Davies, Hodgson, Helliwell, Siebenberg, Thomson,

1    Mismanagement, Inc., and Tamore Limited Extent Pope in

2    accordance with the Memorandum of Agreement dated 1977 as

3    subsequently modified orally in 1983."

4            So you're saying that is where it is incorporated

5    by reference?

6            MR. CARLIN:  Yes.

7            THE COURT:  Okay.  And so --

8            MR. CARLIN:  Well, it's referred to.

9            THE COURT:  Right.  So it's referred to.  Okay.

10           The reason why I ask is because, when I'm looking

11   at the '77 agreement, it says that -- and where was that

12   verbiage?  I'm sorry.  I have to switch tabs here.

13           The '77 agreement says in paragraph 1, "This

14   memorandum shall serve as a fully effective and binding

15   contract unless and until such time as a formal agreement

16   covering the same subjects is entered into."

17           I don't see -- like I said, I may be missing

18   something.  I don't see this '84 agreement serving that

19   purpose.  Am I incorrect, or do you have a different thought as

20   it relates to that?

21           MR. CARLIN:  No.  I agree with you.

22           THE COURT:  So then we move to the '91 agreement

23   which arguably refers to the same -- again, I just want to get

24   the verbiage right -- the same subjects entered into.  But then

25   an issue comes in to whether or not Delicate -- who is bound

1    with respect to that '91 agreement.

2              So I think we're on the same page as it relates

3    to that.  Okay.  As far as the '84, '71 connection or lack

4    thereof because I didn't think that the '84 -- the '84 document

5    is really more focused on Mr. Hodgson's exit; right?

6              MR. CARLIN:  Exactly.

7              THE COURT:  Looking at the '91 agreement, does

8    that represent a formal agreement that covers the same subject?

9    I assume you say yes, but isn't there a problem because

10   Rick Davies is the only signator on the '91 agreement?  So I'm

11   curious as to your thoughts as it relates to that.

12             MR. CARLIN:  Yeah.  Well, we -- we agree that

13   Mr. Hodgson personally is not bound by the '91 agreement.  Our

14   position is that Delicate is bound by the '91 agreement.  So as

15   to Delicate, '91 is a formal agreement.

16             THE COURT:  Okay.

17             MR. CARLIN:  But as to Hodgson, we go back to the

18   '77 agreement.

19             THE COURT:  Okay.  So then let's talk for a

20   minute about the '91 agreement.  I think you say on page 12 of

21   line 8 in your papers that Delicate's primary business is to

22   collect and distribute payment, and I think that's been sort of

23   the nature of the testimony during the course of the trial.

24             If that's the case, it seems to me that the '91

25   agreement suggested Delicate is now doing something different

```
 1   because, for the first time since '77, Delicate is -- acts as
 2   much more than a collector and distributor of the payments.
 3   They're now involved seemingly in the negotiation of
 4   percentages.  You know, there's a section there that talks
 5   about Roger Hodgson and his percentages for "Last Words."  And
 6   then there's now an introduction of additional parties in the
 7   form of I think at least Susan Davies and, I guess, arguably
 8   from '77 even Mismanagement because Mismanagement wasn't
 9   referenced in the '77 agreement.
10            So it seems to me that it's more than simple
11   distribution that Delicate is getting involved in this -- or
12   that at least Delicate is now being mentioned.  And if Delicate
13   is doing something different, doesn't that cut against your
14   argument that it's not in the -- it's not in the normal
15   ordinary course and scope of business.  In the past, Delicate
16   has never taken any affirmative action.  Now it seems like they
17   are.  And if they are doing something outside the course --
18   normal course and scope of business, don't you need both of
19   their signatures?
20            MR. CARLIN:  Okay.  So I have thought about that
21   too, Your Honor.  What the '91 agreement does is it does really
22   just two things.  One is -- because Mr. Hodgson had done this
23   letter of direction to ASCAP prior to that telling ASCAP to
24   just pay him directly his 27 percent and then pay the remaining
25   73 percent over to Delicate so --
```

1          THE COURT:  So let me stop you there.  Is that

2    the testimony that's come out in the trial, or are there some

3    exhibits that support what you just said about Hodgson saying

4    from now on just pay me, skip Delicate?

5          MR. CARLIN:  I believe that is in evidence.  27,

6    Exhibit 27.

7          THE COURT:  Okay.  And when Hodgson did that, do

8    we know -- was he doing it as an individual or as a

9    representative of Delicate?

10          MR. CARLIN:  Let me just back up for a bit.  What

11   was happening before is everything would flow to Delicate and

12   then Delicate would pay our guys 11-and-a-half percent.

13          THE COURT:  Right.

14          MR. CARLIN:  Now Hodgson is saying, well, just

15   send the money directly to me, ASCAP, and send the rest to

16   Delicate and Delicate divides that up.  Now, that means

17   Delicate gets 73 percent.  So the 11 percent of 100 is a

18   different percent of 73.

19          THE COURT:  Okay.

20          MR. CARLIN:  That's all they were doing.  All

21   they were doing is figuring out, okay, what are the new

22   percentages that we are going to allocate to be, you know -- so

23   that it's still 11 percent of the whole?  So that's the one

24   thing.  That is certainly squarely within --

25          THE COURT:  Is it?  Now we're recalculating

1  percentages.

2          MR. CARLIN:  No, you're not.  It's simply

3  recalculating based upon the amount that is going to Delicate

4  rather than -- in other words, it's still 11 percent of the

5  whole.  It's not changing anything.  It's not changing the

6  amounts anybody is getting.  It's just saying, because now

7  Delicate is not getting all of the income --

8          THE COURT:  Tell me where does this say that

9  Delicate is not now getting all of the income?

10          MR. CARLIN:  If you look at Exhibit 20, that's

11  the '91 agreement --

12          THE COURT:  I have it as an independent document.

13  Go ahead.

14          MR. CARLIN:  Okay.  It says, "Now income is

15  received as follows."

16          THE COURT:  What page are you looking at?  Maybe

17  if you look at -- I have page numbers on the bottom, I think.

18          MR. CARLIN:  Just the first page of the contract.

19          THE COURT:  What paragraph?

20          MR. CARLIN:  Paragraph 1-A.

21          THE COURT:  1-A.  1-A says "Crime of the

22  Century," "Crisis?  What Crisis?"

23          MR. CARLIN:  Right.  So it says, "Income is

24  received as follows: Delicate Music, 61.5 percent;

25  Roger Hodgson, 27 percent; Mismanagement 11.5 percent."

```
 1                    THE COURT:  Okay.

 2                    MR. CARLIN:  Okay.  So that reflects that

 3   Hodgson's previous letter of direction to ASCAP to just pay him

 4   directly the 27 percent because before it was all going to

 5   Delicate.

 6                    THE COURT:  Okay.

 7                    MR. CARLIN:  Now that you have a certain amount

 8   of money, you have to recalculate.  And if you go to the next

 9   page --

10                    THE COURT:  Right.

11                    MR. CARLIN:  You see, "Such Delicate Music income

12   net of expenses will be distributed as follows:"  And then it

13   lists how much goes to Davies, Helliwell, et cetera.

14                    THE COURT:  And that percentage has increased.

15                    MR. CARLIN:  Right.  It says 18.7 percent.  But

16   then below that where it says "proof," it shows 11 percent of

17   100 percent is 11.5.  18 percent times 61 percent is also 11.5.

18                    THE COURT:  Okay.

19                    MR. CARLIN:  That's all it's doing.  It just says

20   how much of the amount we are still getting do we distribute to

21   these guys to make sure it's still 11.5.

22                    THE COURT:  Okay.  What about the introduction of

23   Russell Pope and I guess -- also, I think Ms. Davies is a

24   signator to this agreement.  I mean, it seems like now

25   Delicate's involvement is more than just being the middleman
```

1    because, at least according to the document, it says, up front

2    Delicate and Silver Cab formalize this agreement and they're

3    changing the terms.

4                  MR. CARLIN:  No.  Silver Cab, that's Sue Davies's

5    company.  Right.  She's just the manager.  She's acting as the

6    manager for Delicate.  All they are doing is entering into a

7    management contract for -- to handle Delicate's business.

8    Previously they had Mr. Margereson.  The business of Delicate

9    as stated in the '77 Memorandum of Agreement is to administer

10   the compositions and copyrights.  So administration involved

11   management.  So I don't see how that could not be part of its

12   business to retain a manager.

13                  THE COURT:  Even though it's adding different

14   parties to it?  Russell Pope wasn't involved in this back then.

15   So he's added on.  Davies wasn't involved in the '77 agreement.

16   She's added on.

17                  MR. CARLIN:  Well, Russell Pope, as they recite

18   in the -- Russell Pope had a separate oral agreement later on

19   that simply -- that had to do with the "Famous Last Words"

20   record.  So he got a piece of that.  That's not really a

21   change.  That's just a minor amendment.

22                  THE COURT:  Okay.  I guess I have some concerns

23   about that because I view this, you know, as something

24   different.  And at least in my mind, if it's something

25   different, can Davies bind Hodgson when they're doing something

1  different?  That's the concern I have.  I just want to look

2  again at the contract.

3              MR. CARLIN:  By the way, the Russell Pope piece

4  is documented in the '84 Withdrawal Agreement.

5              THE COURT:  But the '84 Withdrawal Agreement has

6  nothing to do with anything; right?  That just -- I

7  characterize it, because I'm not as smart as you all, that is

8  Hodgson's severance package.  He's out.  So arguably the '84

9  agreement has nothing to do with anything.

10             MR. CARLIN:  There was also Pope's

11  Withdrawal Agreement as well.

12             THE COURT:  Again, I'm not sure I see what's the

13  relevance of that.

14             And, then, I'm sorry.  If I can jump back.  I'm

15  looking on page 71 of the '91 agreement.

16             MR. CARLIN:  Yeah.

17             THE COURT:  It starts something about publishing

18  royalties for "Free as a Bird" and "Live '88."  Is that -- is

19  that your position that that is no different than what they

20  were doing in '77?

21             MR. CARLIN:  That's all post the -- that's

22  post --

23             THE COURT:  Breakup?

24             MR. CARLIN:  -- Supertramp release.  So it

25  doesn't relate to our agreement.

 1          THE COURT:  I guess the question in my mind is is

 2     this different -- is this something different than what

 3     Delicate was doing before?  Because to me what I'm focused on

 4     is that to me -- the only way that Hodgson gets pulled in, at

 5     least from looking at the case law and the facts in this case,

 6     is that if what Davies did, when he signed it, was viewed as

 7     the normal course and scope of what Delicate would do, arguably

 8     Davies could sign on behalf of Delicate and that would, in

 9     essence -- Mr. Hodgson's part of Delicate, so he's in.

10          But if it's different, then I don't know if

11     Davies can bind Hodgson as it relates to the '91 agreement.

12     That's what I'm struggling with.

13          MR. CARLIN:  Right.  But this relates to songs

14     that were done after Hodgson left.  So it wouldn't affect

15     Hodgson at all.

16          THE COURT:  I understand that.  But the question

17     is, by virtue of the fact we're now talking about different

18     songs, different publishing, and arguably negotiation of

19     publishing, is this different -- is it a different task that

20     Delicate has now been assigned whereas in the past, from what I

21     understand the testimony, everyone said basically Delicate is

22     just a middleman.  Money comes in, and they distribute it out.

23     Now Delicate is negotiating what those publishing royalties

24     are.

25          MR. CARLIN:  So, yeah.  The post-Hodgson songs

1    are handled by Silver Cab, not by Delicate.

2          THE COURT:  But the contract says -- it starts --

3    it begins with "Delicate and Silver Cab formalize this

4    agreement."  Maybe I didn't see it, but where does it say on

5    page 81 -- I'm sorry -- on page 71 that these publishing

6    royalties are being managed by Silver Cab and not Delicate?

7          MR. CARLIN:  I will have to take another look at

8    that, Your Honor.  Fundamentally, I think, that -- the thing is

9    songs that are post-Roger Hodgson leaving are not -- any income

10   related to them that he didn't write, you know, are not related

11   to -- sorry -- do not affect our clients' rights with respect

12   to Delicate.  So Delicate, you know, it is a -- it's a company

13   that does administrations.  It's a partnership that does

14   administration of copyrights.

15         THE COURT:  Right.  I understand that.  And I

16   understand what you are saying that "Free as a Bird," that

17   money has nothing to do with your clients.  I get that.

18         MR. CARLIN:  Right.

19         THE COURT:  My point is, I think, somewhat

20   different.  Reading the cases, you take the position that when

21   Davies signed in this '91 agreement, he was signing on behalf

22   of Delicate.  Hodgson is part of Delicate and, therefore,

23   Hodgson is also liable.  Defense takes the position, no, Davies

24   went rogue.  He did it on his own.  So you can't bind Hodgson.

25         When you look at the cases it talks about -- and

1    I think both cite cases about, if the nature of the business is

2    the same, then it does bind Hodgson.  But what my concern is

3    looking at this document in '91, it seems like Delicate was

4    doing more than it was doing in the past.  And, if so, I think

5    there is a -- I think then the defense is correct that when

6    Davies signed, he signed and added additional responsibilities

7    to what Delicate normally would do and he could not -- and he

8    could not or should not have done that without having both

9    signatures on the document.  That's the point.

10            MR. CARLIN:  So what I'm trying to do is tie this

11   to the notion of a formal agreement, right, that in some way

12   covers the same material as the '77 agreement.  So we're saying

13   the '91 agreement, if we're going to say it's the formal

14   agreement, then our position is that it is to the extent that

15   it covers the same material in the '77 agreement.  To the

16   extent there are some other things maybe going on in that

17   agreement, it would not relate to the formal agreement to the

18   '77 contract.

19            THE COURT:  But -- I hear you.  I mean, that's

20   why I said, look, '84, in some ways, is not relevant but it's

21   out.  The bridge you're trying to draw is between the '77 and

22   '91 and saying that, you know, it relates to -- I think the

23   verbiage was it's a formal agreement that covers the same

24   subject.  Let's say I agree with you.  Great.  So we say '77,

25   '91 covers the same subject.  But then you get to the issue of

1  who is bound by that, and that's why I'm asking these other

2  questions.

3          I think you can make an argument the '91

4  agreement is the formal agreement that covers the same subject.

5  The challenge then becomes who is bound by it?  Is it Davies

6  only?  Davies and Hodgson individually?  Hodgson individually?

7  Or Delicate?

8          I think, based upon -- the questions I'm asking

9  make me think that Davies could not have or -- could or should

10 not have signed off on that on behalf of Delicate because the

11 '91 contract is adding additional responsibilities that

12 Delicate was not doing before and therefore, in order to bind

13 the partnership, he would have had to have the authorization of

14 Hodgson as well.  That's the issue that I think I'm asking both

15 sides to think about because I think there's a problem there.

16          MR. CARLIN:  Well, I think we compartmentalized

17 the part of the agreement that covers our clients' rights with

18 respect to the '77 agreement and perhaps other matters so that,

19 with respect to the part of it that deals with our clients'

20 rights, it would be binding on Delicate.

21          THE COURT:  Right.  But I don't know if you -- I

22 guess I don't agree, right.  At least from what I'm reading, I

23 don't think that's the case because Delicate in the '91

24 contract seems to now be doing something different and above

25 than what they had done up until that point.  There's

1    negotiations.  There's adding of different parties of which

2    Delicate is the -- at least the intention was to bind Delicate.

3    And I think it needed to have both their signatures.

4               So let me just sort of give you my thoughts as we

5    move forward here.  If that's the case, it seems to me all

6    that's left is the '77 agreement.  Okay.  And if we have this

7    '77 agreement, it seems to me the question then becomes -- or

8    at least my thought is that as it relates to the '77 agreement,

9    I don't think it gives rise to an implied duration of time.  So

10   then the question then becomes in my mind was it terminated

11   after a reasonable time?  And it seems to me that question

12   should go to the jury.

13              But then it raises, I think, another interesting

14   question.  If that question -- if, let's say, all that went to

15   the jury is was the '77 agreement terminated in a reasonable

16   time, who is the -- who is the jury being asked to decide that

17   question as to Hodgson?  Delicate?  Both?

18              Because when you look at the 77 agreement, it

19   says this agreement is made and entered into by Davies,

20   Hodgson, Thomson, Helliwell, Siebenberg, and Margereson.  And

21   the only reference to Delicate is simply saying on paragraph 3,

22   "The copyrights of the compositions shall be owned by the

23   respective writers who write the compositions and shall be

24   administered by Delicate."

25              You know, I have literally all night back and

1    forth of, okay, if the question is -- if we are only focused on

2    the '77 agreement, is Delicate part of this agreement?  Is

3    Hodgson part of this agreement?  Are they both?

4            And the only analogy -- and, admittedly, it's

5    just 3:00 in the morning thoughts in my head.  The only analogy

6    I can think of is in a class action suit, you have an

7    administrator that has the responsibility for administering the

8    funds.  They are literally just the moneyman that pushes the

9    money out and have some management responsibility in that

10    respect.

11            Let's say in that class action context someone

12    didn't get paid.  That person would sue who?  If they sued the

13    defendant, meaning, you know, company A who is in the class

14    action, company A would say why are you suing us?  We gave the

15    money to the administrator.  You need to sue the administrator

16    of which the administrator may turn around and say why are you

17    suing us?  We're not a party to this agreement.

18            So as it relates to the '77 contract, who is the

19    person by which the jury would make a determination of

20    terminating this in a reasonable time?  Is it Hodgson when --

21    again, maybe I'm getting overly intellectual on this point.

22    This contract doesn't say anything about who does what other

23    than Delicate is to administer the contract -- I'm sorry.  It

24    shall be administered by Delicate Music.

25            Now, maybe there's an argument from your

```
 1    perspective that based on the testimony in the trial, Hodgson
 2    said, I'm the one that made sure the money got distributed or
 3    not.  But just looking at the four corners of the agreement,
 4    I'm not sure who is bound by this and what are they bound by?
 5              MR. CARLIN:  Maybe I can cut through this,
 6    Your Honor.
 7              THE COURT:  Okay.
 8              MR. CARLIN:  We cited some black letter law from
 9    Cal Jury that "A partnership may be bound by a written document
10    signed in the name of but one partner if the transaction
11    relates to partnership matters and the intention is to bind the
12    firm."
13              Here we have both partners, the only partners in
14    Delicate, both signed the agreement --
15              THE COURT:  Which agreement so we're clear?
16              MR. CARLIN:  '77.
17              THE COURT:  Okay.
18              MR. CARLIN:  With the intention that it would
19    bind their two-person partnership Delicate.
20              THE COURT:  So then if we reduced it down to the
21    '77 agreement, your view is that whether it was terminated at a
22    reasonable time, it would be related to only Delicate, not
23    Hodgson?
24              MR. CARLIN:  Both.  I mean --
25              THE COURT:  Why both?  If what you just said is
```

1    accurate that Hodgson and Davies entered into this with the

2    intention to have the -- have Delicate distribute the payments,

3    the termination would be isn't it -- when this contract says

4    the only person that is supposed to administer it is Delicate,

5    can you say Hodgson breached it?

6                MR. CARLIN:  Well, they're both bound.  Hodgson

7    is individually bound because he signed it as an individual,

8    but he also bound Delicate as their two-person partnership.

9                THE COURT:  Okay.

10               MR. CARLIN:  They're both bound.

11               I'd like to address your comment about the

12   agreement does not -- that you can't imply from the agreement

13   what the duration should be.  We're going to address that in

14   our Rule 50 Motion.  But just as a preview, we have cited a

15   slew of cases, some here and some will be in our

16   Rule 50 Motion, that the nature of this kind of contract when

17   you're talking about an income stream that is generated by the

18   work of the plaintiff, by its very nature it must continue

19   until the income stream ends.

20               THE COURT:  I understand.  But the defense has

21   also cited a bunch of cases like contracts don't run in

22   perpetuity.  So there is discussion or there is a debate as it

23   relates to it.

24               MR. CARLIN:  Certainly.  We will talk about it

25   when we do our motion.  Their cases involve union contracts and

1  stuff, nothing to do with income streams.  I don't know if you

2  want to address that right now.

3                THE COURT:  Okay.  And then while we are here, I

4  want to jump to the '84 agreement.

5                MR. CARLIN:  Yeah.

6                THE COURT:  Again, I tried to go through it

7  pretty thoroughly this weekend.  I don't think the '84

8  agreement confers any obligation on Hodgson.  This was his

9  severance package.  I'm using that so my mind can grasp it.  So

10  without an obligation to distribute funds in his own individual

11  capacity, sort of where is the -- like, what's the breach?

12                MR. CARLIN:  Well, the breach is he agreed to

13  accept 27 percent.

14                THE COURT:  Okay.

15                MR. CARLIN:  The moment he stopped paying my

16  clients, he was taking more than 27 percent.  He was taking

17  more than he agreed he would take.  He's now taking 50 percent.

18  So that's the breach.  Very simple.

19                THE COURT:  So -- and -- but how does your

20  client -- the contract was talking about his withdrawal.

21                MR. CARLIN:  Right.

22                THE COURT:  He says, I'm going to get 27 percent.

23  Okay.

24                MR. CARLIN:  Uh-huh.

25                THE COURT:  Not to the -- is it -- I don't

```
 1   understand how that's to the detriment of your client.  And I'm
 2   having trouble understanding, like, the breach is that he took
 3   more.  Is that it?  Like, I'm having trouble grasping that
 4   concept.
 5              MR. CARLIN:  Well, there was no detriment to our
 6   clients in the '84 agreement.  It simply reaffirmed what the
 7   percentages were from the '77 agreement as to Mr. Hodgson.
 8   And -- but he promised to my clients -- he and Delicate both
 9   promised to my clients in the '84 agreement that Hodgson would
10   take 27 percent, and that's it.  Now he's taking a lot more
11   than that.  That's a breach.
12              THE COURT:  Yeah.  I'm not sure -- yeah.  I think
13   we might have to agree to disagree.  Like I said, that's the
14   thing that I really -- I don't see it.
15              Mr. Gutman, any thoughts that you have with
16   respect to what's been discussed thus far?  I'd be shocked if
17   you had nothing to say.
18              MR. GUTMAN:  Thank you, Your Honor.  There's a
19   lot that's gone on.  I will start with the last subject first,
20   the topic of the '84 agreement.  It's clear that there is no
21   express obligation.  What it appears by counsel's argument is
22   that he is attempting to superimpose an implied contract that
23   is some obligation that is implied by virtue of the fact that
24   says --
25              THE COURT:  You can't get more than 27 percent?
```

1          MR. GUTMAN:  Yeah.  Because it's -- and I know

2   plaintiffs use this terminology black letter law, but let me

3   cite the 9th Circuit decision from *Berkla*, B-e-r-k-l-a, *versus*

4   *Corel*, C-o-r-e-l, *Corp.*, 302 F.3d 909 at 918.  There cannot be

5   a valid express contract and an implied contract each embracing

6   the same subject matter existing at the same time.

7          So we have a fully integrated agreement, the 1984

8   agreement, without an express obligation that Hodgson must pay

9   to the plaintiffs.  You cannot superimpose some implied

10  obligation through this inverted logic.  And it is completely

11  inverted because they're saying, oh, Delicate shall pay to

12  Hodgson in perpetuity, and then it says 27 percent.  So the

13  presumption that counsel is making in the argument is that,

14  well, therefore, if Hodgson were to take more than 20 percent,

15  27 percent, that would constitute an actionable breach.  It

16  cannot happen.  It can't work that way.

17          THE COURT:  Okay.

18          MR. GUTMAN:  That's it on the '84 agreement.

19          With respect to the 1991 agreement, I want to

20  point out that -- another interesting issue.  It says in that

21  first paragraph Delicate and Silver Cab, which Silver Cab is

22  not Sue Davies's management company.  Interestingly, if you

23  look at the signature blocks in Exhibit 20, Sue Davies's

24  management company is Power Steering, Inc.  Silver Cab is the

25  same administrative type of entity.  It is what we refer to

1  historically as a publishing designee.  It is basically the

2  passive recipient of the publishing revenues and may or may not

3  be involved in disbursement of those revenues.

4           But as a historical fact -- and I'm not going on

5  too much of a tangent -- the reason these publishing designees

6  have existed is because the performing rights societies needed

7  an entity rather than a person to pay the publisher's share as

8  opposed to the writer's share of publishing monies.  It's two

9  corridors of money that comes down.  So Delicate Music was just

10  set up as the recipient as the publishing designee to receive

11  the publisher's share of the income that would be derived from

12  performing it.

13           THE COURT:  So you heard Mr. Carlin say, look, as

14  it relates to that, this '91 agreement is much of the same --

15  they're doing the same thing they did in the '70s and so,

16  therefore, when Davies signed it, it's not a new

17  responsibility, so Hodgson should also be bound by that.

18           MR. GUTMAN:  One -- the point I wanted to make

19  with Silver Cab is Silver Cab is not a signatory to this

20  agreement either.  The same way the plaintiffs are advancing

21  the argument that Delicate Music could be held liable for a

22  breach of contract -- we are talking about the essential

23  elements to establish a prima facie case of breach against

24  Delicate Music based upon the 1991 agreement.

25           Look at it from the Silver Cab perspective.  Can

1    you see in this particular agreement that is not signed in the

2    capacity of anyone, no signature block for Silver Cab, that

3    Silver Cab could be held liable for a breach of this contract?

4            I think your -- the reference, the description

5    with the admin in a class action case is particularly

6    appropriate here.  There is no obligation -- and I think

7    Mr. Carlin was reading what he referred to as something from

8    Cal Jury, not decisional law or statutory law, and I'm not sure

9    what the -- what particular dicta, but the line that he read,

10   the part that stands out for me is intention to bind the firm.

11   If there was an intention to bind Delicate, why is Delicate not

12   a signatory to an agreement?

13           THE COURT:  But wait.  Well, I feel like we're

14   talking about different things because my -- what I'm saying --

15   what I believe, based on reading all this this weekend, is that

16   there is a scenario by which Davies could have signed this

17   document and it would have also bound Hodgson if he was doing

18   it in the normal course and scope of business as Delicate and

19   the task he was assigned with in this contract related to that.

20           And the plaintiffs' position is, yes, all that

21   Davies was doing was signing another agreement that sort of

22   clarified or, you know, made clear the new state of affairs as

23   to who gets what and nothing more.  And if that is the case,

24   then I think the case law suggests that, therefore, Davies was

25   doing it on behalf of Delicate and all the members of Delicate

```
 1   are bound by that meaning your client would be bound by that.
 2              I know you don't agree that your client should be
 3   bound by that, but I'm asking, as it relates to that analysis,
 4   what is your response?
 5              MR. GUTMAN:  You're correct in principle under
 6   California Corporations Code 16301 which was cited in the
 7   brief.  The second component that is missing under this
 8   particular document is the signature requirement because, when
 9   an individual partner signs in his own name as Davies signed in
10   his own name and as the representative of Richard Davies or
11   Rick Davies Productions, Inc., the presumption which -- and
12   it's a rebuttable presumption as I stated in the case law cited
13   in the pocket brief and -- both pocket briefs addressing this
14   subject, the party attempting to assert that the entity, the
15   partnership, should be liable has the burden of proving by a
16   preponderance of the evidence that the intention was for the
17   signature to bind the partnership.  There's been no evidence
18   submitted of that.
19              Then the next element I want to mention -- should
20   I stop there?
21              THE COURT:  No.  Go ahead.
22              MR. GUTMAN:  The next element I want to mention,
23   I also put the recitals from two other agreements that the
24   plaintiffs all executed in which the reference to this
25   particular 1991 publishing agreement clearly identified that
```

1    Delicate Music was not a party to this particular agreement.

2    So -- and that was in Exhibit 57 and Exhibit 76.  And I put

3    little cut and pastes of both.

4                Those are admissions that -- they're not intended

5    to include Delicate Music as a party.

6                THE COURT:  As it relates to those agreements.

7                MR. GUTMAN:  As it relates to the 1991 agreement.

8                THE COURT:  Okay.

9                MR. GUTMAN:  It's a statement asserting a

10   position that Delicate Music is not identified as a party.  So

11   they want to present the 1991 agreement now through all of --

12   and, again, I will use the term inverted logic.  But they can't

13   get over the two obstacles at all -- we will call them

14   obstacles -- but the legal requirements necessary to satisfy a

15   court that they are entitled to have the 1991 agreement held --

16   that Delicate would be held liable.

17               THE COURT:  Okay.  Let's say I agree with you.

18   Like I said, I'm just throwing out my thoughts now.  We are

19   going to bring in the jury shortly.  All that is left is the

20   '77 agreement; right?

21               MR. GUTMAN:  Right.

22               THE COURT:  Who is bound by that agreement from

23   your perspective?

24               MR. GUTMAN:  Only Hodgson.

25               THE COURT:  Why?

```
 1              MR. GUTMAN:  Because Delicate is not a party.

 2   Again --

 3              THE COURT:  Even though two people from Delicate

 4   signed it, and I don't think there is any dispute that when

 5   they signed it, the intention was to Delicate -- that Delicate

 6   would distribute the funds; right?  And I think the testimony,

 7   even from your client and from others, is like, yeah, money

 8   came in.  We decided, because the band members were struggling,

 9   we were going to pay them.  When he says "we," is he talking

10   about him, Delicate, Davies, or all of the above?

11              MR. GUTMAN:  Again, I believe it comes down to

12   the phrase that Mr. Carlin sort of slipped in is that intention

13   to bind the firm.  We have to look at the clear, express, and

14   unambiguous language of Exhibit No. 8, the 1977 agreement.  And

15   there is nowhere where that can be logically interpreted as

16   stating that this is an -- there is an intention to bind

17   Delicate to this specific obligation.

18              THE COURT:  But okay.  Since you -- and I

19   probably should note a copy of this for the record.  Since you

20   found my analogy to be so nice or eloquent or astute, in the

21   class action context, if someone didn't get paid, who would

22   they sue?

23              MR. GUTMAN:  The parties that are responsible --

24              THE COURT:  Are responsible for the payment.

25              MR. GUTMAN:  Owe money.
```

1            THE COURT:  And what I was saying is that they

2   sue the party responsible for the money.  That party

3   responsible for the money says, wait, what are you suing me

4   for?  I gave the money to the administrator.  You sue them.

5   They didn't pay you the money.  Isn't that the case here?

6   Because up until recently, all the monies that the plaintiffs

7   received came through Delicate.  All of a sudden in the 2000s

8   or whenever it stopped, the money is not coming from Delicate.

9   So why wouldn't Delicate be the person -- to the extent there

10  is an issue in the '77 agreement, why wouldn't Delicate be the

11  person that would be responsible?

12            MR. GUTMAN:  First of all, one clarification.

13  Not all the money comes through Delicate.  Hodgson made certain

14  payments or had historically made payments that he received

15  directly.

16            THE COURT:  Has that come out in the testimony?

17  Everyone has been talking about Delicate being the

18  administrator.  So that's where I maybe misunderstood that they

19  were the money group, monies come into Delicate and go out to

20  everyone else.

21            MR. GUTMAN:  There is evidence in the record,

22  Exhibit 77 and 78, which has to do with the receipt of income.

23  Mr. Siebenberg testified he showed the 1099s that he had

24  received.  There are 1099s from Hodgson in addition to 1099s

25  from Delicate.

1              THE COURT:  So should they both be responsible

2      then if both are paying?

3              MR. GUTMAN:  Two different things.  We're talking

4      about payment distribution.  Does the fact that Delicate is

5      the, for lack of a better term, the administrator of the

6      payment, does that incur liability on a breach of contract

7      action where all the essential elements of a breach need to be

8      established based upon an agreement?  Looking at the four

9      corners of the agreement, no.  It is impossible.

10             THE COURT:  It would just be Hodgson as an

11     individual?

12             MR. GUTMAN:  Correct.

13             THE COURT:  Why not as a representative of

14     Delicate if -- when he signed it, he was Delicate as well and

15     so was Davies.  And if the payments don't go out and if -- I

16     mean, my sense is that the only way payments go are if Hodgson

17     and/or Davies say so.  If they don't, no payment goes out;

18     right?  So why wouldn't it be more than just Hodgson as an

19     individual?

20             MR. GUTMAN:  Essentially what -- it sounds almost

21     like a reverse alter ego scenario where the allegation made

22     against the party to the contract, you are saying that the

23     money is being held by an entity where the normal alter ego

24     scenario would be entity and the money's going the other way.

25     I'm talking about a basic concept of contract law where parties

```
 1   to a contract -- we're talking about California Civil Code
 2   1550, parties capable of contracting, do we have a party
 3   capable of contracting?  Yes.  But is that party -- is that
 4   partnership a party to a contract?  The answer is no.
 5            You don't become a party to a contract simply by
 6   having your name referenced in an agreement.  Otherwise, I
 7   think the entire jurisprudence regarding potential contract
 8   liability would be thrown into disarray.
 9            THE COURT:  So your position is that if anything
10   goes to the jury, it would only be the '77 agreement as it
11   relates to Hodgson in his individual capacity.
12            MR. GUTMAN:  Correct.
13            THE COURT:  Let's just play this out.  I don't
14   know what the jury will do with this case.  If the jury finds
15   that Mr. Hodgson in his individual capacity did not terminate
16   at a reasonable time and let's say there is a judgment against
17   Mr. Hodgson, Mr. Hodgson will say, well, how are you going to
18   come after me?  All the money is in Delicate's box.
19            MR. GUTMAN:  That's an interesting point for
20   under the EJL, the enforcement of judgments law.  But it's not
21   an issue that has been addressed in this breach of contract.
22            Look, the --
23            THE COURT:  So on that note, again -- I just want
24   to take a couple more minutes.  Are you saying that the
25   plaintiffs have no viable legal remedy other than an individual
```

1  claim against Mr. Hodgson despite the fact that the majority of

2  the funds that have been distributed came from an entity known

3  as Delicate?

4          MR. GUTMAN:  The answer to the question is

5  actually elementary from the perspective that I'm not the

6  plaintiffs.  I didn't draft the initial complaint.  I didn't

7  say in my Summary Judgment Motion that the '77, '84 and '91

8  agreements constituted a single participation agreement.  In

9  the memorandum of contentions of fact and law that were filed

10 on January 15, so a little bit more than a month ago, there was

11 a reference to a single contract.  It's only when we get the

12 initial proposed Final Pretrial Conference Order that there was

13 a structural breakdown saying Hodgson should be liable under

14 these two agreements and Delicate should be liable under three

15 agreements.

16         I'm taking this from the perspective it is the

17 plaintiffs that prepared a breach of contract cause of action,

18 and in the '77 agreement Delicate is not a party to that

19 contract.

20         THE COURT:  If Hodgson is -- you're saying

21 Hodgson is.  Under this contract, what was he bound to do?

22         MR. GUTMAN:  The express terms of the contract

23 are clear from --

24         THE COURT:  So help me out.

25         MR. GUTMAN:  The interpretation.  It says that

1    the amounts received in publishing shall be allocated to the

2    various participants.

3                THE COURT:  Again, and I'm going to tease you for

4    a moment, objection.  Nonresponsive.  What is he bound to do?

5    If Hodgson is the -- I'm just trying to follow the train of

6    thought.  That's what I have been thinking about at 2:00, 3:00

7    in the morning all weekend.

8                If Hodgson is bound by this contract, '77

9    contract, what was he bound to do?  Because the contract just

10   says there's a distribution.  It doesn't say who does it.

11   Arguably the only thing that says anything about who does

12   something is Delicate because it says the copyrights of the

13   composition shall be owned by the respective writers who write

14   the compositions and shall be administered.  Everything else in

15   this memorandum -- I should say nothing in this memorandum says

16   anything about what Hodgson is supposed to do, what Davies is

17   supposed to do, what Helliwell, Siebenberg.  It just says,

18   here's the split, and Delicate is to administer it.

19               That's why I come back to the question of, if

20   Hodgson is the party to the contract, what was he bound to do?

21               MR. GUTMAN:  You bring up a great point and --

22               THE COURT:  Even the broken clock is right twice

23   a day.

24               MR. GUTMAN:  No.  This is actually right on

25   point.  The plaintiffs had a claim, cause of action, for breach

1    of the implied duty of good faith and fair dealing.  I'm not

2    sure if this rests more in the implied duty category or in the

3    claiming that it's a breach of an implied contract.  But

4    they're implying certain terms that should be read into this

5    particular agreement.

6              But as far as the express terms, I agree with

7    Your Honor.  There is no point where it says that Hodgson is

8    obligated to pay those amounts.  But they did dismiss prior to

9    trial their breach of the implied duty of good faith and fair

10   dealing.  And yet here they are.  That is the only claim they

11   seem to be asserting.

12             I don't know if Your Honor is going to grant them

13   leave under Rule 15 to amend or supplement the pleading.  But

14   the reality is there is no breach of an express contractual

15   provision to your point.

16             THE COURT:  In the '77 agreement?

17             MR. GUTMAN:  Correct.

18             THE COURT:  You say there is no breach.

19             MR. GUTMAN:  There is no breach of an express

20   contractual agreement.

21             THE COURT:  So the case is over then from your --

22   if there is no breach, what's left?

23             MR. GUTMAN:  There is nothing left.  That's my

24   point.

25             THE COURT:  Okay.

1    MR. GUTMAN:  Their argument, their contention is

2    that Hodgson had a specific obligation in connection with the

3    '77 agreement.  There is no express obligation.  There is no

4    clause that says, and Hodgson shall pay to plaintiffs what they

5    are --

6    THE COURT:  Well, do you believe it says Delicate

7    is to pay the plaintiffs?

8    MR. GUTMAN:  No.  It doesn't say that either.

9    THE COURT:  Okay.

10   MR. GUTMAN:  It clearly does not.  I'm not

11   playing any games with the words.  Read the express language.

12   Look at the rules regarding contract interpretation.  The point

13   is they are making an allegation that there is an implied duty

14   of good faith and fair dealing which I think encompasses what

15   they are trying to establish here about the payment.  But there

16   is no express duty to pay.  There would be a sentence that said

17   and Hodgson shall pay.  That would be an express duty.  They're

18   saying it's implied by the structure that Hodgson acquiesced to

19   in the course of that percentage allocation.

20   THE COURT:  Mr. Carlin, anything further or

21   anything you want to say in response?

22   MR. CARLIN:  Well, I guess I should say the law

23   does not condone interpreting contracts as absurdities.  I

24   mean, obviously what this contract says is the plaintiffs are

25   to be paid these amounts.

1            THE COURT:  You say obviously.  Where?  Show me

2    where.  Look, what you are saying is it's -- strike law -- it

3    strikes me what you are saying is there may have been the

4    intent.  I get that.  But I'm looking at the contract which is,

5    when the parties wrote this in the '70s, this was the fully

6    effective and binding contract unless and until a formal

7    agreement covering the same subjects was entered into.

8    Arguably, nothing happened from '77 to '91.  And there's a

9    debate about whether the '91 binds Mr. Hodgson or Delicate.

10   But as it relates to this document, where does it say that

11   Hodgson, Davies, or Delicate shall pay these amounts?

12            MR. CARLIN:  How else could you enforce this

13   contract?

14            THE COURT:  I didn't write it.  I don't know.

15            MR. CARLIN:  What else could the meaning be?

16   There's no other plausible meaning to this contract.  You say

17   the -- the songwriting --

18            THE COURT:  Isn't -- arguably, isn't the other

19   plausible meaning that this just lays out what the split is?

20            MR. CARLIN:  Shall be paid.

21            THE COURT:  By whom?

22            MR. CARLIN:  Shall be paid to each of the

23   undersigned in the following proportions.

24            THE COURT:  By whom?

25            MR. CARLIN:  The people signing the agreement are

1    Mr. Hodgson and Mr. Davies.

2              THE COURT:  Again, by whom?  Who shall it be paid

3    by?

4              MR. CARLIN:  By the people signing the contract.

5              THE COURT:  So all of them because all of them

6    signed it.

7              MR. CARLIN:  But they don't own the copyrights.

8    Only Mr. Hodgson and Mr. Davies own the copyrights.  They're

9    the only ones in the position to pay.  And they have designated

10   their partnership Delicate Music as the entity to pay.  They're

11   both partners in Delicate Music, and they signed it.

12             THE COURT:  So Davies and Hodgson, in your mind,

13   are bound to pay?

14             MR. CARLIN:  Absolutely.

15             THE COURT:  And Davies -- you have settled the

16   case with Davies.

17             MR. CARLIN:  Right.

18             THE COURT:  So he's out of it for purposes of

19   this.

20             MR. CARLIN:  Right.

21             THE COURT:  All right.  Well, look, there's a lot

22   that --

23             MR. CARLIN:  I did have a couple other comments

24   just briefly.

25             Mr. Gutman talked about what Silver Cab is, but

```
 1   there has been no testimony in this case about that.
 2             THE COURT:  I don't know if it matters, quite
 3   frankly.  My issue is more about what I perceive to be a change
 4   in the role and responsibilities and negotiations as it relates
 5   to Delicate in this '91 agreement.
 6             MR. CARLIN:  I understand.  I don't think there's
 7   been any testimony as to specifically what that one issue with
 8   that one song has been.  But what I would say is that the '91
 9   agreement states right at the very beginning that in terms of
10   the intent that Mr. Gutman spoke about, Delicate Music and
11   Silver Cab Music hereby formalize an agreement.
12             THE COURT:  Right.
13             MR. CARLIN:  So obviously the intent was to bind
14   Delicate and Silver Cab.
15             THE COURT:  I don't disagree with you on that.
16   The issue is has Delicate changed its role sufficiently that it
17   would bind or that it would necessitate both Hodgson and Davies
18   to sign it?  That's the issue I'm struggling with.
19             MR. CARLIN:  Perhaps that's a jury question.
20             THE COURT:  I think that's a legal question.  I
21   don't think we're going to give the jury a verdict form, did
22   they change -- I don't think that's a jury question.
23             MR. CARLIN:  Right.  And in terms of, you know,
24   who is responsible to pay under the '77 contract, I certainly
25   urge Your Honor to recognize that it's both anything -- one or
```

 1    the other, they will play the shell game, as you suggested.

 2              THE COURT:  I wasn't suggesting the shell game.

 3    I was suggesting where would the money ultimately come from?

 4    You know, if -- again, I don't know what the jury is going to

 5    do.  But if there was a judgment, at least from what I've heard

 6    thus far, all the monies -- I should not say all but most of

 7    the monies came through Delicate.

 8              MR. CARLIN:  Well, they're both jointly and

 9    severally liable.  That would be our position.

10              THE COURT:  All right.  Let's bring in the jury.

11    How much more time do you think you have on your direct?

12              MR. GUTMAN:  Less than 30 minutes.  Probably more

13    like 15, 20.

14              THE COURT:  Cross-examination, what do you

15    anticipate?

16              MR. GIVEN:  About an hour.

17              THE COURT:  So that will get us close to the noon

18    hour.  Then you have another witness?

19              MR. GUTMAN:  No.

20              THE COURT:  You're going to rest?

21              MR. GUTMAN:  Correct.

22              THE COURT:  Do you intend to call a rebuttal

23    witness on --

24              MR. GIVEN:  A rebuttal witness, Your Honor.  It

25    will be Bob Siebenberg.  15 minutes max.

```
 1              THE COURT:  Okay.  So we will be in the
 2   midafternoon hopefully.  So we might close this afternoon
 3   depending on what I rule on the Rule 50s?  I'm going to take
 4   your Rule 50 under submission for now.  You're going to make
 5   one, and I will likely take it under submission.  So we will
 6   likely argue this afternoon.
 7              MR. GIVEN:  Do we have jury instructions and
 8   verdict form?
 9              THE COURT:  We're working on them now.
10              MR. GIVEN:  I'm prepared to close this afternoon.
11              MR. GUTMAN:  I would be prepared to proceed.
12   Obviously we need to -- I have two versions sort of roughly
13   prepared based upon what I would hope would be the findings of
14   the Court.
15              Do you want Mr. Hodgson to --
16              THE COURT:  Yes.  If you wouldn't mind, why don't
17   you come back on the witness stand, please.
18         (The following proceedings were held in
19          open court in the presence of the jury:)
20              THE COURT:  All right.  Good morning, ladies and
21   gentlemen.  I hope you all had a wonderful weekend.  I'm sure
22   you missed us immensely.  We're going to resume our testimony
23   here.
24              Mr. Gutman.
25              MR. GUTMAN:  Thank you.  Good morning, ladies and
```

1  gentlemen.

2              **CHARLES ROGER POMFRET HODGSON,**

3          **CALLED BY THE DEFENDANTS, WAS SWORN.**

4              **DIRECT EXAMINATION (RESUMED)**

5  BY MR. GUTMAN:

6      Q      Good morning, Mr. Hodgson.

7      A      Good morning.

8      Q      We left off with the reasons you decided to stop

9  paying the plaintiffs.  When did you decide to stop paying a

10  portion of your songwriting royalties to the plaintiffs?

11     A      In 2018.

12     Q      Did you communicate that to someone?

13     A      I did to Paul, Paul Glass and also Shakti, my

14  manager obviously.

15     Q      Why to Paul Glass?

16     A      Because he was the distributor of all the funds

17  from Delicate.

18     Q      Did you make any other payments to the plaintiffs

19  after that communication to Paul Glass?

20     A      There was one three years later.  Is that the one

21  that -- I stopped paying and didn't hear anything from the

22  plaintiffs for about three years.  Then I got a legal letter

23  from -- threatening a lawsuit at which time, actually, I had to

24  go to the hospital.  I had some major heart situation

25  happening.  So I instructed Pam Egan, my bookkeeper, to pay the

44

 1   funds that had not been paid over those three years to issue

 2   checks to everyone to avoid the lawsuit because I couldn't take

 3   it in the condition I was in.

 4        Q      Would you take a look at the exhibit book.  I

 5   believe it's volume 3.  The exhibit number I want to direct

 6   your attention to is Exhibit 106.

 7               Do you have that before you?

 8        A      Yes, I have it.

 9        Q      Can you tell us what that is?

10        A      This is the letter that was sent to the

11   plaintiffs by Pam Egan, my bookkeeper that I asked her to send.

12        Q      You authorized Pam Egan to send that letter on

13   your behalf?

14        A      Yes, I did.

15               MR. GUTMAN:  Move to admit Exhibit 106.

16               THE COURT:  Any objection?

17               MR. GIVEN:  No objection, Your Honor.

18               THE COURT:  All right.  106 will be admitted.

19          (Marked for identification and received

20          into evidence Exhibit No. 106.)

21        Q      BY MR. GUTMAN:  Now, this June 23, 2021, letter,

22   is this where you're authorizing Pam Egan to make a payment to

23   the plaintiffs on your behalf?

24        A      Yes, it is.

25        Q      It refers to in the first sentence there, due to

```
 1    plaintiff's -- due to -- pardon me -- "Due to Roger's health
 2    crisis."  Is that what you were describing with the heart
 3    condition?
 4         A     Yes.  I was facing open heart surgery at that
 5    point, yes.
 6         Q     It goes on to say, "He cannot pursue any legal
 7    matters or have any legal involvement in his life."
 8         A     Correct.
 9         Q     Sort of like what we're doing here now; right?
10               MR. GIVEN:  Objection, Your Honor.
11    Argumentative.  Leading.
12               THE COURT:  Sustained.
13               THE WITNESS:  Yes.  Two weeks later they decided
14    to file anyway.
15               MR. GIVEN:  Move to strike, Your Honor.
16               THE COURT:  Stricken.  Next question, please.
17         Q     BY MR. GUTMAN:  Did you get sued anyway after
18    this letter and money was sent?
19         A     Yes.  A couple weeks later they filed the
20    lawsuit.
21         Q     There is a reference here to the amount of
22    payment that you made, the $24,809.16.
23               Do you see that?
24         A     Yes.  That's what I had paid each one of them,
25    yeah.
```

1      Q      So almost $75,000 total to the three plaintiffs?

2      A      Correct.

3      Q      And how much after this -- after you made that

4   payment and sent this letter did you get sued?

5             MR. GIVEN:  Objection.  Asked and answered.

6             THE COURT:  Sustained.  Next question.

7      Q      BY MR. GUTMAN:  I want to direct your attention

8   now.  We were talking on Friday about your wife Karuna Hodgson.

9             Do you recall that?

10     A      Yes.

11     Q      At some point did you end up terminating that

12  marriage?

13     A      Yes, I did in 2004.

14     Q      During the divorce proceedings, did you identify

15  the payments being made to the plaintiffs as part of your

16  income and expense?

17     A      Yes.  I was providing an income and expense

18  declaration as part of the process.

19     Q      Did you ever identify the payments to the band

20  members as an obligation?

21     A      Not as an obligation but as one of the expenses

22  that I had to -- that I was doing each year.

23     Q      I want to switch topics now to the subject of

24  cover recordings.  I put up on the screen Exhibit 8 which is in

25  evidence.

1          First of all, just highlighting where it says

2     cover recordings, can you explain to all of us what a cover

3     recording is?

4          A     A cover recording is, in my case, is a song of

5     mine that has been recorded by someone else other than --

6     because of this agreement, other than Supertramp.  So it could

7     be me or it could be any other artist in the world, and there

8     are many.

9          Q     How many times have your songs been covered by

10    other artists?

11         A     Thankfully many, many, many times by many

12    artists.

13         Q     Does that result in royalties being paid to you?

14         A     It does increase the royalties, yes.

15         Q     And under this agreement it says that cover

16    recordings are excluded from the payments to the band members;

17    correct?

18         A     Correct.

19         Q     When the statements come in from the various

20    royalty sources, does it identify cover recordings versus

21    recordings made by Supertramp?

22              MR. GIVEN:  Objection.  Lacks foundation.

23              THE WITNESS:  Not always, no.

24              THE COURT:  Overruled.

25         Q     BY MR. GUTMAN:  So does someone need to make a

 1   determination when the statements come in from the royalty

 2   sources as to what is a cover recording versus what's a

 3   Supertramp recording?

 4        A     Yes, they do.

 5        Q     How is that done?

 6        A     Sometimes the individual recordings, the cover

 7   recordings have their own I think it's an IRSC code, but many

 8   times they come into Universal ASCAP just as the song title.

 9   So it requires some detective work.  It requires some letting

10   the accountant, in this case Paul Glass, know that there's been

11   a cover recording of this artist and to expect a sum of money.

12        Q     Are there certain situations where you're

13   granting synchronization licenses?

14        A     Yes.

15        Q     Are you able to identify the cover versions of

16   your songs?

17        A     Yes.  We know what the sums of money are that

18   come in by cover recordings or sync licenses.

19        Q     With certain cover recordings, though, you don't

20   know who's out there recording your music.

21        A     No.  It's -- we did a study once and found

22   thousands and thousands of all shapes and sizes.  But no.

23        Q     So any wannabe musician like me could go out and

24   record one of your songs?

25        A     You could.

1    Q    But I don't think mine would generate any money.

2         Sound Exchange, what is that?

3    A    Sound Exchange is the collection agency in the

4    U.S. market for streaming royalties.

5    Q    Have you been paid your Sound Exchange royalties

6    continuously over the course of the past 20 years?

7    A    No.  Unfortunately they were sent to and

8    distributed to the plaintiffs in this case.

9    Q    And you heard Paul Glass's testimony about he

10   thought the amount was $150,000?

11   A    Correct.  Yes.

12   Q    Is that your understanding?

13   A    Approximately that, yes.

14   Q    So that's money that's never been paid to you

15   from the Sound Exchange monies that were paid to Supertramp?

16   A    Correct.

17   Q    Now I want to talk about your work as a musician.

18   Is it correct that you -- this is the only work you have done

19   for the last 50 plus years?

20   A    Yes.  This is -- music is my life and my living,

21   yes.

22   Q    So you're, what, 73 years old now?

23   A    I'm 73.

24   Q    Since the age of 19, you have been working as a

25   professional musician?

```
 1        A        Yes.
 2        Q        Since leaving Supertramp, did you continue to
 3   work as a musician?
 4        A        I did.  Not straightaway -- yes, I did.
 5        Q        Did you pursue a solo career?
 6        A        I made two solo records, yes, and then I had an
 7   accident that put me out of commission for ten years.  But then
 8   I resumed in the year -- around the late '90s.
 9        Q        By the way, you didn't leave Supertramp
10   specifically to pursue a solo career, did you?
11        A        No.  That was not -- that was not the reason I
12   left.
13        Q        I think we talked about that on Friday with the
14   friction.
15                 Let's talk about these albums that were released.
16   When was your first solo album released?
17        A        In '84, I believe.  '83 or '84.  "In the Eye of
18   the Storm."
19        Q        So pretty much right about the time -- right
20   after the time you left Supertramp.
21        A        Right after, yes.
22        Q        And what happened with that album?
23        A        It was -- it was sabotaged actually by
24   Supertramp.  They -- on its release, Supertramp sued
25   A&M Records for the use of the name Supertramp on a sticker,
```

 1   and that really affected the success of that album.

 2              MR. GIVEN:  Objection.  Move to strike the word

 3   "sabotage."

 4              THE COURT:  Overruled.

 5       Q      BY MR. GUTMAN:  How about your next album after

 6   leaving Supertramp?

 7       A      Next album was in '87, an album called "Hai Hai."

 8   Unfortunately the week that was released I fell and smashed

 9   both of my wrists, and actually the doctor said I would never

10   play again.  So that did not help the album be a success

11   obviously.  So that kind of killed that one.

12       Q      Now, as a result of that accident, you were

13   unable to tour professionally?

14       A      Yes.  I was unable to do anything for quite a

15   while.

16       Q      If I understand correctly, you play keyboards?

17       A      I play keyboards and guitar, yes.

18       Q      So for some period of time, you were unable to

19   play?

20       A      Yes.  I didn't know if I would ever play again,

21   but it took me a year, year and a half to come back.

22       Q      Did you eventually get back in to playing

23   professionally?

24       A      I did, yes.

25       Q      When was that?

1          A          In 1998 I did an album with my son.

2          Q          You toured behind that?

3          A          I did a small tour, yes.

4          Q          I believe we heard about Mr. Helliwell and

5     Mr. Siebenberg had joined you at various times in the late '90s

6     and up in 2000s?

7          A          Yes, they did.

8          Q          Tell us about after 2000 what type of musical

9     work have you been doing?

10         A          I made a studio record in 2000 and from 2000 --

11    well, that was also a time when I went through a very difficult

12    divorce for three years.  But after that and -- during that I

13    started touring.  I did a Ringo tour with Ringo Starr that

14    really reignited something inside of me.  Then I started to go

15    on tour initially totally by myself because I actually didn't

16    have a rolodex of musicians to call upon but then slowly did a

17    duo show and then eventually a band tour and toured straight

18    for about 18, 19 years.

19         Q          Up until what?  2019?

20         A          Until actually 2000 -- until COVID hit.  What was

21    that, 2020?

22         Q          You put together your own band --

23         A          Yes, I did, uh-huh.

24         Q          I think you need to answer audibly.

25         A          Sorry.  Yes, I did.

 1          Q       But for COVID, would you have continued touring?

 2          A       Yes.  I had almost 100 shows planned for that

 3     year that I had to cancel.

 4          Q       Any plans to tour again?

 5          A       If I -- if I can finish this lawsuit, I'd love to

 6     tour again, yes.

 7          Q       All right.  When you're performing, do you

 8     continue to perform the songs you wrote while you were a member

 9     of Supertramp?

10          A       They're my babies.  I played them and I adored

11     every night, yes.

12          Q       Now, the subject was mentioned about this topic

13     of rerecords.  Do you recall that?

14          A       Yes.  Yep.

15          Q       Tell us how these rerecords came about.

16          A       Well, actually, I believe it was around 2006 that

17     the head of Universal Publishing asked me if I would be

18     interested to make a rerecord because Supertramp was charging

19     way too much for the syncs -- sync requests and a lot of money

20     was being lost.  So I agreed to it and made a rerecord of "Give

21     a Little Bit" in the studio that he put me in.  That was the

22     first rerecord.  A few years later -- well, a few years later,

23     I recorded a lot of my shows.  And from the recordings from the

24     shows I made, they were really good, and I started using those

25     as rerecords as well.

1    Q        Now, is this similar to what I have heard about

2   Taylor Swift, what she was doing?

3    A        Totally.  Well, yes.  It's because she wanted to

4   have ownership and get her songs back, and that's really very

5   much what I did with my rerecords.  They're under my control,

6   and I can do what I want with them.  Very much like that.

7    Q        So the songs that you wrote --

8    A        Yes.  They're all songs that I wrote.

9    Q        And using musicians other than the members of

10  Supertramp who played on the original recordings?

11   A        Correct.

12   Q        There was an allegation made that you

13  misrepresented that one of your rerecords was actually a

14  Supertramp recording.

15           Did you hear that?

16   A        I heard it.

17   Q        Did you ever do that?

18   A        No.

19   Q        Why wouldn't you do that?

20   A        First of all, I never saw that letter, never

21  heard about it.  Why?  Because, when I left Supertramp, my

22  whole purpose was to build my own name and connect my name with

23  my songs.  So actually there was a clause in all the agreements

24  that was signed for anyone who wanted to use the song that the

25  word "Supertramp" is not to be used in any shape or form.

```
 1                  MR. GUTMAN:  Fantastic.  I have nothing further.

 2                  THE COURT:  Cross-examination.

 3                  MR. GIVEN:  Thank you, Your Honor.

 4                          CROSS-EXAMINATION

 5    BY MR. GIVEN:

 6          Q      Mr. Hodgson, good morning.

 7          A      Good morning.

 8          Q      I'm delighted to finally meet you and to talk to

 9    you about the history of Supertramp.

10                  Before I begin my examination, Your Honor, I'd

11    like to read or I guess play into the record three excerpts

12    from Mr. Hodgson's videotaped deposition.  This is from

13    volume I, June 7, 2023.  Page 112, line 20, to page 113,

14    line 11; page 114, lines 9 to 16; and page 115, lines 5 to 15.

15                  THE COURT:  All right.  Any objection?

16                  MR. GUTMAN:  No objection.

17                  THE COURT:  All right.  Go ahead.

18          (The video commenced playing before the jury.)

19          Q      BY MR. GIVEN:  Mr. Hodgson.

20          A      Yes.

21          Q      Over here.

22                  Sabotage, that's a pretty strong word.

23          A      It is.

24          Q      And that had to do with your use of the

25    Supertramp name in connection with your solo career?
```

```
 1        A        That had to do with the way A&M, whatever they

 2   put on the sticker on my album.  I think they were claiming

 3   that it was used erroneously or something.  Yes.

 4        Q        The name Supertramp was being used erroneously?

 5        A        The name Supertramp was on the sticker.

 6        Q        Do my three clients control the name Supertramp?

 7        A        It has changed, I believe, over the years.

 8        Q        Changed over the years?

 9        A        Actually, to tell you the truth, I don't know.

10        Q        Does Mr. Davies control the name Supertramp, sir?

11        A        I know they have trademarked the name, yes.

12        Q        Pursuant to your Withdrawal Agreement, there is a

13   provision in there that discusses Mr. Davies's right in that

14   name; correct?

15                 Do you recall that?

16        A        In my Withdrawal Agreement.  Can you repeat the

17   question?

18        Q        In your Withdrawal Agreement, there is a

19   provision that covers the ownership of the name Supertramp.

20                 Do you recall that?

21        A        Not as I sit here today, but I presume it because

22   I was giving Rick and these three guys the name, yes.

23        Q        You were giving Mr. Davies the name?

24        A        Mr. Davies.  Sorry.  Right.

25        Q        My three clients have no rights in the name; is
```

1    that right?  To your understanding?

2        A    They do not have rights in the trademark.

3        Q    So the plaintiffs couldn't have sabotaged your

4    first solo record; right?

5        A    I don't know who sent that letter and how -- what

6    happened, but it was -- I'm not sure who it was.

7        Q    It was a letter, not a lawsuit.  You described it

8    as a lawsuit in your testimony.  There was no lawsuit.

9        A    No.  It was a threat to A&M Records.

10        Q    It was a threat that was made by Mr. Davies's

11    attorney; correct?

12        A    Quite possibly.

13        Q    I have a couple of notes from your narrative on

14    Friday, Mr. Hodgson.

15        A    Uh-huh.

16        Q    You said on Friday that the band had no business

17    manager before Paul Glass, but Norton Warborough was the

18    business manager before Paul Glass; correct?

19        A    I believe so.

20        Q    You also said the band had no attorney at that

21    time.

22        A    At which time?

23        Q    This was back before Paul Glass began in 1978

24    when you were in London and the band was represented by

25    Tony Demetriades.  You recognize that name; right?

1    A    I know who Tony Demetriades is.  I do not recall

2  him being involved with Supertramp.

3    Q    He helped your band get the first record deal at

4  A&M Records in 1973; correct?

5    A    I don't remember that at all.

6    Q    Mr. Demetriades went on to manage Tom Petty.  You

7  know that; right?

8         You also left the name Pulsar out of your

9  testimony.  Pulsar was the company that the first incarnation

10  of Supertramp originally had its first record deal with;

11  correct?

12    A    Correct.  He was what I would term the manager at

13  that time.

14    Q    And Pulsar had the agreement with A&M Records;

15  correct?

16    A    Yes.

17    Q    You haven't seen a contract in this courtroom,

18  have you, between that original incarnation of Supertramp and

19  A&M Records, have you?

20    A    I don't believe so.

21    Q    Let's talk a minute about Dougie Thomson.  He's

22  in the courtroom with us.  Wasn't Mr. Thomson on that

23  disastrous tour that you described to Norway?

24    A    I heard his testimony that it was him.  To tell

25  you the truth, I thought it was someone else.

1          Q        It was that tour that led to the band falling

2    apart in 1972; right?

3          A        Correct.

4          Q        Those were your words on Friday.

5          A        Correct.

6          Q        Wasn't Mr. Thomson also at that first meeting at

7    A&M Records that you had with Derek Greene?

8          A        I believe he was, yes.

9          Q        And you hadn't met Derek Greene before that

10   meeting; right?

11         A        I don't think so, no.

12         Q        You hadn't met Dave Margereson either before that

13   meeting, had you?

14         A        No, I hadn't.

15         Q        You said in your testimony Friday they didn't

16   even know who you were when you walked in the door at

17   A&M Records; right?

18         A        Well, they -- yeah.  A&M Records had changed and,

19   yes, they hadn't met us before.

20         Q        And didn't Mr. Thomson attend a lot of the

21   meetings at A&M Records at that early period before "Crime of

22   the Century"?

23         A        He did, yes.

24                  MR. GIVEN:  Put up Exhibit 74 on the board.

25         Q        Now, before the success that's reflected on the

```
 1    screen or will be reflected on the screen in a moment, is it
 2    fair to say that the band Supertramp was an unstable affair?
 3         A      Unstable --
 4                MR. GUTMAN:  Objection.  Vague and ambiguous.
 5                THE COURT:  Overruled.
 6         Q      BY MR. GIVEN:  You may answer.
 7         A      We were still developing.
 8         Q      Before my three clients joined up, the band went
 9    through nine different band members; right?  You and Mr. Davies
10    went through nine different musicians; correct?
11         A      I never added them up to tell you the truth, but
12    that sounds a bit right.
13         Q      I have a list of names.  Let me read them off to
14    you.
15                Keith Baker?
16         A      Yes.
17         Q      Richard Palmer?
18         A      Yes.
19         Q      In fact, he came up with the name Supertramp;
20    right?
21         A      Yeah.  He and I -- yes.
22         Q      Bob Millar?
23         A      Bob Millar, yes.
24         Q      David Winthrop?
25         A      Correct.
```

```
 1          Q       Frank Farrell?

 2          A       Correct.

 3          Q       Kevin Currie?

 4          A       Correct.

 5          Q       David List?

 6          A       Who?

 7          Q       David List?

 8          A       No.

 9          Q       Dickie Thomas?

10          A       No.

11          Q       Nick --

12          A       Not that --

13          Q       Nick South?

14          A       No.

15          Q       And when my three clients joined up with you and
```

16 Mr. Davies, the band had neither a record deal or a manager;

17 right?

```
18          A       Yes.  I believe that the record deal we had was a
```

19 two-album deal.  So I guess that was completed.

```
20          Q       No record deal.

21          A       Correct.

22          Q       No manager.

23          A       Correct.

24          Q       And the record deal the band finally did get in
```

25 October of 1973 was a product at least in part of

1    Dave Margereson's belief in the band; right?

2         A       Yes, it was.

3         Q       His belief in you.

4         A       Yes.

5         Q       You heard Mr. Siebenberg say Dave Margereson

6    loved Roger Hodgson.  You said on Friday that relationship

7    remained good for a long time, remember?

8         A       Yes.

9         Q       By the way, you don't believe my three clients

10   were some afterthought because of a clerical error on that

11   first A&M contract, do you?

12        A       No.

13        Q       "Crime of the Century" was a team effort, was it

14   not, sir?

15        A       It was.

16        Q       Product of almost a year of rehearsing and

17   recording together.

18        A       It was.

19        Q       And its success, a product at least in part, of

20   the band's sensational live performance on tour.

21        A       I think actually even more it was the success of

22   a hit single which really -- that's the biggest thing that

23   makes an album successful.

24        Q       70 dates over ten months just as you testified;

25   right?

```
 1        A       Yes.

 2        Q       Everyone mucking in as Mr. Helliwell put it;

 3   right?

 4        A       As John said, yes.

 5        Q       And as you said at your deposition and said from

 6   the stand, a lot of work, right, to make "Crime of the Century"

 7   successful?

 8        A       It was a lot of fun work, yes.

 9        Q       Both on "Crime of the Century" and all the other

10   records you made with my three clients; right?

11        A       Yes.  We worked hard, and we enjoyed it.

12        Q       You worked hard for ten years together; correct?

13        A       Yes.  Correct.

14        Q       "Crime of the Century" was the biggest success

15   you had by far in your music career up to that time.  Isn't

16   that so?

17        A       Correct.

18        Q       And the band followed up with two more albums

19   before the end of 1977.

20        A       Correct.

21        Q       Three records in a little more than three years.

22                That sounds like a -- you have to answer audibly,

23   sir.

24        A       Yes.

25        Q       That sounds like a lot of hard work to me.
```

1        A       That does sound like, wow, did we really do that?

2        Q       Knowing what I know about the music business.

3        A       Yes.

4        Q       Those three records included "Even in the

5    Quietest Moment."  That record sold 10 million copies; right?

6        A       I believe you, yes.

7        Q       That record was released in April of 1977; right?

8        A       That sounds right, yes.

9        Q       That was the same year you all signed your

10   Memorandum of Agreement; right?

11       A       Yes.

12       Q       Let's talk about the lead-up to that agreement.

13               You claim that there was a meeting in 1975 in

14   which Mr. Margereson suggested that your and Mr. Davies's song

15   income should be shared with the other band members.  Do you

16   remember that testimony?

17       A       Yes, I do.

18       Q       You don't remember any other conversations on

19   that subject, however?

20       A       I do not, no.

21       Q       That was your testimony on Friday, and that was

22   your testimony that we just looked at at your deposition;

23   correct?

24       A       Yes.  Yes.

25       Q       And you and Mr. Davies agreed at this meeting to

```
1    share song income with the plaintiffs; right?

2         A     The '77 agreement meeting, you mean?

3         Q     1975 agreement.

4         A     1975, yes.  They were -- as they have all

5    testified, they needed money, and the only money coming in was

6    the publishing, and Rick and I agreed to share that.

7              MR. GIVEN:  Your Honor, with permission, I'd like

8    to play a clip from Mr. Hodgson's deposition.  This is the

9    first volume of the P.M.K., page 116, lines 18 to 25.

10             THE COURT:  Depo dated December 14, 2023?

11             MR. GIVEN:  I'm sorry.  No.  I think it's June 7

12   of 2023.  The first date of the three dates.

13             THE COURT:  June 7.  Okay.  What page?  I'm

14   sorry.

15             MR. GIVENS:  Bear with me, sir.  Page 116,

16   lines 18 to 25.

17             THE COURT:  All right.  You may proceed.

18           (The video commenced playing before the jury.)

19        Q     BY MR. GIVEN:  Last, Mr. Hodgson -- nonetheless,

20   you said at your deposition, Mr. Hodgson, that you felt

21   ambushed I think was the word you used; right?

22        A     Yes.

23             MR. GIVEN:  All right.  Let's put Exhibit 8 up on

24   the board.

25        Q     But you didn't sign the contract on the screen
```

1    until two years later; right?

2         A     Correct.

3         Q     So you weren't ambushed then, were you?

4         A     I don't know.  The only thing I remember that was

5    signing five documents in the studio in a ten-minute break from

6    mixing, and I can't tell you whether -- if or whether I even

7    read any of them to tell you the truth.

8                   MR. GIVEN:  Move to strike as nonresponsive,

9    Your Honor.

10                  THE COURT:  Stricken.  Ask your next question.

11        Q     BY MR. GIVEN:  The question asks for a yes or no,

12   sir.

13                  You weren't ambushed then, were you?  You had two

14   years to think it over; right?

15        A     Yes.  I had been thinking about it for two years.

16        Q     You know, by the way, you mentioned being in the

17   studio.  You know it was not common practice for the band to

18   sign important legal documents in the studio; right?

19        A     It didn't happen that often, but it did happen at

20   that time.

21        Q     What we are looking at, by the way, on the

22   screen, sir, that's an important legal document; right?

23        A     Yes.

24        Q     That's why we're here.

25        A     Yes.

```
 1        Q       And you say you didn't even read it.

 2        A       I'm not sure if I read it to tell you the truth,

 3   but I knew it was happening.  But the situation had not

 4   changed.  The band was not making any other money other than

 5   what Rick and I were sharing through the --

 6                MR. GIVEN:  Move to strike everything after "I'm

 7   not sure I read it" I think was the testimony.

 8                THE COURT:  Sustained.  Stricken.

 9        Q       BY MR. GIVEN:  Now, you didn't read it even

10   though you come from an educated background; right?

11        A       Yes.

12        Q       A privileged background; correct?

13        A       It's considered that in England, yes.

14        Q       Went to two different boarding schools; right?

15        A       Yes.

16        Q       Stowe School?

17        A       Stowe School, yes.

18        Q       And Woodcote?

19        A       Correct.

20        Q       And your family home is a titled estate called

21   Coolings; right?

22        A       Estate?  Not an estate.

23                MR. GUTMAN:  Objection.  Relevance.

24                THE COURT:  Sustained.

25        Q       BY MR. GIVEN:  Your father was an admiral in the
```

1   Royal Navy?

2              MR. GUTMAN:  Objection.  Relevance.

3              THE COURT:  Sustained.

4      Q      BY MR. GIVEN:  You must have had some idea when

5   you signed Exhibit 8 what the main points of this were, though,

6   before you signed it; right?

7      A      I knew that the agreement was still -- nothing

8   had changed since 1975, yes.

9      Q      All right.  So there is no difference between

10  what you agreed to in 1975 and Exhibit 8; right?

11     A      We were still sharing some money with the guys

12  because they didn't have any.  That was the only money

13  available.

14     Q      And whether you read Exhibit 8 or not, you

15  understood that everyone else who signed assumed you read it;

16  right?

17     A      Sorry.  Can you repeat your question?

18     Q      Whether you read Exhibit 8 or not, Mr. Hodgson,

19  you understood that everyone else who signed it assumed you had

20  read it; right?

21     A      I don't know that.  I can't assume that.

22     Q      It's a contract; correct?

23     A      It is a contract.

24     Q      Valid and enforceable contract; right?

25             MR. GUTMAN:  Objection.  Legal conclusion.

 1                    THE COURT:  Sustained.

 2        Q        BY MR. GIVEN:  Just like all those other

 3    contracts we have been looking at for the last week; right?

 4        A        It's a contract.

 5        Q        It's drafted by a lawyer.

 6        A        Yes.

 7        Q        Drafted by your lawyer Mr. Cooper.

 8                    MR. GUTMAN:  Objection.  Foundation.  Assumes

 9    facts.

10                    THE COURT:  He may answer if he knows.

11                    THE WITNESS:  I actually -- I have learned about

12    Mr. Cooper.  I'm not sure I even met Mr. Cooper.  I'm realizing

13    in hindsight from this process and the last three years that he

14    represented Supertramp.  I don't remember any of that.

15        Q        BY MR. GIVEN:  He represented Supertramp for

16    several years; right?

17        A        So they tell me.

18        Q        And you never met Mr. Cooper --

19        A        I don't believe -- I don't remember meeting him,

20    no.

21        Q        And in this contract, promises were made; right?

22                    MR. GUTMAN:  Objection.  Calls for legal

23    conclusion.

24                    THE COURT:  Overruled.

25        Q        BY MR. GIVEN:  You made promises in this

```
 1    document; right?
 2                    MR. GUTMAN:  Objection.  Argumentative.
 3                    THE WITNESS:  No, I would not --
 4                    THE COURT:  Overruled.
 5                    THE WITNESS:  I would not describe it that way.
 6         Q      BY MR. GIVEN:  And one promise was that
 7    Delicate Music --
 8                    If you will scroll down to paragraph 3, please,
 9    Mr. O'Malley.
10                    Quote, "Shall administer the songs."  Do you see
11    that language in paragraph 3?
12                    MR. GUTMAN:  Objection.  Argumentative.
13    Foundation.
14                    THE COURT:  Overruled.
15         Q      BY MR. GIVEN:  Do you see that language in
16    paragraph 3, Mr. Hodgson?
17         A      I see paragraph 3 and Delicate Music, yes.
18         Q      That was a promise you made; right?
19                    MR. GUTMAN:  Objection.  Legal conclusion.
20    Argumentative.  Foundation.
21                    THE COURT:  Sustained.
22         Q      BY MR. GIVEN:  And you heard testimony before and
23    I think you gave some testimony to the jury today about what
24    the word administer means; correct?
25         A      Was it -- I wasn't talking about administer.
```

```
 1    Where did that come from?

 2         Q      It's right in the agreement.  What does

 3    Delicate Music do?  You just described it to us.

 4         A      Right.  That was discussed earlier about

 5    Delicate Music administering the monies.

 6         Q      What does that mean?

 7         A      That means that the monies that were -- that came

 8    in from different sources went to Delicate and then were

 9    disseminated to the members of the band.

10         Q      And you had to authorize that, right, as the

11    songwriter?

12         A      Yes.

13         Q      You had to tell ASCAP and Universal Music Group

14    to pay Delicate instead of paying you; right?

15         A      I didn't do that.  That was taken care of by the

16    manager.  He did all that.

17         Q      But it was done on your behalf; correct?

18         A      It was -- yes.  I trusted him.

19         Q      And you've understood the term administer for

20    quite a long time; right?

21         A      I know what the word means.

22         Q      All that being said, sir, at your deposition you

23    call this contract a gift.  Do you remember that testimony?

24         A      Yes, I do.

25         Q      In fact, you wanted a thank you from the three
```

1    members that I represent of Supertramp for this gift.  Do you

2    remember that testimony?

3        A       I don't remember the testimony, but I do feel

4    that some gratitude is deserving, yes.

5        Q       But in 1977, sir, you and Mr. Davies had really

6    good reasons to make those promises to the other band members;

7    right?

8                MR. GUTMAN:  Objection.  Argumentative as

9    referring to promises.

10               THE COURT:  Overruled.

11               THE WITNESS:  They were still needing money.

12       Q       BY MR. GIVEN:  To keep the other band members

13   happy; right?

14       A       Sorry.  Say it again.

15       Q       To keep the other band members happy.

16       A       To keep the band functioning and happy, yes.  I

17   mean, I wasn't going to say, no, you can't have any money, I

18   want it all.  No.  I was wanting the band to be successful, and

19   everyone needed money to live.  Full stop.

20               MR. GIVEN:  Strike everything after the word

21   "happy," Your Honor, as nonresponsive.

22               THE COURT:  Overruled.

23       Q       BY MR. GIVEN:  You wanted to continue to work

24   with my three clients; right?

25       A       Yes.

1    Q      You thought it was to your benefit to continue to

2    work with my three clients; right?

3    A      Correct.

4    Q      You and Mr. Davies both had really good reasons

5    to keep the other band members rehearsing, recording, and

6    touring with you; correct?

7    A      Correct.

8    Q      To keep mucking in; right?

9    A      Correct.

10    Q      And they did keep mucking in after you signed the

11    1977 contract on the screen; right?

12    A      We kept working.

13    Q      And that turned out pretty good for you.

14    A      It turned out pretty good for all of us.

15    Q      Because the next album you five guys did was

16    "Breakfast in America."

17    A      Correct.

18    Q      The biggest album you guys had by far.

19    A      Yes.

20    Q      And that album took eight months to record.

21    A      It did.

22    Q      Months more to rehearse.

23    A      Yes.  We rehearsed quite a long time.

24    Q      Both before recording and before touring; right?

25    A      Probably.

1     Q     Whole process collectively probably took over a

2  year; correct?

3     A     Probably.

4     Q     It was almost two years between release of

5  "Quietest Moments" and "Breakfast in America"; right?

6     A     I don't -- I'm not recollecting that but if you

7  say so.

8     Q     Four times Platinum here in the U.S.; right?

9     A     Something like that.

10     Q     You have those plaques on your wall at home,

11  don't you?

12     A     No.

13     Q     30 million albums sold.

14     A     It did well.

15     Q     That album alone is a career in the music

16  business; right?

17          MR. GUTMAN:  Objection.  Argumentative.

18          THE COURT:  Overruled.

19          THE WITNESS:  It's something I'm very proud of.

20     Q     BY MR. GIVEN:  And it's possible, isn't it,

21  Mr. Hodgson, that the "Breakfast in America" album would never

22  have happened if you had not agreed to share song income with

23  my three clients?

24          MR. GUTMAN:  Objection.  Speculation.

25  Foundation.

```
 1                    THE COURT:  Sustained.

 2                    MR. GIVEN:  Exhibit 81, please.

 3          Q        You remember the time.  This is back in 1979.  I

 4   was a senior in high school if you can believe that.  I

 5   remember the record.  I assume you remember the time as well.

 6   You recognize that photograph; right?

 7          A        I recognize the photo, yes.

 8                    MR. GIVEN:  Technical difficulties, Your Honor.

 9                    THE COURT:  I thought it was a rendition of

10   "Breakfast in America."

11          Q        BY MR. GIVEN:  So let's take a trip back to 1979.

12   This is the prime of your and the other four guys' professional

13   life; right?

14          A        It was the peak, yes.

15          Q        As reflected in the photograph, you guys packed

16   your bags.

17                    THE COURT:  Nothing is on the -- there we go.

18          Q        BY MR. GIVEN:  Do you see that?

19          A        Yes.  We were --

20          Q        And you geared up to go out for the "Breakfast in

21   America" tour; right?

22          A        I don't remember when this was.  It sounds about

23   right.  We kind of looked like tramps.

24          Q        And that tour was by far the biggest and most

25   lucrative tour you five guys had ever done to that date; right?
```

1    A    Yes.  Until that time, yes.

2    Q    It's possible, Mr. Hodgson, is it not, that that

3    tour would never have happened had you not agreed to share song

4    income with my three clients?

5         MR. GUTMAN:  Objection.  Foundation.

6    Speculation.

7         THE COURT:  Sustained.

8    Q    BY MR. GIVEN:  Touring helped to keep the

9    Supertramp music alive; right?

10   A    It was part of what made it all work, yes.

11   Q    It was an important promotional and marketing

12   tour; right?

13   A    Yes.

14   Q    And that tour lasted until the end of 1979.

15   A    Correct.

16   Q    At which point Supertramp could probably lay

17   claim to being the biggest band in the world; right?

18   A    I'm not sure.  We were -- yes.  We had definitely

19   made a mark, yes.

20   Q    Maybe not Tay Tay or Beyoncé but Maroon 5.  Do

21   you know who Maroon 5 is?

22   A    I know the name.

23   Q    By then or shortly after the record royalties

24   were certainly rolling in, weren't they?

25   A    They didn't come in straightaway.  Record

1  royalties take a good year at least before they roll in.  But

2  in '81 I believe they came in.

3      Q      And you didn't terminate the 1977 agreement then,

4  did you?

5      A      I did not.

6      Q      You didn't even mention it to anyone, did you?

7      A      Not to the band, no.

8      Q      And that's because you never had that right;

9  correct?

10             MR. GUTMAN:  Objection.  Foundation.  Legal

11  conclusion.

12             THE COURT:  Sustained.

13      Q      BY MR. GIVEN:  Instead, you came off the road

14  after ten months and launched into a renegotiation into your

15  record and music publishing deals.

16             Do you remember that?

17      A      Vaguely.

18      Q      And you ended up with the richest deal

19  A&M Records had ever offered a recording artist to that date.

20      A      So I have been told.

21      Q      We have looked at this photograph before.

22      A      Uh-huh.

23      Q      I'm guessing you remember the occasion.  Do you

24  remember the occasion?

25      A      To tell you the truth, I don't, but it rings a

```
 1   bell vaguely.

 2        Q      This is a photograph commemorating your signing

 3   that agreement.

 4        A      I see what it is, and I see the people there.

 5        Q      You see the big pile of legal paperwork.

 6        A      Yes.

 7        Q      You recognize yourself in this photograph; right?

 8        A      Yes, I do.

 9        Q      That would be standing third from the left, is

10   that you?

11        A      Correct.

12        Q      You recognize all or almost all of the people in

13   this photograph?

14        A      Most of them.

15        Q      They don't take photographs like this at every

16   record industry signing, do they?

17               MR. GUTMAN:  Objection.  Foundation.

18               THE COURT:  Calls for speculation.  Sustained.

19        Q      BY MR. GIVEN:  This was a big deal, Mr. Hodgson,

20   in the life of the band; correct?

21        A      Well, I have been -- the success we had achieved

22   was a big deal, yes.  Yes.  I mean, we re-signed.  I don't

23   remember it as a, wow, at that time.

24        Q      You don't remember this occasion as a wow?

25        A      I'm sorry I don't.  I was very happy to be with
```

1   A&M Records and happy that we were re-signing with them.

2        Q       All the band and Mr. Pope were there.

3        A       Yes.

4        Q       Must have been a thrill to be in the same room

5   with Herb Alpert who was sitting second from the left.

6                MR. GUTMAN:  Objection.  Relevance.

7                THE COURT:  Sustained.

8        Q       BY MR. GIVEN:  Do you see him?

9        A       I do see him.

10       Q       I would have been thrilled.

11               MR. GUTMAN:  Objection.  Relevance.  Move to

12  strike the editorial comments by counsel.

13               THE COURT:  Sustained.

14               Counsel, just please ask questions of the

15  witness.

16               MR. GIVEN:  Thank you, Your Honor.

17       Q       The head of the music publishing company was

18  there, Lance Freed.  Do you see him?

19       A       Lance Freed, yes.

20       Q       Your lawyer was there, Mr. Leonard?

21       A       Yes.

22       Q       Your accountant Mr. Glass was there.

23       A       Yes.

24       Q       Your manager Mr. Margereson was there.

25       A       Yes.

 1          Q       That's the professional team; right?  Lawyer,

 2    accountant, manager that Mr. Jampol spoke of last week.

 3    Remember?

 4          A       Yes.

 5          Q       And that deal was something that you continue to

 6    benefit from; is that correct?

 7          A       Which deal?  This signing this --

 8          Q       When you signed in 1981.

 9          A       I hope so, yes.

10          Q       And you will continue to benefit from it for as

11    long as those records continue to sell; right?

12                  MR. GUTMAN:  Objection.  Relevance.

13                  THE COURT:  Overruled.

14                  THE WITNESS:  Yes.

15          Q       BY MR. GIVEN:  Or be downloaded; right?

16          A       I think -- I mean, it's a miracle it's been going

17    this long, but they still seem to be popular.

18          Q       Or be streamed and listened to; right?

19          A       Yes.

20          Q       And it's possible, is it not, Mr. Hodgson, that

21    this deal, the richest of its kind at that time, would never

22    have happened had you not agreed to share song income with my

23    three clients?

24                  MR. GUTMAN:  Objection.  Foundation.

25    Speculation.  This is argumentative.

```
 1                    THE COURT:  Sustained.

 2                    MR. GUTMAN:  This is the third time he's asked

 3    the same sustained question.

 4                    THE COURT:  Sustained.

 5        Q      BY MR. GIVEN:  In any event, during the yearlong

 6    negotiation in which your entire team was engaged, there was no

 7    change at all to the song income sharing arrangement among the

 8    band members; correct?

 9                    MR. GUTMAN:  Objection.  Asked and answered.

10                    THE COURT:  Sustained.

11        Q      BY MR. GIVEN:  In fact, you never even discussed

12    that possibility with anyone at that time, did you?

13                    MR. GUTMAN:  Objection.  Asked and answered.

14                    THE COURT:  Sustained.

15        Q      BY MR. GIVEN:  Now, you didn't terminate that

16    arrangement at any point in the one-year period leading up to

17    this agreement; correct?

18                    MR. GUTMAN:  Objection.  Asked and answered.

19                    THE COURT:  Sustained.

20        Q      BY MR. GIVEN:  And that's because you never had

21    that right, isn't it?

22                    MR. GUTMAN:  Objection.  Argumentative.  No

23    foundation.  Legal conclusion.

24                    THE COURT:  Sustained.

25        Q      BY MR. GIVEN:  Later you did make a slight change
```

1    to that agreement, though, right?  Income sharing arrangement?

2    I assume you remember that.

3         A       Yes, I do.

4         Q       But only with respect to the song income from

5    "Famous Last Words"; right?

6         A       Yes.  That's where it ended up, yes.

7                 MR. GIVEN:  Exhibit 15, please.

8         Q       This is the memorandum that Mr. Glass prepared

9    memorializing that agreement.  I assume you have seen it

10   before.  I will put it up on the screen just to make sure.

11               You recognize this document, don't you?

12        A       I have seen it lately quite a few times, yes.

13                MR. GIVEN:  Scroll down to the piece that talks

14   about new publishing agreement.

15        Q       Do you see that down below that is general, "the

16   majority of the meeting was spent discussing publishing."  Do

17   you see that?

18        A       I do.

19        Q       You did discuss publishing at that meeting, but

20   you only changed the song income for "Famous Last Words";

21   correct?

22        A       Correct.

23        Q       No changes at all to the splits on the first five

24   records; correct?

25        A       Correct.

1        Q       And no changes even though later you demanded

2   from the other band members more money and more credit from

3   them; right?

4        A       What are you referring to?

5        Q       I'm referring to the three-day meeting that you

6   called in early or middle of 1981, '82.  You called a three-day

7   meeting of the band in Los Angeles.

8                Do you remember that?

9        A       I'm trying to remember.

10       Q       The other band members including Mr. Davies, they

11  weren't down with the program of giving you more money and more

12  credit for Supertramp material; right?

13       A       I'm actually not -- I'm not sure which meeting

14  you are referring to to tell you the truth.  This is the first

15  I'm hearing of it.  What are you claiming?  What are you saying

16  I'm saying?

17       Q       I'm the one asking the questions, Mr. --

18       A       All right.  I'm sorry.

19               MR. GUTMAN:  Objection.  Argumentative.

20               THE COURT:  Overruled.

21               Next question, please.

22       Q       BY MR. GIVEN:  You don't remember a meeting that

23  you called in Los Angeles in 1982 with all the band members

24  present and their wives to discuss band business?  You hosted

25  that meeting; right?

```
 1        A       I did?

 2        Q       Now you're saying you remember it.

 3        A       No.

 4                MR. GUTMAN:  Objection.  May I just ask can the

 5    attorney allow the witness to finish his answer before

 6    interrupting?

 7                THE COURT:  Next question, please.

 8                MR. GIVEN:  My apologies.

 9                THE WITNESS:  "I did" was actually a question.  I

10    was surprised to hear you say that.  I do not remember this

11    meeting, and I'm not quite sure what you're claiming was done

12    there.

13        Q       BY MR. GIVEN:  But you eventually blew the whole

14    Supertramp project up for a solo career; right?

15                MR. GUTMAN:  Objection.  Argumentative.

16                THE COURT:  Sustained.

17        Q       BY MR. GIVEN:  What was the first album you put

18    out after Supertramp?  I think you mentioned it.  "In the Eye

19    of the Storm"?

20        A       Correct.

21                MR. GIVEN:  I have a cover of it I'd like to show

22    the witness, Your Honor, with your permission.

23                THE COURT:  All right.

24                MR. GIVEN:  Permission to approach.

25                THE COURT:  Yes.
```

 1      Q       BY MR. GIVEN:  Do you recognize this record album

 2  cover --

 3      A       Yes, I do.

 4      Q       Do you recognize this as the cover of your first

 5  solo record --

 6      A       I do, yes.

 7      Q       -- after Supertramp?

 8      A       Uh-huh.

 9              MR. GIVEN:  I will move the cover into evidence

10  as Exhibit 85, Your Honor.

11              THE COURT:  Any objection?

12              MR. GUTMAN:  No objection.

13              THE COURT:  85 will be admitted.  Please make

14  sure the Court gets a copy of this.  If you have any more

15  audibles you're going to call, you need to let the Court know

16  in advance.

17              MR. GIVEN:  Will do.  I do have an extra copy for

18  Your Honor.

19          (Marked for identification and received

20          into evidence Exhibit No. 85.)

21      Q       BY MR. GIVEN:  "In the Eye of the Storm," that

22  record was released in October of 1984; right?

23      A       That sounds about right.

24      Q       That was two months before you signed your exit

25  agreement with the other guys in Supertramp; right?

1      A      Sounds right.

2      Q      Two of the tracks were songs you recorded for

3  "Famous Last Words" that didn't get used on that album; right?

4      A      Two tracks were slated for "Famous Last Words."

5  They didn't work out, and I redid them for this album, yes.

6      Q      And that record took you more than a year to

7  make; correct?

8      A      It took a while, yes.

9      Q      You were hard at work on "Eye of the Storm" while

10  the band was rehearsing for the "Famous Last Words" tour;

11  right?

12      A      Maybe.  There was actually an album I attempted

13  before this one that didn't work -- work out.  So I'm not quite

14  sure whether it was this one or that one.

15      Q      In fact, you missed a lot of those rehearsals,

16  didn't you, because you were working on your solo effort?

17      A      No.

18      Q      Who released "In the Eye of the Storm"?

19      A      Who released it?  A&M Records.

20      Q      Supertramp's record label; right?

21      A      Yes.

22      Q      What did Dougie Thomson say he told you?  He told

23  you to go for it, then come back; right?

24      A      Yes.  I don't remember that, but I believe he

25  would have said something like that.

 1      Q      And, in fact, when you were on the "Famous Last
 2  Words" tour, you would get up at every show and announce you
 3  were leaving for a solo career; right?
 4      A      I would get up and thank the audience for the
 5  support over the years and let them know I was leaving, yes.
 6      Q      Then you left, and you never returned.
 7      A      Yes.
 8      Q      So you made your deal with the band.  Remember?
 9  That's Exhibit 17, your Withdrawal Agreement.
10      A      Yes.  That was negotiated, yes.
11            MR. GIVEN:  Put that on the board, please.
12      Q      I believe you have testified in court,
13  Mr. Hodgson, this was a contract you actually read before
14  signing; right?  Your Withdrawal Agreement?
15      A      Probably more, yes.
16      Q      And that's because there were some very important
17  issues in your leaving the band; right?  I think that was your
18  testimony.
19      A      Yes.  This was leaving something that I put
20  14 years of my life into, and my attorney really wanted to make
21  sure I was not shafted and -- sorry -- treated right going
22  forward.
23            MR. GIVEN:  Move to strike everything after the
24  word "yes," please.
25            THE COURT:  Sustained.  Stricken.

1    Q    BY MR. GIVEN:  One issue that -- by the way, you

2   mentioned your attorney.

3    A    Yes.

4    Q    Her name was Michelle Anthony; right?

5    A    Yes.

6    Q    Very fine music industry lawyer; correct?

7    A    Beautiful person, yes.

8    Q    In fact, she went on to run Sony Music?

9    A    Yes.

10        MR. GIVEN:  With the Court's permission, I would

11   like to play a clip from the December 14 deposition.  This

12   would be page 51, lines 4 through 13, and page 52, lines 2

13   through 6.

14        THE COURT:  Any objection?

15        MR. GUTMAN:  I need a moment, please.

16        Your Honor, I believe there was an objection

17   asserted.  I can't match up whether or not --

18        MR. GIVEN:  I will represent to the Court it was

19   overruled, Your Honor.

20        THE COURT:  All right.  You may proceed.

21        (The video commenced playing before the jury.)

22    Q    BY MR. GIVEN:  You say you weren't thinking of

23   it, but Michelle Anthony was probably thinking of it; right?

24        MR. GUTMAN:  Objection.  Assumes facts.

25   Foundation.  Speculation.

```
 1              THE COURT:  Sustained.
 2        Q     BY MR. GIVEN:  So let's go back to Exhibit 17 for
 3   a minute and jump to page 40.
 4              You had an opportunity to review this with
 5   Ms. Anthony before you signed it?
 6        A     What is this?  The Withdrawal Agreement?
 7        Q     Uh-huh.  Make it bigger.  Yes.
 8              You had an opportunity to discuss it with your
 9   lawyer before you signed it; right?
10              MR. GUTMAN:  Objection.  Attorney/client
11   privilege.
12              THE COURT:  I will overrule it.
13              THE WITNESS:  Probably.
14        Q     BY MR. GIVEN:  You spoke to her about it many,
15   many times I assume; correct?
16              MR. GUTMAN:  Now it's attorney/client privilege.
17   Objection.
18              THE COURT:  Overruled.
19        Q     BY MR. GIVEN:  Right?  You talked to her a lot
20   about it?  She was your lawyer.  This was an important moment.
21              THE COURT:  Wait.  Ask the question and let the
22   witness have an opportunity to answer.  I don't need your
23   editorial.  Okay?
24              MR. GIVEN:  Thank you, Your Honor.
25              THE WITNESS:  I was very happy to have Michelle
```

```
 1    helping to put this agreement together.  It was a very
 2    important one.  You're saying how many times -- I went over and
 3    over it, no, I don't remember any of that.  I remember that she
 4    was very capable and really protecting me in leaving something
 5    and trying to make sure I was not taken advantage of in any
 6    way.
 7         Q      BY MR. GIVEN:  And to your knowledge, she never
 8    brought up ending the song sharing arrangement with the other
 9    guys; right?
10         A      My knowledge --
11                THE COURT:  Hold on.
12                MR. GUTMAN:  That is attorney/client privilege.
13                THE COURT:  Sustained.
14         Q      BY MR. GIVEN:  All right.  So you see her
15    signature?  She actually signed this agreement; right?
16         A      It looks like, yes.
17         Q      Approved as to form and content.  Do you see
18    that?
19         A      Sorry.  I don't -- approved as to form and
20    content?
21         Q      Yes.
22         A      I see that.
23         Q      All right.  So let's jump to page 36.  Do you see
24    your signature there at the top?
25         A      I do.
```

1    Q    It's actually signed twice, once individually;

2    right?

3    A    Correct.

4    Q    Once for Roger Hodgson Productions, Inc.;

5    correct?

6    A    Correct.

7    Q    And then jump to page 38.

8         You also signed for Delicate Music.  Do you see

9    that?

10   A    Yes.

11   Q    So you were making promises in this agreement for

12   both yourself and Delicate Music; right?

13        MR. GUTMAN:  Objection.  Argumentative.  Legal

14   conclusion.

15        THE COURT:  Sustained.

16   Q    BY MR. GIVEN:  So scroll back to page 14.  Let's

17   look at paragraph 7.4.  Do you see the sentence that begins

18   "Davies and Hodgson" about midway down?

19   A    Yes.

20   Q    I will read it to you.  "Davies and Hodgson agree

21   that Delicate shall continue in business and shall not be

22   dissolved notwithstanding the death or disability of either of

23   them until the expiration of all copyrights including renewal

24   terms owned in whole or in part by Delicate."

25        Do you see that language?

1       A       I do.

2       Q       And you agreed to that so that Delicate Music

3  would continue collecting and paying the song income for the

4  life of the songs; right?

5                  MR. GUTMAN:  Argumentative.  Document speaks for

6  itself.

7                  THE COURT:  Overruled.

8       Q       BY MR. GIVEN:  Right?

9       A       I see that Delicate would continue to do what

10 Delicate had been doing.

11      Q       And you agreed to that so that Delicate Music

12 would continue to do what it was doing; right?

13                 MR. GUTMAN:  Argumentative.  Asked and answered.

14                 THE COURT:  Overruled.

15                 THE WITNESS:  Well, all I can say is what's

16 written in there.  That's what I signed.

17      Q       BY MR. GIVEN:  And as far as who Delicate Music

18 was paying, that's recited at the beginning of the document;

19 right?  Let's look at recital G on page 2.  First sentence of

20 that recital reads, "Delicate Music is a California general

21 partnership, the partners of which are Davies and Hodgson."

22                 That was true at the time; correct?

23      A       Yes.

24      Q       It's still true today?

25      A       Yes.

1    Q    "Delicate operates under an oral partnership

2    agreement."  That was true then; right?

3    A    Yes.

4    Q    It's true today; right?

5    A    Yes.

6    Q    "Delicate's income is allocated among Davies,

7    Hodgson, Helliwell, Siebenberg, Thomson, Mismanagement,

8    Inc. --" Mismanagement, Inc., is Mr. Margereson's entity;

9    correct?

10    A    Yes.

11    Q    "-- and to a more limited extent Pope --" Pope is

12    Russell Pope; correct?

13    A    Yes.

14    Q    "-- in accordance with that certain Memorandum of

15    Agreement publishing dated as of January 18 of 1977."

16         That is Exhibit 8; right?  That's what we were

17    looking at before?

18    A    Yes.

19    Q    "As subsequently modified orally in March 1983."

20         That's the meeting we were talking about before,

21    right, where you agreed to change the splits on "Famous Last

22    Words"?

23    A    Is that what that refers to?  Okay.

24    Q    Okay.  Then as far as your interest in that

25    income, you stated that in paragraph 7.1, right?

```
 1                    Let's go to paragraph 7.1, page 12.

 2                    Right at the top, second sentence, "Hodgson shall

 3       continue to receive from Delicate in perpetuity --" and then

 4       you see the two figures, 27 percent; right?  Do you see that?

 5            A       I see it.

 6            Q       And 32.15 percent on "Famous Last Words"?

 7            A       I see it.

 8            Q       And the 27 percent pertains to the splits on the

 9       song income from the first five Supertramp albums; right?

10            A       Correct.

11            Q       And that first figure 27 percent, that figure is

12       the same figure reflected in the contract you signed in 1977;

13       right?  Should I show it to you to remind you?

14            A       No.  That's okay.  That was the figure agreed to

15       in '77, yeah.

16            Q       And the second figure is the same figure

17       reflected in the modification the band made to that contract in

18       March 1982; right?

19            A       Correct.

20            Q       You have the words "in perpetuity" here, the same

21       words your lawyer showed you on Friday; remember?

22            A       I see the words.

23            Q       These are the same words of Mr. Margereson's exit

24       agreement; right?

25            A       Yes, he has them too.
```

```
 1          Q       Same words that are in Mr. Pope's exit agreement;
 2    right?
 3          A       Yes.
 4          Q       By the way, you didn't terminate their interests
 5    in song income, did you?
 6          A       When?
 7          Q       Any time.
 8          A       Ask the question again.  Did I --
 9          Q       When they left, when Mr. Margereson left and
10    Mr. Pope left, you didn't terminate their interest in the song
11    income, did you?
12                  MR. GUTMAN:  Objection.  Assumes fact and
13    foundation.  I can explain.
14                  THE COURT:  Overruled.
15                  Why don't we take our morning recess at this
16    time.
17                  Ladies and gentlemen, please do not form or
18    express any opinion about the case until the matter is finally
19    submitted to you.  Don't talk with anyone about the case, don't
20    allow anyone to talk to you about the case, and do not conduct
21    any research of any kind on any subject matter connected with
22    the case.  Let's have you come back at 11:40, and we will go
23    until 12:30 or so for lunch.
24                  THE CLERK:  All rise for the jury.
25                  (The following proceedings were held in
```

```
 1                open court outside the presence of the jury:)

 2                     THE CLERK:  Please be seated.

 3                     THE COURT:  Why don't you step down.

 4                Mr. Gutman.

 5                MR. GUTMAN:  The only issue is the question which

 6    related to asking if Mr. Hodgson terminated when they left.

 7    The perpetuity language appears for Mr. Margereson and Mr. Pope

 8    in their Withdrawal Agreements.  So it makes no sense to say,

 9    did you terminate when they left?  The agreement was created

10    when they left.  That's the point.

11                     THE COURT:  All right.  All right.  It's noted

12    but overruled.

13                How much further do you think you have on cross?

14                     MR. GIVEN:  Let me check, Your Honor.  I'm more

15    than halfway done.  Maybe half an hour, 20 minutes to half an

16    hour.

17                     THE COURT:  All right.  So we will continue on.

18    Then we are working on the jury instructions.  And then you

19    said this will be your last witness.

20                     MR. GUTMAN:  Correct.

21                     THE COURT:  Then you will call a witness.  All

22    right.  We will see you back at 11:40.  Thank you.

23                     THE CLERK:  All rise.

24                (A recess was taken at 11:25 a.m.)

25                (The following proceedings were held in
```

```
 1              open court in the presence of the jury:)

 2              THE COURT:  All right.  Please continue,

 3   Mr. Given.

 4              MR. GIVEN:  Thank you, Your Honor.

 5       Q      I think there was a question pending when we

 6   broke off and a ruling was pending on the question.  I will ask

 7   the question again.

 8              Mr. Hodgson, when Mr. Pope left the band, you

 9   didn't terminate your song sharing arrangement with him, did

10   you?

11       A      No.

12       Q      And when Mr. Margereson left as personal manager,

13   you didn't terminate your song sharing arrangement with him,

14   did you?

15       A      No.

16       Q      I want to break off for a second and ask you to

17   look at Exhibit 13 in the binder.

18       A      In the binder.  Sorry.  Say it again.  Which one?

19       Q      13.

20       A      13, volume 1.  I haven't figured these out yet.

21   So what is the binder number?

22       Q      Volume 1, Exhibit 13.

23       A      I think I've got it.

24       Q      Do you recognize that agreement as the 1981 A&M

25   agreement that was signed by -- I wouldn't call it a ceremony,
```

1    but it was captured in the photograph.  Is that familiar to

2    you?

3         A    No.  But I see what it is.

4              MR. GIVEN:  All right.  I'm going to move

5    Exhibit 13 into evidence, Your Honor.

6              MR. GUTMAN:  No objection.

7              THE COURT:  All right.  Admitted.

8              MR. GIVEN:  Thank you, Your Honor.

9         (Marked for identification and received

10            into evidence Exhibit No. 13.)

11        Q    BY MR. GIVEN:  Now please turn to Exhibit 14.

12        A    Yes.

13        Q    Do you recognize that agreement as the 1981

14    songwriter and composer agreement with Almo Music?

15        A    I don't recognize it, but I know what it is.

16             MR. GIVEN:  We will move Exhibit 14 into

17    evidence, Your Honor.

18             THE COURT:  14 will be admitted.

19        (Marked for identification and received

20            into evidence Exhibit No. 14.)

21             MR. GIVEN:  Can you publish Exhibit 14 for a

22    moment.

23        Q    Mr. Hodgson, it will come up on the screen.  I

24    want to flip to the last page where the signatures are.

25             Do you see the signatures there?  You have signed

```
 1   on behalf of Delicate Music; right?

 2        A     Yes.

 3        Q     Above your signature is the signature of

 4   Mr. Davies?

 5        A     Correct.

 6        Q     Just in terms of what Delicate Music does, we

 7   talked a little bit about the term administration meaning that

 8   Delicate collects and distributes money.  But it actually does

 9   some other things too; right?  For example, reflected in this

10   agreement, it's granting rights to third parties; right?

11              MR. GUTMAN:  Objection.  Calls for legal

12   conclusion.  Foundation.

13              THE COURT:  Sustained.

14        Q     BY MR. GIVEN:  Does Delicate Music in the

15   ordinary course of its business grant rights to others?

16              MR. GUTMAN:  Objection.  Calls for legal

17   conclusion.

18              THE COURT:  Overruled.

19              THE WITNESS:  I am not aware of what you are

20   talking about.

21        Q     BY MR. GIVEN:  I'm talking about, for instance,

22   an agreement like this one.

23              MR. GUTMAN:  It's back to the legal conclusion.

24   Objection.  Legal conclusion.

25              THE COURT:  Overruled.
```

```
 1              THE WITNESS:  Yeah.  I don't even understand the
 2    question to tell you the truth.  My understanding of what
 3    Delicate does is what I have explained.
 4         Q     BY MR. GIVEN:  Let me ask you this.  When a
 5    request comes in for what is called a synchronization use --
 6    you understand that term; right?
 7         A     Yes.
 8         Q     That's a request by somebody to use a song in an
 9    audiovisual work; correct?
10         A     Yes.
11         Q     Who grants the right to that third party?  It's
12    Delicate Music; right?
13         A     No.
14         Q     It's not Delicate Music.  Who is it?
15         A     It's -- well, it's Universal, and it's myself.
16         Q     All right.  Okay.
17         A     If it's my song.
18         Q     All right.  Understood.  Thank you for that
19    clarification.
20              Let's go back to Exhibit 17, the
21    Withdrawal Agreement.  I want to go back to paragraph 7.1 for a
22    moment, Mr. Hodgson.
23              Now we go back to these percentages that are
24    stated here, the 27 percent for the first five records.  Do you
25    see that?
```

1    A    Yes.

2    Q    The 32.15 percent for "Famous Last Words"; right?

3    A    Yes.

4    Q    Isn't it the case that since you have stopped

5    paying my three clients, you have actually been receiving more

6    than the percentages stated here?

7                MR. GUTMAN:  Objection.  Argumentative.

8                THE COURT:  Overruled.

9                THE WITNESS:  Repeat the question, please.

10    Q    BY MR. GIVEN:  If you're not paying my clients

11    their entitlements under the 1977 agreement, then you're

12    receiving more than the 27 percent and the 32.15 percent stated

13    here; right?

14    A    Money has continued to come in, and I don't know

15    whether I describe it as receiving.  It is either in the

16    Delicate Music account or in my -- in an escrow account with

17    me.

18    Q    So the answer is --

19    A    Currently.  The money has not been distributed if

20    that is your question.

21    Q    It's not being distributed to my three clients.

22    A    Correct.

23    Q    And you're keeping that money; right?

24    A    Correct.

25    Q    Which means you are getting more than 27 percent

```
 1   on the first five records; correct?

 2        A      Correct.

 3        Q      And you're getting more than 32.15 percent on

 4   "Famous Last Words"; correct?

 5        A      Correct.

 6        Q      So you're violating your own Withdrawal Agreement

 7   right now; right?

 8             MR. GUTMAN:  Objection.  Argumentative.

 9             THE COURT:  Sustained.

10        Q      BY MR. GIVEN:  Okay.  There's another provision I

11   want to draw your attention to, Mr. Hodgson.

12             Scroll down to page 15, please, Mr. O'Malley.

13             Look at paragraph 7.5 with me, Mr. Hodgson.

14   Right at the top it reads -- and I will read it and make sure I

15   get it right here.

16             "Immediately upon receipt by Hodgson or his

17   representatives of any monies representing the writer's share

18   of public performance income derived from exploitation of the

19   Delicate compositions, whether such income is received from a

20   public performance society such as ASCAP --" we have talked

21   about ASCAP; right?

22        A      Yes.

23        Q      "-- or from any other source except Delicate,

24   Hodgson shall pay over to Delicate and shall endorse any and

25   all checks and drafts necessary to effect such payment over to
```

 1    Delicate any and all such monies."

 2             Do you see that sentence?

 3    A       I saw --

 4    Q       Paragraph 7.5?

 5    A       I see that.

 6    Q       You later opted out of that provision of this

 7    contract; right?

 8    A       In 2018, yes.

 9    Q       Actually, earlier than that.  Let's take a look

10    at Exhibit 28, please.

11             This is the ASCAP letter of direction that you

12    signed and sent to ASCAP.  Do you remember this agreement?

13    That's your name at the top, name of your lawyer; correct?

14    A       Yes.  This was 1988, is it?

15    Q       Yes, sir.  It's dated August 5th, 1988.

16    A       I recognize this as the letter that Paul wanted

17    me to send, yes.

18    Q       All right.  Scroll to the bottom.  That's your

19    signature; right?

20    A       Yes, it is.

21    Q       And in this document, you weren't turning over to

22    Delicate, quote, "any and all such monies," were you?

23             MR. GUTMAN:  Objection.  Document speaks for

24    itself.

25             THE COURT:  Overruled.

```
 1                    THE WITNESS:  Question again, please?

 2         Q        BY MR. GIVEN:  In this document, you weren't

 3    turning over any and all such monies, were you?

 4         A        This was a -- a distribution mechanism that Paul

 5    wanted to make the distributions easier.  That is what this

 6    document is about.

 7         Q        So the answer is you weren't turning over all the

 8    money to Delicate; right?

 9         A        No.  I got my portion, and the rest went to Rick,

10    and he paid your plaintiffs.

11         Q        Right.  And that portion you kept and didn't turn

12    over to Delicate; right?

13         A        My portion, my 27 percent, yeah.

14         Q        And Mr. Davies is the other signatory to this

15    letter of direction?

16         A        He is.

17         Q        You made a side deal with Mr. Davies on that

18    subject; correct?

19         A        I made a side deal?

20         Q        Yes.

21         A        I wouldn't --

22         Q        You made a deal with Mr. Davies to keep a portion

23    of your writer share and not turn it over to Delicate Music;

24    right?

25         A        This was -- I wouldn't call it a side deal.  This
```

1    was an arrangement to make the distribution -- distributing the

2    finances easier for Paul Glass so that, out of Rick's

3    percentage, which I believe was 73 percent, he would pay the

4    other three members.

5         Q       And that deal allowed you -- that deal, meaning

6    this letter of direction, allowed you to keep a certain

7    percentage of that money and not turn it over to

8    Delicate Music; right?

9         A       That meant that I was only paid under -- at this

10   time my percentage; correct.

11        Q       By the way, did you ever tell any of my three

12   clients about this letter of direction at the time?

13        A       I was -- I don't think this was discussed, no.

14        Q       So the answer is no?

15        A       Correct.

16        Q       You're not aware that Mr. Glass made them aware

17   of this agreement, this letter of direction?

18        A       It didn't make any difference to them in the way

19   they paid.

20        Q       Well, that's a good point.  In fact, that's what

21   the 1991 agreement is about; right?

22                MR. GUTMAN:  Objection.  Argumentative.

23   Foundation.  Legal --

24                THE COURT:  Overruled.

25                MR. GIVEN:  I'm sorry.  We're talking over each

1    other.  My apologies, Your Honor.

2                    THE COURT:  You have to stop.

3                    MR. GIVEN:  Understood.

4        Q      So that's what the 1991 agreement is about;

5    right?

6                    MR. GUTMAN:  Objection.  Witness has no personal

7    knowledge of the 1991 agreement.  Foundation.

8                    THE COURT:  Sustained.

9        Q      BY MR. GIVEN:  Well, let's take a look at that

10   agreement.

11                   Can you put up Exhibit 20.  Scroll down to the

12   second page.  All right.

13                   Do you see all that fancy math under "proof"?

14   This was Mr. Glass's explanation for how the money worked

15   because of the letter of direction you signed to ASCAP; right?

16                   MR. GUTMAN:  Objection.  Argumentative.  No

17   foundation.

18                   THE COURT:  Sustained.

19       Q      BY MR. GIVEN:  ASCAP was and is one of the main

20   sources of song income; right?

21       A      Yes.

22       Q      And in that letter of direction that we just

23   looked at, the 1988 document, you were directing ASCAP in how

24   to pay Mr. Davies a portion of your song income to facilitate

25   paying my clients; right?

1                MR. GUTMAN:  Objection.  Asked and answered.

2                THE COURT:  Overruled.

3                THE WITNESS:  You will have to ask that again.

4    That's complicated.

5                MR. GIVEN:  Let's put the letter of direction

6    back up on the board.

7        Q        It might be easier if you have the binder with

8    the actual physical document in front of you.

9        A        You have to tell me where it is.

10       Q        Sure.  It's Exhibit 28 in volume 1.

11       A        Volume 1.  Okay.

12       Q        Let me know when you're there.  Do you see it?

13       A        I see it, yes.

14       Q        So in this letter of direction, what you were

15   doing, Mr. Hodgson, is you were directing ASCAP in how to pay

16   Mr. Davies a portion of your song income to facilitate paying

17   my clients; right?

18       A        That's basically what this was, yes.

19       Q        And in this document, you weren't terminating my

20   clients' interest in that songwriting; correct?

21       A        Correct.

22       Q        In fact, you were making it easier for my three

23   guys to get paid; right?

24       A        I'm making it easier for Paul Glass to pay them,

25   yes.

1          Q       Does that seem like the action of someone who

2    thought they could end the sharing arrangement at any time?

3                  MR. GUTMAN:  Objection.  Argumentative.

4                  THE COURT:  Sustained.

5                  MR. GIVEN:  Let's go back to Exhibit 17, please.

6    One last provision I would like to talk to you about.  If you

7    would scroll down to page 30.  Isolate paragraph 13.1.

8          Q       Do you see that provision, Mr. Hodgson?  It's on

9    your screen.  That's an important provision, right, in this

10   document?  Important to you?  Important to Mr. Davies?

11         A       It was important to Rick and Sue Davies, yes.

12         Q       That's right.  Because they had the rights in the

13   Supertramp name.

14         A       Yes.  They were wanting it, yes.

15         Q       And it says here that "ROHOP," which I believe is

16   your production company; right?

17         A       Correct.

18         Q       "and/or Hodgson shall have the right to use the

19   name Supertramp solely in the phrase formerly of Supertramp."

20                 Do you see that language?

21         A       I do.

22         Q       Have you complied with this provision?

23         A       I have done my best to -- what's the word you

24   used?  Adhere to this provision, yes.

25                 Q       You have never had anything on your Roger Hodgson

1    website that might differ from the phrase here?

2         A       I'm sure I have.  I'm sure other promoters have

3    also done things that do not adhere to this provision.

4         Q       And similarly you have had stuff on your official

5    Roger Hodgson YouTube channel that differs from the phrase here

6    "formerly of"?

7         A       Probably.

8         Q       Let's go back to recital G for just a quick

9    moment.  I just want to look at the names that are called out

10   in this recital starting with Mr. Davies.  He continues to get

11   his song income; right?

12        A       Sorry.  Say it again.

13        Q       Mr. Davies continues to get his song income?

14        A       He does.

15        Q       There's you.  You continue to get your song

16   income?

17        A       Yes.

18        Q       And Mr. Pope continues to get his song income?

19        A       Mr. Pope I can't speak for.  He's actually not in

20   this world anymore.

21        Q       All right.  But Delicate Music is paying his

22   heirs; right?

23        A       I don't know.

24        Q       All right.  And Mismanagement, it's continuing to

25   receive its income too; right?

```
 1        A       It is, yes.

 2        Q       That's right.  You made a deal with

 3   Dave Margereson, right, to continue paying him?

 4        A       I didn't make a deal with him.  He -- he or his

 5   attorney put together a Withdrawal Agreement when he quit to

 6   assure that he got continual payments.

 7        Q       Well, there's been a lot of fuss about this

 8   lawsuit that Mr. Margereson brought against you.  You heard

 9   your lawyer talk to you about it.

10        A       I'm very aware of the lawsuit he brought against

11   me, yes.

12        Q       Didn't you settle that lawsuit with

13   Mr. Margereson?

14                MR. GUTMAN:  Objection.  Federal Rule of Evidence

15   408 and relevance.

16                THE COURT:  Sustained.

17                MR. GIVEN:  Your Honor, sidebar?

18                THE COURT:  No.  Continue.

19                MR. GIVEN:  Okay.

20        Q       Didn't you report to his Honor that you had

21   reached a, quote, "settlement in principle" --

22                MR. GUTMAN:  Objection.

23                THE COURT:  Sidebar.

24              (The following proceedings were held at sidebar:)

25                THE COURT:  Mr. Given, I don't understand this.
```

```
 1    I mean, I sustain an objection, so you just ask the same

 2    question with a different tone and think I'm not going to

 3    sustain it again?

 4              MR. GIVEN:  My apologies, Your Honor.  That's

 5    wrong, and I made that mistake earlier, and I apologize for

 6    that.  I was cautioned by my colleague about that.  How can it

 7    possibly be privileged --

 8              THE COURT:  Are we going to reargue the objection

 9    that I already sustained?  The purpose of this was to say

10    enough.  Just keep moving.

11              MR. GIVEN:  All right.  Will do.

12              (The following proceedings were held in

13              open court in the presence of the jury:)

14         Q    BY MR. GIVEN:  All right.  So we talked -- I

15    guess your lawyer talked to you a little bit about these

16    rerecords.  Do you remember that testimony, Mr. Hodgson?

17         A    I'm not sure which testimony you are talking

18    about.

19         Q    Rerecords that you have done.

20         A    Yeah.  I know rerecords.  Yes.

21         Q    Of Supertramp songs.

22         A    Uh-huh.

23         Q    I think your testimony was you started

24    rerecording Supertramp songs back in 2006.

25         A    That was the first time, yes.
```

1    Q        And that continued through to about 2013?

2    A        As I have said, I recorded the shows that I

3    played on tour with my band, and some of these versions were so

4    good that I used them as rerecords.

5    Q        And I think you have already told us that, by

6    doing these rerecords, you got to keep all the song income.

7    You didn't have to share that income with my clients because

8    those rerecords were covers; right?

9    A        They were my personal rerecords, and I was doing

10   what, yeah, what Taylor Swift basically did when she rerecorded

11   hers.  Same thing.

12   Q        Well, it's a little bit different than

13   Taylor Swift; right?

14   A        Not much.

15   Q        No?

16   A        No.

17   Q        Taylor Swift was in a battle with her former

18   manager.

19   A        Right.  And who am I in a battle with?  Sorry.

20   Q        These three guys were your partners, right, and

21   bandmates.

22   A        Way back, yes.

23   Q        So a little bit different than Tay Tay.

24            All those rerecords, those took a lot of time,

25   money, and effort; right?

1      A      Some.

2      Q      But if you had the right to terminate my three

3  clients' interests in your song income, did you really have to

4  go through the trouble of creating these rerecords?

5      A      Yes.  To get control over my songs and recordings

6  of my songs, I had to do them again.

7      Q      And when you give a permission to use your song,

8  you're also giving a permission to use your recording; right?

9      A      I have approval rights over my songs in whatever

10 version.

11     Q      Right.  So if you say to a third party you can't

12 use my song without using my rerecord, that means my clients

13 also don't participate in the record royalties; right?

14     A      If I say that, but I do not say that.

15     Q      Okay.  Over the years since Michelle Anthony

16 began representing you, you've had a series of lawyers

17 representing you in various matters.

18     A      I have had a few.

19     Q      Lisa Alter, does that name sound familiar?

20     A      Yes.

21     Q      She represented you for a number of years?

22     A      She represented me for the terminations.

23     Q      Okay.  And you have had a lot of different

24 personal managers in the music business?

25     A      Not a lot.  A few.

1        Q       All right.  Your current manager or one of your

2  current managers is Linda Tyler.  She's been with you for

3  20 years; right?

4        A       Yes.

5        Q       Shakti Shivaya, she's been with you for almost

6  20 years.

7        A       Correct.

8        Q       Debra Katzenmiller who also is on your manager

9  team, I think you said she's been with you for 20 years.

10        A       She assists me, yes.

11        Q       And you have your own bookkeeper who works for

12  you, Pam Egan; right?

13        A       Correct.

14        Q       As far as other personal managers, the name

15  Doug Pringle, I assume, is familiar?

16        A       Yes.

17        Q       He came in after Dave Furano; right?

18        A       They were in the '80s, yes.

19        Q       Dave Furano served as your personal manager even

20  while you were in the band Supertramp; right?

21        A       He helped me, yes.

22        Q       He attended band meetings on your behalf; right?

23        A       He did.

24        Q       He communicated with this Mr. Margereson on a

25  regular basis, didn't he?

1          A          Yes.  They worked together.

2          Q          He saw to your affairs; correct?

3          A          What was the question?

4          Q          Saw to your affairs.

5          A          Saw to my affairs?

6          Q          Yes.

7          A          He helped me with building a studio and different

8     things, yes.

9          Q          Things related to the band Supertramp?

10         A          Somewhat.  He was an advisor.  Yes.

11         Q          Doug Pringle came after Doug Furano.  He was with

12    you for two or three years; right?

13         A          Correct.

14         Q          He was someone who had music business experience;

15    right?

16         A          He had experience in radio, yes.

17         Q          By the way, Dave Furano also had music business

18    experience; correct?

19         A          He had experience in merchandising, yes.

20         Q          Right.  Because his brother was Del Furano who is

21    a legendary figure in the music merchandizing area; correct?

22                    MR. GUTMAN:  Objection.  Relevance.

23                    THE COURT:  Sustained.

24         Q          BY MR. GIVEN:  You had another senior manager, I

25    think you called him, by the name of Elliot Lott; right?

```
 1          A       Correct.

 2          Q       You have had a long relationship with Mr. Lott?

 3          A       Quite long.

 4          Q       He manages other acts like the Beach Boys?

 5          A       He does.

 6          Q       Now, you said you stopped paying my clients in

 7   around 2018; right?

 8          A       Correct.

 9          Q       And you claim now that was because you became --

10   I think the word you used at your deposition was educated as to

11   your supposed right to do that; right?

12          A       No.  That was not the prime reason.

13                  MR. GIVEN:  Okay.  I'd like to read from Mr. --

14                  THE WITNESS:  Not that I didn't say that.

15          Q       BY MR. GIVEN:  Not that you didn't say it.  You

16   did say it.

17          A       That was one thing that happened, but it was not

18   the reason that I terminated.

19          Q       And you were educated in that by your lawyer;

20   right?

21                  MR. GUTMAN:  Objection.  Calls for

22   attorney/client privilege.

23                  THE COURT:  I will allow it.  Overruled.

24                  THE WITNESS:  An attorney told me, yes, that I

25   was within my rights.
```

1      Q      BY MR. GIVEN:  And you have also said -- and I

2  think you said it to the jury -- that you always thought you

3  had the right to terminate the song sharing arrangement because

4  it was a gift.

5      A      I said that in my deposition, and as actually

6  your clients have all spoken, this money was given to them

7  because they were broke, and it was my understanding that it

8  would be terminated at a time when other royalties came in.

9  That never happened because I'm not going to go --

10          MR. GIVEN:  Strike everything after the word

11  "yes."

12          THE COURT:  Stricken.

13      Q      BY MR. GIVEN:  So which is it, Mr. Hodgson?  Did

14  you always have the right to terminate?

15      A      I was always planning to end the payments.

16  Whether I had the right or not was -- that's a legal

17  conclusion, and I didn't know that.

18      Q      Now, you remember there was some discussion about

19  copyright termination.  Do you remember that discussion that

20  that somehow affected your -- my clients' entitlements to song

21  income?  Do you remember that discussion with your lawyer about

22  that?

23      A      I'm not sure I remember the discussion, but I

24  know that copyrights were terminated with Universal and

25  Universal Publishing at around the same time, 2018.  That is

```
 1   when a lot of things were changing and being renegotiated.
 2        Q       In fact, you used that as an excuse to stop
 3   paying my clients a certain portion of the song income; right?
 4        A       There was a -- a discussion whether the
 5   additional monies because of these -- the situation of
 6   terminating and re-signing would be -- it was one of the
 7   arguments in this case.
 8        Q       And it only affected the song income on
 9   "Breakfast in America" and "Famous Last Words"; right?
10        A       Correct.
11        Q       In fact, if I'm not mistaken, Mr. Glass's office
12   rendered an accounting that showed that certain income was
13   being held back as a result of that termination; right?
14        A       I vaguely remember that.
15        Q       And, in fact, you asserted that right in this
16   lawsuit at the very start of this lawsuit; right?
17                MR. GUTMAN:  Objection.  Argumentative.
18                THE COURT:  Sustained.
19        Q       BY MR. GIVEN:  You only gave up -- it was only
20   after you gave up that argument that you came up with the new
21   excuse that for the first time in 47 years you actually had the
22   right to terminate the entire 1977 agreement.
23                MR. GUTMAN:  Objection.  Argumentative.
24                THE COURT:  Sustained.
25        Q       BY MR. GIVEN:  All right.  Let's talk a little
```

```
 1   bit about the reasons you gave your client for -- for stopping

 2   the payments to my clients.  You said one was because the band

 3   had stopped performing; right?

 4       A     That was an additional factor, yes.

 5       Q     Okay.  But that was in 2011.

 6       A     Rick made the announcement in 2018 that the band

 7   was over.

 8       Q     2018.

 9       A     2018.

10       Q     And, in fact, you reached an agreement the very

11   next year with my clients -- let's look at Exhibit 57 -- to

12   continue to pay them; right?  Let's take a look at the

13   agreement.  Do you recognize this document?  It's been admitted

14   into evidence.

15       A     Vaguely.

16       Q     Okay.  Scroll down.  Do you see that it calls for

17   the payment to my clients of certain monies, $75,000?  Do you

18   see that?  Paragraph 1.

19       A     Yes.

20       Q     Those were payments that you participated in

21   making; correct?

22       A     That I participated in making?

23       Q     Look at the second sentence of paragraph 1.

24       A     Uh-huh.

25       Q     It says, "The publisher parties hereby agree to
```

```
 1   cause the payment of $45,000 of the settlement payment to the

 2   royalty participants," that's my three clients, "from Hodgson's

 3   share."

 4              Do you see that language?

 5        A    I do.

 6        Q    Do you see what follows in paragraph 3, a release

 7   of claims?

 8        A    Do you want me to read it?

 9        Q    If you'd like.

10        A    Unless you have a question about it, no.

11        Q    Scroll up to that recital of Mr. -- that your

12   lawyer was spending some time on.  Do you see the recital?

13   It's the second recital whereas.  Let's highlight that.

14              That's identifying this 1991 agreement; right?

15        A    I don't know what you're talking about.  That's a

16   legal way of saying it.  I see it.

17        Q    And this settlement agreement we're looking at,

18   this was the product of a pretty lengthy negotiation; right?

19        A    I can't remember actually.

20        Q    Lasted a couple years, did it not, sir?

21        A    I can't remember.  It was very -- I don't know.

22        Q    And this agreement is calling out the existence

23   of the 1991 publishing agreement.  That is Exhibit 20 that we

24   were looking at before of the fancy math.

25        A    I see that written here, yes.
```

1    Q      Yes.  Now, I think you said the first time -- you

2   may have said it in court.  I know you said it at your

3   deposition.  I think you said the first time you learned of

4   this 1991 agreement was when we filed our lawsuit and it was

5   attached to the complaint.

6    A      Correct.

7    Q      That's still your testimony?

8           MR. GUTMAN:  Objection, for the record, to the

9   argumentative editorial comment about the testimony.  The

10  record speaks for itself.

11          THE COURT:  Sustained.

12          Ask the question, counsel.

13          MR. GIVEN:  Thank you, Your Honor.

14   Q      So, Mr. Hodgson, you stopped touring just around

15  the time of COVID?

16   A      Yes.

17   Q      Okay.  Just going back to your solo records,

18  nowhere near what the band Supertramp did, right, in its glory

19  years?  Is that fair to say?

20   A      It did okay.

21   Q      And your touring, you know, not very much either

22  in terms of in comparison to what you were doing back in the

23  day?

24   A      Actually, quite the opposite.  My touring was

25  actually really taking off.

```
1        Q       Were you actually making money on the tour?  I
2   know how hard it is sometimes to do that.
3                MR. GUTMAN:  Objection.  Relevance.
4                THE COURT:  Sustained.
5                MR. GIVEN:  All right.
6        Q       And you don't have any current plans to go back
7   out on tour, do you?
8        A       Not currently, but if I can get this done as I
9   said earlier.
10               MR. GIVEN:  All right.  Let's put Exhibit 20 back
11  up on the board, please.
12       Q       This is the document we were talking about before
13  that you say you didn't see until we filed our lawsuit.  I just
14  want to make sure we understand each other on that subject.
15       A       This is the 1991 agreement?
16       Q       Yes.
17       A       Okay.
18               MR. GIVEN:  You can take that down.
19       Q       So your lawyer mentioned your divorce, and I'm
20  sensitive to your personal situation.  But there were some
21  representations that were made in that proceeding that I want
22  to ask you about.
23               As part of that divorce, you agreed to pay your
24  ex-spouse support; right?
25       A       Yes.
```

```
 1        Q        And part of the support you agreed to pay her was
 2   a portion of your royalties; right?
 3        A        Yes.
 4        Q        Okay.
 5        A        Well, yeah.
 6        Q        All right.  Would you turn in the notebook to
 7   Exhibit 77.
 8                 THE COURT:  Exhibit 77 in the binder, sir.
 9                 THE WITNESS:  All right.  Thank you.
10                 MR. GIVEN:  I'm sorry.  With your permission,
11   Your Honor, I believe I have given you the updated which is a
12   redacted version.  Permission to approach and put this in the
13   binder for the witness.
14                 THE COURT:  Well, just hand him the document.
15                 MR. GIVEN:  Will do.
16                 THE COURT:  Sir, Mr. Givens is going to hand you
17   the document that he's talking about.
18                 THE WITNESS:  So I don't have to look it up?
19                 THE COURT:  Correct.
20                 THE WITNESS:  Okay.
21        Q        BY MR. GIVEN:  I want to ask you if you recognize
22   it because the first few pages -- let's go to -- bear with me.
23   This would be page 16.
24        A        Okay.
25        Q        Do you recognize this document as a judgment the
```

```
 1    Court entered in your divorce in July of 2004?

 2        A      Vaguely.

 3        Q      And this is -- this is a -- well, this is a

 4    publicly-available document; right?  It is filed with the

 5    court?

 6               MR. GUTMAN:  Objection.  Relevance.  Foundation.

 7               THE COURT:  Sustained.

 8        Q      BY MR. GIVEN:  Under this judgment, your wife

 9    received as non-modifiable spousal support an amount equal to

10    30 percent of your gross royalties.

11               Do you see that?

12               MR. GUTMAN:  Objection.  Relevance.

13               MR. GIVEN:  Page 17.

14               THE COURT:  I will allow it.  Overruled.

15        Q      BY MR. GIVEN:  Do you see it on page 17?

16        A      I see 17.  Yes.  Okay.

17        Q      Do you see the definition of gross royalties

18    being all your royalties, quote, "less all normal expenses and

19    payouts to third parties."

20        A      I see that.

21        Q      And it includes but is not limited to band

22    members; right?  Do you see that language?

23        A      I'm just looking for it.  It's the second

24    paragraph you're talking about?

25        Q      Uh-huh.
```

1    A       Yeah.  I see.  Okay.

2    Q       This is something you agreed to; right?

3    A       What did I agree to?

4    Q       You agreed to pay your wife a certain percentage

5    of your gross royalties as defined here.

6            MR. GUTMAN:  Objection.  Relevance.

7            THE COURT:  Overruled.

8            THE WITNESS:  Well, it was something I agreed to,

9    and that was one of the expenses that I had at that time.

10   Q       BY MR. GIVEN:  All right.  So turn to page 26.  I

11   just want to confirm that's your signature.

12   A       I definitely signed this agreement.

13   Q       It's actually attached to the judgment.

14   A       Okay.

15   Q       Is that your signature at the bottom of page 26?

16   A       It is.

17   Q       All right.  And this is what is called an income

18   and expense declaration.  You filed several of these in your

19   divorce; right?

20   A       They come up quite regularly, yes.

21   Q       And you signed this under penalty of perjury.  Do

22   you see that?

23   A       I see the phrase, yes.

24   Q       All right.  And if you turn to page 32, you

25   signed under penalty of perjury that "and we're making claim to

1    a band payout as an expense."  Right?  Do you see that on

2    page 32?

3         A       No, I don't.

4         Q       Turn to page 32.

5         A       I'm there.

6         Q       It's right in the middle before the -- between

7    the first redaction and the second.

8         A       Band payout, yes.

9         Q       Do you see that?

10        A       Yes.

11        Q       Less $90,341; right?

12        A       Yes.

13        Q       The band payout was credited against the money

14   you had to pay your wife; right?  Or ex-wife?

15        A       Yes.  It was one of those expenses at that time.

16        Q       So by claiming the band payout as an expense, you

17   reduced the amount you had to pay your ex-wife; right?

18               MR. GUTMAN:  Objection.  Relevance.

19               THE COURT:  Overruled.

20               THE WITNESS:  It was one of the deductions before

21   her percentage was calculated.

22        Q       BY MR. GIVEN:  In other words, you told the Court

23   in your divorce proceeding that you were obligated to pay the

24   band their share of royalties before you had to pay your

25   ex-wife for spousal support in that same income stream, same

1    royalties; right?

2              MR. GUTMAN:  Objection.  Document speaks for

3    itself.  Foundation.  Argumentative.

4              THE COURT:  Overruled.

5              THE WITNESS:  I don't remember telling the jury

6    or the judge or the Court anything.  This was income and

7    expense declaration where all my current expenses -- and you

8    will see the others that you have not mentioned -- they were

9    mentioned, and the band payout was one of my expenses at that

10   time.

11      Q    BY MR. GIVEN:  But now in this lawsuit you're

12   claiming that the band payout was not an expense and not an

13   obligation to the plaintiffs; right?

14             MR. GUTMAN:  Objection.  Argumentative and

15   assumes facts not in evidence.

16             THE COURT:  Sustained.

17      Q    BY MR. GIVEN:  You claim it was a gift.  You said

18   that.  And that it was always temporary; right?  Is that your

19   testimony here?

20      A    It is my testimony that the intention for the

21   payments when they were made, when they were agreed to in '75

22   and by signing that '77 agreement was because the band needed

23   money and the three guys did not have money.  That is the

24   reason that happened.

25             MR. GIVEN:  I'm going to move the redacted

 1    version of Exhibit 77 into evidence, Your Honor.

 2                 THE COURT:  Any objection?

 3                 MR. GUTMAN:  No objection.

 4                 THE COURT:  It will be admitted.

 5                 MR. GIVEN:  Let's go back to Exhibit 77.

 6             (Marked for identification and received

 7             into evidence Exhibit No. 77.)

 8         Q      BY MR. GIVEN:  Everyone agrees that when you all

 9    signed Exhibit 8, the contract on song income sharing, you

10    signed a couple other documents; right?

11         A      Sorry.  Exhibit 8 is what?

12         Q      Is the Memorandum of Agreement.

13         A      Okay.

14         Q      Same day you signed that you signed a bunch of

15    other agreements; right?

16         A      There were a few, yes.

17         Q      One of them was the contract with A&M Records in

18    1977; right?

19         A      I believe so.

20         Q      When you signed that contract, I assume -- tell

21    us if I'm right -- your expectation was that A&M Records would

22    pay you and the other guys record royalties for as long as A&M

23    sold records; right?

24                 MR. GUTMAN:  Objection.  Subjective unexpressed

25    intent.

```
 1              THE COURT:  Overruled.

 2      Q       BY MR. GIVEN:  That was your expectation;

 3  correct?

 4      A       I don't know if I -- I mean, if you sign a

 5  contract with a record company and there are terms in there,

 6  then my understanding was that is what would be happening going

 7  forward.

 8      Q       For as long as they sold records, you would

 9  continue to get your record royalties; right?

10      A       I guess that's supposed to be the way it happens,

11  yes.

12      Q       And that was true for all the agreements you

13  signed with A&M Records; right?

14      A       Yes.  I could pretty much -- I don't -- I'm

15  sorry.  But, yes, those agreements were whatever they were, and

16  I can't remember each one of them, but they were agreements

17  with A&M and the publishing company, I believe.

18      Q       And as long as A&M was dealing in the band's

19  recordings, your expectation was A&M would pay you and the

20  other guys record royalties; right?

21      A       Yes.

22      Q       All right.  So let's look at the 1977 A&M

23  agreement.  This is the one you signed the same time you signed

24  the 1977 Memorandum of Agreement.

25              Exhibit 5, please.
```

```
 1        A       Are you going to put it up, or should I look it
 2   up?
 3        Q       We will put it up.  We will scroll down to page 6
 4   and look at paragraph 12.  It probably makes sense also to open
 5   it up in your binder, Mr. Hodgson, if you wouldn't mind.  Turn
 6   to page 6.
 7        A       What number is it?
 8        Q       Exhibit 5.  Look at paragraph 12.
 9                This is the paragraph that deals with what
10   A&M Records pays you and the other guys in the band in respect
11   to record royalties; right?
12                MR. GUTMAN:  Objection.  Document speaks for
13   itself.
14                Can I ask counsel what page is this on?
15                MR. GIVEN:  I think it's page 6, paragraph 12.
16                MR. GUTMAN:  It's not my page 6.  I see.
17                THE COURT:  The objection is overruled.
18        Q       BY MR. GIVEN:  This is the paragraph that deals
19   with record royalties; right?
20        A       Which one are you looking at?
21        Q       Paragraph 12.
22        A       12A?  B?  C?  Which?
23        Q       Well, it goes on for several pages because
24   there's a lot of different ways that the record label sells
25   records.  But as a general proposition, this is the paragraph
```

1    that deals with what the band gets paid by the record label.

2        A    It looks like that, yes.

3        Q    Now, where -- take a look at this paragraph and

4    show me where the words "in perpetuity" are.

5            MR. GUTMAN:  Objection.  Document speaks for

6    itself.  Argumentative.

7            THE COURT:  Sustained.

8        Q    BY MR. GIVEN:  A&M Records is still paying you;

9    right?

10       A    I believe so.  Universal is, and they bought

11   A&M Records.

12       Q    Right.  Universal is what's called the successor

13   in interest of A&M Records; right?

14       A    Sounds right.

15       Q    They are still paying you just as you expected;

16   right?

17       A    Yes.

18       Q    And you expect that A&M will continue to pay you

19   right into the future?

20       A    Yes.

21       Q    That's because the music is still alive; right?

22       A    Yes.

23           MR. GUTMAN:  Objection.  Argumentative.

24   Foundation.

25           THE COURT:  Overruled.

1    Q    BY MR. GIVEN:  Now, you talked a little bit about

2  Sound Exchange.  What steps did you take to register with

3  Sound Exchange?

4    A    Me personally, none.  But my representative, I

5  believe it may have been Pam Egan, registered me.  But

6  unbeknownst to me, just registered me as a solo artist.  The

7  Supertramp -- my portion, my fifth of the Supertramp

8  Sound Exchange royalties, unbeknownst to me, somehow ended up

9  with Paul Glass and the three plaintiffs.

10    Q    And how do you know that?

11    A    By doing detective work.

12    Q    Okay.  Are you blaming my three clients for not

13  registering you correctly with Sound Exchange?

14    A    I'm not blaming them, no.

15    Q    It's not their responsibility to have you

16  registered with Sound Exchange; correct?

17    A    No.

18    Q    That was your responsibility; right?

19         MR. GUTMAN:  Objection.  Argumentative.

20         THE COURT:  Overruled.

21         THE WITNESS:  Sorry.  What was your question?  It

22  was my responsibility?

23    Q    BY MR. GIVEN:  Yes.

24    A    Yes.  But it was also -- yes.  I will just leave

25  it there.

 1          MR. GIVEN:  Nothing further, Your Honor.

 2          THE COURT:  All right.  Why don't we take our

 3    lunch break at this time.

 4          Ladies and gentlemen, do not form or express any

 5    opinion about the case until the matter is finally submitted to

 6    you.  Don't talk with anyone about the case, don't allow anyone

 7    to talk to you about the case, and do not conduct any research

 8    of any kind on any subject matter connected with the case.

 9          I'm going to ask, if you don't mind, come back at

10    2:00 o'clock.  I'm going to try to deal with some matters with

11    the lawyers before then.  You will have a little longer lunch

12    break.  We will see you back at 2:00 o'clock.

13          THE CLERK:  All rise for the jury.

14          (The following proceedings were held in

15           open court outside the presence of the jury:)

16          THE COURT:  You can step down.

17          THE WITNESS:  Thank you, sir.

18          THE COURT:  I will ask the lawyers to come back

19    at 1:30 so I can discuss -- I will give you a draft of some of

20    the jury instructions and the verdict form just so that you

21    have it, and then you will do redirect.  How long do you think

22    you have on redirect?

23          MR. GUTMAN:  Less than five minutes.

24          THE COURT:  Okay.  Then I guess it depends on

25    cross.  And then you want to call a witness in rebuttal?

```
 1                    MR. GIVEN:  Very short rebuttal.

 2                    THE COURT:  Short like this cross short or

 3     short --

 4                    MR. GIVEN:  Shorter.

 5                    THE COURT:  Shorter.

 6                    MR. GIVEN:  15 minutes.  Mr. O'Malley is going to

 7     conduct that.

 8                    THE COURT:  That gives me hope that it might

 9     actually be short.

10                    MR. GUTMAN:  Just one point about their rebuttal,

11     it's not going to be a repeat of just recycling the same four

12     hours of Mr. Siebenberg's testimony?

13                    THE COURT:  I didn't bring my crystal ball with

14     me this morning, so I don't know the answer to that.  We will

15     see.

16                    So everyone come back at 1:30, and I will give

17     you the proposed verdict form and jury instructions at that

18     time.  Thank you.

19                    MR. GIVEN:  Thank you, Your Honor.

20                    THE CLERK:  All rise.

21                    (A lunch recess was taken until

22                     1:30 p.m. of the same day.)

23

24

25
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5             I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                    DATED THIS  20TH  DAY OF APRIL, 2024.

16

17

18                    /S/ MIRANDA ALGORRI

19                    _____
                      MIRANDA ALGORRI, CSR NO. 12743, CRR
20                    FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

## $

**$150,000** [1] - 49:10
**$24,809.16** [1] - 45:22
**$45,000** [1] - 120:1
**$75,000** [2] - 46:1, 119:17
**$90,341** [1] - 126:11

## '

**'70S** [2] - 26:15, 38:5
**'71** [1] - 8:3
**'75** [1] - 127:21
**'77** [39] - 6:13, 6:15, 7:11, 7:13, 8:18, 9:1, 9:8, 9:9, 13:9, 13:15, 14:20, 17:12, 17:15, 17:18, 17:21, 17:24, 18:18, 19:6, 19:7, 19:8, 19:15, 20:2, 20:18, 21:16, 21:21, 24:7, 29:20, 31:10, 33:10, 34:7, 34:18, 35:8, 36:16, 37:3, 38:8, 40:24, 65:2, 94:15, 127:22
**'80S** [1] - 114:18
**'81** [1] - 77:2
**'82** [1] - 83:6
**'83** [1] - 50:17
**'84** [20] - 6:5, 6:9, 6:18, 7:18, 8:3, 8:4, 14:4, 14:5, 14:8, 17:20, 23:4, 23:7, 24:6, 24:9, 24:20, 25:18, 34:7, 50:17
**'87** [1] - 51:7
**'88** [1] - 14:18
**'90S** [2] - 50:8, 52:5
**'91** [27] - 7:22, 8:1, 8:7, 8:10, 8:13, 8:14, 8:15, 8:20, 8:24, 9:21, 11:11, 14:15, 15:11, 16:21, 17:3, 17:13, 17:22, 17:25, 18:3, 18:11, 18:23, 26:14, 34:7, 38:8, 38:9, 40:5, 40:8

## /

**/S** [1] - 135:18

## 1

**1** [8] - 1:9, 7:13, 9:7.20, 97:22, 107:10, 107:11, 119:18, 119:23

**1-A** [3] - 11:20, 11:21
**10** [1] - 64:5
**100** [3] - 10:17, 12:17, 53:2
**106** [5] - 4:8, 44:6, 44:15, 44:18, 44:20
**1099S** [3] - 31:23, 31:24
**11** [5] - 10:17, 10:23, 11:4, 12:16, 55:14
**11-AND-A-HALF** [1] - 10:12
**11.5** [4] - 11:25, 12:17, 12:21
**112** [1] - 55:13
**113** [1] - 55:13
**114** [1] - 55:14
**115** [1] - 55:14
**116** [2] - 65:9, 65:15
**11:25** [1] - 96:24
**11:40** [2] - 95:22, 96:22
**12** [6] - 8:20, 94:1, 130:4, 130:8, 130:15, 130:21
**12743** [2] - 1:23, 135:19
**128** [2] - 4:6
**12:30** [1] - 95:23
**12A** [1] - 130:22
**13** [8] - 4:4, 88:12, 97:17, 97:19, 97:20, 97:22, 98:5, 98:10
**13.1** [1] - 108:7
**135** [1] - 1:9
**14** [10] - 4:5, 65:10, 87:20, 88:11, 91:16, 98:11, 98:16, 98:18, 98:20, 98:21
**15** [8] - 34:10, 36:13, 41:13, 41:25, 55:14, 82:7, 102:12, 134:6
**1550** [1] - 33:2
**16** [2] - 55:14, 123:23
**16301** [1] - 28:6
**17** [7] - 87:9, 89:2, 100:20, 108:5, 124:13, 124:15, 124:16
**18** [5] - 12:17, 52:18, 65:9, 65:16, 93:15
**18.7** [1] - 12:15
**19** [2] - 49:24, 52:18
**1972** [1] - 59:2
**1973** [2] - 58:4, 61:25
**1975** [5] - 64:13, 65:3, 65:4, 68:8, 68:10
**1977** [14] - 7:2, 30:14, 63:19, 64:7, 72:5, 73:11, 77:3, 93:15,

94:12, 101:11, 118:22, 128:18, 129:22, 129:24
**1978** [1] - 57:23
**1979** [3] - 75:3, 75:11, 76:14
**1981** [5] - 4:4, 80:8, 83:6, 97:24, 98:13
**1982** [2] - 83:23, 94:18
**1983** [2] - 7:3, 93:19
**1984** [3] - 6:5, 25:7, 85:22
**1988** [3] - 103:14, 103:15, 106:23
**1991** [13] - 25:19, 26:24, 28:25, 29:7, 29:11, 29:15, 105:21, 106:4, 106:7, 120:14, 120:23, 121:4, 122:15
**1998** [1] - 52:1
**1:30** [3] - 133:19, 134:16, 134:22
**1ST** [1] - 1:24

## 2

**2** [2] - 88:12, 92:19
**20** [13] - 11:10, 25:14, 25:23, 41:13, 49:6, 55:13, 96:15, 106:11, 114:3, 114:6, 114:9, 120:23, 122:10
**2000** [4] - 52:8, 52:10, 52:20
**2000S** [2] - 31:7, 52:6
**2004** [2] - 46:13, 124:1
**2006** [2] - 53:16, 111:24
**201** [1] - 2:7
**2011** [1] - 119:5
**2013** [1] - 112:1
**2018** [7] - 43:11, 103:8, 116:7, 117:25, 119:6, 119:8, 119:9
**2019** [1] - 52:19
**2020** [1] - 52:21
**2021** [1] - 44:21
**2023** [3] - 55:13, 65:10, 65:12
**2024** [3] - 1:15, 5:1, 135:15
**20TH** [1] - 135:15
**21-08124** [1] - 5:7
**21-08124-AB** [1] - 1:7
**23** [1] - 44:21
**25** [2] - 65:9, 65:16

**26** [4] - 1:15, 5:1, 125:10, 125:15
**27** [19] - 9:24, 10:5, 10:6, 11:25, 12:4, 23:13, 23:16, 23:22, 24:10, 24:25, 25:12, 25:15, 94:4, 94:8, 94:11, 100:24, 101:12, 101:25, 104:13
**28** [3] - 103:10, 107:10, 135:8
**2:00** [3] - 35:6, 133:10, 133:12

## 3

**3** [7] - 19:21, 44:5, 70:8, 70:11, 70:16, 70:17, 120:6
**30** [4] - 41:12, 74:13, 108:7, 124:10
**302** [1] - 25:4
**32** [3] - 125:24, 126:2, 126:4
**32.15** [4] - 94:6, 101:2, 101:12, 102:3
**350** [2] - 1:24, 2:12
**36** [1] - 90:23
**38** [1] - 91:7
**39** [1] - 2:6
**3:00** [2] - 20:5, 35:6

## 4

**4** [1] - 88:12
**40** [1] - 89:3
**408** [1] - 110:15
**43** [1] - 3:5
**44** [2] - 4:8
**4455** [1] - 1:24
**47** [1] - 118:21

## 5

**5** [7] - 1:14, 5:9, 55:14, 76:20, 76:21, 129:25, 130:8
**50** [6] - 5:24, 22:14, 22:16, 23:17, 42:4, 49:19
**50S** [1] - 42:3
**51** [1] - 88:12
**52** [1] - 88:12
**55** [1] - 3:5
**57** [2] - 29:2, 119:11
**5TH** [1] - 103:15

## 6

**6** [5] - 88:13, 130:3, 130:6, 130:15, 130:16
**61** [1] - 12:17
**61.5** [1] - 11:24

## 7

**7** [3] - 55:13, 65:11, 65:13
**7.1** [3] - 93:25, 94:1, 100:21
**7.4** [1] - 91:17
**7.5** [2] - 102:13, 103:4
**70** [1] - 62:24
**71** [2] - 14:15, 16:5
**73** [6] - 9:25, 10:17, 10:18, 49:22, 49:23, 105:3
**74** [1] - 59:24
**753** [1] - 135:8
**76** [1] - 29:2
**77** [8] - 4:6, 19:18, 31:22, 123:7, 123:8, 128:1, 128:5, 128:7
**78** [1] - 31:22

## 8

**8** [11] - 8:21, 30:14, 46:24, 65:23, 68:5, 68:10, 68:14, 68:18, 93:16, 128:9, 128:11
**81** [2] - 16:5, 75:2
**85** [6] - 4:7, 85:10, 85:13, 85:20

## 9

**9** [1] - 55:14
**90012** [1] - 1:25
**90212** [1] - 2:12
**909** [1] - 25:4
**918** [1] - 25:4
**9350** [1] - 2:11
**94129** [1] - 2:7
**98** [4] - 4:4, 4:5
**9:14** [2] - 1:16, 5:1
**9TH** [1] - 25:3

## A

**A&M** [29] - 4:4, 50:25, 56:1, 57:9, 58:4, 58:14, 58:19, 59:7, 59:17, 59:18, 59:21, 62:11, 77:19, 79:1, 86:19, 97:24,

128:17, 128:21, 128:22, 129:13, 129:17, 129:18, 129:19, 129:22, 130:10, 131:8, 131:11, 131:13, 131:18
**A.M** [2] - 1:16, 5:1
**A.M** [1] - 96:24
**ABLE** [1] - 48:15
**ABOVE** [1] - 135:11
**ABOVE-ENTITLED** [1] - 135:11
**ABSOLUTELY** [1] - 39:14
**ABSURDITIES** [1] - 37:23
**ACCEPT** [1] - 23:13
**ACCIDENT** [2] - 50:7, 51:12
**ACCORDANCE** [2] - 7:2, 93:14
**ACCORDING** [1] - 13:1
**ACCOUNT** [2] - 101:16
**ACCOUNTANT** [3] - 48:10, 79:22, 80:2
**ACCOUNTING** [1] - 118:12
**ACCURATE** [1] - 22:1
**ACHIEVED** [1] - 78:21
**ACQUIESCED** [1] - 37:18
**ACTING** [1] - 13:5
**ACTION** [1] - 4:6
**ACTION** [10] - 9:16, 20:6, 20:11, 20:14, 27:5, 30:21, 32:7, 34:17, 35:25, 108:1
**ACTIONABLE** [1] - 25:15
**ACTS** [2] - 9:1, 116:4
**ACTUAL** [1] - 107:8
**ADDED** [4] - 13:15, 13:16, 17:6, 60:11
**ADDING** [3] - 13:13, 18:11, 19:1
**ADDITION** [1] - 31:24
**ADDITIONAL** [5] - 9:6, 17:6, 18:11, 118:5, 119:4
**ADDRESS** [3] - 22:11, 22:13, 23:2
**ADDRESSED** [1] - 33:21
**ADDRESSING** [1] - 28:13
**ADHERE** [2] - 108:24, 109:3

**ADMIN** [1] - 27:5
**ADMINISTER** [8] - 13:9, 20:23, 22:4, 35:18, 70:10, 70:24, 70:25, 71:19
**ADMINISTERED** [3] - 19:24, 20:24, 35:14
**ADMINISTERING** [2] - 20:7, 71:5
**ADMINISTRATION** [3] - 13:10, 16:14, 99:7
**ADMINISTRATIONS** [1] - 16:13
**ADMINISTRATIVE** [1] - 25:25
**ADMINISTRATOR** [7] - 20:7, 20:15, 20:16, 31:4, 31:18, 32:5
**ADMIRAL** [1] - 67:25
**ADMISSIONS** [1] - 29:4
**ADMIT** [1] - 44:15
**ADMITTED** [6] - 44:18, 85:13, 98:7, 98:18, 119:13, 128:4
**ADMITTEDLY** [1] - 20:4
**ADORED** [1] - 53:10
**ADVANCE** [1] - 85:16
**ADVANCING** [1] - 26:20
**ADVANTAGE** [1] - 90:5
**ADVISOR** [1] - 115:10
**AFFAIR** [1] - 60:2
**AFFAIRS** [4] - 27:22, 115:2, 115:4, 115:5
**AFFECT** [2] - 15:14, 16:11
**AFFECTED** [3] - 51:1, 117:20, 118:8
**AFTERNOON** [3] - 42:2, 42:6, 42:10
**AFTERTHOUGHT** [1] - 62:10
**AGE** [1] - 49:24
**AGENCY** [1] - 49:3
**AGO** [1] - 34:10
**AGREE** [11] - 7:21, 8:12, 17:24, 18:22, 24:13, 28:2, 29:17, 36:6, 91:20, 119:25, 125:3
**AGREED** [19] - 23:12, 23:17, 53:20, 64:25, 65:6, 68:10, 74:22, 76:3, 80:22, 92:2, 92:11, 93:21, 94:14, 122:23, 123:1, 125:2, 125:4, 125:8,

127:21
**AGREEMENT** [150] - 6:5, 6:6, 6:9, 6:13, 6:15, 6:18, 6:24, 7:11, 7:13, 7:15, 7:18, 7:22, 8:1, 8:7, 8:8, 8:10, 8:13, 8:14, 8:15, 8:18, 8:20, 8:25, 9:9, 9:21, 11:11, 12:24, 13:2, 13:15, 13:18, 14:9, 14:15, 14:25, 15:11, 16:4, 16:21, 17:11, 17:12, 17:13, 17:14, 17:15, 17:17, 17:23, 18:4, 18:17, 18:18, 19:6, 19:7, 19:8, 19:15, 19:18, 19:19, 20:2, 20:3, 20:17, 21:3, 21:14, 21:15, 21:21, 22:12, 23:4, 23:8, 24:6, 24:7, 24:9, 24:20, 25:7, 25:8, 25:18, 25:19, 26:14, 26:20, 26:24, 27:1, 27:12, 27:21, 28:25, 29:1, 29:7, 29:11, 29:15, 29:20, 29:22, 30:14, 31:10, 32:8, 32:9, 33:6, 33:10, 34:8, 34:18, 36:5, 36:16, 36:20, 37:3, 38:7, 38:25, 40:5, 40:9, 40:11, 47:6, 47:15, 58:14, 64:12, 65:2, 65:3, 68:7, 71:2, 77:3, 78:3, 81:17, 82:1, 82:9, 82:14, 85:25, 90:1, 90:15, 91:11, 93:2, 94:24, 95:1, 96:9, 97:24, 97:25, 98:13, 98:14, 99:10, 99:22, 101:11, 103:12, 105:17, 105:21, 106:4, 106:7, 106:10, 118:22, 119:10, 119:13, 120:14, 120:17, 120:22, 120:23, 121:4, 122:15, 125:12, 127:22, 129:23
**AGREEMENT** [20] - 4:4, 4:5, 7:2, 13:9, 14:4, 14:5, 14:11, 56:12, 56:16, 56:18, 64:10, 87:9, 87:14, 89:6, 93:15, 100:21, 102:6, 110:5, 128:12, 129:24

**AGREEMENTS** [10] - 28:23, 29:6, 34:8, 34:14, 34:15, 54:23, 128:15, 129:12, 129:15, 129:16
**AGREEMENTS** [1] - 96:8
**AGREES** [1] - 128:8
**AHEAD** [3] - 11:13, 28:21, 55:17
**AL** [4] - 1:5, 1:8, 5:8, 5:9
**ALAN** [1] - 5:14
**ALAN** [1] - 2:11
**ALBUM** [21] - 50:16, 50:22, 51:1, 51:5, 51:7, 51:10, 52:1, 56:2, 61:19, 62:23, 73:15, 73:18, 73:20, 74:15, 74:21, 84:17, 85:1, 86:3, 86:5, 86:12
**ALBUM** [1] - 4:7
**ALBUMS** [4] - 50:15, 63:18, 74:13, 94:9
**ALGORRI** [4] - 1:23, 135:5, 135:18, 135:19
**ALIVE** [2] - 76:9, 131:21
**ALLEGATION** [3] - 32:21, 37:13, 54:12
**ALLOCATE** [1] - 10:22
**ALLOCATED** [3] - 6:24, 35:1, 93:6
**ALLOCATION** [1] - 37:19
**ALLOW** [5] - 84:5, 95:20, 116:23, 124:14, 133:6
**ALLOWED** [2] - 105:5, 105:6
**ALMO** [1] - 98:14
**ALMOST** [7] - 32:20, 46:1, 53:2, 62:16, 74:4, 78:12, 114:5
**ALONE** [1] - 74:15
**ALPERT** [1] - 79:5
**ALTER** [2] - 32:21, 32:23
**ALTER** [1] - 113:19
**AMBIGUOUS** [1] - 60:4
**AMBUSHED** [3] - 65:21, 66:3, 66:13
**AMEND** [1] - 36:13
**AMENDMENT** [1] - 13:21
**AMERICA** [6] - 73:16, 74:5, 74:21, 75:10,

75:21, 118:9
**AMOUNT** [7] - 11:3, 12:7, 12:20, 45:21, 49:10, 124:9, 126:17
**AMOUNTS** [5] - 11:6, 35:1, 36:8, 37:25, 38:11
**ANALOGY** [3] - 20:4, 20:5, 30:20
**ANALYSIS** [1] - 28:3
**AND** [3] - 135:6, 135:9, 135:11
**ANDRÉ** [1] - 1:3
**ANGELES** [2] - 83:7, 83:23
**ANGELES** [3] - 1:16, 1:25, 5:2
**ANNOUNCE** [1] - 87:2
**ANNOUNCEMENT** [1] - 119:6
**ANSWER** [12] - 33:4, 34:4, 52:24, 60:6, 63:22, 69:10, 84:5, 89:22, 101:18, 104:7, 105:14, 134:14
**ANSWERED** [6] - 46:5, 81:9, 81:13, 81:18, 92:13, 107:1
**ANTHONY** [4] - 88:4, 88:23, 89:5, 113:15
**ANTICIPATE** [1] - 41:15
**ANYWAY** [2] - 45:14, 45:17
**APART** [1] - 59:2
**APOLOGIES** [3] - 84:8, 106:1, 111:4
**APOLOGIZE** [1] - 111:5
**APPEARANCES** [1] - 2:1
**APPEARANCES** [1] - 5:10
**APPROACH** [2] - 84:24, 123:12
**APPROPRIATE** [1] - 27:6
**APPROVAL** [1] - 113:9
**APPROVED** [2] - 90:17, 90:19
**APRIL** [1] - 64:7
**APRIL** [1] - 135:15
**AREA** [1] - 115:21
**ARGUABLY** [8] - 7:23, 9:7, 14:8, 15:7, 15:18, 35:11, 38:8, 38:18
**ARGUE** [1] - 42:6

**ARGUMENT** [9] - 5:23, 9:14, 18:3, 20:25, 24:21, 25:13, 26:21, 37:1, 118:20
**ARGUMENTATIVE** [26] - 45:11, 70:2, 70:12, 70:20, 72:8, 74:17, 80:25, 81:22, 83:19, 84:15, 91:13, 92:5, 92:13, 101:7, 102:8, 105:22, 106:16, 108:3, 118:17, 118:23, 121:9, 127:3, 127:14, 131:6, 131:23, 132:19
**ARGUMENTS** [1] - 118:7
**ARRANGEMENT** [9] - 81:7, 81:16, 82:1, 90:8, 97:9, 97:13, 105:1, 108:2, 117:3
**ARTIST** [4] - 47:7, 48:11, 77:19, 132:6
**ARTISTS** [2] - 47:10, 47:12
**ASCAP** [14] - 9:23, 10:15, 12:3, 48:8, 71:13, 102:20, 102:21, 103:11, 103:12, 106:15, 106:19, 106:23, 107:15
**ASIDE** [1] - 5:22
**ASSERT** [1] - 28:14
**ASSERTED** [2] - 88:17, 118:15
**ASSERTING** [2] - 29:9, 36:11
**ASSIGNED** [2] - 15:20, 27:19
**ASSISTS** [1] - 114:10
**ASSUME** [8] - 8:9, 68:21, 75:5, 82:2, 82:9, 89:15, 114:15, 128:20
**ASSUMED** [2] - 68:15, 68:19
**ASSUMES** [4] - 69:8, 88:24, 95:12, 127:15
**ASSURE** [1] - 110:6
**ASTUTE** [1] - 30:20
**ATTACHED** [2] - 121:5, 125:13
**ATTEMPTED** [1] - 86:12
**ATTEMPTING** [2] - 24:22, 28:14
**ATTEND** [1] - 59:20
**ATTENDED** [1] -

114:22
**ATTENTION** [3] - 44:6, 46:7, 102:11
**ATTORNEY** [7] - 57:11, 57:20, 84:5, 87:20, 88:2, 110:5, 116:24
**ATTORNEY/CLIENT** [4] - 89:10, 89:16, 90:12, 116:22
**AUDIBLES** [1] - 85:15
**AUDIBLY** [2] - 52:24, 63:22
**AUDIENCE** [1] - 87:4
**AUDIOVISUAL** [1] - 100:9
**AUGUST** [1] - 103:15
**AUTHORIZATION** [1] - 18:13
**AUTHORIZE** [1] - 71:10
**AUTHORIZED** [1] - 44:12
**AUTHORIZING** [1] - 44:22
**AVAILABLE** [2] - 68:13, 124:4
**AVOID** [1] - 44:2
**AWARE** [4] - 99:19, 105:16, 110:10

# B

**BABIES** [1] - 53:10
**BACKGROUND** [2] - 67:10, 67:12
**BAGS** [1] - 75:16
**BAKER** [1] - 60:15
**BALL** [1] - 134:13
**BAND** [60] - 30:8, 46:19, 47:16, 52:17, 52:22, 57:16, 57:20, 57:24, 58:3, 59:1, 60:2, 60:8, 60:9, 61:16, 61:24, 62:1, 63:18, 64:15, 66:17, 67:4, 71:9, 72:6, 72:12, 72:15, 72:16, 72:18, 73:5, 76:17, 77:7, 78:20, 79:2, 81:8, 83:2, 83:7, 83:10, 83:23, 83:24, 86:10, 87:8, 87:17, 94:17, 97:8, 112:3, 114:20, 114:22, 115:9, 119:2, 119:6, 121:18, 124:21, 126:1, 126:8, 126:13, 126:16, 126:24, 127:9,

127:12, 127:22, 130:10, 131:1
**BAND'S** [2] - 62:20, 129:18
**BANDMATES** [1] - 112:21
**BASED** [7] - 11:3, 18:8, 21:1, 26:24, 27:15, 32:8, 42:13
**BASIC** [1] - 32:25
**BASIS** [1] - 114:25
**BATTLE** [2] - 112:17, 112:19
**BEACH** [1] - 116:4
**BEAR** [2] - 65:15, 123:22
**BEAUTIFUL** [1] - 88:7
**BECAME** [1] - 116:9
**BECOME** [1] - 33:5
**BECOMES** [3] - 18:5, 19:7, 19:10
**BEGAN** [2] - 57:23, 113:16
**BEGIN** [1] - 55:10
**BEGINNING** [2] - 40:9, 92:18
**BEGINS** [2] - 16:3, 91:17
**BEHALF** [10] - 5:14, 15:8, 16:21, 18:10, 27:25, 44:13, 44:23, 71:17, 99:1, 114:22
**BEHIND** [1] - 52:2
**BELIEF** [2] - 62:1, 62:3
**BELL** [1] - 78:1
**BELOW** [2] - 12:16, 82:15
**BENEFIT** [3] - 73:1, 80:6, 80:10
**BERKLA** [1] - 25:3
**BERKLA** [1] - 25:3
**BEST** [1] - 108:23
**BETTER** [1] - 32:5
**BETWEEN** [5] - 17:21, 58:18, 68:9, 74:4, 126:6
**BEVERLY** [1] - 2:12
**BEYONCÉ** [1] - 76:20
**BIG** [3] - 78:5, 78:19, 78:22
**BIGGER** [1] - 89:7
**BIGGEST** [5] - 62:22, 63:14, 73:18, 75:24, 76:17
**BIND** [15] - 13:25, 15:11, 16:24, 17:2, 18:12, 19:2, 21:11, 21:19, 27:10, 27:11, 28:17, 30:13, 30:16,

40:13, 40:17
**BINDER** [7] - 97:17, 97:18, 97:21, 107:7, 123:8, 123:13, 130:5
**BINDING** [3] - 7:14, 18:20, 38:6
**BINDS** [1] - 38:9
**BIRD** [2] - 14:18, 16:16
**BIROTTE** [1] - 1:3
**BIT** [1] - 53:21
**BIT** [9] - 10:10, 34:10, 60:12, 99:7, 111:15, 112:12, 112:23, 119:1, 132:1
**BLACK** [2] - 21:8, 25:2
**BLAMING** [2] - 132:12, 132:14
**BLEW** [1] - 84:13
**BLOCK** [1] - 27:2
**BLOCKS** [1] - 25:23
**BOARD** [5] - 59:24, 65:24, 87:11, 107:6, 122:11
**BOARDING** [1] - 67:14
**BOB** [3] - 41:25, 60:22, 60:23
**BOOK** [1] - 44:4
**BOOKKEEPER** [3] - 43:25, 44:11, 114:11
**BOTTOM** [3] - 11:17, 103:18, 125:15
**BOUGHT** [1] - 131:10
**BOULEVARD** [1] - 2:11
**BOUND** [24] - 7:25, 8:13, 8:14, 18:1, 18:5, 21:4, 21:9, 22:6, 22:7, 22:8, 22:10, 26:17, 27:17, 28:1, 28:3, 29:22, 34:21, 35:4, 35:8, 35:9, 35:20, 39:13
**BOX** [1] - 33:18
**BOYS** [1] - 116:4
**BREACH** [20] - 23:11, 23:12, 23:18, 24:2, 24:11, 25:15, 26:22, 26:23, 27:3, 32:6, 32:7, 33:21, 34:17, 35:25, 36:3, 36:9, 36:14, 36:18, 36:19, 36:22
**BREACHED** [1] - 22:5
**BREAK** [4] - 66:5, 97:16, 133:3, 133:12
**BREAKDOWN** [1] - 34:13
**BREAKFAST** [6] - 73:16, 74:5, 74:21,

75:10, 75:20, 118:9
**BREAKUP** [1] - 14:23
**BRIDGE** [1] - 17:21
**BRIEF** [2] - 28:7, 28:13
**BRIEFING** [1] - 5:21
**BRIEFLY** [1] - 39:24
**BRIEFS** [1] - 28:13
**BRING** [4] - 29:19, 35:21, 41:10, 134:13
**BROKE** [2] - 97:6, 117:7
**BROKEN** [1] - 35:22
**BROTHER** [1] - 115:20
**BROUGHT** [3] - 90:8, 110:8, 110:10
**BUILD** [1] - 54:22
**BUILDING** [1] - 115:7
**BUNCH** [2] - 22:21, 128:14
**BURDEN** [1] - 28:15
**BUSINESS** [18] - 8:21, 9:15, 9:18, 13:7, 13:8, 13:12, 17:1, 27:18, 57:16, 57:18, 64:2, 74:16, 83:24, 91:21, 99:15, 113:24, 115:14, 115:17
**BY** [84] - 2:4, 2:5, 2:5, 2:11, 43:3, 43:5, 44:21, 45:17, 46:7, 47:25, 51:5, 55:5, 55:19, 60:6, 65:19, 66:11, 67:9, 67:25, 68:4, 69:2, 69:15, 69:25, 70:6, 70:15, 70:22, 72:12, 72:23, 74:20, 75:11, 75:18, 76:8, 77:13, 78:19, 79:8, 80:15, 81:5, 81:11, 81:15, 81:20, 81:25, 83:22, 84:13, 84:17, 85:1, 85:21, 88:1, 88:22, 89:2, 89:14, 89:19, 90:7, 90:14, 91:16, 92:8, 92:17, 98:11, 99:14, 99:21, 100:4, 101:10, 102:10, 104:2, 106:9, 106:19, 111:14, 115:24, 116:15, 117:1, 117:13, 118:19, 118:25, 123:21, 124:8, 124:15, 125:10, 126:22, 127:11, 127:17, 128:8,

129:2, 130:18, 131:8, 132:1, 132:23

## C

**CAB** [16] - 13:2, 13:4, 16:1, 16:3, 16:6, 25:21, 25:24, 26:19, 26:25, 27:2, 27:3, 39:25, 40:11, 40:14
**CAL** [2] - 21:9, 27:8
**CALCULATED** [1] - 126:21
**CALIFORNIA** [5] - 1:2, 1:16, 1:25, 5:2, 135:7
**CALIFORNIA** [6] - 2:7, 2:12, 6:22, 28:6, 33:1, 92:20
**CALLED** [1] - 43:3
**CAMPBELL** [1] - 5:8
**CAMPBELL** [1] - 1:5
**CANCEL** [1] - 53:3
**CANNOT** [4] - 25:4, 25:9, 25:16, 45:6
**CAPABLE** [3] - 33:2, 33:3, 90:4
**CAPACITY** [4] - 23:11, 27:2, 33:11, 33:15
**CAPTURED** [1] - 98:1
**CARE** [1] - 71:15
**CAREER** [7] - 50:5, 50:10, 55:25, 63:15, 74:15, 84:14, 87:3
**CARLIN** [71] - 2:4, 2:5, 6:11, 6:16, 6:19, 7:6, 7:8, 7:21, 8:6, 8:12, 8:17, 9:20, 10:5, 10:10, 10:14, 10:20, 11:2, 11:10, 11:14, 11:18, 11:20, 11:23, 12:2, 12:7, 12:11, 12:15, 12:19, 13:4, 13:17, 14:3, 14:10, 14:16, 14:21, 14:24, 15:13, 15:25, 16:7, 16:18, 17:10, 18:16, 21:5, 21:8, 21:16, 21:18, 21:24, 22:6, 22:10, 22:24, 23:5, 23:12, 23:15, 23:21, 23:24, 24:5, 37:22, 38:12, 38:15, 38:20, 38:22, 38:25, 39:4, 39:7, 39:14, 39:17, 39:20, 39:23, 40:6, 40:13, 40:19, 40:23, 41:8
**CARLIN** [5] - 5:12, 26:13, 27:7, 30:12,

37:20
**CASE** [1] - 1:6
**CASE** [29] - 5:7, 8:24, 15:5, 18:23, 19:5, 26:23, 27:5, 27:23, 27:24, 28:12, 31:5, 33:14, 36:21, 39:16, 40:1, 47:4, 48:10, 49:8, 95:18, 95:19, 95:20, 95:22, 101:4, 118:7, 133:5, 133:6, 133:7, 133:8
**CASES** [6] - 16:20, 16:25, 17:1, 22:15, 22:21, 22:25
**CATEGORY** [1] - 36:2
**CAUTIONED** [1] - 111:6
**CENTRAL** [2] - 1:2, 135:7
**CENTURY** [6] - 11:22, 59:22, 62:13, 63:6, 63:9, 63:14
**CEREMONY** [1] - 97:25
**CERTAIN** [11] - 12:7, 31:13, 36:4, 48:12, 48:19, 93:14, 105:6, 118:3, 118:12, 119:17, 125:4
**CERTAINLY** [4] - 10:24, 22:24, 40:24, 76:24
**CERTIFICATE** [1] - 135:1
**CERTIFY** [1] - 135:7
**CETERA** [1] - 12:13
**CHALLENGE** [1] - 18:5
**CHANGE** [6] - 13:21, 40:3, 40:22, 81:7, 81:25, 93:21
**CHANGED** [7] - 40:16, 56:7, 56:8, 59:18, 67:4, 68:8, 82:20
**CHANGES** [2] - 82:23, 83:1
**CHANGING** [4] - 11:5, 13:3, 118:1
**CHANNEL** [1] - 109:5
**CHARACTERIZE** [1] - 14:7
**CHARGING** [1] - 53:18
**CHARLES** [2] - 1:8, 43:2
**CHARLES** [1] - 3:4, 5:8
**CHECK** [1] - 96:14
**CHECKS** [2] - 44:2, 102:25

**CIRCUIT** [1] - 25:3
**CITE** [2] - 17:1, 25:3
**CITED** [5] - 21:8, 22:14, 22:21, 28:6, 28:12
**CIVIL** [1] - 33:1
**CIVIL** [1] - 5:7
**CLAIM** [8] - 34:1, 35:25, 36:10, 64:13, 76:17, 116:9, 125:25, 127:17
**CLAIMING** [6] - 36:3, 56:2, 83:15, 84:11, 126:16, 127:12
**CLAIMS** [1] - 120:7
**CLARIFICATION** [2] - 31:12, 100:19
**CLARIFIED** [1] - 27:22
**CLASS** [5] - 20:6, 20:11, 20:13, 27:5, 30:21
**CLAUSE** [2] - 37:4, 54:23
**CLEAR** [5] - 21:15, 24:20, 27:22, 30:13, 34:23
**CLEARLY** [2] - 28:25, 37:10
**CLERICAL** [1] - 62:10
**CLERK** [6] - 5:7, 95:24, 96:2, 96:23, 133:13, 134:20
**CLIENT** [8] - 23:20, 24:1, 28:1, 28:2, 30:7, 119:1
**CLIENTS** [32] - 16:17, 23:16, 24:6, 24:8, 24:9, 56:6, 56:25, 60:8, 61:15, 62:9, 63:10, 72:24, 73:2, 74:23, 76:4, 80:23, 101:5, 101:10, 101:21, 105:12, 106:25, 107:17, 112:7, 113:12, 116:6, 117:6, 118:3, 119:2, 119:11, 119:17, 120:2, 132:12
**CLIENTS'** [6] - 16:11, 18:17, 18:19, 107:20, 113:3, 117:20
**CLIP** [2] - 65:8, 88:11
**CLOCK** [1] - 35:22
**CLOSE** [3] - 41:17, 42:2, 42:10
**CODE** [2] - 28:6, 33:1
**CODE** [1] - 135:8
**CODE** [1] - 48:7

**COLLEAGUE** [1] - 111:6
**COLLECT** [1] - 8:22
**COLLECTING** [1] - 92:3
**COLLECTION** [1] - 49:3
**COLLECTIVELY** [1] - 74:1
**COLLECTOR** [1] - 9:2
**COLLECTS** [1] - 99:8
**COMBINED** [1] - 5:20
**COMING** [2] - 31:8, 65:5
**COMMEMORATING** [1] - 78:2
**COMMENCED** [3] - 55:18, 65:18, 88:21
**COMMENT** [2] - 22:11, 121:9
**COMMENTS** [2] - 39:23, 79:12
**COMMISSION** [1] - 50:7
**COMMON** [1] - 66:17
**COMMUNICATE** [1] - 43:12
**COMMUNICATED** [1] - 114:24
**COMMUNICATION** [1] - 43:19
**COMPANY** [11] - 13:5, 16:12, 20:13, 20:14, 25:22, 25:24, 58:9, 79:17, 108:16, 129:5, 129:17
**COMPARISON** [1] - 121:22
**COMPARTMENTALIZED** [1] - 18:16
**COMPLAINT** [2] - 34:6, 121:5
**COMPLETED** [1] - 61:19
**COMPLETELY** [1] - 25:10
**COMPLICATED** [1] - 107:4
**COMPLIED** [1] - 108:22
**COMPONENT** [1] - 28:7
**COMPOSER** [1] - 4:5
**COMPOSER** [1] - 98:14
**COMPOSITION** [1] - 35:13
**COMPOSITIONS** [5] - 13:10, 19:22, 19:23, 35:14, 102:19

**CONCEPT** [2] - 24:4, 32:25
**CONCERN** [2] - 14:1, 17:2
**CONCERNS** [1] - 13:22
**CONCLUSION** [11] - 68:25, 69:23, 70:19, 77:11, 81:23, 91:14, 99:12, 99:17, 99:23, 99:24, 117:17
**CONDITION** [2] - 44:3, 45:3
**CONDONE** [1] - 37:23
**CONDUCT** [3] - 95:20, 133:7, 134:7
**CONFERENCE** [1] - 34:12
**CONFERENCE** [1] - 135:12
**CONFERS** [1] - 23:8
**CONFIRM** [1] - 125:11
**CONFORMANCE** [1] - 135:12
**CONNECT** [1] - 54:22
**CONNECTED** [2] - 95:21, 133:8
**CONNECTION** [5] - 8:3, 37:2, 55:25
**CONSIDERED** [1] - 67:13
**CONSTITUTE** [1] - 25:15
**CONSTITUTED** [1] - 34:8
**CONTENT** [2] - 90:17, 90:20
**CONTENTION** [1] - 37:1
**CONTENTIONS** [1] - 34:9
**CONTEXT** [2] - 20:11, 30:21
**CONTINUAL** [1] - 110:6
**CONTINUE** [21] - 22:18, 50:2, 53:8, 72:23, 73:1, 80:5, 80:10, 80:11, 91:21, 92:3, 92:9, 92:12, 94:3, 96:17, 97:2, 109:15, 110:3, 110:18, 119:12, 129:9, 131:18
**CONTINUED** [3] - 53:1, 101:14, 112:1
**CONTINUES** [3] - 109:10, 109:13, 109:18
**CONTINUING** [1] -

109:24
**CONTINUOUSLY** [1] - 49:6
**CONTRACT** [64] - 7:15, 11:18, 13:7, 14:2, 16:2, 17:18, 18:11, 18:24, 20:18, 20:22, 20:23, 22:3, 22:16, 23:20, 24:22, 25:5, 26:22, 27:3, 27:19, 32:6, 32:22, 32:25, 33:1, 33:4, 33:5, 33:7, 33:21, 34:11, 34:17, 34:19, 34:21, 34:22, 35:8, 35:9, 35:20, 36:3, 37:12, 37:24, 38:4, 38:6, 38:13, 38:16, 39:4, 40:24, 58:17, 62:11, 65:25, 68:22, 68:23, 68:24, 69:4, 69:21, 71:23, 73:11, 87:13, 94:12, 94:17, 103:7, 128:9, 128:17, 128:20, 129:5
**CONTRACTING** [2] - 33:2, 33:3
**CONTRACTS** [5] - 6:2, 22:21, 22:25, 37:23, 69:3
**CONTRACTUAL** [2] - 36:14, 36:20
**CONTROL** [4] - 54:5, 56:6, 56:10, 113:5
**CONVERSATIONS** [1] - 64:18
**COOLINGS** [1] - 67:21
**COOPER** [4] - 69:7, 69:12, 69:18
**COPIES** [1] - 64:5
**COPY** [3] - 30:19, 85:14, 85:17
**COPYRIGHT** [1] - 117:19
**COPYRIGHTS** [8] - 13:10, 16:14, 19:22, 35:12, 39:7, 39:8, 91:23, 117:24
**COREL** [1] - 25:4
**COREL** [1] - 25:4
**CORNERS** [2] - 21:3, 32:9
**CORP** [1] - 25:4
**CORPORATIONS** [1] - 28:6
**CORRECT** [99] - 17:5, 28:5, 32:12, 33:12, 36:17, 41:21, 45:8, 46:2, 47:17, 47:18,

49:11, 49:16, 49:18, 54:11, 56:14, 57:11, 57:18, 58:4, 58:11, 58:12, 58:15, 59:3, 59:5, 60:10, 60:25, 61:2, 61:4, 61:21, 61:23, 63:12, 63:13, 63:17, 63:20, 64:23, 66:2, 67:12, 67:19, 68:22, 70:24, 71:17, 73:3, 73:6, 73:7, 73:9, 73:17, 74:2, 76:15, 77:9, 78:11, 78:20, 80:6, 81:8, 81:17, 82:21, 82:22, 82:24, 82:25, 84:20, 86:7, 88:6, 89:15, 91:3, 91:5, 91:6, 92:22, 93:9, 93:12, 94:10, 94:19, 96:20, 99:5, 100:9, 101:22, 101:24, 102:1, 102:2, 102:4, 102:5, 103:13, 104:18, 105:10, 105:15, 107:20, 107:21, 108:17, 114:7, 114:13, 115:2, 115:13, 115:18, 115:21, 116:1, 116:8, 118:10, 119:21, 121:6, 123:19, 129:3, 132:16
**CORRECT** [1] - 135:9
**CORRECTLY** [2] - 51:16, 132:13
**CORRIDORS** [1] - 26:9
**COUNSEL** [1] - 2:1
**COUNSEL** [6] - 5:10, 25:13, 79:12, 79:14, 121:12, 130:14
**COUNSEL'S** [1] - 24:21
**COUPLE** [6] - 33:24, 39:23, 45:19, 57:13, 120:20, 128:10
**COURSE** [9] - 8:23, 9:15, 9:17, 9:18, 15:7, 27:18, 37:19, 49:6, 99:15
**COURT** [7] - 42:14, 85:14, 85:15, 88:18, 124:1, 126:22, 127:6
**COURT** [10] - 5:6, 29:15, 42:19, 87:12, 96:1, 97:1, 111:13, 121:2, 124:5, 133:15
**COURT** [234] - 1:1,

1:24, 5:13, 5:16, 6:14, 6:17, 6:20, 7:7, 7:9, 7:22, 8:7, 8:16, 8:19, 10:1, 10:7, 10:13, 10:19, 10:25, 11:8, 11:12, 11:16, 11:19, 11:21, 12:1, 12:6, 12:10, 12:14, 12:18, 12:22, 13:13, 13:22, 14:5, 14:12, 14:17, 14:23, 15:1, 15:16, 16:2, 16:15, 16:19, 17:19, 18:21, 21:7, 21:15, 21:17, 21:20, 21:25, 22:9, 22:20, 23:3, 23:6, 23:14, 23:19, 23:22, 23:25, 24:12, 24:25, 25:17, 26:13, 27:13, 28:21, 29:6, 29:8, 29:17, 29:22, 29:25, 30:3, 30:18, 30:24, 31:1, 31:16, 32:1, 32:10, 32:13, 33:9, 33:13, 33:23, 34:20, 34:24, 35:3, 35:22, 36:16, 36:18, 36:21, 36:25, 37:6, 37:9, 37:20, 38:1, 38:14, 38:18, 38:21, 38:24, 39:2, 39:5, 39:12, 39:15, 39:18, 39:21, 40:2, 40:12, 40:15, 40:20, 41:2, 41:10, 41:14, 41:17, 41:20, 41:22, 42:1, 42:9, 42:16, 42:20, 44:16, 44:18, 45:12, 45:16, 46:6, 47:24, 51:4, 55:2, 55:15, 55:17, 60:5, 65:10, 65:13, 65:17, 66:10, 67:8, 67:24, 68:3, 69:1, 69:10, 69:24, 70:4, 70:14, 70:21, 72:10, 72:22, 74:18, 75:1, 75:9, 75:17, 76:7, 77:12, 78:18, 79:7, 79:13, 80:13, 81:1, 81:4, 81:10, 81:14, 81:19, 81:24, 83:20, 84:7, 84:16, 84:23, 84:25, 85:11, 85:13, 87:25, 88:14, 88:20, 89:1, 89:12, 89:18, 89:21, 90:11, 90:13, 91:15, 92:7, 92:14, 95:14, 96:3, 96:11, 96:17, 96:21, 97:2, 98:7, 98:18, 99:13, 99:18, 99:25, 101:8,

102:9, 103:25, 105:24, 106:2, 106:8, 106:18, 107:2, 108:4, 110:16, 110:18, 110:23, 110:25, 111:8, 115:23, 116:23, 117:12, 118:18, 118:24, 121:11, 122:4, 123:8, 123:14, 123:16, 123:19, 124:7, 124:14, 125:7, 126:19, 127:4, 127:16, 128:2, 128:4, 129:1, 130:17, 131:7, 131:25, 132:20, 133:2, 133:16, 133:18, 133:24, 134:2, 134:5, 134:8, 134:13, 135:6, 135:6
**COURT'S** [1] - 88:10
**COURTROOM** [2] - 58:17, 58:22
**COVER** [16] - 46:24, 47:2, 47:4, 47:15, 47:20, 48:2, 48:6, 48:11, 48:15, 48:18, 48:19, 84:21, 85:2, 85:4, 85:9
**COVER** [1] - 4:7
**COVERED** [1] - 47:9
**COVERING** [2] - 7:16, 38:7
**COVERS** [9] - 8:8, 17:12, 17:15, 17:23, 17:25, 18:4, 18:17, 56:19, 112:8
**COVID** [3] - 52:20, 53:1, 121:15
**CREATED** [1] - 96:9
**CREATING** [1] - 113:4
**CREDIT** [2] - 83:2, 83:12
**CREDITED** [1] - 126:13
**CRIME** [6] - 11:21, 59:21, 62:13, 63:6, 63:9, 63:14
**CRISIS** [1] - 45:2
**CRISIS** [2] - 11:22
**CROSS** [1] - 55:4
**CROSS** [5] - 41:14, 55:2, 96:13, 133:25, 134:2
**CROSS** [1] - 3:5
**CROSS-EXAMINATION** [1] -

55:4
**CROSS-EXAMINATION** [2] - 41:14, 55:2
**CROSS-EXAMINATION** [1] - 3:5
**CRR** [2] - 1:23, 135:19
**CRYSTAL** [1] - 134:13
**CSR** [2] - 1:23, 135:19
**CURIOUS** [1] - 8:11
**CURRENT** [4] - 114:1, 114:2, 122:6, 127:7
**CURRIE** [1] - 61:3
**CUT** [3] - 9:13, 21:5, 29:3
**CV** [1] - 1:7

## D

**DATE** [3] - 65:12, 75:25, 77:19
**DATED** [1] - 135:15
**DATED** [4] - 7:2, 65:10, 93:15, 103:15
**DATES** [2] - 62:24, 65:12
**DAVE** [7] - 59:12, 62:1, 62:5, 110:3, 114:17, 114:19, 115:17
**DAVID** [1] - 2:4
**DAVID** [4] - 5:12, 60:24, 61:5, 61:7
**DAVIES** [60] - 6:23, 6:25, 8:10, 9:7, 12:13, 12:23, 13:15, 13:25, 15:6, 15:8, 15:11, 16:21, 16:23, 17:6, 18:5, 18:6, 18:9, 19:19, 22:1, 26:16, 27:16, 27:21, 27:24, 28:9, 28:10, 28:11, 30:10, 32:15, 32:17, 35:16, 38:11, 39:1, 39:8, 39:12, 39:15, 39:16, 40:17, 56:10, 56:23, 56:24, 60:9, 61:16, 64:25, 72:5, 73:4, 83:10, 91:18, 91:20, 92:21, 93:6, 99:4, 104:14, 104:17, 104:22, 106:24, 107:16, 108:10, 108:11, 109:10, 109:13
**DAVIES'S** [6] - 13:4, 25:22, 25:23, 56:13, 57:10, 64:14
**DAY** [2] - 1:14, 135:15

**DEAL** [23] - 58:3, 58:10, 61:16, 61:18, 61:19, 61:20, 61:24, 77:18, 78:19, 78:22, 80:5, 80:7, 80:21, 87:8, 104:17, 104:19, 104:22, 104:25, 105:5, 110:2, 110:4, 133:10
**DEALING** [4] - 36:1, 36:10, 37:14, 129:18
**DEALS** [5] - 18:19, 77:15, 130:9, 130:18, 131:1
**DEATH** [1] - 91:22
**DEBATE** [2] - 22:22, 38:9
**DEBRA** [1] - 114:8
**DECEMBER** [2] - 65:10, 88:11
**DECIDE** [2] - 19:16, 43:9
**DECIDED** [3] - 30:8, 43:8, 45:13
**DECISION** [1] - 25:3
**DECISIONAL** [1] - 27:8
**DECLARATION** [3] - 46:18, 125:18, 127:7
**DEDUCTIONS** [1] - 126:20
**DEFENDANT** [1] - 20:13
**DEFENDANT** [1] - 2:9
**DEFENDANTS** [1] - 5:15
**DEFENDANTS** [2] - 1:10, 43:3
**DEFENSE** [3] - 16:23, 17:5, 22:20
**DEFINED** [1] - 125:5
**DEFINITELY** [2] - 76:18, 125:12
**DEFINITION** [1] - 124:17
**DEL** [1] - 115:20
**DELICATE** [146] - 6:21, 7:25, 8:14, 8:15, 8:25, 9:1, 9:11, 9:12, 9:15, 9:25, 10:4, 10:9, 10:11, 10:12, 10:16, 10:17, 11:3, 11:7, 11:9, 11:24, 12:5, 12:11, 13:2, 13:6, 13:8, 15:3, 15:7, 15:8, 15:9, 15:20, 15:21, 15:23, 16:1, 16:3, 16:6, 16:12, 16:22, 17:3, 17:7, 18:7,

18:10, 18:12, 18:20, 18:23, 19:2, 19:17, 19:21, 19:24, 20:2, 20:23, 20:24, 21:14, 21:19, 21:22, 22:2, 22:4, 22:8, 24:8, 25:11, 25:21, 26:9, 26:21, 26:24, 27:11, 27:18, 27:25, 29:1, 29:5, 29:10, 29:16, 30:1, 30:3, 30:5, 30:10, 30:17, 31:7, 31:8, 31:9, 31:10, 31:13, 31:17, 31:19, 31:25, 32:4, 32:14, 34:3, 34:14, 34:18, 35:12, 35:18, 37:6, 38:9, 38:11, 39:10, 39:11, 40:5, 40:10, 40:14, 40:16, 41:7, 43:17, 70:7, 70:17, 71:3, 71:5, 71:8, 71:14, 91:8, 91:12, 91:21, 91:24, 92:2, 92:9, 92:10, 92:11, 92:17, 92:20, 93:1, 94:3, 99:1, 99:6, 99:8, 99:14, 100:3, 100:12, 100:14, 101:16, 102:19, 102:23, 102:24, 103:1, 103:22, 104:8, 104:12, 104:23, 105:8, 109:21
**DELICATE** [1] - 6:23
**DELICATE'S** [6] - 6:24, 8:21, 12:25, 13:7, 33:18, 93:6
**DELIGHTED** [1] - 55:8
**DEMANDED** [1] - 83:1
**DEMETRIADES** [3] - 57:25, 58:1, 58:6
**DEPO** [1] - 65:10
**DEPOSITION** [10] - 55:12, 63:5, 64:22, 65:8, 65:20, 71:22, 88:11, 116:10, 117:5, 121:3
**DEREK** [2] - 59:7, 59:9
**DERIVED** [3] - 6:7, 26:11, 102:18
**DESCRIBE** [2] - 70:5, 101:15
**DESCRIBED** [3] - 57:7, 58:23, 71:3
**DESCRIBING** [1] - 45:2
**DESCRIPTION** [1] -

27:4
**DESCRIPTION** [1] - 4:3
**DESERVING** [1] - 72:4
**DESIGNATED** [1] - 39:9
**DESIGNEE** [2] - 26:1, 26:10
**DESIGNEES** [1] - 26:5
**DESPITE** [1] - 34:1
**DETECTIVE** [2] - 48:9, 132:11
**DETERMINATION** [2] - 20:19, 48:1
**DETRIMENT** [2] - 24:1, 24:5
**DEVELOPING** [1] - 60:7
**DICKIE** [1] - 61:9
**DICTA** [1] - 27:9
**DIFFER** [1] - 109:1
**DIFFERENCE** [2] - 68:9, 105:18
**DIFFERENT** [31] - 7:19, 8:25, 9:13, 10:18, 13:13, 13:24, 13:25, 14:1, 14:19, 15:2, 15:10, 15:17, 15:18, 15:19, 16:20, 18:24, 19:1, 27:14, 32:3, 60:9, 60:10, 67:14, 71:8, 111:2, 112:12, 112:23, 113:23, 115:7, 130:24
**DIFFERS** [1] - 109:5
**DIFFICULT** [1] - 52:11
**DIFFICULTIES** [1] - 75:8
**DIRECT** [1] - 43:4
**DIRECT** [3] - 41:11, 44:5, 46:7
**DIRECT** [1] - 3:5
**DIRECTING** [2] - 106:23, 107:15
**DIRECTION** [11] - 9:23, 12:3, 103:11, 104:15, 105:6, 105:12, 105:17, 106:15, 106:22, 107:5, 107:14
**DIRECTLY** [4] - 9:24, 10:15, 12:4, 31:15
**DISABILITY** [1] - 91:22
**DISAGREE** [2] - 24:13, 40:15
**DISARRAY** [1] - 33:8
**DISASTROUS** [1] - 58:23

**DISBURSEMENT** [1] - 26:3
**DISCUSS** [5] - 5:17, 82:19, 83:24, 89:8, 133:19
**DISCUSSED** [4] - 24:16, 71:4, 81:11, 105:13
**DISCUSSES** [1] - 56:13
**DISCUSSING** [1] - 82:16
**DISCUSSION** [6] - 22:22, 117:18, 117:19, 117:21, 117:23, 118:4
**DISMISS** [1] - 36:8
**DISPUTE** [1] - 30:4
**DISSEMINATED** [1] - 71:9
**DISSOLVED** [1] - 91:22
**DISTRIBUTE** [6] - 8:22, 12:20, 15:22, 22:2, 23:10, 30:6
**DISTRIBUTED** [6] - 12:12, 21:2, 34:2, 49:8, 101:19, 101:21
**DISTRIBUTES** [1] - 99:8
**DISTRIBUTING** [1] - 105:1
**DISTRIBUTION** [5] - 9:11, 32:4, 35:10, 104:4, 105:1
**DISTRIBUTIONS** [1] - 104:5
**DISTRIBUTOR** [2] - 9:2, 43:16
**DISTRICT** [5] - 1:1, 1:2, 1:3, 135:6, 135:7
**DIVIDES** [1] - 10:16
**DIVISION** [1] - 1:2
**DIVORCE** [7] - 46:14, 52:12, 122:19, 122:23, 124:1, 125:19, 126:23
**DO** [1] - 135:7
**DOCTOR** [1] - 51:9
**DOCUMENT** [31] - 8:4, 11:12, 13:1, 17:3, 17:9, 21:9, 27:17, 28:8, 38:10, 66:22, 70:1, 82:11, 92:5, 92:18, 103:21, 103:23, 104:2, 104:6, 106:23, 107:8, 107:19, 108:10, 119:13,

122:12, 123:14, 123:17, 123:25, 124:4, 127:2, 130:12, 131:5
**DOCUMENTED** [1] - 14:4
**DOCUMENTS** [3] - 66:5, 66:18, 128:10
**DONE** [14] - 9:22, 15:14, 17:8, 18:25, 48:5, 49:18, 71:17, 75:25, 84:11, 96:15, 108:23, 109:3, 111:19, 122:8
**DOOR** [1] - 59:16
**DOUG** [3] - 114:15, 115:11
**DOUGIE** [2] - 58:21, 86:22
**DOUGLAS** [1] - 1:5
**DOUGLAS** [1] - 5:8
**DOWN** [16] - 21:20, 26:9, 30:11, 70:8, 82:13, 82:15, 83:11, 91:18, 96:3, 102:12, 106:11, 108:7, 119:16, 122:18, 130:3, 133:16
**DOWNLOADED** [1] - 80:15
**DRAFT** [2] - 34:6, 133:19
**DRAFTED** [2] - 69:5, 69:7
**DRAFTS** [1] - 102:25
**DRAW** [2] - 17:21, 102:11
**DRAWING** [1] - 6:4
**DUE** [2] - 44:25, 45:1
**DUE** [1] - 45:1
**DUO** [1] - 52:17
**DURATION** [2] - 19:9, 22:13
**DURING** [4] - 8:23, 46:14, 52:12, 81:5
**DUTY** [6] - 36:1, 36:2, 36:9, 37:13, 37:16, 37:17

**E**

**EARLY** [2] - 59:21, 83:6
**EASIER** [5] - 104:5, 105:2, 107:7, 107:22, 107:24
**EDITORIAL** [3] - 79:12, 89:23, 121:9
**EDUCATED** [3] - 67:10, 116:10,

116:19
**EFFECT** [1] - 102:25
**EFFECTIVE** [2] - 7:14, 38:6
**EFFORT** [3] - 62:13, 86:16, 112:25
**EGAN** [6] - 43:25, 44:11, 44:12, 44:22, 114:12, 132:5
**EGO** [2] - 32:21, 32:23
**EIGHT** [1] - 73:20
**EITHER** [6] - 26:20, 37:8, 59:12, 91:22, 101:15, 121:21
**EJL** [1] - 33:20
**ELEMENT** [2] - 28:19, 28:22
**ELEMENTARY** [1] - 34:5
**ELEMENTS** [2] - 26:23, 32:7
**ELLIOT** [1] - 115:25
**ELOQUENT** [1] - 30:20
**EMBRACING** [1] - 25:5
**ENCOMPASSES** [1] - 37:14
**END** [5] - 46:11, 63:19, 76:14, 108:2, 117:15
**ENDED** [3] - 77:18, 82:6, 132:8
**ENDING** [1] - 90:8
**ENDORSE** [1] - 102:24
**ENDS** [1] - 22:19
**ENFORCE** [1] - 38:12
**ENFORCEABLE** [1] - 68:24
**ENFORCEMENT** [1] - 33:20
**ENGAGED** [1] - 81:6
**ENGLAND** [1] - 67:13
**ENJOYED** [1] - 63:11
**ENTERED** [6] - 7:16, 7:24, 19:19, 22:1, 38:7, 124:1
**ENTERING** [1] - 13:6
**ENTIRE** [3] - 33:7, 81:6, 118:22
**ENTITLED** [1] - 29:15
**ENTITLED** [1] - 135:11
**ENTITLEMENTS** [2] - 101:11, 117:20
**ENTITY** [8] - 25:25, 26:7, 28:14, 32:23, 32:24, 34:2, 39:10, 93:8
**EQUAL** [1] - 124:9

**ERLEWINE** [1] - 2:4
**ERRONEOUSLY** [2] - 56:3, 56:4
**ERROR** [1] - 62:10
**ESCROW** [1] - 101:16
**ESSENCE** [1] - 15:9
**ESSENTIAL** [2] - 26:22, 32:7
**ESSENTIALLY** [1] - 32:20
**ESTABLISH** [2] - 26:23, 37:15
**ESTABLISHED** [1] - 32:8
**ESTATE** [3] - 67:20, 67:22
**ET** [5] - 1:5, 1:8, 5:8, 5:9, 12:13
**EVENT** [1] - 81:5
**EVENTUALLY** [3] - 51:22, 52:17, 84:13
**EVIDENCE** [1] - 4:2
**EVIDENCE** [1] - 110:14
**EVIDENCE** [16] - 10:5, 28:16, 28:17, 31:21, 44:20, 46:25, 85:9, 85:20, 98:5, 98:10, 98:17, 98:20, 119:14, 127:15, 128:1, 128:7
**EX** [4] - 122:24, 126:14, 126:17, 126:25
**EX-SPOUSE** [1] - 122:24
**EX-WIFE** [3] - 126:14, 126:17, 126:25
**EXACTLY** [1] - 8:6
**EXAMINATION** [2] - 43:4, 55:4
**EXAMINATION** [5] - 3:5, 3:5, 41:14, 55:2, 55:10
**EXAMPLE** [1] - 99:9
**EXCEEDED** [1] - 5:23
**EXCEPT** [1] - 102:23
**EXCERPTS** [1] - 55:11
**EXCHANGE** [9] - 49:2, 49:3, 49:5, 49:15, 132:2, 132:3, 132:8, 132:13, 132:16
**EXCLUDED** [1] - 47:16
**EXCUSE** [3] - 5:25, 118:2, 118:21
**EXECUTED** [1] - 28:24
**EXHIBIT** [49] - 10:6, 11:10, 25:23, 29:2, 30:14, 31:22, 44:6,

44:15, 44:20, 46:24, 59:24, 65:23, 68:5, 68:10, 68:14, 68:18, 75:2, 82:7, 85:10, 85:20, 87:9, 89:2, 93:16, 97:17, 97:22, 98:5, 98:10, 98:11, 98:16, 98:20, 98:21, 100:20, 103:10, 106:11, 107:10, 108:5, 119:11, 120:23, 122:10, 123:7, 123:8, 128:1, 128:5, 128:7, 128:9, 128:11, 129:25, 130:8
**EXHIBIT** [2] - 44:4, 44:5
**EXHIBITS** [1] - 4:1
**EXHIBITS** [1] - 10:3
**EXISTED** [1] - 26:6
**EXISTENCE** [1] - 120:22
**EXISTING** [1] - 25:6
**EXIT** [4] - 8:5, 85:24, 94:23, 95:1
**EXPECT** [2] - 48:11, 131:18
**EXPECTATION** [3] - 128:21, 129:2, 129:19
**EXPECTED** [1] - 131:15
**EXPENSE** [7] - 46:16, 46:17, 125:18, 126:1, 126:16, 127:7, 127:12
**EXPENSES** [7] - 12:12, 46:21, 124:18, 125:9, 126:15, 127:7, 127:9
**EXPERIENCE** [4] - 115:14, 115:16, 115:18, 115:19
**EXPIRATION** [1] - 91:23
**EXPLAIN** [2] - 47:2, 95:13
**EXPLAINED** [1] - 100:3
**EXPLANATION** [1] - 106:14
**EXPLICIT** [1] - 6:6
**EXPLOITATION** [1] - 102:18
**EXPRESS** [14] - 24:21, 25:5, 25:8, 30:13, 34:22, 36:6, 36:14, 36:19, 37:3, 37:11, 37:16, 37:17, 95:18,

133:4
**EXTENT** [4] - 17:14, 17:16, 31:9, 93:11
**EXTENT** [1] - 7:1
**EXTRA** [1] - 85:17
**EYE** [5] - 50:17, 84:18, 85:21, 86:9, 86:18

**F**

**F.3D** [1] - 25:4
**FACIE** [1] - 26:23
**FACILITATE** [2] - 106:24, 107:16
**FACING** [1] - 45:4
**FACT** [19] - 15:17, 24:23, 26:4, 32:4, 34:1, 34:9, 60:19, 71:25, 81:11, 86:15, 87:1, 88:8, 95:12, 105:20, 107:22, 118:2, 118:11, 118:15, 119:10
**FACTOR** [1] - 119:4
**FACTS** [4] - 15:5, 69:9, 88:24, 127:15
**FAIR** [5] - 36:1, 36:9, 37:14, 60:2, 121:19
**FAITH** [3] - 36:1, 36:9, 37:14
**FALLING** [1] - 59:1
**FAMILIAR** [3] - 98:1, 113:19, 114:15
**FAMILY** [1] - 67:20
**FAMOUS** [12] - 13:19, 82:5, 82:20, 86:3, 86:4, 86:10, 87:1, 93:21, 94:6, 101:2, 102:4, 118:9
**FANCY** [2] - 106:13, 120:24
**FANTASTIC** [1] - 55:1
**FAR** [10] - 8:3, 24:16, 36:6, 41:6, 63:15, 73:18, 75:24, 92:17, 93:24, 114:14
**FARRELL** [1] - 61:1
**FATHER** [1] - 67:25
**FEBRUARY** [2] - 1:15, 5:1
**FEDERAL** [1] - 110:14
**FEDERAL** [3] - 1:24, 135:5, 135:19
**FELL** [1] - 51:8
**FELT** [1] - 65:20
**FEW** [7] - 53:22, 82:12, 113:18, 113:25, 123:22, 128:16
**FIFTH** [1] - 132:7

**FIGURE** [7] - 94:11, 94:12, 94:14, 94:16, 115:21
**FIGURED** [1] - 97:20
**FIGURES** [1] - 94:4
**FIGURING** [1] - 10:21
**FILE** [1] - 45:14
**FILED** [6] - 34:9, 45:19, 121:4, 122:13, 124:4, 125:18
**FILINGS** [1] - 5:17
**FINAL** [1] - 34:12
**FINALLY** [4] - 55:8, 61:24, 95:18, 133:5
**FINANCES** [1] - 105:2
**FINDINGS** [1] - 42:13
**FINE** [1] - 88:6
**FINISH** [2] - 53:5, 84:5
**FIRM** [3] - 21:12, 27:10, 30:13
**FIRST** [33] - 9:1, 11:18, 24:19, 25:21, 31:12, 44:25, 47:1, 50:16, 53:22, 54:20, 57:4, 58:3, 58:9, 58:10, 59:6, 62:11, 65:9, 65:12, 82:23, 83:14, 84:17, 85:4, 92:19, 94:9, 94:11, 100:24, 102:1, 111:25, 118:21, 121:1, 121:3, 123:22, 126:7
**FIVE** [8] - 66:5, 73:15, 75:25, 82:23, 94:9, 100:24, 102:1, 133:23
**FLIP** [1] - 98:24
**FLOW** [1] - 10:11
**FOCUSED** [3] - 8:5, 15:3, 20:1
**FOLLOW** [1] - 35:5
**FOLLOWED** [1] - 63:18
**FOLLOWING** [8] - 5:5, 38:23, 42:18, 95:25, 96:25, 110:24, 111:12, 133:14
**FOLLOWS** [4] - 11:15, 11:24, 12:12, 120:6
**FOR** [6] - 2:3, 2:9, 4:2, 135:6
**FOREGOING** [1] - 135:9
**FORM** [10] - 9:7, 40:21, 42:8, 54:25, 90:17, 90:19, 95:17, 133:4, 133:20, 134:17

8

**FORMAL** [9] - 7:15, 8:8, 8:15, 17:11, 17:13, 17:17, 17:23, 18:4, 38:6
**FORMALIZE** [3] - 13:2, 16:3, 40:11
**FORMAT** [1] - 135:11
**FORMER** [1] - 112:17
**FORMERLY** [2] - 108:19, 109:6
**FORTH** [1] - 20:1
**FORWARD** [3] - 19:5, 87:22, 129:7
**FOUNDATION** [19] - 47:22, 69:8, 70:13, 70:20, 74:25, 76:5, 77:10, 78:17, 80:24, 81:23, 88:25, 95:13, 99:12, 105:23, 106:7, 106:17, 124:6, 127:3, 131:24
**FOUR** [5] - 21:3, 32:8, 74:8, 75:12, 134:11
**FRANCISCO** [1] - 2:7
**FRANK** [1] - 61:1
**FRANKLY** [1] - 40:3
**FREE** [2] - 14:18, 16:16
**FREED** [2] - 79:18, 79:19
**FRICTION** [1] - 50:14
**FRIDAY** [9] - 46:8, 50:13, 57:14, 57:16, 59:4, 59:15, 62:6, 64:21, 94:21
**FRONT** [2] - 13:1, 107:8
**FULL** [1] - 72:19
**FULLY** [3] - 7:14, 25:7, 38:5
**FUN** [1] - 63:8
**FUNCTIONING** [1] - 72:16
**FUNDAMENTALLY** [1] - 16:8
**FUNDS** [6] - 20:8, 23:10, 30:6, 34:2, 43:16, 44:1
**FURANO** [5] - 114:17, 114:19, 115:11, 115:17, 115:20
**FUSS** [1] - 110:7
**FUTURE** [1] - 131:19

## G

**GAME** [2] - 41:1, 41:2
**GAMES** [1] - 37:11
**GEARED** [1] - 75:20
**GENERAL** [4] - 6:22,

82:15, 92:20, 130:25
**GENERATE** [1] - 49:1
**GENERATED** [1] - 22:17
**GENTLEMEN** [4] - 42:21, 43:1, 95:17, 133:4
**GIFT** [4] - 71:23, 72:1, 117:4, 127:17
**GIVEN** [4] - 97:3, 110:25, 117:6, 123:11
**GIVEN** [140] - 2:4, 2:4, 5:11, 41:16, 41:24, 42:7, 42:10, 44:17, 45:10, 45:15, 46:5, 47:22, 51:2, 55:3, 55:5, 55:19, 59:24, 60:6, 65:7, 65:11, 65:19, 65:23, 66:8, 66:11, 67:6, 67:9, 67:25, 68:4, 69:2, 69:15, 69:25, 70:6, 70:15, 70:22, 72:12, 72:20, 72:23, 74:20, 75:2, 75:8, 75:11, 75:18, 76:8, 77:13, 78:19, 79:8, 79:16, 80:15, 81:5, 81:11, 81:15, 81:20, 81:25, 82:7, 82:13, 83:22, 84:8, 84:13, 84:17, 84:21, 84:24, 85:1, 85:9, 85:17, 85:21, 87:11, 87:23, 88:1, 88:10, 88:18, 88:22, 89:2, 89:14, 89:19, 89:24, 90:7, 90:14, 91:16, 92:8, 92:17, 96:14, 97:4, 98:4, 98:8, 98:11, 98:16, 98:21, 99:14, 99:21, 100:4, 101:10, 102:10, 104:2, 105:25, 106:3, 106:9, 106:19, 107:5, 108:5, 110:17, 110:19, 111:4, 111:11, 111:14, 115:24, 116:13, 116:15, 117:1, 117:10, 117:13, 118:19, 118:25, 121:13, 122:5, 122:10, 122:18, 123:10, 123:15, 123:21, 124:8, 124:13, 124:15, 125:10, 126:22, 127:11,

127:17, 127:25, 128:5, 128:8, 129:2, 130:15, 130:18, 131:8, 132:1, 132:23, 133:1, 134:1, 134:4, 134:6, 134:19
**GIVEN** [2] - 3:5, 5:12
**GIVENS** [1] - 123:16
**GIVENS** [1] - 65:15
**GLASS** [10] - 43:13, 43:15, 43:19, 48:10, 57:17, 57:18, 57:23, 105:2, 107:24, 132:9
**GLASS** [3] - 79:22, 82:8, 105:16
**GLASS'S** [1] - 49:9
**GLASS'S** [2] - 106:14, 118:11
**GLORY** [1] - 121:18
**GRANT** [2] - 36:12, 99:15
**GRANTING** [2] - 48:13, 99:10
**GRANTS** [1] - 100:11
**GRASP** [1] - 23:9
**GRASPING** [1] - 24:3
**GRATITUDE** [1] - 72:4
**GREAT** [2] - 17:24, 35:21
**GREENE** [2] - 59:7, 59:9
**GROSS** [3] - 124:10, 124:17, 125:5
**GROUP** [1] - 31:19
**GROUP** [1] - 71:13
**GUESS** [12] - 5:21, 9:7, 12:23, 13:22, 15:1, 18:22, 37:22, 55:11, 61:19, 111:15, 129:10, 133:24
**GUESSING** [1] - 77:23
**GUITAR** [1] - 51:17
**GUTMAN** [1] - 5:25
**GUTMAN** [123] - 2:10, 2:11, 5:14, 24:18, 25:1, 25:18, 26:18, 28:5, 28:22, 29:7, 29:9, 29:21, 29:24, 30:1, 30:11, 30:23, 30:25, 31:12, 31:21, 32:3, 32:12, 32:20, 33:12, 33:19, 34:4, 34:22, 34:25, 35:21, 35:24, 36:17, 36:19, 36:23, 37:1, 37:8, 37:10, 41:12, 41:19, 41:21, 42:11, 42:25, 43:5, 44:15, 44:21,

45:17, 46:7, 47:25, 51:5, 55:1, 55:16, 60:4, 67:23, 68:2, 68:25, 69:8, 69:22, 70:2, 70:12, 70:19, 72:8, 74:17, 74:24, 76:5, 77:10, 78:17, 79:6, 79:11, 80:12, 80:24, 81:2, 81:9, 81:13, 81:18, 81:22, 83:19, 84:4, 84:15, 85:12, 88:15, 88:24, 89:10, 89:16, 90:12, 91:13, 92:5, 92:13, 95:12, 96:5, 96:20, 98:6, 99:11, 99:16, 99:23, 101:7, 102:8, 103:23, 105:22, 106:6, 106:16, 107:1, 108:3, 110:14, 110:22, 115:22, 116:21, 118:17, 118:23, 121:8, 122:3, 124:6, 124:12, 125:6, 126:18, 127:2, 127:14, 128:3, 128:24, 130:12, 130:16, 131:5, 131:23, 132:19, 133:23, 134:10
**GUTMAN** [7] - 3:5, 5:14, 24:15, 39:25, 40:10, 42:24, 96:4
**GUYS** [16] - 10:12, 12:21, 56:22, 68:11, 73:15, 73:18, 75:15, 75:25, 85:25, 90:9, 107:23, 112:20, 127:23, 128:22, 129:20, 130:10
**GUYS'** [1] - 75:12

## H

**HAI** [2] - 51:7
**HALF** [3] - 51:21, 96:15
**HALFWAY** [1] - 96:15
**HAND** [2] - 123:14, 123:16
**HANDLE** [1] - 13:7
**HANDLED** [1] - 16:1
**HAPPY** [7] - 72:13, 72:15, 72:16, 72:21, 78:25, 79:1, 89:25
**HARD** [5] - 63:11, 63:12, 63:25, 86:9, 122:2
**HEAD** [3] - 20:5,

53:17, 79:17
**HEALTH** [1] - 45:1
**HEAR** [4] - 17:19, 43:21, 54:15, 84:10
**HEARD** [11] - 26:13, 41:5, 49:9, 52:4, 54:1, 54:16, 54:21, 58:24, 62:5, 70:22, 110:8
**HEARING** [1] - 83:15
**HEART** [3] - 43:24, 45:2, 45:4
**HEIRS** [1] - 109:22
**HELD** [13] - 5:5, 26:21, 27:3, 29:15, 29:16, 32:23, 42:18, 95:25, 96:25, 110:24, 111:12, 118:13, 133:14
**HELD** [1] - 135:10
**HELLIWELL** [8] - 6:8, 6:25, 12:13, 19:20, 35:17, 52:4, 63:2, 93:7
**HELP** [2] - 34:24, 51:10
**HELPED** [4] - 58:3, 76:8, 114:21, 115:7
**HELPING** [1] - 90:1
**HERB** [1] - 79:5
**HEREBY** [1] - 135:7
**HEREBY** [2] - 40:11, 119:25
**HIGH** [1] - 75:4
**HIGHLIGHT** [1] - 120:13
**HIGHLIGHTING** [1] - 47:1
**HILLS** [1] - 2:12
**HINDSIGHT** [1] - 69:13
**HISTORICAL** [1] - 26:4
**HISTORICALLY** [2] - 26:1, 31:14
**HISTORY** [1] - 55:9
**HIT** [2] - 52:20, 62:22
**HODGSON** [3] - 1:8, 3:4, 43:2
**HODGSON** [10] - 5:9, 6:23, 6:25, 8:13, 8:17, 9:5, 9:22, 10:3, 10:7, 10:14, 11:25, 13:25, 15:4, 15:11, 15:14, 15:15, 15:25, 16:9, 16:22, 16:23, 16:24, 17:2, 18:6, 18:14, 19:17, 19:20, 20:3, 20:20, 21:1, 21:23, 22:1, 22:5,

22:6, 23:8, 24:7, 24:9, 25:8, 25:12, 25:14, 26:17, 27:17, 29:24, 31:13, 31:24, 32:10, 32:16, 32:18, 33:11, 33:15, 33:17, 34:1, 34:13, 34:20, 34:21, 35:5, 35:8, 35:16, 35:20, 36:7, 37:2, 37:4, 37:17, 37:18, 38:9, 38:11, 39:1, 39:8, 39:12, 40:17, 42:15, 43:6, 46:8, 55:6, 55:19, 57:14, 62:6, 65:19, 65:20, 68:18, 70:16, 74:21, 76:2, 78:19, 80:20, 87:13, 91:4, 91:18, 91:20, 92:21, 93:7, 94:2, 96:6, 97:8, 98:23, 100:22, 102:11, 102:13, 102:16, 102:24, 107:15, 108:8, 108:18, 108:25, 109:5, 111:16, 117:13, 121:14, 130:5

**HODGSON'S** [7] - 8:5, 12:3, 14:8, 15:9, 55:12, 65:8, 120:2

**HOLD** [2] - 6:17, 90:11

**HOME** - 67:20, 74:10

**HONOR** [40] - 5:11, 6:11, 9:21, 16:8, 21:6, 24:18, 36:7, 36:12, 40:25, 41:24, 44:17, 45:10, 45:15, 55:3, 55:10, 65:7, 66:9, 72:21, 75:8, 79:16, 84:22, 85:10, 85:18, 88:16, 88:19, 89:24, 96:14, 97:4, 98:5, 98:8, 98:17, 106:1, 110:17, 110:20, 111:4, 121:13, 123:11, 128:1, 133:1, 134:19

**HONORABLE** [1] - 1:3

**HOPE** [4] - 42:13, 42:21, 80:9, 134:8

**HOPEFULLY** [1] - 42:2

**HOSPITAL** - 43:24

**HOSTED** [1] - 83:24

**HOUR** [4] - 41:16, 41:18, 96:15, 96:16

**HOURS** [15] - 134:12

**I**

**IDEA** [1] - 68:4

**IDENTIFICATION** [5] - 44:19, 85:19, 98:9, 98:19, 128:6

**IDENTIFICATION** [1] - 4:2

**IDENTIFIED** [2] - 28:25, 29:10

**IDENTIFY** [4] - 46:14, 46:19, 47:20, 48:15

**IDENTIFYING** [1] - 120:14

**IMMEDIATELY** [1] - 102:16

**IMMENSELY** [1] - 42:22

**IMPLIED** [11] - 19:9, 24:22, 24:23, 25:5, 25:9, 36:1, 36:2, 36:3, 36:9, 37:13, 37:18

**IMPLY** [1] - 22:12

**IMPLYING** [1] - 36:4

**IMPORTANT** [10] - 66:18, 66:22, 76:11, 87:16, 89:20, 90:2, 108:9, 108:10, 108:11

**IMPOSSIBLE** [1] - 32:9

**IN** [3] - 135:6, 135:10, 135:11

**INC** [6] - 7:1, 25:24, 28:11, 91:4, 93:8

**INCARNATION** [2] - 58:9, 58:18

**INCLUDE** [1] - 29:5

**INCLUDED** [2] - 5:24, 64:4

**INCLUDES** [1] - 124:21

**INCLUDING** [2] - 83:10, 91:23

**INCOME** [1] - 11:23

**INCOME** [51] - 6:7, 6:10, 6:24, 11:7, 11:9, 11:14, 12:11, 16:9, 22:17, 22:19, 23:1, 26:11, 31:22, 46:16, 46:17, 64:15, 65:1, 74:22, 76:4, 80:22, 81:7, 82:1, 82:4, 82:20, 92:3, 93:6, 93:25, 94:9, 95:5, 95:11, 102:18, 102:19, 106:20, 106:24, 107:16, 109:11, 109:13,

109:16, 109:18, 109:25, 112:6, 112:7, 113:3, 117:21, 118:3, 118:8, 118:12, 125:17, 126:25, 127:6, 128:9

**INCORPORATE** [2] - 6:13, 6:14

**INCORPORATED** [1] - 7:4

**INCORRECT** [1] - 7:19

**INCREASE** [1] - 47:14

**INCREASED** [1] - 12:14

**INCUR** [1] - 32:6

**INDEPENDENT** [1] - 11:12

**INDEX** [2] - 3:1, 4:1

**INDIVIDUAL** [10] - 10:8, 22:7, 23:10, 28:9, 32:11, 32:19, 33:11, 33:15, 33:25, 48:6

**INDIVIDUALLY** [4] - 18:6, 22:7, 91:1

**INDUSTRY** [2] - 78:16, 88:6

**INITIAL** [1] - 34:6, 34:12

**INSIDE** [1] - 52:14

**INSTANCE** [1] - 99:21

**INSTEAD** [2] - 71:14, 77:13

**INSTRUCTED** [1] - 43:25

**INSTRUCTIONS** [4] - 42:7, 96:18, 133:20, 134:17

**INTEGRATED** [1] - 25:7

**INTELLECTUAL** [1] - 20:21

**INTEND** [1] - 41:22

**INTENDED** [1] - 29:4

**INTENT** [4] - 38:4, 40:10, 40:13, 128:25

**INTENTION** [11] - 19:2, 21:11, 21:18, 22:2, 27:10, 27:11, 28:16, 30:5, 30:12, 30:16, 127:20

**INTEREST** [4] - 93:24, 95:10, 107:20, 131:13

**INTERESTED** [1] - 53:18

**INTERESTING** [3] - 19:13, 25:20, 33:19

**INTERESTINGLY** [1] -

25:22

**INTERESTS** [2] - 95:4, 113:3

**INTERPRETATION** [2] - 34:25, 37:12

**INTERPRETED** [1] - 30:15

**INTERPRETING** [1] - 37:23

**INTERRUPTING** [1] - 84:6

**INTRODUCTION** [2] - 9:6, 12:22

**INVERTED** [3] - 25:10, 25:11, 29:12

**INVOLVE** [1] - 22:25

**INVOLVED** [7] - 9:3, 9:11, 13:10, 13:14, 13:15, 26:3, 58:2

**INVOLVEMENT** [2] - 12:25, 45:7

**IRSC** [1] - 48:7

**IS** [2] - 135:9, 135:11

**ISOLATE** [1] - 108:7

**ISSUE** [13] - 7:25, 17:25, 18:14, 25:20, 31:10, 33:21, 40:3, 40:7, 40:16, 40:18, 44:1, 88:1, 96:5

**ISSUES** [1] - 87:17

**ITSELF** [6] - 92:6, 103:24, 121:10, 127:3, 130:13, 131:6

**J**

**JAMPOL** [1] - 80:2

**JANUARY** [2] - 34:10, 93:15

**JOHN** [1] - 63:4

**JOINED** [3] - 52:5, 60:8, 61:15

**JOINTLY** [1] - 41:8

**JOKING** [1] - 5:22

**JR** [1] - 1:3

**JUDGE** [1] - 127:6

**JUDGE** [1] - 1:3

**JUDGMENT** [1] - 34:7

**JUDGMENT** [5] - 33:16, 41:5, 123:25, 124:8, 125:13

**JUDGMENTS** [1] - 33:20

**JUDICIAL** - 135:12

**JULY** [1] - 124:1

**JUMP** [5] - 14:14, 23:4, 89:3, 90:23, 91:7

**JUNE** [4] - 44:21, 55:13, 65:11, 65:13

**JURISPRUDENCE** [1] - 33:7

**JURY** [32] - 5:6, 5:9, 19:12, 19:15, 19:16, 20:19, 29:19, 33:10, 33:14, 40:19, 40:21, 40:22, 42:19, 55:18, 65:18, 70:23, 88:21, 95:24, 96:1, 96:18, 97:1, 111:13, 117:2, 127:5, 133:13, 133:15, 133:20, 134:17

**JURY** [1] - 1:14

**JURY** [2] - 21:9, 27:8

**K**

**KARUNA** [1] - 46:8

**KATZENMILLER** [1] - 114:8

**KEEP** [11] - 72:12, 72:15, 72:16, 73:5, 73:8, 73:10, 76:8, 104:22, 105:6, 111:10, 112:6

**KEEPING** [1] - 101:23

**KEITH** [1] - 60:15

**KEPT** [2] - 73:12, 104:11

**KEVIN** [1] - 61:3

**KEYBOARDS** [2] - 51:16, 51:17

**KILLED** [1] - 51:11

**KIND** [6] - 22:16, 51:11, 75:23, 80:21, 95:21, 133:8

**KNOWING** [1] - 64:2

**KNOWLEDGE** [1] - 90:7, 90:10, 106:7

**KNOWN** [1] - 34:2

**KNOWS** [1] - 69:10

**KYLE** [1] - 5:12

**KYLE** [1] - 2:5

**L**

**LABEL** [3] - 86:20, 130:24, 131:1

**LACK** [2] - 8:3, 32:5

**LACKS** [1] - 47:22

**LADIES** [4] - 42:20, 42:25, 95:17, 133:4

**LANCE** [2] - 79:18, 79:19

**LANGUAGE** [9] - 30:14, 37:11, 70:11, 70:15, 91:25, 96:7, 108:20, 120:4,

124:22

**LAST** [9] - 24:19, 49:19, 65:19, 69:3, 69:13, 80:2, 96:19, 98:24, 108:6

**LAST** [13] - 9:5, 13:19, 82:5, 82:20, 86:3, 86:4, 86:10, 87:1, 93:21, 94:6, 101:2, 102:4, 118:9

**LASTED** [2] - 76:14, 120:20

**LATE** [2] - 50:8, 52:5

**LATELY** [1] - 82:12

**LAUNCHED** [1] - 77:14

**LAW** [1] - 2:10

**LAW** [12] - 15:5, 21:8, 25:2, 27:8, 27:24, 28:12, 32:25, 33:20, 34:9, 37:22, 38:2

**LAWSUIT** [15] - 43:23, 44:2, 45:20, 53:5, 57:7, 57:8, 110:8, 110:10, 110:12, 118:16, 121:4, 122:13, 127:11

**LAWYER** [15] - 69:5, 69:7, 79:20, 80:1, 88:6, 89:9, 89:20, 94:21, 103:13, 110:9, 111:15, 116:19, 117:21, 120:12, 122:19

**LAWYERS** [3] - 113:16, 133:11, 133:18

**LAY** [1] - 76:16

**LAYS** [1] - 38:19

**LEAD** [1] - 64:12

**LEAD-UP** [1] - 64:12

**LEADING** [2] - 45:11, 81:16

**LEARNED** [2] - 69:11, 121:3

**LEAST** [12] - 9:7, 9:12, 13:1, 13:24, 15:5, 18:22, 19:2, 19:8, 41:5, 61:25, 62:19, 77:1

**LEAVE** [3] - 36:13, 50:9, 132:24

**LEAVING** [8] - 16:9, 50:2, 51:6, 87:3, 87:5, 87:17, 87:19, 90:4

**LED** [1] - 59:1

**LEFT** [21] - 15:14, 19:6, 29:19, 36:22, 36:23, 43:8, 50:12,

50:20, 54:21, 58:8, 78:9, 79:5, 87:6, 95:9, 95:10, 96:6, 96:9, 96:10, 97:8, 97:12

**LEGAL** [22] - 29:14, 33:25, 40:20, 43:22, 45:6, 45:7, 66:18, 66:22, 68:25, 69:22, 70:19, 77:10, 78:5, 81:23, 91:13, 99:11, 99:16, 99:23, 99:24, 105:23, 117:16, 120:16

**LEGENDARY** [1] - 115:21

**LENGTHY** [1] - 120:18

**LEONARD** [1] - 79:20

**LESS** [4] - 41:12, 124:18, 126:11, 133:23

**LETTER** [23] - 9:23, 12:3, 21:8, 25:2, 43:22, 44:10, 44:12, 44:21, 45:18, 46:4, 54:20, 57:5, 57:7, 103:11, 103:16, 104:15, 105:6, 105:12, 105:17, 106:15, 106:22, 107:5, 107:14

**LETTER** [1] - 4:8

**LETTING** [1] - 48:9

**LIABILITY** [2] - 32:6, 33:8

**LIABLE** [8] - 16:23, 26:21, 27:3, 28:15, 29:16, 34:13, 34:14, 41:9

**LICENSES** [2] - 48:13, 48:18

**LIFE** [6] - 45:7, 49:20, 75:13, 78:20, 87:20, 92:4

**LIKELY** [2] - 42:5, 42:6

**LIMIT** [1] - 5:23

**LIMITED** [2] - 93:11, 124:21

**LIMITED** [1] - 7:1

**LINDA** [1] - 114:2

**LINE** [4] - 8:21, 27:9, 55:13, 55:14

**LINES** [6] - 55:14, 65:9, 65:16, 88:12

**LISA** [1] - 113:19

**LIST** [1] - 60:13

**LIST** [2] - 61:5, 61:7

**LISTENED** [1] - 80:18

**LISTS** [1] - 12:13

**LITERALLY** [2] - 19:25, 20:8

**LIVE** [2] - 62:20, 72:19

**LIVE** [1] - 14:18

**LIVING** [1] - 49:20

**LLP** [1] - 2:4

**LOGIC** [2] - 25:10, 29:12

**LOGICALLY** [1] - 30:15

**LONDON** [1] - 57:24

**LOOK** [32] - 11:10, 11:17, 14:1, 16:7, 16:25, 17:20, 19:18, 25:23, 26:13, 26:25, 30:13, 33:22, 37:12, 38:2, 39:21, 44:4, 91:17, 92:19, 97:17, 102:13, 103:9, 106:9, 109:9, 119:11, 119:12, 119:23, 123:18, 129:22, 130:1, 130:4, 130:8, 131:3

**LOOKED** [4] - 64:22, 75:23, 77:21, 106:23

**LOOKING** [17] - 6:1, 7:10, 8:7, 11:16, 14:15, 15:5, 17:3, 21:3, 32:8, 38:4, 66:21, 69:3, 93:17, 120:17, 120:24, 124:23, 130:20

**LOOKS** [2] - 90:16, 131:2

**LOS** [2] - 83:7, 83:23

**LOS** [3] - 1:16, 1:25, 5:2

**LOST** [1] - 53:20

**LOTT** [1] - 115:25

**LOTT** [1] - 116:2

**LOVE** [1] - 53:5

**LOVED** [1] - 62:6

**LUCRATIVE** [1] - 75:25

**LUNCH** [4] - 95:23, 133:3, 133:11, 134:21

---

# M

**MAIN** [2] - 68:5, 106:19

**MAJOR** [1] - 43:24

**MAJORITY** [2] - 34:1, 82:16

**MANAGE** [1] - 58:6

**MANAGED** [1] - 16:6

**MANAGEMENT** [5] - 13:7, 13:11, 20:9,

25:22, 25:24

**MANAGER** [18] - 13:5, 13:6, 13:12, 43:14, 57:17, 57:18, 58:12, 61:16, 61:22, 71:16, 79:24, 80:2, 97:12, 112:18, 114:1, 114:8, 114:19, 115:24

**MANAGERS** [3] - 113:24, 114:2, 114:14

**MANAGES** [1] - 116:4

**MARCH** [2] - 93:19, 94:18

**MARGERESON** [13] - 13:8, 19:20, 59:12, 62:5, 64:14, 79:24, 95:9, 96:7, 97:12, 110:3, 110:8, 110:13, 114:24

**MARGERESON'S** [2] - 62:1, 93:8, 94:23

**MARK** [1] - 76:19

**MARKED** [5] - 44:19, 85:19, 98:9, 98:19, 128:6

**MARKET** [1] - 49:4

**MARKETING** [1] - 76:11

**MAROON** [2] - 76:20, 76:21

**MARRIAGE** [1] - 46:12

**MATCH** [1] - 88:17

**MATERIAL** [3] - 17:12, 17:15, 83:12

**MATH** [2] - 106:13, 120:24

**MATTER** [1] - 135:11

**MATTER** [5] - 25:6, 95:18, 95:21, 133:5, 133:8

**MATTERS** [6] - 18:18, 21:11, 40:2, 45:7, 113:17, 133:10

**MAX** [1] - 41:25

**MEAN** [12] - 12:24, 17:19, 21:24, 32:16, 37:24, 65:2, 71:6, 72:17, 78:22, 80:16, 111:1, 129:4

**MEANING** [7] - 20:13, 28:1, 38:15, 38:16, 38:19, 99:7, 105:5

**MEANS** [6] - 10:16, 70:24, 71:7, 71:21, 101:25, 113:12

**MEANT** [1] - 105:9

**MECHANISM** [1] - 104:4

**MEET** [1] - 55:8

**MEETING** [16] - 59:6, 59:10, 59:13, 64:13, 64:25, 65:2, 69:19, 82:16, 82:19, 83:5, 83:7, 83:13, 83:22, 83:25, 84:11, 93:20

**MEETINGS** [2] - 59:21, 114:22

**MEMBER** [1] - 53:8

**MEMBERS** [19] - 27:25, 30:8, 46:20, 47:16, 54:9, 60:9, 64:15, 71:9, 72:1, 72:6, 72:12, 72:15, 73:5, 81:8, 83:2, 83:10, 83:23, 105:4, 124:22

**MEMORANDUM** [6] - 7:2, 13:9, 64:10, 93:14, 128:12, 129:24

**MEMORANDUM** [5] - 7:14, 34:9, 35:15, 82:8

**MEMORIALIZING** [1] - 82:9

**MENTION** [4] - 6:12, 28:19, 28:22, 77:6

**MENTIONED** [8] - 9:12, 53:12, 66:16, 84:18, 88:2, 122:19, 127:8, 127:9

**MERCHANDISING** [1] - 115:19

**MERCHANDIZING** [1] - 115:21

**MESA** [1] - 2:6

**MET** [5] - 59:9, 59:12, 59:19, 69:12, 69:18

**MICHELLE** [4] - 88:4, 88:23, 89:25, 113:15

**MIDAFTERNOON** [1] - 42:2

**MIDDLE** [2] - 83:6, 126:6

**MIDDLEMAN** [2] - 12:25, 15:22

**MIDWAY** [1] - 91:18

**MIGHT** [5] - 24:13, 42:2, 107:7, 109:1, 134:8

**MILLAR** [2] - 60:22, 60:23

**MILLION** [2] - 64:5, 74:13

**MIND** [8] - 13:24, 15:1, 19:10, 23:9, 39:12, 42:16, 130:5, 133:9

**MINE** [2] - 47:5, 49:1

MINOR [1] - 13:21
MINUTE [4] - 8:20, 58:21, 66:5, 89:3
MINUTES [6] - 33:24, 41:12, 41:25, 96:15, 133:23, 134:6
MIRACLE [1] - 80:16
MIRANDA [4] - 1:23, 135:5, 135:18, 135:19
MIRANDAALGORRI @GMAIL.COM [1] - 1:25
MISMANAGEMENT [7] - 7:1, 9:8, 11:25, 93:7, 93:8, 109:24
MISREPRESENTED [1] - 54:13
MISSED [2] - 42:22, 86:15
MISSING [2] - 7:17, 28:7
MISTAKE [1] - 111:5
MISTAKEN [1] - 118:11
MISUNDERSTOOD [1] - 31:18
MIXING [1] - 66:6
MODIFIABLE [1] - 124:9
MODIFICATION [1] - 94:17
MODIFIED [2] - 7:3, 93:19
MOMENT [8] - 23:15, 35:4, 60:1, 88:15, 89:20, 98:22, 100:22, 109:9
MOMENT [1] - 64:5
MOMENTS [1] - 74:5
MONDAY [2] - 1:15, 5:1
MONEY [49] - 10:15, 12:8, 15:22, 16:17, 20:9, 20:15, 21:2, 26:9, 30:7, 30:25, 31:2, 31:3, 31:4, 31:5, 31:8, 31:13, 31:19, 32:23, 33:18, 41:3, 45:18, 48:11, 48:17, 49:1, 49:14, 53:19, 65:5, 67:4, 68:11, 68:12, 72:11, 72:17, 72:19, 83:2, 83:11, 99:8, 101:14, 101:19, 101:23, 104:8, 105:7, 106:14, 112:25, 117:6, 122:1, 126:13, 127:23

MONEY'S [1] - 32:24
MONEYMAN [1] - 20:8
MONIES [14] - 26:8, 31:6, 31:19, 41:6, 41:7, 49:15, 71:5, 71:7, 102:17, 103:1, 103:22, 104:3, 118:5, 119:17
MONTH [1] - 34:10
MONTHS [5] - 62:24, 73:20, 73:22, 77:14, 85:24
MORNING [13] - 5:11, 5:13, 5:14, 20:5, 35:7, 42:20, 42:25, 43:6, 43:7, 55:6, 55:7, 95:15, 134:14
MORNING [1] - 1:15
MOST [3] - 41:6, 75:24, 78:14
MOTION [3] - 22:14, 22:16, 34:7
MOTION [1] - 22:25
MOVE [13] - 7:22, 19:5, 44:15, 45:15, 51:2, 66:8, 67:6, 79:11, 85:9, 87:23, 98:4, 98:16, 127:25
MOVING [1] - 111:10
MR [329] - 5:11, 5:14, 6:11, 6:16, 6:19, 7:6, 7:8, 7:21, 8:6, 8:12, 8:17, 9:20, 10:5, 10:10, 10:14, 10:20, 11:2, 11:10, 11:14, 11:18, 11:20, 11:23, 12:2, 12:7, 12:11, 12:15, 12:19, 13:4, 13:17, 14:3, 14:10, 14:16, 14:21, 14:24, 15:13, 15:25, 16:7, 16:18, 17:10, 18:16, 21:5, 21:8, 21:16, 21:18, 21:24, 22:6, 22:10, 22:24, 23:5, 23:12, 23:15, 23:21, 23:24, 24:5, 24:18, 25:1, 25:18, 26:18, 28:5, 28:22, 29:7, 29:9, 29:21, 29:24, 30:1, 30:11, 30:23, 30:25, 31:12, 31:21, 32:3, 32:12, 32:20, 33:12, 33:19, 34:4, 34:22, 34:25, 35:21, 35:24, 36:17, 36:19, 36:23, 37:1, 37:8, 37:10, 37:22, 38:12, 38:15, 38:20, 38:22, 38:25, 39:4, 39:7,

39:14, 39:17, 39:20, 39:23, 40:6, 40:13, 40:19, 40:23, 41:8, 41:12, 41:16, 41:19, 41:21, 41:24, 42:7, 42:10, 42:11, 42:25, 43:5, 44:15, 44:17, 44:21, 45:10, 45:15, 45:17, 46:5, 46:7, 47:22, 47:25, 51:2, 51:5, 55:1, 55:3, 55:5, 55:16, 55:19, 59:24, 60:4, 60:6, 65:7, 65:11, 65:15, 65:19, 65:23, 66:8, 66:11, 67:6, 67:9, 67:23, 67:25, 68:2, 68:4, 68:25, 69:2, 69:8, 69:15, 69:22, 69:25, 70:2, 70:6, 70:12, 70:15, 70:19, 70:22, 72:8, 72:12, 72:20, 72:23, 74:17, 74:20, 74:24, 75:2, 75:8, 75:11, 75:18, 76:5, 76:8, 77:10, 77:13, 78:17, 78:19, 79:6, 79:8, 79:11, 79:16, 80:12, 80:15, 80:24, 81:2, 81:5, 81:9, 81:11, 81:13, 81:15, 81:18, 81:20, 81:22, 81:25, 82:7, 82:13, 83:19, 83:22, 84:4, 84:8, 84:13, 84:15, 84:17, 84:21, 84:24, 85:1, 85:9, 85:12, 85:17, 85:21, 87:11, 87:23, 88:1, 88:10, 88:15, 88:18, 88:22, 88:24, 89:2, 89:10, 89:14, 89:16, 89:19, 89:24, 90:7, 90:12, 90:14, 91:13, 91:16, 92:5, 92:8, 92:13, 92:17, 95:12, 96:5, 96:14, 96:20, 97:4, 98:4, 98:6, 98:8, 98:11, 98:16, 98:21, 99:11, 99:14, 99:16, 99:21, 99:23, 100:4, 101:7, 101:10, 102:8, 102:10, 103:23, 104:2, 105:22, 105:25, 106:3, 106:6, 106:9, 106:16, 106:19, 107:1, 107:5, 108:3, 108:5, 110:14, 110:17, 110:19,

110:22, 111:4, 111:11, 111:14, 115:22, 115:24, 116:13, 116:15, 116:21, 117:1, 117:10, 117:13, 118:17, 118:19, 118:23, 118:25, 121:8, 121:13, 122:3, 122:5, 122:10, 122:18, 123:10, 123:15, 123:21, 124:6, 124:8, 124:12, 124:13, 124:15, 125:6, 125:10, 126:18, 126:22, 127:2, 127:11, 127:14, 127:17, 127:25, 128:3, 128:5, 128:8, 128:24, 129:2, 130:12, 130:15, 130:16, 130:18, 131:5, 131:8, 131:23, 132:1, 132:19, 132:23, 133:1, 133:23, 134:1, 134:4, 134:6, 134:10, 134:19
MUCKING [3] - 63:2, 73:8, 73:10
MUSIC [36] - 6:21, 11:24, 12:11, 20:24, 26:9, 26:21, 26:24, 29:1, 29:5, 29:10, 39:10, 39:11, 40:10, 40:11, 70:7, 70:17, 71:3, 71:5, 71:13, 88:8, 91:8, 91:12, 92:2, 92:11, 92:17, 92:20, 98:14, 99:1, 99:6, 99:14, 100:12, 100:14, 101:16, 104:23, 105:8, 109:21
MUSIC [14] - 48:20, 49:20, 63:15, 64:2, 74:15, 76:9, 77:15, 79:17, 88:6, 113:24, 115:14, 115:17, 115:21, 131:21
MUSICAL [1] - 52:8
MUSICIAN [4] - 48:23, 49:17, 49:25, 50:3
MUSICIANS [3] - 52:16, 54:9, 60:10
MUST [4] - 22:18, 25:8, 68:4, 79:4

N

NAME [30] - 21:10, 28:9, 28:10, 33:6, 50:25, 54:22, 55:25, 56:4, 56:5, 56:6, 56:10, 56:11, 56:14, 56:19, 56:22, 56:23, 56:25, 57:25, 58:8, 60:19, 76:22, 88:4, 103:13, 108:13, 108:19, 113:19, 114:14, 115:25
NAMES [2] - 60:13, 109:9
NARRATIVE [1] - 57:13
NATURE [4] - 8:23, 17:1, 22:16, 22:18
NAVY [1] - 68:1
NEAR [1] - 121:18
NECESSARY [2] - 29:14, 102:25
NECESSITATE [1] - 40:17
NEED [9] - 9:18, 20:15, 32:7, 42:12, 47:25, 52:24, 85:15, 88:15, 89:22
NEEDED [5] - 19:3, 26:6, 65:5, 72:19, 127:22
NEEDING [1] - 72:11
NEGOTIATED [1] - 87:10
NEGOTIATING [1] - 15:23
NEGOTIATION [4] - 9:3, 15:18, 81:6, 120:18
NEGOTIATIONS [2] - 19:1, 40:4
NET [2] - 6:7, 12:12
NEVADA [1] - 4:6
NEVER [17] - 9:16, 49:14, 51:9, 54:20, 60:11, 69:18, 74:21, 76:3, 77:8, 80:21, 81:11, 81:20, 87:6, 90:7, 108:25, 117:9
NEVERTHELESS [1] - 6:1
NEW [5] - 10:21, 26:16, 27:22, 82:14, 118:20
NEXT [12] - 12:8, 28:19, 28:22, 45:16, 46:6, 51:5, 51:7, 66:10, 73:15, 83:21, 84:7, 119:11

**NICE** [1] - 30:20
**NICHOLAS** [1] - 5:12
**NICHOLAS** [1] - 2:5
**NICK** [2] - 61:11, 61:13
**NIGHT** [2] - 19:25, 53:11
**NINE** [2] - 60:9, 60:10
**NO** [1] - 135:19
**NON** [1] - 124:9
**NON-MODIFIABLE** [1] - 124:9
**NONE** [1] - 132:4
**NONETHELESS** [1] - 65:19
**NONRESPONSIVE** [3] - 35:4, 66:8, 72:21
**NOON** [1] - 41:17
**NORMAL** [6] - 9:14, 9:18, 15:7, 27:18, 32:23, 124:18
**NORMALLY** [1] - 17:7
**NORTON** [1] - 57:17
**NORWAY** [1] - 58:23
**NOTE** [2] - 30:19, 33:23
**NOTEBOOK** [1] - 123:6
**NOTED** [2] - 5:22, 96:11
**NOTES** [3] - 5:18, 6:3, 57:13
**NOTHING** [13] - 14:6, 14:9, 16:17, 23:1, 24:17, 27:23, 35:15, 36:23, 38:8, 55:1, 68:7, 75:17, 133:1
**NOTION** [1] - 17:11
**NOTWITHSTANDING** [1] - 91:22
**NOWHERE** [2] - 30:15, 121:18
**NUMBER** [4] - 44:5, 97:21, 113:21, 130:7
**NUMBER** [1] - 4:3
**NUMBERS** [1] - 11:17

## O

**O'CLOCK** [2] - 133:10, 133:12
**O'MALLEY** [1] - 2:5
**O'MALLEY** [4] - 5:12, 70:9, 102:12, 134:6
**OBJECTION** [80] - 35:4, 44:16, 44:17, 45:10, 46:5, 47:22, 51:2, 55:15, 55:16, 60:4, 67:23, 68:2, 68:25, 69:8, 69:22,

70:2, 70:12, 70:19, 72:8, 74:17, 74:24, 76:5, 77:10, 78:17, 79:6, 79:11, 80:12, 80:24, 81:9, 81:13, 81:18, 81:22, 83:19, 84:4, 84:15, 85:11, 85:12, 88:14, 88:16, 88:24, 89:10, 89:17, 91:13, 95:12, 98:6, 99:11, 99:16, 99:24, 101:7, 102:8, 103:23, 105:22, 106:6, 106:16, 107:1, 108:3, 110:14, 110:22, 111:1, 111:8, 115:22, 116:21, 118:17, 118:23, 121:8, 122:3, 124:6, 124:12, 125:6, 126:18, 127:2, 127:14, 128:2, 128:3, 128:24, 130:12, 130:17, 131:5, 131:23, 132:19
**OBLIGATED** [2] - 36:8, 126:23
**OBLIGATION** [13] - 23:8, 23:10, 24:21, 24:23, 25:8, 25:10, 27:6, 30:17, 37:2, 37:3, 46:20, 46:21, 127:13
**OBSTACLES** [2] - 29:13, 29:14
**OBVIOUSLY** [7] - 6:13, 37:24, 38:1, 40:13, 42:12, 43:14, 51:11
**OCCASION** [3] - 77:23, 77:24, 78:24
**OCTOBER** [2] - 61:25, 85:22
**OF** [11] - 1:2, 1:14, 2:1, 3:1, 4:1, 135:1, 135:7, 135:9, 135:12, 135:15
**OFFERED** [1] - 77:19
**OFFICE** [1] - 118:11
**OFFICIAL** [4] - 1:24, 135:1, 135:5, 135:19
**OFFICIAL** [1] - 109:4
**OFTEN** [1] - 66:19
**OLD** [1] - 49:22
**ONCE** [3] - 48:21, 91:1, 91:4
**ONE** [42] - 9:22, 10:23, 21:2, 21:10, 26:18,

31:12, 40:7, 40:8, 40:25, 42:5, 43:20, 45:24, 46:21, 48:24, 51:11, 54:13, 70:6, 81:16, 83:17, 86:13, 86:14, 88:1, 90:2, 97:18, 99:22, 106:19, 108:6, 114:1, 116:17, 118:6, 119:2, 125:9, 126:15, 126:20, 127:9, 128:17, 129:16, 129:23, 130:20, 134:10
**ONE-YEAR** [1] - 81:16
**ONES** [1] - 39:9
**OOO** [1] - 5:3
**OPEN** [8] - 5:6, 42:19, 45:4, 96:1, 97:1, 111:13, 130:4, 133:15
**OPERATES** [2] - 6:23, 93:1
**OPINION** [2] - 95:18, 133:5
**OPPORTUNITY** [3] - 89:4, 89:8, 89:22
**OPPOSED** [1] - 26:8
**OPPOSITE** [1] - 121:24
**OPTED** [1] - 103:6
**ORAL** [3] - 6:23, 13:18, 93:1
**ORALLY** [1] - 7:3, 93:19
**ORDER** [1] - 18:12
**ORDER** [1] - 34:12
**ORDINARY** [2] - 9:15, 99:15
**ORIGINAL** [2] - 54:10, 58:18
**ORIGINALLY** [1] - 58:10
**OTHERWISE** [1] - 33:6
**OUTSIDE** [4] - 5:6, 9:17, 96:1, 133:15
**OVERLY** [1] - 20:21
**OVERRULE** [1] - 89:12
**OVERRULED** [32] - 47:24, 51:4, 60:5, 69:24, 70:4, 70:14, 72:10, 72:22, 74:18, 80:13, 83:20, 88:19, 89:18, 92:7, 92:14, 95:14, 96:12, 99:18, 99:25, 101:8, 103:25, 105:24, 107:2, 116:23,

124:14, 125:7, 126:19, 127:4, 129:1, 130:17, 131:25, 132:20
**OWE** [1] - 30:25
**OWN** [11] - 16:24, 23:10, 28:9, 28:10, 39:7, 39:8, 48:7, 52:22, 54:22, 102:6, 114:11
**OWNED** [3] - 19:22, 35:13, 91:24
**OWNERSHIP** [2] - 54:4, 56:19

## P

**P.M** [1] - 134:22
**P.M.K** [1] - 65:9
**PACKAGE** [2] - 14:8, 23:9
**PACKED** [1] - 75:15
**PAGE** [2] - 3:3, 135:11
**PAGE** [42] - 5:23, 8:2, 8:20, 11:16, 11:17, 11:18, 12:9, 14:15, 16:5, 55:13, 55:14, 65:9, 65:13, 65:15, 88:12, 89:3, 90:23, 91:7, 91:16, 92:19, 94:1, 98:24, 102:12, 106:12, 108:7, 123:23, 124:13, 124:15, 125:10, 125:15, 125:24, 126:2, 126:4, 130:3, 130:6, 130:14, 130:15, 130:16
**PAGES** [2] - 123:22, 130:23
**PAGES** [1] - 1:9
**PAID** [17] - 20:12, 30:21, 37:25, 38:20, 38:22, 39:2, 44:1, 45:24, 47:13, 49:5, 49:14, 49:15, 105:9, 105:19, 107:23, 131:1
**PALMER** [1] - 60:17
**PAM** [6] - 43:25, 44:11, 44:12, 44:22, 114:12, 132:5
**PAPERS** [1] - 8:21
**PAPERWORK** [1] - 78:5
**PARAGRAPH** [28] - 7:13, 11:19, 11:20, 19:21, 25:21, 70:8, 70:11, 70:16, 70:17,

91:17, 93:25, 94:1, 100:21, 102:13, 103:4, 108:7, 119:18, 119:23, 120:6, 124:24, 130:4, 130:8, 130:9, 130:15, 130:18, 130:21, 130:25, 131:3
**PARDON** [1] - 45:1
**PART** [16] - 13:11, 15:9, 16:22, 18:17, 18:19, 20:2, 20:3, 27:10, 46:15, 46:18, 61:25, 62:19, 76:10, 91:24, 122:23, 123:1
**PARTICIPANTS** [2] - 35:2, 120:2
**PARTICIPATE** [1] - 113:13
**PARTICIPATED** [2] - 119:20, 119:22
**PARTICIPATION** [1] - 34:8
**PARTICULAR** [6] - 27:1, 27:9, 28:8, 28:25, 29:1, 36:5
**PARTICULARLY** [1] - 27:5
**PARTIES** [10] - 9:6, 13:14, 19:1, 30:23, 32:25, 33:2, 38:5, 99:10, 119:25, 124:19
**PARTNER** [2] - 21:10, 28:9
**PARTNERS** [6] - 6:22, 21:13, 39:11, 92:21, 112:20
**PARTNERSHIP** [14] - 6:22, 6:24, 16:13, 18:13, 21:9, 21:11, 21:19, 22:8, 28:15, 28:17, 33:4, 39:10, 92:21, 93:1
**PARTY** [17] - 20:17, 28:14, 29:1, 29:5, 29:10, 30:1, 31:2, 32:22, 33:2, 33:3, 33:4, 33:5, 34:18, 35:20, 100:11, 113:11
**PASSIVE** [1] - 26:2
**PAST** [4] - 9:15, 15:20, 17:4, 49:6
**PASTES** [1] - 29:3
**PAUL** [14] - 43:13, 43:15, 43:19, 48:10, 49:9, 57:17, 57:18, 57:23, 103:16,

104:4, 105:2, 107:24, 132:9
**PAY** [38] - 9:24, 10:4, 10:12, 12:3, 25:8, 25:11, 26:7, 30:9, 31:5, 36:8, 37:4, 37:7, 37:16, 37:17, 38:11, 39:9, 39:10, 39:13, 40:24, 43:25, 71:14, 102:24, 105:3, 106:24, 107:15, 107:24, 119:12, 122:23, 123:1, 125:4, 126:14, 126:17, 126:23, 126:24, 128:22, 129:19, 131:18
**PAYING** [18] - 23:15, 32:2, 43:9, 43:21, 71:14, 92:3, 92:18, 101:5, 101:10, 106:25, 107:16, 109:21, 110:3, 116:6, 118:3, 131:8, 131:15
**PAYMENT** [13] - 8:22, 30:24, 32:4, 32:6, 32:17, 37:15, 44:22, 45:22, 46:4, 102:25, 119:17, 120:1
**PAYMENTS** [15] - 9:2, 22:2, 31:14, 32:15, 32:16, 43:18, 46:15, 46:19, 47:16, 110:6, 117:15, 119:2, 119:20, 127:21
**PAYOUT** [6] - 126:1, 126:8, 126:13, 126:16, 127:9, 127:12
**PAYOUTS** [1] - 124:19
**PAYS** [1] - 130:10
**PEAK** [1] - 75:14
**PENALTY** [2] - 125:21, 125:25
**PENDING** [2] - 97:5, 97:6
**PEOPLE** [5] - 30:3, 38:25, 39:4, 78:4, 78:12
**PERCEIVE** [1] - 40:3
**PERCENT** [39] - 9:24, 9:25, 10:12, 10:17, 10:18, 10:23, 11:4, 11:24, 11:25, 12:4, 12:15, 12:16, 12:17, 23:13, 23:16, 23:17, 23:22, 24:10, 24:25, 25:12, 25:14, 25:15,

94:4, 94:6, 94:8, 94:11, 100:24, 101:2, 101:12, 101:25, 102:3, 104:13, 105:3, 124:10
**PERCENTAGE** [7] - 12:14, 37:19, 105:3, 105:7, 105:10, 125:4, 126:21
**PERCENTAGES** [7] - 9:4, 9:5, 10:22, 11:1, 24:7, 100:23, 101:6
**PERFORM** [1] - 53:8
**PERFORMANCE** [3] - 62:20, 102:18, 102:20
**PERFORMING** [4] - 26:6, 26:12, 53:7, 119:3
**PERHAPS** [2] - 18:18, 40:19
**PERIOD** [3] - 51:18, 59:21, 81:16
**PERJURY** [2] - 125:21, 125:25
**PERMISSION** [8] - 65:7, 84:22, 84:24, 88:10, 113:7, 113:8, 123:10, 123:12
**PERPETUITY** [6] - 22:22, 25:12, 94:3, 94:20, 96:7, 131:4
**PERSON** [9] - 20:12, 20:19, 21:19, 22:4, 22:8, 26:7, 31:9, 31:11, 88:7
**PERSONAL** [7] - 97:12, 106:6, 112:9, 113:24, 114:14, 114:19, 122:20
**PERSONALLY** [2] - 8:13, 132:4
**PERSPECTIVE** [6] - 6:6, 21:1, 26:25, 29:23, 34:5, 34:16
**PERTAINS** [1] - 94:8
**PETTY** [1] - 58:6
**PG** [2] - 4:3
**PHILLIPS** [1] - 2:4
**PHOTO** [1] - 75:7
**PHOTOGRAPH** [7] - 75:6, 75:15, 77:21, 78:2, 78:7, 78:13, 98:1
**PHOTOGRAPHS** [1] - 78:15
**PHRASE** [5] - 30:12, 108:19, 109:1, 109:5, 125:23

**PHYSICAL** [1] - 107:8
**PIECE** [3] - 13:20, 14:3, 82:13
**PILE** [1] - 78:5
**PLAINTIFF** [3] - 5:24, 6:4, 22:18
**PLAINTIFF'S** [1] - 45:1
**PLAINTIFFS** [2] - 1:6, 2:3
**PLAINTIFFS** [27] - 5:12, 25:2, 25:9, 26:20, 28:24, 31:6, 33:25, 34:6, 34:17, 35:25, 37:4, 37:7, 37:24, 43:9, 43:10, 43:18, 43:22, 44:11, 44:23, 46:1, 46:15, 49:8, 57:3, 65:1, 104:10, 127:13, 132:9
**PLAINTIFFS'** [1] - 27:20
**PLANNED** [1] - 53:2
**PLANNING** [1] - 117:15
**PLANS** [2] - 53:4, 122:6
**PLAQUES** [1] - 74:10
**PLATINUM** [1] - 74:8
**PLAUSIBLE** [2] - 38:16, 38:19
**PLAY** [10] - 33:13, 41:1, 51:10, 51:16, 51:17, 51:19, 51:20, 55:11, 65:8, 88:11
**PLAYED** [3] - 53:10, 54:10, 112:3
**PLAYING** [5] - 37:11, 51:22, 55:18, 65:18, 88:21
**PLEADING** [1] - 36:13
**PLEADINGS** [1] - 4:6
**PLUS** [1] - 49:19
**POCKET** [2] - 28:13
**POINT** [20] - 16:19, 17:9, 18:25, 20:21, 25:20, 26:18, 33:19, 35:21, 35:25, 36:7, 36:15, 36:24, 37:12, 45:5, 46:11, 76:16, 81:16, 96:10, 105:20, 134:10
**POINTS** [1] - 68:5
**POMFRET** [2] - 1:8, 43:2
**POMFRET** [3] - 3:4, 5:8
**POPE** [15] - 7:1, 12:23, 13:14, 13:17, 13:18,

14:3, 79:2, 93:11, 93:12, 95:10, 96:7, 97:8, 109:18, 109:19
**POPE'S** [2] - 14:10, 95:1
**POPULAR** [1] - 80:17
**PORTION** [10] - 43:10, 104:9, 104:11, 104:13, 104:22, 106:24, 107:16, 118:3, 123:2, 132:7
**POSITION** [10] - 8:14, 14:19, 16:20, 16:23, 17:14, 27:20, 29:10, 33:9, 39:9, 41:9
**POSSIBILITY** [1] - 81:12
**POSSIBLE** [5] - 74:20, 76:2, 80:20
**POSSIBLY** [2] - 57:12, 111:7
**POST** [4] - 14:21, 14:22, 15:25, 16:9
**POST-HODGSON** [1] - 15:25
**POST-ROGER** [1] - 16:9
**POTENTIAL** [1] - 33:7
**POWER** [1] - 25:24
**PRACTICE** [1] - 66:17
**PREPARED** [5] - 34:17, 42:10, 42:11, 42:13, 82:8
**PREPONDERANCE** [1] - 28:16
**PRESENCE** [6] - 5:6, 42:19, 96:1, 97:1, 111:13, 133:15
**PRESENT** [2] - 29:11, 83:24
**PRESIDIO** [1] - 2:6
**PRESUME** [1] - 56:21
**PRESUMPTION** [3] - 25:13, 28:11, 28:12
**PRETRIAL** [1] - 34:12
**PRETTY** [7] - 23:7, 50:19, 55:22, 73:13, 73:14, 120:18, 129:14
**PREVIEW** [1] - 22:14
**PREVIOUS** [1] - 12:3
**PREVIOUSLY** [1] - 13:8
**PRIMA** [1] - 26:23
**PRIMARY** [1] - 8:21
**PRIME** [2] - 75:12, 116:12
**PRINCIPLE** [2] - 28:5, 110:21
**PRINGLE** [2] - 114:15,

115:11
**PRIVILEGE** [4] - 89:11, 89:16, 90:12, 116:22
**PRIVILEGED** [2] - 67:12, 111:7
**PROBLEM** [2] - 8:9, 18:15
**PROCEED** [3] - 42:11, 65:17, 88:20
**PROCEEDING** [2] - 122:21, 126:23
**PROCEEDINGS** [1] - 135:10
**PROCEEDINGS** [8] - 5:5, 42:18, 46:14, 95:25, 96:25, 110:24, 111:12, 133:14
**PROCESS** [3] - 46:18, 69:13, 74:1
**PRODUCT** [4] - 61:25, 62:16, 62:19, 120:18
**PRODUCTION** [1] - 108:16
**PRODUCTIONS** [2] - 28:11, 91:4
**PROFESSIONAL** [3] - 49:25, 75:12, 80:1
**PROFESSIONALLY** [2] - 51:13, 51:23
**PROGRAM** [1] - 83:11
**PROJECT** [1] - 84:14
**PROMISE** [2] - 70:6, 70:18
**PROMISED** [2] - 24:8, 24:9
**PROMISES** [5] - 69:21, 69:25, 72:6, 72:9, 91:11
**PROMOTERS** [1] - 109:2
**PROMOTIONAL** [1] - 76:11
**PROOF** [2] - 12:16, 106:13
**PROPORTIONS** [2] - 6:10, 38:23
**PROPOSED** [2] - 34:12, 134:17
**PROPOSITION** [1] - 130:25
**PROTECTING** [1] - 90:4
**PROUD** [1] - 74:19
**PROVIDING** [1] - 46:17
**PROVING** [1] - 28:15
**PROVISION** [11] - 36:15, 56:13, 56:19,

102:10, 103:6, 108:6, 108:8, 108:9, 108:22, 108:24, 109:3
**PUBLIC** [2] - 102:18, 102:20
**PUBLICLY** [1] - 124:4
**PUBLICLY-AVAILABLE** [1] - 124:4
**PUBLISH** [1] - 98:21
**PUBLISHER** [1] - 119:25
**PUBLISHER'S** [2] - 26:7, 26:11
**PUBLISHING** [2] - 53:17, 117:25
**PUBLISHING** [23] - 6:7, 6:10, 14:17, 15:18, 15:19, 15:23, 16:5, 26:1, 26:2, 26:5, 26:8, 26:10, 28:25, 35:1, 65:6, 77:15, 79:17, 82:14, 82:16, 82:19, 93:15, 120:23, 129:17
**PULL** [3] - 6:3, 6:17, 6:20
**PULLED** [1] - 15:4
**PULSAR** [3] - 58:8, 58:9, 58:14
**PURPOSE** [3] - 7:19, 54:22, 111:9
**PURPOSES** [1] - 39:18
**PURSUANT** [1] - 56:12
**PURSUANT** [1] - 135:8
**PURSUE** [3] - 45:6, 50:5, 50:10
**PUSHES** [1] - 20:8
**PUT** [22] - 28:23, 29:2, 46:24, 50:7, 52:22, 53:21, 56:2, 59:24, 63:2, 65:23, 82:10, 84:17, 87:11, 87:19, 90:1, 106:11, 107:5, 110:5, 122:10, 123:12, 130:1, 130:3

**Q**

**QUESTIONS** [6] - 5:19, 6:2, 18:2, 18:8, 79:14, 83:17
**QUICK** [1] - 109:8
**QUIETEST** [2] - 64:5, 74:5
**QUIT** [1] - 110:5

**QUITE** [11] - 40:2, 51:14, 57:12, 71:20, 73:23, 82:12, 84:11, 86:13, 116:3, 121:24, 125:20
**QUOTE** [4] - 70:10, 103:22, 110:21, 124:18

**R**

**RADIO** [1] - 115:16
**RAISES** [1] - 19:13
**RATHER** [2] - 11:4, 26:7
**RE** [3] - 78:22, 79:1, 118:6
**RE-SIGNED** [1] - 78:22
**RE-SIGNING** [2] - 79:1, 118:6
**REACHED** [2] - 110:21, 119:10
**READ** [19] - 27:9, 36:4, 37:11, 55:11, 60:13, 66:7, 67:1, 67:2, 67:7, 67:9, 68:14, 68:15, 68:18, 68:20, 87:13, 91:20, 102:14, 116:13, 120:8
**READING** [4] - 16:20, 18:22, 27:7, 27:15
**READS** [2] - 92:20, 102:14
**REAFFIRMED** [1] - 24:6
**REALITY** [1] - 36:14
**REALIZING** [1] - 69:12
**REALLY** [16] - 8:5, 9:21, 13:20, 24:14, 51:1, 52:14, 53:24, 54:4, 62:22, 64:1, 72:5, 73:4, 87:20, 90:4, 113:3, 121:25
**REALTIME** [1] - 135:5
**REARGUE** [1] - 111:8
**REASON** [6] - 7:10, 26:5, 50:11, 116:12, 116:18, 127:24
**REASONABLE** [5] - 19:11, 19:15, 20:20, 21:22, 33:16
**REASONS** [4] - 43:8, 72:6, 73:4, 119:1
**REBUTTABLE** [1] - 28:12
**REBUTTAL** [5] - 41:22, 41:24, 133:25, 134:1,

134:10
**RECALCULATE** [1] - 12:8
**RECALCULATING** [2] - 10:25, 11:3
**RECEIPT** [2] - 31:22, 102:16
**RECEIVE** [2] - 26:10, 94:3, 109:25
**RECEIVED** [15] - 5:17, 5:21, 11:15, 11:24, 31:7, 31:14, 31:24, 35:1, 44:19, 85:19, 98:9, 98:19, 102:19, 124:9, 128:6
**RECEIVING** [3] - 101:5, 101:12, 101:15
**RECENTLY** [1] - 31:6
**RECESS** [3] - 95:15, 96:24, 134:21
**RECIPIENT** [2] - 26:2, 26:10
**RECITAL** [10] - 6:16, 6:18, 6:21, 92:19, 92:20, 109:8, 109:10, 120:11, 120:12, 120:13
**RECITALS** [1] - 28:23
**RECITE** [1] - 13:17
**RECITED** [1] - 92:18
**RECOGNIZE** [16] - 40:25, 57:25, 75:6, 75:7, 78:7, 78:12, 82:11, 85:1, 85:4, 97:24, 98:13, 98:15, 103:16, 119:13, 123:21, 123:25
**RECOLLECTING** [1] - 74:6
**RECORD** [37] - 13:20, 30:19, 31:21, 48:24, 52:10, 55:11, 57:4, 58:3, 58:10, 61:16, 61:18, 61:20, 61:24, 64:5, 64:7, 73:20, 75:5, 76:23, 76:25, 77:15, 78:16, 85:1, 85:5, 85:22, 86:6, 86:20, 113:13, 121:8, 121:10, 128:22, 129:5, 129:9, 129:20, 130:11, 130:19, 130:24, 131:1
**RECORDED** [4] - 47:5, 53:23, 86:2, 112:2
**RECORDING** [12] - 47:3, 47:4, 48:2,

48:3, 48:11, 48:20, 54:14, 62:17, 73:5, 73:24, 77:19, 113:8
**RECORDINGS** [13] - 46:24, 47:2, 47:16, 47:20, 47:21, 48:6, 48:7, 48:18, 48:19, 53:23, 54:10, 113:5, 129:19
**RECORDS** [12] - 50:6, 63:10, 63:21, 64:4, 80:11, 82:24, 100:24, 102:1, 121:17, 128:23, 129:8, 130:25
**RECORDS** [19] - 50:25, 57:9, 58:4, 58:14, 58:19, 59:7, 59:17, 59:18, 59:21, 77:19, 79:1, 86:19, 128:17, 128:21, 129:13, 130:10, 131:8, 131:11, 131:13
**RECYCLING** [1] - 134:11
**REDACTED** [2] - 123:12, 127:25
**REDACTION** [1] - 126:7
**REDID** [1] - 86:5
**REDIRECT** [2] - 133:21, 133:22
**REDUCED** [2] - 21:20, 126:17
**REFER** [1] - 25:25
**REFERENCE** [11] - 6:6, 6:8, 6:9, 6:13, 6:15, 7:5, 19:21, 27:4, 28:24, 34:11, 45:21
**REFERENCED** [2] - 9:9, 33:6
**REFERRED** [3] - 7:8, 7:9, 27:7
**REFERRING** [4] - 72:9, 83:4, 83:5, 83:14
**REFERS** [3] - 7:23, 44:25, 93:23
**REFLECTED** [6] - 59:25, 60:1, 75:15, 94:12, 94:17, 99:9
**REFLECTS** [1] - 12:2
**REGARDING** [2] - 33:7, 37:12
**REGISTER** [1] - 132:2
**REGISTERED** [3] - 132:5, 132:6, 132:16
**REGISTERING** [1] -

132:13
**REGULAR** [1] - 114:25
**REGULARLY** [1] - 125:20
**REGULATIONS** [1] - 135:12
**REHEARSALS** [1] - 86:15
**REHEARSE** [1] - 73:22
**REHEARSED** [1] - 73:23
**REHEARSING** [3] - 62:16, 73:5, 86:10
**REIGNITED** [1] - 52:14
**RELATE** [2] - 14:25, 17:17
**RELATED** [7] - 5:22, 16:10, 21:22, 27:19, 96:6, 115:9
**RELATES** [17] - 7:20, 8:2, 8:11, 15:11, 15:13, 17:22, 19:8, 20:18, 21:11, 22:23, 26:14, 28:3, 29:6, 29:7, 33:11, 38:10, 40:4
**RELATIONSHIP** [2] - 62:6, 116:2
**RELEASE** [4] - 14:24, 50:24, 74:4, 120:6
**RELEASED** [7] - 50:15, 50:16, 51:8, 64:7, 85:22, 86:18, 86:19
**RELEVANCE** [13] - 14:13, 67:23, 68:2, 79:6, 79:11, 80:12, 110:15, 115:22, 122:3, 124:6, 124:12, 125:6, 126:18
**RELEVANT** [1] - 17:20
**REMAINED** [1] - 62:7
**REMAINING** [1] - 9:24
**REMEDY** [1] - 33:25
**REMEMBER** [42] - 58:5, 62:7, 64:16, 64:18, 66:4, 69:14, 69:19, 71:23, 72:2, 72:3, 75:3, 75:5, 75:22, 77:16, 77:23, 77:24, 78:23, 78:24, 80:3, 82:2, 83:8, 83:9, 83:22, 84:2, 84:10, 86:24, 87:8, 90:3, 94:21, 103:12, 111:16, 117:18,

117:19, 117:21, 117:23, 118:14, 120:19, 120:21, 127:5, 129:16
**REMIND** [1] - 94:13
**RENDERED** [1] - 118:12
**RENDITION** [1] - 75:9
**RENEGOTIATED** [1] - 118:1
**RENEGOTIATION** [1] - 77:14
**RENEWAL** [1] - 91:23
**REPEAT** [4] - 56:16, 68:17, 101:9, 134:11
**REPORT** [1] - 110:20
**REPORTED** [1] - 135:10
**REPORTER** [4] - 1:24, 135:1, 135:6, 135:19
**REPORTER'S** [1] - 1:14
**REPRESENT** [3] - 8:8, 72:1, 88:18
**REPRESENTATIONS** [1] - 122:21
**REPRESENTATIVE** [4] - 10:9, 28:10, 32:13, 132:4
**REPRESENTATIVES** [1] - 102:17
**REPRESENTED** [5] - 57:24, 69:14, 69:15, 113:21, 113:22
**REPRESENTING** [3] - 102:17, 113:16, 113:17
**REQUEST** [2] - 100:5, 100:8
**REQUESTS** [1] - 53:19
**REQUIREMENT** [1] - 28:8
**REQUIREMENTS** [1] - 29:14
**REQUIRES** [2] - 48:9
**RERECORD** [4] - 53:18, 53:20, 53:22, 113:12
**RERECORDED** [1] - 112:10
**RERECORDING** [1] - 111:24
**RERECORDS** [14] - 53:13, 53:15, 53:25, 54:5, 54:13, 111:16, 111:19, 111:20, 112:4, 112:6, 112:8, 112:9, 112:24, 113:4
**RESEARCH** [2] -

95:21, 133:7
**RESPECT** [11] - 6:5, 6:10, 8:1, 16:11, 18:18, 18:19, 20:10, 24:16, 25:19, 82:4, 130:10
**RESPECTIVE** [2] - 19:23, 35:13
**RESPONSE** [2] - 28:4, 37:21
**RESPONSIBILITIES** [3] - 17:6, 18:11, 40:4
**RESPONSIBILITY** [6] - 20:7, 20:9, 26:17, 132:15, 132:18, 132:22
**RESPONSIBLE** [7] - 30:23, 30:24, 31:2, 31:3, 31:11, 32:1, 40:24
**REST** [3] - 10:15, 41:20, 104:9
**RESTS** [1] - 36:2
**RESULT** [3] - 47:13, 51:12, 118:13
**RESUME** [1] - 42:22
**RESUMED** [2] - 3:5, 50:8
**RESUMED** [1] - 43:4
**RETAIN** [1] - 13:12
**RETURNED** [1] - 87:6
**REVENUES** [2] - 26:2, 26:3
**REVERSE** [1] - 32:21
**REVIEW** [1] - 89:4
**REVIEWED** [1] - 6:1
**RICHARD** [2] - 28:10, 60:17
**RICHEST** [2] - 77:18, 80:21
**RICK** [8] - 8:10, 28:11, 56:22, 65:6, 67:5, 104:9, 108:11, 119:6
**RICK'S** [1] - 105:2
**RIGHTS** [11] - 16:11, 18:17, 18:20, 26:6, 56:25, 57:2, 99:10, 99:15, 108:12, 113:9, 116:25
**RINGO** [2] - 52:13
**RINGS** [1] - 77:25
**RISE** [5] - 19:9, 95:24, 96:23, 133:13, 134:20
**ROAD** [1] - 77:13
**ROGER** [9] - 3:4, 5:8, 9:5, 11:25, 16:9, 62:6, 91:4, 108:25, 109:5
**ROGER** [2] - 1:8, 43:2

**ROGER'S** [1] - 45:1
**ROGUE** [1] - 16:24
**ROHOP** [1] - 108:15
**ROLE** [2] - 40:4, 40:16
**ROLL** [1] - 77:1
**ROLLING** [1] - 76:24
**ROLODEX** [1] - 52:16
**ROOM** [1] - 79:4
**ROUGHLY** [1] - 42:12
**ROYAL** [1] - 68:1
**ROYALTIES** [25] - 14:18, 15:23, 16:6, 43:10, 47:13, 47:14, 49:4, 49:5, 76:23, 77:1, 113:13, 117:8, 123:2, 124:10, 124:17, 124:18, 125:5, 126:24, 127:1, 128:22, 129:9, 129:20, 130:11, 130:19, 132:8
**ROYALTY** [3] - 47:20, 48:1, 120:2
**RPR** [1] - 1:23
**RULE** [7] - 5:24, 22:14, 22:16, 36:13, 42:3, 42:4, 110:14
**RULE** [1] - 42:3
**RULES** [1] - 37:12
**RULING** [1] - 97:6
**RUN** [2] - 22:21, 88:8
**RUSSELL** [6] - 12:23, 13:14, 13:17, 13:18, 14:3, 93:12

# S

**SABOTAGE** [2] - 51:3, 55:22
**SABOTAGED** [2] - 50:23, 57:3
**SAN** [1] - 2:7
**SATISFY** [1] - 29:14
**SAW** [5] - 54:20, 103:3, 115:2, 115:4, 115:5
**SCENARIO** [3] - 27:16, 32:21, 32:24
**SCHOOL** [1] - 75:4
**SCHOOL** [2] - 67:16, 67:17
**SCHOOLS** [1] - 67:14
**SCOPE** [4] - 9:15, 9:18, 15:7, 27:18
**SCREEN** [9] - 46:24, 60:1, 65:25, 66:22, 73:11, 82:10, 98:23, 108:9
**SCROLL** [10] - 70:8,

82:13, 91:16, 102:12, 103:18, 106:11, 108:7, 119:16, 120:11, 130:3
**SEATED** [1] - 96:2
**SECOND** [10] - 28:7, 79:5, 94:2, 94:16, 97:16, 106:12, 119:23, 120:13, 124:23, 126:7
**SECTION** [1] - 9:4
**SECTION** [1] - 135:8
**SEE** [69] - 6:20, 7:17, 7:18, 12:11, 13:11, 14:12, 16:4, 24:14, 27:1, 45:23, 70:10, 70:15, 70:17, 75:18, 78:4, 78:5, 79:8, 79:9, 79:18, 82:15, 82:17, 90:14, 90:17, 90:22, 90:23, 91:8, 91:17, 91:25, 92:9, 94:4, 94:5, 94:7, 94:22, 96:22, 98:3, 98:25, 100:25, 103:2, 103:5, 106:13, 107:12, 107:13, 108:8, 108:20, 119:16, 119:18, 120:4, 120:6, 120:12, 120:16, 120:25, 122:13, 124:11, 124:15, 124:16, 124:17, 124:20, 124:22, 125:1, 125:22, 125:23, 126:1, 126:9, 127:8, 130:16, 133:12, 134:15
**SEEM** [3] - 36:11, 80:17, 108:1
**SEEMINGLY** [1] - 9:3
**SELL** [1] - 80:11
**SELLS** [1] - 130:24
**SEND** [5] - 10:15, 44:11, 44:12, 103:17
**SENIOR** [2] - 75:4, 115:24
**SENSATIONAL** [1] - 62:20
**SENSE** [3] - 32:16, 96:8, 130:4
**SENSITIVE** [1] - 122:20
**SENT** [6] - 44:10, 45:18, 46:4, 49:7, 57:5, 103:12
**SENTENCE** [7] -

37:16, 44:25, 91:17, 92:19, 94:2, 103:2, 119:23
**SEPARATE** [1] - 13:18
**SERIES** [1] - 113:16
**SERVE** [1] - 7:14
**SERVED** [1] - 114:19
**SERVING** [1] - 7:18
**SESSION** [1] - 1:15
**SET** [1] - 26:10
**SETTLE** [1] - 110:12
**SETTLED** [1] - 39:15
**SETTLEMENT** [3] - 110:21, 120:1, 120:17
**SEVERAL** [3] - 69:16, 125:18, 130:23
**SEVERALLY** [1] - 41:9
**SEVERANCE** [2] - 14:8, 23:9
**SHAFTED** [1] - 87:21
**SHAKTI** [2] - 43:13, 114:5
**SHALL** [20] - 7:14, 19:22, 19:23, 20:24, 25:11, 35:1, 35:13, 35:14, 37:4, 37:17, 38:11, 38:20, 38:22, 39:2, 91:21, 94:2, 102:24, 108:18
**SHALL** [1] - 70:10
**SHAPE** [1] - 54:25
**SHAPES** [1] - 48:22
**SHARE** [13] - 26:7, 26:8, 26:11, 65:1, 65:6, 74:22, 76:3, 80:22, 102:17, 104:23, 112:7, 120:3, 126:24
**SHARED** [1] - 64:15
**SHARES** [1] - 6:12
**SHARING** [10] - 67:5, 68:11, 81:7, 82:1, 90:8, 97:9, 97:13, 108:2, 117:3, 128:9
**SHELL** [2] - 41:1, 41:2
**SHIVAYA** [1] - 114:5
**SHOCKED** [1] - 24:16
**SHORT** [6] - 6:4, 134:1, 134:2, 134:3, 134:9
**SHORTER** [2] - 134:4, 134:5
**SHORTLY** [2] - 29:19, 76:23
**SHOW** [6] - 38:1, 52:17, 84:21, 87:2, 94:13, 131:4
**SHOWED** [3] - 31:23, 94:21, 118:12

**SHOWS** [5] - 12:16, 53:2, 53:23, 53:24, 112:2
**SIDE** [3] - 104:17, 104:19, 104:25
**SIDEBAR** [3] - 110:17, 110:23, 110:24
**SIDES** [2] - 5:23, 18:15
**SIEBENBERG** [9] - 6:8, 6:25, 19:20, 31:23, 35:17, 41:25, 52:5, 62:5, 93:7
**SIEBENBERG'S** [1] - 134:12
**SIGN** [5] - 15:8, 40:18, 65:25, 66:18, 129:4
**SIGNATOR** [2] - 8:10, 12:24
**SIGNATORY** [3] - 26:19, 27:12, 104:14
**SIGNATURE** [11] - 25:23, 27:2, 28:8, 28:17, 90:15, 90:24, 99:3, 103:19, 125:11, 125:15
**SIGNATURES** [5] - 9:19, 17:9, 19:3, 98:24, 98:25
**SIGNED** [49] - 15:6, 16:21, 17:6, 18:10, 21:10, 21:14, 22:7, 26:16, 27:1, 27:16, 28:9, 30:4, 30:5, 32:14, 39:6, 39:11, 54:24, 64:9, 68:5, 68:6, 68:15, 68:19, 73:10, 78:22, 80:8, 85:24, 89:5, 89:9, 90:15, 91:1, 91:8, 92:16, 94:12, 97:25, 98:25, 103:12, 106:15, 125:12, 125:21, 125:25, 128:9, 128:10, 128:14, 128:20, 129:13, 129:23
**SIGNING** [12] - 16:21, 27:21, 38:25, 39:4, 66:5, 78:2, 78:16, 79:1, 80:7, 87:14, 118:6, 127:22
**SIGNS** [1] - 28:9
**SILVER** [15] - 13:2, 16:1, 16:3, 16:6, 25:21, 25:24, 26:19, 26:25, 27:2, 27:3, 39:25, 40:11, 40:14
**SILVER** [1] - 13:4
**SIMILAR** [1] - 54:1

**SIMILARLY** [1] - 109:4
**SIMPLE** [2] - 9:10, 23:18
**SIMPLY** [5] - 11:2, 13:19, 19:21, 24:6, 33:5
**SINGLE** [3] - 34:8, 34:11, 62:22
**SIT** [1] - 56:21
**SITTING** [1] - 79:5
**SITUATION** [4] - 43:24, 67:3, 118:5, 122:20
**SITUATIONS** [1] - 48:12
**SIZES** [1] - 48:22
**SKIP** [1] - 10:4
**SLATED** [1] - 86:4
**SLEW** [1] - 22:15
**SLIGHT** [1] - 81:25
**SLIPPED** [1] - 30:12
**SLOWLY** [1] - 52:16
**SMALL** [1] - 52:3
**SMART** [1] - 14:7
**SMASHED** [1] - 51:8
**SOCIETIES** [1] - 26:6
**SOCIETY** [1] - 102:20
**SOLD** [4] - 64:5, 74:13, 128:23, 129:8
**SOLELY** [1] - 108:19
**SOLO** [12] - 50:5, 50:6, 50:10, 50:16, 55:25, 57:4, 84:14, 85:5, 86:16, 87:3, 121:17, 132:6
**SOMEONE** [8] - 20:11, 30:21, 43:12, 47:5, 47:25, 58:25, 108:1, 115:14
**SOMETIMES** [2] - 48:6, 122:2
**SOMEWHAT** [4] - 5:21, 5:22, 16:19, 115:10
**SON** [1] - 52:1
**SONG** [37] - 40:8, 47:4, 48:8, 54:24, 64:14, 65:1, 74:22, 76:3, 80:22, 81:7, 82:4, 82:20, 90:8, 92:3, 94:9, 95:5, 95:10, 97:9, 97:13, 100:8, 100:17, 106:20, 106:24, 107:16, 109:11, 109:13, 109:15, 109:18, 112:6, 113:3, 113:7, 113:12, 117:3, 117:20, 118:3,

118:8, 128:9
**SONGS** [20] - 15:13, 15:18, 15:25, 16:9, 47:9, 48:16, 48:24, 53:8, 54:4, 54:7, 54:8, 54:23, 70:10, 86:2, 92:4, 111:21, 111:24, 113:5, 113:6, 113:9
**SONGWRITER** [1] - 4:5
**SONGWRITER** [2] - 71:11, 98:14
**SONGWRITING** [3] - 38:17, 43:10, 107:20
**SONY** [1] - 88:8
**SORRY** [23] - 7:12, 14:14, 16:5, 16:11, 20:23, 52:25, 56:24, 65:11, 65:14, 68:17, 72:14, 78:25, 83:18, 87:21, 90:19, 97:18, 105:25, 109:12, 112:19, 123:10, 128:11, 129:15, 132:21
**SORT** [7] - 8:22, 19:4, 23:11, 27:21, 30:12, 42:12, 45:9
**SOUND** [9] - 49:2, 49:3, 49:5, 49:15, 132:2, 132:3, 132:8, 132:13, 132:16
**SOUND** [2] - 64:1, 113:19
**SOUNDS** [9] - 32:20, 60:12, 63:22, 63:25, 64:8, 75:22, 85:23, 86:1, 131:14
**SOURCE** [1] - 102:23
**SOURCES** [4] - 47:20, 48:2, 71:8, 106:20
**SOUTH** [1] - 61:13
**SPEAKS** [6] - 92:5, 103:23, 121:10, 127:2, 130:12, 131:5
**SPECIFIC** [3] - 6:12, 30:17, 37:2
**SPECIFICALLY** [3] - 6:12, 40:7, 50:10
**SPECULATION** [5] - 74:24, 76:6, 78:18, 80:25, 88:25
**SPENDING** [1] - 120:12
**SPENT** [2] - 6:1, 82:16
**SPLIT** [2] - 35:18, 38:19
**SPLITS** [3] - 82:23, 93:21, 94:8

**SPOKEN** [1] - 117:6
**SPOUSAL** [2] - 124:9, 126:25
**SPOUSE** [1] - 122:24
**SQUARELY** [1] - 10:24
**STAND** [3] - 5:20, 42:17, 63:6
**STANDING** [1] - 78:9
**STANDS** [1] - 27:10
**STARR** [1] - 52:13
**START** [2] - 24:19, 118:16
**STARTED** [4] - 52:13, 52:14, 53:24, 111:23
**STARTING** [1] - 109:10
**STARTS** [2] - 14:17, 16:2
**STATE** [2] - 5:10, 27:22
**STATEMENT** [1] - 29:9
**STATEMENTS** [2] - 47:19, 48:1
**STATES** [4] - 1:1, 135:6, 135:8, 135:13
**STATES** [1] - 40:9
**STATING** [1] - 30:16
**STATUTORY** [1] - 27:8
**STEERING** [1] - 25:24
**STENOGRAPHICALLY** [1] - 135:10
**STEP** [2] - 96:3, 133:16
**STEPS** [1] - 132:2
**STICKER** [3] - 50:25, 56:2, 56:5
**STILL** [14] - 10:23, 11:4, 12:20, 12:21, 60:7, 68:7, 68:11, 72:11, 80:17, 92:24, 121:7, 131:8, 131:15, 131:21
**STOP** [7] - 10:1, 28:20, 43:8, 43:9, 72:19, 106:2, 118:2
**STOPPED** [7] - 23:15, 31:8, 43:21, 101:4, 116:6, 119:3, 121:14
**STOPPING** [1] - 119:1
**STORM** [5] - 50:18, 84:19, 85:21, 86:9, 86:18
**STOWE** [2] - 67:16, 67:17
**STRAIGHT** [1] - 52:17
**STRAIGHTAWAY** [2] - 50:4, 76:25

**STRAW** [1] - 6:4
**STREAM** [3] - 22:17, 22:19, 126:25
**STREAMED** [1] - 80:18
**STREAMING** [1] - 49:4
**STREAMS** [1] - 23:1
**STREET** [1] - 1:24
**STREET** [1] - 2:6
**STRICKEN** [5] - 45:16, 66:10, 67:8, 87:25, 117:12
**STRIKE** [9] - 38:2, 45:15, 51:2, 66:8, 67:6, 72:20, 79:12, 87:23, 117:10
**STRIKES** [1] - 38:3
**STRONG** [1] - 55:22
**STRUCTURAL** [1] - 34:13
**STRUCTURE** [1] - 37:18
**STRUGGLING** [3] - 15:12, 30:8, 40:18
**STUDIO** [6] - 52:10, 53:21, 66:5, 66:17, 66:18, 115:7
**STUDY** [1] - 48:21
**STUFF** [2] - 23:1, 109:4
**SUBJECT** [14] - 8:8, 17:24, 17:25, 18:4, 24:19, 25:6, 28:14, 46:23, 53:12, 64:19, 95:21, 104:18, 122:14, 133:8
**SUBJECTIVE** [1] - 128:24
**SUBJECTS** [3] - 7:16, 7:24, 38:7
**SUBMISSION** [2] - 42:4, 42:5
**SUBMITTED** [3] - 28:18, 95:19, 133:5
**SUBSEQUENTLY** [2] - 7:3, 93:19
**SUCCESS** [7] - 51:1, 51:10, 59:25, 62:19, 62:21, 63:14, 78:21
**SUCCESSFUL** [3] - 62:23, 63:7, 72:18
**SUCCESSOR** [1] - 131:12
**SUDDEN** [1] - 31:7
**SUE** [5] - 20:12, 20:15, 30:22, 31:2, 31:4
**SUE** [4] - 13:4, 25:22, 25:23, 108:11
**SUED** [4] - 20:12, 45:17, 46:4, 50:24

SUFFICIENTLY [1] - 40:16
SUGGESTED [3] - 8:25, 41:1, 64:14
SUGGESTING [2] - 41:2, 41:3
SUGGESTS [1] - 27:24
SUING [3] - 20:14, 20:17, 31:3
SUIT [1] - 20:6
SUITE [2] - 2:7, 2:12
SUITE [1] - 1:24
SUM [1] - 48:11
SUMMARY [1] - 34:7
SUMS [1] - 48:17
SUPERIMPOSE [2] - 24:22, 25:9
SUPERTRAMP [51] - 14:24, 47:6, 47:21, 48:3, 49:15, 50:2, 50:9, 50:20, 50:24, 50:25, 51:6, 53:9, 53:18, 54:10, 54:14, 54:21, 54:25, 55:9, 55:25, 56:4, 56:5, 56:6, 56:10, 56:19, 58:2, 58:10, 58:18, 60:2, 60:19, 69:14, 69:15, 72:1, 76:9, 76:16, 83:12, 84:14, 84:18, 85:7, 85:25, 94:9, 108:13, 108:19, 111:21, 111:24, 114:20, 115:9, 121:18, 132:7
SUPERTRAMP'S [1] - 86:20
SUPPLEMENT [1] - 36:13
SUPPORT [6] - 10:3, 87:5, 122:24, 123:1, 124:9, 126:25
SUPPOSED [5] - 22:4, 35:16, 35:17, 116:11, 129:10
SURGERY [1] - 45:4
SURPRISED [1] - 84:10
SUSAN [1] - 9:7
SUSTAIN [2] - 111:1, 111:3
SUSTAINED [40] - 45:12, 46:6, 67:8, 67:24, 68:3, 69:1, 70:21, 75:1, 76:7, 77:12, 78:18, 79:7, 79:13, 81:1, 81:3, 81:4, 81:10, 81:14, 81:19, 81:24, 84:16,

87:25, 89:1, 90:13, 91:15, 99:13, 102:9, 106:8, 106:18, 108:4, 110:16, 111:9, 115:23, 118:18, 118:24, 121:11, 122:4, 124:7, 127:16, 131:7
SWIFT [4] - 54:2, 112:10, 112:13, 112:17
SWITCH [2] - 7:12, 46:23
SWORN [1] - 43:3
SYNC [2] - 48:18, 53:19
SYNCHRONIZATION [2] - 48:13, 100:5
SYNCS [1] - 53:19

### T

TABS [1] - 7:12
TALKS [3] - 9:4, 16:25, 82:13
TAMORE [1] - 7:1
TANGENT [1] - 26:5
TASK [2] - 15:19, 27:19
TAY [4] - 76:20, 112:23
TAYLOR [4] - 54:2, 112:10, 112:13, 112:17
TEAM [4] - 62:13, 80:1, 81:6, 114:9
TEASE [1] - 35:3
TECHNICAL [1] - 75:8
TEMPORARY [1] - 127:18
TEN [5] - 50:7, 62:24, 63:12, 66:5, 77:14
TEN-MINUTE [1] - 66:5
TERM [6] - 29:12, 32:5, 58:12, 71:19, 99:7, 100:6
TERMINATE [12] - 33:15, 77:3, 81:15, 95:4, 95:10, 96:9, 97:9, 97:13, 113:2, 117:3, 117:14, 118:22
TERMINATED [7] - 19:10, 19:15, 21:21, 96:6, 116:18, 117:8, 117:24
TERMINATING [4] - 20:20, 46:11, 107:19, 118:6

TERMINATION [3] - 22:3, 117:19, 118:13
TERMINATIONS [1] - 113:22
TERMINOLOGY [1] - 25:2
TERMS [10] - 13:3, 34:22, 36:4, 36:6, 40:9, 40:23, 91:24, 99:6, 121:22, 129:5
TESTIFIED [4] - 31:23, 62:24, 65:5, 87:12
TESTIMONY [32] - 8:23, 10:2, 15:21, 21:1, 30:6, 31:16, 40:1, 40:7, 42:22, 49:9, 57:8, 58:9, 58:24, 59:15, 64:16, 64:21, 64:22, 67:7, 70:22, 70:23, 71:23, 72:2, 72:3, 87:18, 111:16, 111:17, 111:23, 121:7, 121:9, 127:19, 127:20, 134:12
THANKFULLY [1] - 47:11
THAT [3] - 135:7, 135:8, 135:11
THE [275] - 2:3, 2:6, 2:9, 5:7, 5:13, 5:16, 6:14, 6:17, 6:20, 7:7, 7:9, 7:22, 8:7, 8:16, 8:19, 10:1, 10:7, 10:13, 10:19, 10:25, 11:8, 11:12, 11:16, 11:19, 11:21, 12:1, 12:6, 12:10, 12:14, 12:18, 12:22, 13:13, 13:22, 14:5, 14:12, 14:17, 14:23, 15:1, 15:16, 16:2, 16:15, 16:19, 17:19, 18:21, 21:7, 21:15, 21:17, 21:20, 21:25, 22:9, 22:20, 23:3, 23:6, 23:14, 23:19, 23:22, 23:25, 24:12, 24:25, 25:17, 26:13, 27:13, 28:21, 29:6, 29:8, 29:17, 29:22, 29:25, 30:3, 30:18, 30:24, 31:1, 31:16, 32:1, 32:10, 32:13, 33:9, 33:13, 33:23, 34:20, 34:24, 35:3, 35:22, 36:16, 36:18, 36:21, 36:25, 37:6, 37:9, 37:20, 38:1, 38:14, 38:18, 38:21, 38:24,

39:2, 39:5, 39:12, 39:15, 39:18, 39:21, 40:2, 40:12, 40:15, 40:20, 41:2, 41:10, 41:14, 41:17, 41:20, 41:22, 42:1, 42:9, 42:16, 42:20, 43:3, 44:16, 44:18, 45:12, 45:13, 45:16, 46:6, 47:23, 47:24, 51:4, 55:2, 55:15, 55:17, 60:5, 65:10, 65:13, 65:17, 66:10, 67:8, 67:24, 68:3, 69:1, 69:10, 69:11, 69:24, 70:3, 70:4, 70:5, 70:14, 70:21, 72:10, 72:11, 72:22, 74:18, 74:19, 75:1, 75:9, 75:17, 76:7, 77:12, 78:18, 79:7, 79:13, 80:13, 80:14, 81:1, 81:4, 81:10, 81:14, 81:19, 81:24, 83:20, 84:7, 84:9, 84:16, 84:23, 84:25, 85:11, 85:13, 87:25, 88:14, 88:20, 89:1, 89:12, 89:13, 89:18, 89:21, 89:25, 90:11, 90:13, 91:15, 92:7, 92:14, 92:15, 95:14, 95:24, 96:2, 96:3, 96:11, 96:17, 96:21, 96:23, 97:2, 98:7, 98:18, 99:13, 99:18, 99:19, 99:25, 100:1, 101:8, 101:9, 102:9, 103:25, 104:1, 105:24, 106:2, 106:8, 106:18, 107:2, 107:3, 108:4, 110:16, 110:18, 110:23, 110:25, 111:8, 115:23, 116:14, 116:23, 116:24, 117:12, 118:18, 118:24, 121:11, 122:4, 123:8, 123:9, 123:14, 123:16, 123:18, 123:19, 123:20, 124:7, 124:14, 125:7, 125:8, 126:19, 126:20, 127:4, 127:5, 127:16, 128:2, 128:4, 129:1, 130:17, 131:7, 131:25, 132:20, 132:21, 133:2,

133:13, 133:16, 133:17, 133:18, 133:24, 134:2, 134:5, 134:8, 134:13, 134:20, 135:6, 135:7, 135:8, 135:9, 135:10, 135:11, 135:12, 135:13
THEREFORE [5] - 16:22, 18:12, 25:14, 26:16, 27:24
THEREOF [1] - 8:4
THINKING [4] - 35:6, 66:15, 88:22, 88:23
THIRD [6] - 78:9, 81:2, 99:10, 100:11, 113:11, 124:19
THIS [1] - 135:15
THOMAS [1] - 61:9
THOMSON [10] - 5:8, 6:7, 6:25, 19:20, 58:21, 58:22, 59:6, 59:20, 86:22, 93:7
THOMSON [1] - 1:5
THOROUGHLY [1] - 23:7
THOUGHTS [6] - 5:20, 8:11, 19:4, 20:5, 24:15, 29:18
THOUSANDS [2] - 48:22
THREAT [2] - 57:9, 57:10
THREATENING [1] - 43:23
THREE [40] - 6:9, 34:14, 43:20, 43:22, 44:1, 46:1, 52:12, 55:11, 56:6, 56:22, 56:25, 60:8, 61:15, 62:9, 63:10, 63:21, 64:4, 65:12, 69:13, 71:25, 72:24, 73:2, 74:23, 76:4, 80:23, 83:5, 83:6, 101:5, 101:21, 105:4, 105:11, 107:22, 112:20, 113:2, 115:12, 120:2, 127:23, 132:9, 132:12
THREE-DAY [2] - 83:5, 83:6
THRILL [1] - 79:4
THRILLED [1] - 79:10
THROWING [1] - 29:18
THROWN [1] - 33:8
TIE [1] - 17:10

**TITLE** [1] - 135:8
**TITLE** [1] - 48:8
**TITLED** [1] - 67:20
**TO** [2] - 1:9, 135:8
**TODAY** [4] - 56:21, 70:23, 92:24, 93:4
**TOGETHER** [6] - 52:22, 62:17, 63:12, 90:1, 110:5, 115:1
**TOM** [1] - 58:6
**TONE** [1] - 111:2
**TONY** [2] - 57:25, 58:1
**TOOK** [7] - 24:2, 51:21, 73:20, 74:1, 86:6, 86:8, 112:24
**TOP** [4] - 90:24, 94:2, 102:14, 103:13
**TOPIC** [2] - 24:20, 53:12
**TOPICS** [1] - 46:23
**TOTAL** [1] - 46:1
**TOTALLY** [2] - 52:15, 54:3
**TOUR** [21] - 51:13, 52:3, 52:13, 52:15, 52:17, 53:4, 53:6, 58:23, 59:1, 62:20, 75:21, 75:24, 75:25, 76:3, 76:12, 76:14, 86:10, 87:2, 112:3, 122:1, 122:7
**TOURED** [2] - 52:2, 52:17
**TOURING** [8] - 52:13, 53:1, 73:6, 73:24, 76:8, 121:14, 121:21, 121:24
**TRACKS** [2] - 86:2, 86:4
**TRADEMARK** [1] - 57:2
**TRADEMARKED** [1] - 56:11
**TRAIN** [1] - 35:5
**TRAMPS** [1] - 75:23
**TRANSACTION** [1] - 21:10
**TRANSCRIPT** [3] - 1:14, 135:9, 135:11
**TREATED** [1] - 87:21
**TRIAL** [1] - 1:14
**TRIAL** [5] - 5:9, 8:23, 10:2, 21:1, 36:9
**TRIED** [1] - 23:6
**TRIP** [1] - 75:11
**TROUBLE** [3] - 24:2, 24:3, 113:4
**TRUE** [5] - 92:22, 92:24, 93:2, 93:4, 129:12

**TRUE** [1] - 135:9
**TRUSTED** [1] - 71:18
**TRUTH** [8] - 56:9, 58:25, 60:11, 66:7, 67:2, 77:25, 83:14, 100:2
**TRY** [1] - 133:10
**TRYING** [6] - 17:10, 17:21, 35:5, 37:15, 83:9, 90:5
**TURN** [10] - 20:16, 98:11, 104:11, 104:23, 105:7, 123:6, 125:10, 125:24, 126:4, 130:5
**TURNED** [2] - 73:13, 73:14
**TURNING** [3] - 103:21, 104:3, 104:7
**TWICE** [2] - 35:22, 91:1
**TWO** [24] - 9:22, 21:19, 22:8, 26:8, 28:23, 29:13, 30:3, 32:3, 34:14, 42:12, 45:13, 50:6, 61:19, 63:18, 66:1, 66:13, 66:15, 67:14, 74:4, 85:24, 86:2, 86:4, 94:4, 115:12
**TWO-ALBUM** [1] - 61:19
**TWO-PERSON** [2] - 21:19, 22:8
**TYLER** [1] - 114:2
**TYPE** [2] - 25:25, 52:8

## U

**U.S** [3] - 1:3, 49:4, 74:8
**ULTIMATELY** [1] - 41:3
**UNABLE** [3] - 51:13, 51:14, 51:18
**UNAMBIGUOUS** [1] - 30:14
**UNBEKNOWNST** [2] - 132:6, 132:8
**UNDER** [20] - 6:23, 28:5, 28:7, 33:20, 34:13, 34:14, 34:21, 36:13, 40:24, 42:4, 42:5, 47:15, 54:5, 93:1, 101:11, 105:9, 106:13, 124:8, 125:21, 125:25
**UNDERSIGNED** [1] - 38:23
**UNDERSTOOD** [5] -

68:15, 68:19, 71:19, 100:18, 106:3
**UNEXPRESSED** [1] - 128:24
**UNFORTUNATELY** [2] - 49:7, 51:8
**UNION** [1] - 22:25
**UNITED** [4] - 1:1, 135:6, 135:8, 135:13
**UNIVERSAL** [8] - 48:8, 53:17, 71:13, 100:15, 117:24, 117:25, 131:10, 131:12
**UNLESS** [3] - 7:15, 38:6, 120:10
**UNSTABLE** [2] - 60:2, 60:3
**UP** [48] - 6:3, 6:17, 6:20, 10:10, 10:16, 13:1, 18:25, 26:10, 31:6, 35:21, 46:11, 46:24, 52:6, 52:19, 59:24, 60:8, 60:11, 60:19, 61:15, 63:15, 63:18, 64:12, 65:23, 75:20, 77:18, 81:16, 82:6, 82:10, 84:14, 87:2, 87:4, 88:17, 90:8, 98:23, 106:11, 107:6, 118:19, 118:20, 120:11, 122:11, 123:18, 125:20, 130:1, 130:2, 130:3, 130:5, 132:8
**UPDATED** [1] - 123:11
**URGE** [1] - 40:25

## V

**VAGUE** [1] - 60:4
**VAGUELY** [5] - 77:17, 78:1, 118:14, 119:15, 124:2
**VALID** [2] - 25:5, 68:24
**VARIOUS** [4] - 35:2, 47:19, 52:5, 113:17
**VERBIAGE** [3] - 7:12, 7:24, 17:23
**VERDICT** [4] - 40:21, 42:8, 133:20, 134:17
**VERSION** [3] - 113:10, 123:12, 128:1
**VERSIONS** [3] - 42:12, 48:15, 112:3
**VERSUS** [4] - 5:8, 25:3, 47:20, 48:2
**VIABLE** [1] - 33:25

**VIDEO** [3] - 55:18, 65:18, 88:21
**VIDEOTAPED** [1] - 55:12
**VIEW** [2] - 13:23, 21:21
**VIEWED** [1] - 15:6
**VIOLATING** [1] - 102:6
**VIRTUE** [2] - 15:17, 24:23
**VOLUME** [6] - 44:5, 55:13, 65:9, 97:20, 107:10, 107:11
**VOLUME** [1] - 97:22
**VS** [1] - 1:7

## W

**WAIT** [3] - 27:13, 31:3, 89:21
**WALKED** [1] - 59:16
**WALL** [1] - 74:10
**WANNABE** [1] - 48:23
**WARBOROUGH** [1] - 57:17
**WAS** [1] - 43:3
**WAYS** [2] - 17:20, 130:24
**WEBSITE** [1] - 109:1
**WEEK** [3] - 51:8, 69:3, 80:2
**WEEKEND** [6] - 5:17, 6:1, 23:7, 27:15, 35:7, 42:21
**WEEKS** [2] - 45:13, 45:19
**WEST** [1] - 1:24
**WESTERN** [2] - 1:2
**WHEREAS** [2] - 15:20, 120:13
**WHOLE** [6] - 10:23, 11:5, 54:22, 74:1, 84:13, 91:24
**WIFE** [7] - 46:8, 124:8, 125:4, 126:14, 126:17, 126:25
**WILSHIRE** [1] - 2:11
**WINTHROP** [1] - 60:24
**WITH** [1] - 135:12
**WITHDRAWAL** [1] - 23:20
**WITHDRAWAL** [13] - 14:4, 14:5, 14:11, 56:12, 56:16, 56:18, 87:9, 87:14, 89:6, 96:8, 100:21, 102:6, 110:5
**WITNESS** [27] - 45:13, 47:23, 69:11, 70:3,

70:5, 72:11, 74:19, 80:14, 84:9, 89:13, 89:25, 92:15, 99:19, 100:1, 101:9, 104:1, 107:3, 116:14, 116:24, 123:9, 123:18, 123:20, 125:8, 126:20, 127:5, 132:21, 133:17
**WITNESS** [13] - 41:18, 41:23, 41:24, 42:17, 79:15, 84:5, 84:22, 89:22, 96:19, 96:21, 106:6, 123:13, 133:25
**WITNESSES** [2] - 3:1, 3:3
**WIVES** [1] - 83:24
**WONDERFUL** [1] - 42:21
**WOODCOTE** [1] - 67:18
**WORD** [11] - 51:2, 54:25, 55:22, 65:21, 70:24, 71:21, 72:20, 87:24, 108:23, 116:10, 117:10
**WORDS** [11] - 6:8, 11:4, 37:11, 59:4, 94:20, 94:21, 94:22, 94:23, 95:1, 126:22, 131:4
**WORDS** [13] - 9:5, 13:19, 82:5, 82:20, 86:3, 86:4, 86:10, 87:2, 93:22, 94:6, 101:2, 102:4, 118:9
**WORKS** [1] - 114:11
**WORLD** [3] - 47:7, 76:17, 109:20
**WOW** [3] - 64:1, 78:23, 78:24
**WRISTS** [1] - 51:9
**WRITE** [4] - 16:10, 19:23, 35:13, 38:14
**WRITER** [1] - 104:23
**WRITER'S** [2] - 26:8, 102:17
**WRITERS** [2] - 19:23, 35:13
**WRITING** [1] - 6:7
**WRITTEN** [1] - 21:9, 92:16, 120:25
**WROTE** [4] - 38:5, 53:8, 54:7, 54:8

## Y

**YEAR** [12] - 46:22,

50:8, 51:21, 53:3, 62:16, 64:9, 74:2, 77:1, 81:16, 86:6, 119:11

**YEARLONG** [1] - 81:5

**YEARS** [32] - 43:20, 43:22, 44:1, 49:6, 49:19, 49:22, 50:7, 52:12, 52:18, 53:22, 56:7, 56:8, 63:12, 63:21, 66:1, 66:14, 66:15, 69:13, 69:16, 74:4, 87:5, 87:20, 113:15, 113:21, 114:3, 114:6, 114:9, 115:12, 118:21, 120:20, 121:19

**YOURSELF** [2] - 78:7, 91:12

**YOUTUBE** [1] - 109:5